FILED
2023 Sep-07  AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT P. FOWLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| JUSTICE FAMILY GROUP, LLC; | ) | |
| BLUESTONE RESOURCES, INC.; | ) | Jury Trial Requested |
| SOUTHERN COAL CORPORATION; | ) | |
| GREENBRIER HOTEL CORP.; and | ) | |
| JAMES C. JUSTICE, III, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, Robert P. Fowler ("Executive"), by his undersigned attorney, for his Complaint against Defendants, Justice Family Group, LLC, Southern Coal Corporation, Bluestone Resources, Inc.,[1] Greenbrier Hotel Corp., and James C. Justice, III, in both his official capacity and as an individual ("Jay Justice") (jointly "Defendants"), states as follows.

## NATURE OF THE ACTION

1.      This is an action arising from: (i) the Company Defendants' material breaches of a valid October 19, 2021  Executive Employment Agreement ("Agreement") (attached hereto as "Exhibit 1"), (ii) both Company Defendants' and Defendant Greenbrier's material breach of promised employment benefits, namely medical insurance coverage, and (iii) both the Company

---

[1] Collectively, Justice Family Group, LLC, Bluestone Resources, Inc., and Southern Coal Corporation are referenced to herein as the "Company Defendants."

Defendants' and Defendant Jay Justice's fraudulent inducements made to convince Executive to resign his senior partnership from a prestigious Birmingham-based law firm and enter into that Agreement.

2.      This action involves damages stemming from Company Defendants' contract with Executive for him to serve as their Executive Vice President of Environmental Engineering and Regulatory Compliance ("EVP").[2]

3.      Defendants' wrongful actions created a situation wherein Executive was given the title, the responsibility, and potential civil and criminal liability without the power, authority, or resources necessary for achieving the Defendants' stated fraudulent purposes for which they hired him. Defendants' actions created an ethical and reputational dilemma for Executive, leaving him with no options but to resign his employment for "Good Reason" pursuant to the Agreement.

4.      This action seeks: (i) compensatory damages, pre- and post-judgment interest, costs, and attorneys' fees for the two breach of contract claims and (ii) compensatory monetary damages, mental anguish damages, emotional distress damages, punitive damages, costs, post-judgment interest, and attorneys' fees for fraudulent inducement into a contract.

## **NAMED PARTIES**

5.      Executive is an adult resident of Hoover, Alabama, and citizen of Jefferson County, Alabama. He resides in this judicial district and division.

---

[2] Because of Executive's commitment to uphold attorney/client confidentiality, this Complaint does not include any legal advice given by Executive to Defendant Jay Justice, Company Defendants, or any of the Justice companies; rather, all allegations are related solely to Executive's role as EVP for the named Defendants.

6.      Justice Family Group, LLC ("Justice Family Group"), is a Delaware limited liability company with its principal place of business at 101 Main St. W, White Sulphur Springs, West Virginia. Its members include Defendant Jay Justice and Jillean L. Justice.  Defendant Jay Justice is a resident and citizen of the state of Virginia.  Jillean L. Justice is a resident and citizen of the state of West Virginia. The Justice Family Group is a party to the Agreement.

7.      Bluestone Resources, Inc. ("Bluestone"), is a Delaware corporation with its principal place of business at 100 Cranberry Creek Drive, Beckley, West Virginia.  Bluestone is headquartered at 302 S. Jefferson Street, Roanoke, Virginia. For companies under the Bluestone corporate family, Governor James C. Justice II of West Virginia has a 60% controlling interest and Defendant Jay Justice has a 40% interest. Bluestone is a party to the Agreement.

8.      Southern Coal Corporation ("SCC") is a Delaware corporation with its principal place of business at 302 S. Jefferson Street, Roanoke, Virginia. In 2012, James C. Justice, II, Defendant Jay Justice, and Jillian L. Justice were the record owners of all outstanding stock of SCC.  SCC is a party to the Agreement.

9.      Greenbrier Hotel Corp. ("Defendant Greenbrier") is a West Virginia corporation with its principal place of business at 101 Main Street W., White Sulphur Springs, West Virginia. At Defendant Jay Justice's request, Defendant Greenbrier assumed portions of Company Defendants' obligations under the Agreement by paying Executive's salary, bonus, health care benefits, and social security from February 2, 2023 until June 3, 2023.

10.     Defendant Jay Justice is an adult resident and citizen of the state of Virginia, living in or around Roanoke, Virginia. Upon information and belief, Defendant Jay Justice is an owner, controller, and/or agent of each of the Company Defendants and other Justice companies.

Defendant Jay Justice is also the President of Bluestone and SCC and is a member of Encore Leasing, LLC, and the Justice Family Group.

## OTHER PARTIES

11.     Encore Leasing, LLC ("Encore") is a Virginia limited liability company with its principal place of business at 302 S. Jefferson Street, Roanoke, Virginia. Encore's sole member, Defendant Jay Justice, is a resident and citizen of the state of Virginia. Encore's corporate filing lists Stephen W. Ball as a member/manager. Stephen W. Ball is a resident and citizen of the state of Virginia. Between November 16, 2021, and February 2, 2023, Encore assumed some of Company Defendants' obligations under the Agreement by paying Executive's salary, health benefits, social security, and 401K matching contributions. Executive was an employee of Encore during that time. On June 9, 2023, Encore issued Executive an expense reimbursement check for expenses accrued between November 16, 2021, and June 3, 2023.

12.     Justice Companies.  Although Executive's Employment Agreement is between the Justice Family Group, Bluestone, and SCC, Executive was constructively working as the EVP for all of the Justice companies (approximately 75) ("Justice Companies")  as requested by Defendant Jay Justice.

## JURISDICTION, VENUE, AND GOVERNING LAW

13.     Diversity jurisdiction exists under 28 U.S.C. § 1332 because the amount in controversy is more than $75,000, exclusive of interest and costs, and Executive is wholly diverse from all Defendants.

14.     Pursuant to 28 U.S.C. § 1391, venue properly lies in the Northern District of Alabama because Executive was employed by the Company Defendants, Encore, and Defendant Greenbrier in this judicial District, a substantial part of the events giving rise to the claims herein

occurred in this judicial District, and because parties agreed in Section 14(f) of the Agreement that it was "entered into in the State of Alabama and contemplates and requires performance in the State of Alabama." The Northern District of Alabama is the judicial District in which Executive resides, works, and where he fulfilled most of his obligations under the Agreement.

15.    Company Defendants agreed that all claims regarding the Agreement shall be "construed under and enforced" in accordance with the "substantive laws of the State of Alabama," pursuant to Section 14(f) of the Agreement.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

16.    Prior to entering into the Agreement with Company Defendants, Executive was a senior law partner with Balch & Bingham LLP ("Balch"), in Birmingham, Alabama, having been with that firm since 1996 and an equity partner for more than 22 years. Balch is a full- service firm with more than 200 lawyers in ten offices in five states and the District of Columbia. It was founded in 1922 and is well-known for assisting clients in the regulated industries, including deep expertise in energy and environmental laws. During that time, Executive's reputation among peers, business professionals, mining professionals, clients, consultants, and governmental agencies was stellar. Executive could have, and intended to, finished out the remaining 10-15 years of his career at Balch.

17.    On September 29, 2021, and at the request of Defendant Jay Justice, Executive traveled via one of Justice Companies' planes to Roanoke, Virginia, to discuss Executive's potential employment with Defendant Jay Justice and to discuss developing a "global Justice environmental program." At that meeting, Defendant Jay Justice asked Executive to be the EVP for Environmental Engineering and Regulatory Compliance for all the Justice Companies, with

Defendant Jay Justice's stated intent of Executive hiring, overseeing, and managing a global environmental engineering and compliance team and program for those companies.

18.    At the September 29, 2021 meeting, Defendant Jay Justice asked Executive two questions: (1) What would it take for Executive to give up his partnership and leave his clients and career at Balch to work for Defendant Jay Justice? and (2) What authority, office requirements, support staff (operational and legal), and computer and software requirements Executive would require to leave Balch and implement an effective global environmental compliance program for the Justice Companies located in Alabama, Kentucky, South Carolina, Tennessee, Virginia, and  West Virginia?

## COUNT ONE

## BREACH OF CONTRACT—EMPLOYMENT AGREEMENT

### Enforceable Contract

19.    For good, valuable, and adequate consideration, Executive and the Company Defendants entered into and executed a legally valid contract--the Agreement.  Key provisions of the Agreement include:

a.    "Section 1. Employment.  Subject to the terms of this Agreement, the Companies hereby jointly employ Executive as their Executive Vice President of Environmental Engineering and Regulatory Compliance.  Additionally, Executive from time to time may hold the position of General Counsel for Environmental Affairs, and Executive hereby accepts such employment."

b.    "Section 2. Term. The term of employment under this Agreement shall begin on the Effective Date, and unless sooner terminated as provided in Section 7, shall conclude on June 16, 2031 (the 'Term') . . .."

c.      "Section 3.  Duties. Executive shall serve as Executive Vice President of Environmental Engineering and Regulatory Compliance and shall report . . . solely to . . . [Defendant] Jay Justice . . ., currently President of Bluestone Resources, Inc., and Southern Coal Corporation, and Manager of Justice Family Group, LLC.  Executive shall perform such duties as are customary for Executive's position (including environmental permitting, bonding, and compliance) as well as duties necessary to oversee the Companies' environmental legal program (i.e., oversee regulatory negotiations for fines, penalties, consent decrees, compliance programs, etc.,) . . .."

d.      "Section 4. Compensation. "The Companies shall pay Executive a base salary (the "Base Salary") . . .. Commencing as of January 1, 2023, and on each January 1st thereafter, the then effective Base Salary shall be increased (but not decreased) by at least an amount which shall reflect the increase, if any, in the cost of living during the previous 12 months by adding to the Base Salary an amount computed by multiplying the Base Salary by the percentage by which the level of the Consumer Price Index ["CPI"] for the area including Birmingham, Alabama, as reported on January 1st of the new year by the Bureau of Labor Statistics of the United States Department of Labor has increased over its level as of January 1st of the prior year. . . ."

e.      "Section 5 . . .(b) Cash Annual Bonuses.  The Companies shall pay Executive an annual minimum cash bonus of ten percent (10%) of Base Salary for the Term on or before the [sic] March 31st for performance during the prior year. . .."

f.      "Section 6.  Fringe Benefits and Expenses. . . . (c) Expenses.  Companies shall promptly (and in any event within sixty (60) calendar days of submission of a request for reimbursement) reimburse Executive for reasonable business expenses

incurred by Executive in the performance of his duties under this Agreement, provided Executive incurs and accounts for such expenses in accordance with all policies of the Companies in effect from time to time. . . ."

     g.    "Section 7. <u>Termination.</u> . . . (e) <u>By Executive</u>. Subject to the cure provisions provided below, and at his option, Executive may terminate his employment hereunder for 'Good Reason' (as defined below) by giving thirty (30) days written notice to the Compan[ies]. For purposes of this Agreement, '<u>Good Reason</u>' shall be defined as:

    (i)    a material diminution in the nature or scope of Executive's duties, responsibilities, authority, powers or functions;

    (ii)    a reduction in Executive's compensation payable in accordance with <u>Section 4</u> hereof, or failure to make scheduled bonus payments to Executive in accordance with <u>Section 5</u> above;

    (iii)    the Companies material breach of any provision of this Agreement;

    . . .

    (v)    the voluntary or involuntary transfer of greater than 50 percent ownership of one of [the] entities in the Companies to any entity (individual or company) not owned or controlled by at least one of the Companies that is a party to this Agreement.

The foregoing notwithstanding, if the Companies cure the condition giving rise to the termination notice within fifteen (15) days following receipt of Executive's notice of termination, Executive's employment will not terminate. If the Companies fail to cure the condition, the termination for Good Reason shall become effective on the date specified in Executive's notice of termination. . .."

8

  h. "Section 8. Termination Payments and Benefits. . . .(b) Termination for Good Reason . . . Upon the termination of employment (i) by Executive for Good Reason . . .Executive shall become entitled to receive as a termination settlement an amount of Three Million Dollars ($3,000,000) (the "Termination Payment").  The Termination Payment shall be payable in periodic payments spread over the six (6) month period immediately following the effective date of the termination in accordance with the Companies standard payroll practices . . ..  In addition to the forgoing, the Companies shall continue (at its cost) Executive's health benefits for a period of twelve (12) months from the date of termination of Executive's employment."

### Executive Fully Performed Under the Agreement

20. At all times during the Term of the Agreement, Executive fully performed all obligations, promises, and duties required by the Agreement.

21. Defendant Greenbrier maintains a website containing all formal performance reviews for its employees.  The site does not contain any negative reviews of Executive's performance.

22. At no time during the Term of the Agreement did Company Defendants or Defendant Jay Justice allege a breach of the Agreement by Executive or provide him with written notice of termination, nor did they request that he cure any alleged breaches as required by Section 7(c) of the Agreement.

23. On May 1, 2023, pursuant to the notice requirements of Section 13 of the Agreement, via email to Defendant Jay Justice, Executive provided Notice of Termination for Good Reasons to the Company Defendants as required by Section 7(e) of the Agreement ("Notice of Termination"). That Notice of Termination stated that Executive intended to

resign/terminate his employment on June 1, 2023, for Good Reasons if Company Defendants failed to cure numerous breaches of the Agreement. Executive identified the following Good Reasons for his termination: (1) the failure to pay Executive's 2022 CPI Base Salary increase beginning on January 1, 2023, (2) the failure to pay Executive's guaranteed annual bonus for work performed in 2022, (3) the failure to reimburse all properly submitted expense reimbursement requests, (4) the material change to the nature and scope of Executive's duties, responsibilities, authority, and power from those agreed upon at the beginning of his employment, and (5) the potential transfer of greater than 50 percent ownership of one or more of the Company Defendants' interest to a third party.

24.     On May 2, 2023, via UPS Next-Day Delivery, Executive provided a second Notice of Termination to the Company Defendants and Defendant Jay Justice to assure proof of delivery (i.e., return receipt). The May 2, 2023, Notice of Termination changed Executive's Termination Date from June 1, 2023, to June 3, 2023, to assure that Executive provided the 30-day notice required by Section 7(e) and Section 13 of the Agreement.

25.     On May 3, 2023, UPS delivered the May 2, 2023 Termination Notice to Defendant Jay Justice.

26.     On May 3, 2023, Defendant Jay Justice acknowledged receipt of the May 1, 2023 Termination Notice via email to Executive, stating that he would later provide a written response.

27.     On May 15, 2023, Defendant Jay Justice responded to Executive's May 1, 2023 Termination Notice.  Defendant Jay Justice's response did not cure or agree to cure any of Executive's Good Reasons for terminating his employment pursuant to Section 7(e) and Section

13 of the Agreement. Defendant Jay Justice's response denied that Executive's reasons for termination were Good Reasons under the Agreement.

28.     Because Defendants failed to cure the Good Reasons outlined in Executive's May 2, 2023 Termination Notice, Executive terminated his employment on June 3, 2023, pursuant to Section 7(e) of the Agreement, which states that "the termination for Good Reason shall become effective on the date specified in Executive's notice of termination."

<u>**Company Defendants Breached the Agreement**</u>

**Company Defendants materially breached the Agreement by failing to timely pay Executive's CPI raise beginning January 1, 2023, allowing Executive the option of terminating his employment for Good Reason.**

29.     Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

30.     The CPI for the area including Birmingham, Alabama, as reported by the Bureau of Labor Statistics of the United States Department of Labor, from January 1, 2022, to January 1, 2023, was seven (7) percent.

31.     Pursuant to Section 4 of the Agreement, beginning January 1, 2023, until the Termination Date, Company Defendants were required to increase Executive's Base Salary by the 2022 CPI rate of seven (7) percent ($56,000 annual increase).

32.     Company Defendants materially breached Section 4 of the Agreement by failing to timely pay Executive the CPI-based salary increase.

33.     Company Defendants did not cure this breach within the 15-day cure period allowed by Section 7 of the Agreement, following receipt of Executive's Notice of Termination.

34.     Section 7(e)(ii) of the Agreement defines Executive's termination as a Good Reason if Company Defendants reduce "Executive's compensation payable in accordance with Section 4 . . .," allowing Executive the option of terminating his employment for Good Reason.

35.     As stated in Executive's Notice of Termination, he terminated his employment for Good Reason pursuant to Section 7(e)(ii) of the Agreement on June 3, 2023.

36.     On June 7, 2023, four days after Executive terminated his employment and after he was no longer employed by Company Defendants or Defendant Greenbrier, five months after Executive's CPI Base Salary increase became effective and due, and well outside of the Agreement's Section 7 15-day deadline for Company Defendants to cure any noticed defaults, Defendant Greenbrier paid Executive the CPI salary increase for 2023.  This is the same date that Company Defendants' first Termination Payment under Section 8(b) of the Agreement was due to Executive, which has not been paid.

**Company Defendants materially breached the Agreement by failing to timely pay Executive his guaranteed annual bonus for 2022, allowing Executive the option of terminating his employment for Good Reason.**

37.     Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

38.     Pursuant to Section 5(b) of the Agreement, Company Defendants were obligated to pay the Executive a ten (10) percent annual bonus ($80,000) on or before March 31, 2023, for performance during the prior year.

39.     Company Defendants materially breached Section 5(b) of the Agreement by failing to pay Executive his required annual bonus prior to Executive's Termination Date.

40.     Company Defendants did not cure this breach within the 15-day cure period allowed by Section 7 of the Agreement, following receipt of Executive's Notice of Termination.

41.     Section 7(e)(ii) of the Agreement defines Executive's termination as a Good Reason if Company Defendants "fail[] to make scheduled bonus payments to Executive in accordance with Section 5" of the Agreement, allowing Executive the option of terminating his employment for Good Reason.

42.     As stated in Executive's Notice of Termination, Executive terminated his employment for Good Reason pursuant to Section 7(e)(ii) of the Agreement.

43.     On June 7, 2023, four days after Executive terminated his employment and was no longer employed by Company Defendants or Defendant Greenbrier, sixty-eight (68) days after Executive's annual bonus was due, and well outside of the Agreement's Section 7 15-day deadline to cure any noticed defaults, Defendant Greenbrier paid Executive his annual bonus for 2022. This is the same date that Company Defendants' first Termination Payment under Section 8(b) of the Agreement was due to Executive, which has not been paid.

**Company Defendants materially breached the Agreement by failing to timely reimburse Executive's legitimate business expenses, allowing Executive the option of terminating his employment for Good Reason.**

44.     Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

45.     At various times during the Term of his employment, Executive submitted requests for reimbursement of business expenses pursuant to Section 6(c) of the Agreement and in accordance with Company Defendants', Encore's, and Defendant Greenbrier's policies.

46.     Pursuant to Section 6(c) of the Agreement, Company Defendants were obligated to timely reimburse Executive's properly incurred and submitted expenses.

47.     Company Defendants materially breached Section 6(c) of the Agreement by failing to reimburse Executive any expenses during the entire Term of his employment.

48.    Company Defendants did not cure this breach within the 15-day cure period allowed by Section 7 of the Agreement, following receipt of Executive's Notice of Termination.

49.    Section 7(e)(iii) of the Agreement defines Executive's termination as a Good Reason if the Company Defendants "material[ly] breach . . . any provision of the Agreement," allowing Executive the option of terminating his employment for Good Reason.

50.    On June 3, 2023, as stated in Executive's Notice of Termination, Executive terminated his employment for Good Reason pursuant to Section 7(e)(iii) of the Agreement.

51.    On June 9, 2023, six (6) days after Executive terminated his employment and was no longer employed by Company Defendants or Defendant Greenbrier, more than sixteen (16) months after Executive's first expense reimbursement payment was due, and well outside of the Agreement's Section 7 15-day deadline to cure noticed defaults, Encore paid Executive's outstanding expense reimbursement requests. Encore made this payment two days after Company Defendant's first Termination Payment under Section 8(b) of the Agreement was due to Executive, which has not been paid.

**Company Defendants materially reduced the nature and scope of Executive's duties, responsibilities, authority, powers, and functions, allowing Executive the option of terminating his employment for Good Reason.**

52.    Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

53.    Immediately after executing the Agreement, Company Defendants materially reduced the nature and scope of Executive's duties, responsibilities, authority, powers, and functions.

54.    Executive's general duties under the Agreement are outlined in Section 3, which states that Executive's duties include those that "are customary for Executive's position" as EVP

14

of Environmental Engineering and Regulatory Compliance, including, but not limited to, "permitting, bonding, and compliance."

55.    The duties of an EVP "customarily" include, but are not limited to, overseeing relevant departments of a company's business or operations, having a departmental budget, having the ability to decide how money is spent, having the ability to hire support and operational staff, having the ability to hire outside consultants, and having the ability to make operational decisions regarding permitting and compliance.

56.    Defendant Jay Justice, acting on behalf of Company Defendants, reduced Executive's authority to develop long-term budgets for Executive's department and to implement budgets for individual projects, ignoring Executive's requests for even minimal budgets for major compliance issues, and resulting in significant operational deficiencies and potential liability not only for Defendants but also for Executive.  Without any reliable funding for his department, Executive could not develop any type of compliance planning—long-term or short term.

57.    Defendant Jay Justice, acting on behalf of Company Defendants, reduced Executive's responsibilities, authority, power, and functions by **prohibiting Executive from authorizing any work within his department that required the expenditure of any money**. As  EVP for Environmental Engineering and Regulatory Compliance, Executive could not authorize the purchase of gasoline for mining reclamation projects, payments for major or minor repairs to construction equipment necessary for remediation and environmental compliance, payments for equipment rental, payments necessary to relocate equipment, payments for repairs of pumps necessary for compliance, payments to restore electricity for required pumps, payments for chemicals necessary to treat sediment ponds, payments to reimburse valid employee expenses

within his department (i.e., gasoline or brakes for company trucks), payments for environmental consultants, payments for temporary staff to assist with permitting and reporting,  payments for safety equipment or repairs, payments for air monitoring, payments for water monitoring, payments required for fish tissue sampling, payments for consultants to assist in the disposal of industrial and hazardous wastes, payments for rental of hazardous wastes storage containers, payments required under various **court-approved agreements and court-ordered Consent Decrees**, payments necessary to assure required bonding, payments for environmental permit fees, **payments of court-ordered civil fines to state and local agencies**, payments to assure required bonding at sites, payments for outside legal counsel, payments for required environmental studies, etc.  Defendant Jay Justice often delayed or ignored requests for these expenditures, preventing Executive from performing his duties as EVP, which materially harmed Executive's reputation and credibility within his profession and specialized field.

58.     Defendant Jay Justice, acting on behalf of Company Defendants, constructively reduced Executive's responsibilities, authority, power, and functions by ignoring Executive's numerous requests to hire necessary administrative personnel, environmental engineers, consultants, and equipment operators. Defendant Jay Justice's actions prevented Executive from assuring adequate engineering assistance necessary for environmental compliance for all of the Justice Companied, including numerous sites in Alabama, Kentucky, Tennessee, Virginia, West Virginia, and South Carolina.  Defendant Jay Justice's actions also limited Executive's ability to fully address numerous environmental, employment, and real estate legal issues, including significant litigation matters.

59.     On December 27, 2021, Defendant Jay Justice authorized Executive to hire an engineer to assist with environmental permitting and compliance. Less than four months later,

partly due to office working conditions at Bluestone Coke (i.e., no heat, no running water, no reliable electricity, no reliable Wi-Fi, the use of Porta Potties, etc.), that engineer resigned. Defendant Jay Justice did not authorize Executive to hire a replacement.

60.     Defendant Jay Justice, acting on behalf of Company Defendants, constructively reduced Executive's responsibilities, authority, power, and functions by terminating operational personnel, including an Environmental Manager at Bluestone Coke who oversaw significant environmental matters at that facility.  Defendant Jay Justice did not consult with Executive on his decision to terminate said Environmental Manager or allow Executive to rehire or replace him.

61.     Defendant Jay Justice, acting on behalf of Company Defendants, constructively reduced Executive's responsibilities, authority, power, and functions by failing to honor commitments to local, state, and federal agencies and outside consultants.  Defendant Jay Justice's failure to honor agreements, consent decrees, settlements and informal commitments permanently damaged Executive's reputation, his relationship with agencies and consultants, and his ability to effectively negotiate with those entities on behalf of the Defendants and in the future.

62.     The Agreement gave Executive the title, responsibilities, duties, authority, power, and functions of an EVP for environmental engineering and compliance. As outlined in Paragraphs 49-57 above, however, Defendant Jay Justice and the Company Defendants subsequently removed Executive's functions, power, and authority to ensure environmental compliance, leaving him only with potential liability over matters for which he had absolutely no control.

63.     Section 7(e)(i) of the Agreement defines Executive's termination as a Good Reason if there is a "material diminution in the nature or scope of Executive's duties, responsibilities, authority, powers and functions," allowing Executive the option of terminating his employment for Good Reason.

64.     Executive provided Company Defendants' proper notice and terminated his employment for Good Reason as allowed by Section 7(e)(i) of the Agreement.

**Company Defendants materially breached the Agreement by the voluntary or involuntary transfer of greater than 50 percent interest in Bluestone, allowing Executive the option of terminating his employment for Good Reason.**

65.     Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

66.     Section 7(e)(v) of the Agreement defines Executive's termination as a Good Reason if Company Defendants "voluntary or involuntary transfer . . . greater than 50 percent ownership of one of the . . . [Company Defendants] to any entity (individual or company) not owned or controlled by at least one of the Companies that is a party to this Agreement."

67.     On June 24, 2022, Credit Suisse Asset Management issued a public press release, stating that Bluestone "agreed that the proceeds from any sale of the Bluestone entities would be shared [equally] between the Justice family and the [Credit Suisse/Greensill Bank] noteholders."

68.     On or about March 14, 2023, the Wall Street Journal reported that Bluestone publicly announced that it had retained the global investment banking firm Perella Weinberg Partners to begin marketing the sale of certain Bluestone mining assets.

69.     Since October 19, 2021, Bluestone has divested itself of greater than 50 percent interest in entities that are not owned or controlled by  SCC or the Justice Family Group.

70.     In Defendant Jay Justice's May 15, 2023 response to Executive's May 1, 2023 Notice of Termination, he did not respond to or deny Executive's right to terminate his employment based on Bluestone's divestment of greater than 50 percent of its interests and/or ownership.

71.     On June 3, 2023, Executive terminated his employment for Good Reason as allowed by Section 7(e)(v) of the Agreement.

**Company Defendants materially breached the Agreement by failing to timely pay Executive a guaranteed Termination Payment after Executive terminated his employment for Good Reason.**

72.     Pursuant to Section 8(b) of the Agreement and upon Executive's termination of employment for Good Reason, Company Defendants are required to pay Executive a Termination Payment in the amount of $3,000,000, to be paid "in periodic payments spread over the six (6) month period immediately following the effective date of the termination in accordance with the Companies['] standard payroll practices . . . ."

73.     Operating on behalf of the Company Defendants, Defendant Greenbrier has thirteen (13) pay periods over the six (6) months preceding Executive's Termination date of June 3, 2023, beginning on June 7, 2023. The Agreement requires the Company Defendants to pay Executive $230,769 on each of those thirteen (13) pay dates.

74.     Company Defendants materially breached Section 8(b) of the Agreement by failing to make the required Termination Payments pursuant to Section 8(b) on June 7, 2023, June 21, 2023, July 5, 2023, July 19 2023, August 2, 2023, August 16, 2023,  and August 30, 2023, which were Defendant Greenbrier's standard payroll dates following the Termination Date.

**Company Defendants materially breached the Agreement by cancelling Executive's health benefits**

75.       Pursuant to Section 8(b) of the Agreement and upon Executive 's termination of employment for Good Reason, the Company Defendants are required to "continue [at their costs] Executive's health benefits for a period of twelve (12) months from the date of termination of Executive's employment."

76.       On June 7, 2023, Executive was notified that his Greenbrier Health Care Plan had been cancelled.  On July 13, 2023, Executive contacted Defendant Greenbrier and Defendant Jay Justice, requesting that Defendant Greenbrier continue his health benefits as agreed upon. Defendant Greenbrier and Defendant Jay Justice ignored Executive's request.

77.       On July 24, 2023, Forefront Dermatology informed Executive that Defendant Greenbrier's health insurance plan denied coverage for a medical procedure conducted on May 22, 2023, while Executive was employed by Defendant Greenbrier and during the Term of the Agreement.  Executive was himself required to pay $823.01 to Forefront Dermatology. Defendant Greenbrier and Company Defendants canceled Executive's health insurance prior to his Termination Date.

78.       Company Defendants materially breached Sections 6(a) and 8(b) of the Agreement by cancelling his health insurance prior to the Termination Date and by not continuing Executive's health benefits for a period of twelve (12) months after Executive terminated his employment for Good Reason.

**Company Defendants materially breached the Agreement by failing to pay Executive his earned and accrued Annual Bonus based on his Base Salary for work from January 1, 2023, until June 3, 2023.**

79.       Executive earned a Base Salary from January 1, 2023, until June 3, 2023.

80.     Pursuant to Section 5 (b) of the Agreement, the Company Defendants are obligated to pay Executive his earned and accrued bonus of ten (10) percent ($36,162) of that amount.

81.     Neither Defendant Greenbrier nor the Company Defendants has paid Executive his accrued earned bonus for his Base Salary earned from January 1, 2023, to June 3, 2023, which is now due.  This is a breach of the Agreement.

**Company Defendants owe Executive the costs of reasonable moving expenses and storage for his office furniture under Section 6(c) of the Agreement.**

82.     Section 6(c) of the Agreement states that the Company Defendants "shall reimburse Executive for reasonable moving expenses, storage, etc. for costs associated with locating from his current office to a yet to be determined office location in Birmingham, Alabama."

83.     Because Defendant Jay Justice refused to authorize Executive to lease office space for Executive's Environmental Engineering and Regulatory Compliance department, Executive delayed moving his office furniture and furnishings.

84.     On July 12, 2023, Balch informed Executive that it could no longer store Executive's office furniture at its offices.  Executive removed  his furniture on August 22, 2023.

85.     Executive paid $712.50 for moving expenses.  Pursuant to Section 6(c) of the Agreement, Company Defendants are responsible for reimbursing Executive for this expense.

## <u>Company Defendants' Breaches of the Agreement Caused Damages to Executive</u>

86.     Executive's damages for Company Defendants' breach of the Agreement are Three Million Dollars ($3,000,000) for failing to pay Executive's Termination Payment as required by Section 8(b) of the Agreement. Executive is entitled to pre-judgment interest on these damages.

87.     Executive's damages for Company Defendants' breach of the Agreement are $26,340 for failing to pay Executive's health benefits for a period of twelve months as required by Section 8(b) of the Agreement, plus Executive's out of pocket medical expenses. This amount is calculated based on the Company Defendants' June 7, 2023, Termination of Health Care Notice costs for COBRA Insurance for one year. Executive is entitled to pre-judgment interest on these damages.

88.      Executive's damages for Company Defendants' breach of the Agreement are $36,160 for failing to pay Executive's Annual  Bonus for Base Salary earned in 2023 as required by Section 5(b) of the Agreement. Executive is entitled to pre-judgment interest on these damages.

89.     Executive was damaged by Company Defendants' failure to reimburse reasonable moving expenses for office furniture as required by Section 6(c) of the Agreement. Executive is entitled to pre-judgment interest on these damages.

90.     Pursuant to Section 14(e) of the Agreement, Executive is entitled to all reasonable attorney fees, costs, and expenses arising out of or relating to the Agreement or the employment relationship between the parties.

## COUNT TWO

## BREACH OF CONTRACT—EMPLOYEE BENEFITS

91.     Executive restates and incorporates the allegations and facts of the preceding paragraphs as if set out anew.

92.     On February 2, 2023, Defendant Jay Justice internally moved Executive's employment to Defendant Greenbrier, a subsidiary of Defendant Justice Family Group. Executive was employed by Defendant Greenbrier until the effective date of his resignation on

June 3, 2023.  Defendant Greenbrier created an employer/employee contract with Executive, pursuant to Company Defendants' obligations under the Agreement by classifying him as an employee, paying Executive's salary, bonus, health care benefits, and social security from February 2, 2023 until June 3, 2023.

93.     At all times, Executive performed pursuant to his employment agreement with Defendant Greenbrier.

94.     Defendant Greenbrier materially breached its employment contract with Executive by failing to pay his Termination Payment as outlined in the Agreement.

95.     Defendant Greenbrier's Employee Benefits Package and Health Care Plan was a valid enforceable contract with Executive to provide health care insurance (family plan) for Executive during his employment and, because Executive terminated his employment for Good Reason, for an additional year after Executive's Termination Date pursuant to Section 8(b) of the Agreement.

96.     Defendant Greenbrier materially breached its employment contract with Executive by terminating his health insurance coverage during the Term of his employment and by failing to provide health insurance coverage for one year after Executive's Termination Date.

97.     On June 7, 2023, Defendant Greenbrier paid Executive's 2022 annual bonus, as required by Section 5(b) of the Agreement, for performance during 2022. Also on June 7, 2023, Defendant Greenbrier paid Executive's base salary raise for the time between January 1, 2023, and June 3, 2023.  Also on June 7,2023, Defendant Greenbrier paid Executive's salary from the beginning of the pay period through July 3, 2023—the Termination Date.

98.     Defendant Greenbrier materially breached its employment contract with Executive by failing to pay his earned and accrued annual bonus on his Base Salary from January 1, 2023 to June 3, 2023, as required pursuant to the Agreement.

99.     As a result of Defendant Greenbrier's actions, Executive suffered damages by not receiving his Termination Payment, by not having medical insurance, and by not receiving his earned bonus based on his 2023 base salary.

## COUNT THREE
## FRAUDULENT INDUCMENT INTO CONTRACT

100.     Executive restates and incorporates the facts of the preceding paragraphs as  if  set out anew. This claim alleges that both Defendant Jay Justice and Company Defendants are liable for fraudulent inducement into a contract under Alabama law.

### Relevant Facts

101.     At all times material herein Defendant Jay Justice was acting on behalf of Company Defendants and the Justice Companies.

102.     On September 29, 2021, at the request of Defendant Jay Justice, Executive traveled to Roanoke, Virginia, to discuss Executive's potential employment with Defendant Jay Justice and/or the Justice Companies.

103.     Defendant Jay Justice informed Executive prior to that meeting that he wanted to discuss how Executive could assist with developing and overseeing an environmental compliance program for all of the Justice Companies. Defendant Jay Justice identified the prospective program as a "global Justice environmental program," for the approximately 75-80

Justice Companies located in Alabama, Kentucky, South Carolina, Tennessee, Virginia, and West Virginia.

104.    At that meeting, Defendant Jay Justice asked  Executive what it would take for Executive to leave his law practice and  his  firm of 27 years, give up a senior partner's book of business, and work for Defendant Jay Justice.   Executive informed Defendant Jay Justice that he needed time to think about the offer and would put his salary, benefits, and terms of employment in writing, which subsequently became the Agreement.

**Company Defendants and Defendant Jay Justice Misrepresented Material Facts**

105.    The remaining discussions at the September 29, 2021 meeting in Roanoke, Virginia, and in subsequent communications, included discussions of how to implement a "global Justice environmental program" and what Defendant Jay Justice would do if Executive was willing to accept the position  and  give up his partnership at Balch and his book of business built and nurtured over more than a quarter century.

106.    At that meeting, Defendant Jay Justice fraudulently represented to Executive that Defendant Jay Justice would provide the necessary financial resources to fund a global environmental program.

107.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently represented to Executive that the Justice Companies were in "good shape" financially, even with the collapse of Greensill Capital,  one source of operating capital for the Justice Companies, and the shutdown of Bluestone Coke. Executive was never privy to the overall financial condition of the Justice Companies before submitting his Notice of Termination.

108.    At that meeting and in other communications, Defendant Jay Justice fraudulently represented that Executive could hire 8-10 additional employees necessary to implement an effective global environmental compliance program, including an environmental associate attorney, paralegals with experience in environmental law, administrative assistants, and additional environmental engineers.  Except for the one engineer Executive hired as discussed in Paragraph 59 above, Defendant Jay Justice ignored numerous requests by Executive during the Term of his employment to hire additional staff, including requests within weeks of Executive's employment.  Without seeking Executive's input or knowledge and on different occasions, Defendant Jay Justice terminated various employees responsible for environmental compliance during Executive's Term of employment.

109.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently represented that Executive would be authorized to lease office space in Birmingham, Alabama, to house the environmental legal team and the environmental compliance department. Executive identified several viable office spaces within 45 days of his employment and  presented each option to Defendant Jay Justice.  Defendant Jay Justice never allowed Executive to lease any office space. Defendant Jay Justice asked Executive to use an office at Bluestone Coke, which Executive originally did. However, due to the fact that there was no running water, sporadic electricity from a generator—which often could not run for days at a time due to no fuel and equipment break downs—no heat, and limited and intermittent Wi-Fi, Executive relocated his office to his personal residence.

110.    After receiving Executive's May 2, 2023 Notice of Termination, Defendant Jay Justice indicated that Executive's "authority on these [hiring and spending] matters was always considered to be consistent with the company's purchasing practices, which are consistent

among all operations and all departments of the organization." Before making representations, promises, and commitments to Executive regarding his authority and autonomy, Defendant Jay Justice knew that such representations, promises, and commitments were false and that Executive would always be required to obtain his approval, which Defendant Jay Justice routinely and unreasonably denied.

111.    Summer Harrison, Vice President of Treasury at Defendant Bluestone, explained the purchasing practice of the Company Defendants as, "if you do not get approval you need to keep asking.  It is the responsibility of the compliance team to make sure nothing falls through the cracks. So if you don't get an approval or wire confirmation you need to keep asking." Once Summer Harrison or her staff received any email request for funds or payment, they forwarded that request to Defendant Jay Justice and asked him if they could make the payment. Defendant Jay Justice then made the decision on whether to fund the request or to simply ignore it.

112.    Prior to Defendant Jay Justice making the aforesaid fraudulent misrepresentations, he was aware that he alone made decisions on hiring, firing, expenditure approvals, leases, and consultants, thereby making those misrepresentation willful, intentional, and patently dishonest.

113.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently represented that he wanted Executive to move "some of the compliance functions from an engineering standpoint" to Birmingham, Alabama.

114.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently represented that Executive would "run" his own "show" in terms of the environmental compliance and legal departments.

115.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently represented to Executive that, although Defendant Jay Justice would want to always

be on the same page, Executive would have "autonomy" over the environmental compliance and environmental legal department.

116.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently indicated that Executive would be a "key member" of an executive team that included him and only a few of Justice Companies' Executive Vice Presidents.  Defendant Jay Justice also fraudulently represented that he wanted Executive to be on a team that makes "major decisions that may even be outside of your group."

117.    At that meeting and in subsequent communications, Defendant Jay Justice fraudulently agreed to fully pay outstanding legal invoices to Balch after Executive indicated that Executive would need that commitment before accepting a  position with the Justice Companies. Balch's invoices for work long since completed have not been fully paid to this date.

**Company Defendants and Defendant Jay Justice Made Misrepresentations Willfully and Recklessly to Deceive Executive**

118.    Defendant Jay Justice's misrepresentations were willful and/or reckless with the intent of deceiving Executive into accepting a position as EVP with the Justice Companies.

119.    Defendant Jay Justice was aware of Executive's apprehensions regarding his willingness to take the position of EVP,  Executive informed Defendant Jay Justice that he was "absolutely secure" at Balch with his client base and expected to practice there until he retired in 10-15 years.  Defendant Jay Justice made the willful and  reckless misrepresentations to deceive Executive into accepting the EVP position, knowing that his misrepresentations could significantly impact Executive's remaining 10 to 15-year career and that Executive was giving up a client book of business that he could not get back.

120.    Defendant Jay Justice was aware of Executive's good reputation among local, state, and federal agencies and consultants, yet nonetheless willfully and  recklessly

misrepresented material facts, intending to deceive Executive into accepting a  position, which Defendant Jay Justice knew at the time was nothing more than an environmental manager's position, with no authority or power to implement a global Justice environmental compliance program, and on which representations Executive relied in resigning his senior partnership at Balch, giving up his book of business, and accepting the position with Defendants.  Defendant Jay Justice indicated to Executive that his reputation and contacts would be helpful in resolving several compliance matters. Defendant Jay Justice made the representations in order to entice and deceive Executive into accepting the EVP position, thereby capitalizing on his reputation and contacts.

121.    Defendant Jay Justice was aware at the time that he made the misrepresentations that he approves all expenditures relating to coal mining and coking activity for the Justice Companies.  At the time that Defendant Jay Justice made the representations, he was aware that Executive would not accept the position if Executive could not "run the show" and have general autonomy over the global Justice environmental compliance and legal program, the hiring of necessary staff, leasing office space, etc. Defendant Jay Justice made the representations to entice and deceive Execute into accepting the EVP position, which, to his detriment, Executive did.

122.    Defendant Jay Justice misrepresented material facts to entice and deceive Executive into accepting the EVP position by indicating that Executive would be in charge  of a "global Justice environmental program."  Defendant Jay Justice was aware that Executive would not accept the EVP position if  the offer was not equally or more prestigious than his current senior partnership at a major law firm with offices in Alabama, Georgia, Florida, Mississippi, Texas, and the District of Columbia.

123.    Defendant Jay Justice made the following willful, reckless, and fraudulent statements for the purposes of enticing and deceiving Executive into accepting a position as EVP for the Justice Companies:  (i) Executive would "run the show," (ii) Executive would implement a "global Justice environmental program,"   (iii) Executive could hire an  "environmental legal team ([a]ssociate, paralegal, admin., etc.)" to house them in Birmingham, Alabama,  (iv) "I want you to rent office space," (v) "You  are a key member of the executive team for major decisions that may even be outside of your group," and (vi) that he was in the position to adequately fund Executive's compliance program.

124.    Defendant Jay Justice made statements about the financial condition of the Justice Companies overall in order to entice and deceive Executive into accepting the EVP position. Defendant Jay Justice knew at the time that Executive would not accept the EVP  position if Executive believed the Justice Companies were financially unsound. In reliance on said misrepresentations, Executive accepted the EVP offer.  Bolstering his prior assurances to Executive, one day after executing the Agreement, Defendant Jay Justice stated that, if Company Defendants had to close the Bluestone Coke facility in Birmingham, Alabama, "this has no impact on our deal with [Executive] and no impact on the need for [Executive] or the stability for [Executive] at Justice Co[mpanies]."

**Executive Reasonably Relied on Defendant Jay Justice's Representations Under the Circumstances**

125.    Executive reasonably relied on Defendant Jay Justice's representations, promises, and commitments under the circumstances. Executive would not have entered into the Agreement with Company Defendants but for Defendant Jay Justice's fraudulent misrepresentations.

126.    Based on Defendant Jay Justice's fraudulent misrepresentations, Executive transferred all of his clients to various attorneys at Balch.

127.    Executive had never served in an EVP position during his career and reasonably relied on Defendant Jay Justice's misrepresentation of what Executive's authority, powers, responsibilities, and duties would be were he to accept the position.

128.    Executive reasonably relied on Defendant Jay Justice's comment that as far as Executive's **"[a]utonomy**: I want you and I to have an open line of communication that we are always on the same page, **but I would expect you to run the show** and be a key member of the executive team for major decisions that may be outside of your group."

129.    Executive independently and  reasonably conducted due diligence on the financial stability of the Justice Companies.  All of the Justice Companies are privately held with limited information publicly available regarding their operations or financial stability.  His best efforts to the contrary notwithstanding, Executive was not in a position to discern the veracity of Defendant Jay Justice's comments.  Executive reasonably relied on Defendant Jay Justice's misrepresentations.

130.    Defendant Jay Justice, Governor James C. Justice, III, and the Justice Companies often publicly dispute the financial conditions of the Justice Companies.

### Executive Suffered Damages as a  Proximate Result of Defendant Jay Justice's Fraudulent Misrepresentations and Inducement into the Agreement

131.    Executive suffered damages as the proximate result of Defendant Jay Justice's fraudulent and  material misrepresentations.

132.    Executive was a Senior Partner at Balch, having been there 27 years, with a large book of business, which he could continue to service, or take with him to another law firm.

133.     As a result of Defendant Jay Justice's fraudulent and material misrepresentations, Executive resigned his 27-year career at Balch, giving up his book of business and relinquishing his senior partnership.

134.     Defendant Jay Justice was aware that Executive intended to work an additional 10-15 years at Balch prior to retiring.

135.     Executive suffered the loss of his client book of business, professional opportunity as a Senior Partner at a reputable law firm, loss of professional reputation, and damage to his career growth and potential.

136.     Executive is now unemployed without a client base  Executive's future salary at any law firm will be based on the clients he is able to bring to a law firm. Without a book of business, he will not likely be able to join as a partner. Based on a loss of all of Executive's clients, his resignation of his senior partnership at Balch, and the Company Defendants' and Defendant Jay Justice's knowledge that Executive intended to continue at Balch for another "10-15 years", Company Defendants' and Defendant Jay Justice's fraudulent misrepresentations caused approximately $3,000,000 to $4,000,000 in damages to Executive.

137.     As a result of Company Defendants' and Defendant Jay Justice's fraudulent misrepresentations, Executive has suffered significant damages, including compensatory, mental anguish, and emotional distress regarding his current unemployment status, his future employment, his loss of clients, and his loss of reputation. His reputation as an environmental lawyer whose word could be trusted by regulators and opposing counsel has been decimated. Because of that reputation and Executive's ethics, he had no choice but to resign his employment.   As a result thereof, Executive seeks the following:

    a.  Compensatory damages to compensate him for the aforesaid economic losses;

    b.   Mental anguish and emotional distress damages for the aforesaid losses suffered

        as a proximate result of Company Defendants and Defendant Jay Justice's

        tortious acts;

    c.   Punitive damages, to deter such conduct in the future; and

    d.   Interest, costs, attorneys' fees, and such other or different relief as to which

        Executive may be entitled.

PLAINTIFF DEMANDS TRIAL BY A STRUCK JUIRY ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,

/s/ John D. Saxon

_____

John D. Saxon
Alabama State Bar No. ASB-3258-07IJ
Attorney for Plaintiff

OF COUNSEL:

JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203
Telephone: (205)324-1039
Facsimile: (205)323-1583
Email: jsaxon@saxonattorneys.com

PLAINTIFF'S ADDRESS:

Mr. Robert P. Fowler
c/o John D. Saxon, P.C.
2119 3rd Avenue North
Birmingham, AL 35203
Telephone: (205)324-1039
Facsimile: (205)323-1583
Email: jsaxon@saxonattorneys.com

<u>PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>:

Bluestone Resources, Inc
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington DE 19801

Southern Coal Corporation
c/o Pras, LLC
560 Main St. W.
White Sulfur Springs, WV 24986.

Adam Long
Justice Family Group, LLC
101 Main St. W.
White Sulphur Springs, WV 24986

Adam Long
Greenbrier Hotel Corp.
101 Main St. W.
White Sulphur Springs, WV 24986

Stephen W. Ball
Bluestone Resources, Inc.
Southern Coal Corporation
The Justice Family Group, LLC
Encore Leasing, LLC
302 S. Jefferson Street
Roanoke, VA 24011-1711

James C. Justice, III
302 South Jefferson Street
Roanoke, VA 24011-1710