FILED
2025 Jul-09 PM 08:33
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:23-cv-01180-GMB

PLAINTIFF'S EXHIBIT 4

ROBERT P. FOWLER,
Plaintiff and Counterclaim Defendant,
vs.
JUSTICE FAMILY GROUP, LLC; BLUESTONE RESOURCES, INC.; SOUTHERN COAL CORPORATION,
Defendants and Counterclaim Plaintiffs,
--- and ---
GREENBRIER HOTEL CORP.; and JAMES C. JUSTICE, III,
Defendants.

DEPOSITION TESTIMONY OF:
DON WIGGINS

FEBRUARY 11, 2025
9:00 A.M.

Page 2

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of DON WIGGINS may be taken before Tanya D. Cornelius, RPR, CSR, and Notary Public, at the offices of Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, The Kress Building, 301 19th Street North, Birmingham, Alabama, on the 11th day of February, 2025, commencing at approximately 9:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is NOT waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may

Page 3

make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

Page 4

I N D E X


| EXAMINATION BY: | PAGE NUMBER |
|---|---|
| MR. CALAMUSA | 7 |


* * * * * * * * * * * * * *

EXHIBIT INDEX


| PLAINTIFF'S EXHIBIT NO: | | PAGE NUMBER |
|---|---|---|
| Exhibit 1 | E-mail | 34 |
| Exhibit 2 | E-mails | 35 |
| Exhibit 3 | E-mails | 37 |
| Exhibit 4 | E-mails | 37 |
| Exhibit 5 | E-mails | 41 |
| Exhibit 6 | E-mails | 48 |
| Exhibit 7 | E-mails | 51 |


Page 5

A P P E A R A N C E S

FOR THE PLAINTIFF:
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
BY: Rocco Calamusa, Jr., Esq.
D.G. Pantazis, Jr., Esq.
The Kress Building
301 – 19th Street North
Birmingham, Alabama 35203

FOR THE DEFENDANTS:
CAREY, DOUGLAS, KESSLER & RUBY, PLLC
BY: Raymond S. Franks, Esq.
707 Virginia Street, Suite 901
Charleston, West Virginia 25301

Page 6

I, Tanya D. Cornelius, RPR, CSR, and Notary Public, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure, and the foregoing stipulation of counsel, there came before me at the offices of Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, The Kress Building, 301 19th Street North, Birmingham, Alabama, beginning at 9:00 a.m., DON WIGGINS, witness in the above cause, for oral examination, whereupon the following proceedings were had:

DON WIGGINS,
being first duly sworn, was
examined and testified as follows:

THE REPORTER: Will this be usual stipulations?
MR. CALAMUSA: That's fine.

Page 7

EXAMINATION
BY MR. CALAMUSA:
Q. Would you state your name, please, sir?
A. Robert Donald Wiggins.
Q. And, Mr. Wiggins, you go by Donald; is that what I understand?
A. I go by Don, yes. I couldn't hear you.
Q. What's your current address?
A. [redacted], Hoover, Alabama 35244.
Q. Okay. Have you ever had your deposition taken, what we're doing here?
A. I have.
Q. So you know a little bit about this. How many times have you been deposed?
A. Twice that I can remember.
Q. Dealing with your employment or were there any personal matters? I don't want to ask about personal.
A. No, just business.
Q. Business. When was that? When were

Page 8

they?
A. The last one was within a month or two ago, and the other one I can't even remember the date. Probably '98 to 2000, somewhere in that range.
Q. The one about a month or two ago, who were the parties?
A. Riverkeepers, SELC, GASP.
Q. Okay. And you were there as an employee of Bluestone Coke?
A. Correct.
Q. Is that right?
A. Yes.
Q. I'm going to ask you some questions today. If you don't understand my question, be sure to ask me to repeat it. If you answer, I'm going to assume you understood. Fair enough?
A. Yes.
Q. You're being recorded as you see, so be sure to answer out loud. She has difficulties -- she really doesn't, she's so good at this, but I like to claim she has difficulties with head nods and uh-huhs.

Page 9

A. I understand.
Q. So at times I might try to pull an answer out.
The only other thing I ask is we'll try not to talk on top of each other. I will confess I have a problem with that. But I will do my best to let you finish before I interrupt.
But I ask that you also let me finish. And I'm known to pause at times, so let me finish. It just makes it cleaner.
Where are you currently employed?
A. Bluestone Coke.
Q. What's your position?
A. I don't -- title, I don't really have a title. If I put it on a piece of paper, I put representative of the company.
Q. Have you ever had a title?
A. Sure.
Q. What was the last title you had?
A. Manager of technical services.
Q. How long have you been at Bluestone Coke?
A. I've been at that company, which had

Page 10

prior names, since December 1989. So what is that, thirty-six years?
Q. So when you say company, I'm thinking facility, right there.
A. Yes.
Q. You've been there since '89.
A. Yes.
Q. And then they had multiple names as I gather. What was it called prior to Bluestone Coke?
A. When I arrived, it was Sloss Industries.
Q. Uh-huh (positive response).
A. It went to Walter Coke.
Q. Walter?
A. Walter.
Q. Yes.
A. Walter Coke. And then ERP Coke and Bluestone Coke. Now, I will say under Walter, we were a Jim Walter Resource Company, so our name -- people would call us Jim Walter, but Walter Coke is what we were.
Q. Sure. You said you had manager of

Page 11

technical services as a title at some point. Was that for Bluestone?
A. Yes.
Q. All right. Did you have any other titles? Have you had any other titles since Bluestone took over?
A. Just representative of the company.
Q. Okay. Did you have a title prior to Bluestone?
A. The answer is yes, but I was -- all the way back to Walter Coke, I was manager of technical services.
Q. Okay. You say -- I asked a simple question of who are you employed by. Do you get paid by Bluestone Coke?
A. I do not.
Q. Okay. Who pays you?
A. Ascott Resources.
Q. Give me that spelling.
A. A-s-c-o-t -- I've got to look. Two Ts, and then Resources.
Q. Has Ascott always paid you?
A. No.

Page 12

Q. When did Ascott begin to pay you? And for the purposes, unless I say something different, Mr. Wiggins, I'm talking the period of time Bluestone took over, okay?
Let's do this before you answer that. Give me the date as best you can of when Bluestone took over the facility and it subsequently became Bluestone Coke.
A. My gut says August, but it may have been September of 2019.
Q. Okay. All right. Ascott Resource, when did they start paying you?
A. This is going to sound bad because I'm off by either a year. November -- no. December of '22, I believe, is the correct date.
Q. Okay. And who paid you before Ascott?
A. I don't remember what was on the check, but I feel like it was Bluestone Coke is what it was worded.
Q. Okay. Do you know if Ascott Resources pays other employees at the facility?
A. At the facility?

Page 13

Q. At the facility.
A. Yes.
Q. It does?
A. Yes.
Q. Is there any employees at the facility that are not paid by Ascott to your knowledge?
A. Not to my knowledge.
Q. While I'm on that question, why don't you tell me, what are we, February of '25, how many employees at the Bluestone Coke facility?
A. There are three people that work at the facility, and then we're down to three additional security employees.
Q. Okay. So the three what I'll call employees that work as you said, what are their names?
A. Of course, myself.
Q. Uh-huh (positive response).
A. Charlie Franks, Gullie Bryant.
Q. Gullie Bryant?
A. Yes. That's an i-e, not y.
Q. Thank you. What's Mr. Frank's

Page 14

position?
A. We're all just employees, representatives. No titles.
Q. What do they do?
A. Security, maintenance, grounds keep, whatever we're -- whatever is required basically.
Q. I didn't ask you what your duties and responsibilities are. What do you do?
A. Primarily --
Q. Everything?
A. Yeah.
Q. Give me something more than that.
A. The same thing those other two guys do and a little bit more environmental, which they do some environmental work, too.
Q. When you say environmental, what do you mean?
A. I'm the in between with EPA, ADEM. So I'm the face when they come to town. I'm -- I keep up with the RCRA program, RCRA program.
Q. How do you spell that?
A. R-C-R-A. What it stands for, I have to think for a while.

Page 15

Q. Why don't you give me what it is?
A. Resource Conservation & Recovery Act.
Q. Thank you.
What else falls under environmental?
A. State water, county air, hazardous waste with the state land, what is that, solids with the land.
Q. Anything else you do as being over environmental?
A. I mean, those -- I mean, no, that covers the -- I mean, there may be physical tasks, but we're not going there yet.
Q. Do y'all have consultants or engineers that assist you in these environmental tasks?
A. Yes.
Q. Do you physically do any of these tasks or do you kind of oversee the consultants and engineers and are the face with the state and federal agencies? Is that what I understand?
A. The only physical that I or the other two guys would do is a water pH sample daily.
Q. Okay. You're not involved in moving

Page 16

of hazardous waste physically? You don't do that?
A. No.
Q. Testing, air testing, soil testing, any of that, collections? You don't do any of that?
A. I don't do it, no.
Q. All right. We jumped with three current employees. Why don't we try to do it as best we can, as best you can, 2001 to 2000 -- excuse me. 2021 to 2023, did you have more than the three employees?
A. You need to clarify your question, because 2000 -- what was the first year, '21?
Q. '21.
A. At what point in the year, because that would matter.
Q. Okay. Let's start January, and you tell me when it shifted. And I appreciate that.
A. January of '21 there was a lot more employees, because the plant was operating.
Q. Correct.
A. And --

Page 17

Q. Give me a rough number of operating.
A. I could be wrong, but I would say eighty-five maybe.
Q. Okay. When did the plant cease operation in '21?
A. November of '21.
Q. Because I've seen September. I've seen October.
A. There was a slow down. There was a shutdown, picked it back up. There was a shutdown of 3 battery, and then there was a shutdown of 3 battery and 4 battery.
Q. Let's do this, because it's next somewhere in this little outline of, explain that to me. Let's do it now.
So it was fully operational as of January of '21?
A. Correct.
Q. And then walk me through, if you will, it's the best way I know to ask this, the procedure getting to the ultimate shutdown.
A. Okay. I cannot tell you March the 3rd or whatever like that, but I will tell you

Page 18

that at some point middle of the year to the end of the year we took Number 3 battery -- there are three batteries, 3, 4, and 5. We took Number 3 battery down for good.
Q. What is a battery?
A. Well, I'm sorry. I say good is not the word. Battery, it's a group of ovens.
Q. Thank you. Okay.
A. We took it down, idled it, and then we brought it back up a couple of days later. And then several weeks down the road, it was taken down for good.
Q. And do you know about when it was taken down for good? You gave me November as the ultimate date where it all was done.
A. I don't know the dates off the top of my head. My guess is in the second half of the year, August, August, September, November, somewhere in those.
Q. All right. That's the Number 3 battery. Keep going.
A. And then we did 4 and 5 batteries.
Q. After 3 went down, up, down for good?

Page 19

A. Uh-huh (positive response).
Q. So 3 is down for good?
A. Yep.
Q. And then you shifted to 4 and 5 at the same time or was it, again, you did 4, then you did 5 or --
A. You're hurting my memory. I can't remember. I think we did them at the same time.
Q. This will be the hardest thing you do all day, I promise. Okay.
A. I think we did them at the same time.
Q. Just down?
A. Uh-huh (positive response), took them down, and that was it.
Q. And, again, sometime late summer, early fall of '21?
A. That would have been the September, November.
Q. September, October, November?
A. September.
Q. And at that point -- I'm sorry. Go ahead.
A. I'm just thinking.

Page 20

Q. I know.
A. Yeah, I'm thinking it probably was 3 in September, and then that November would have been 4 and 5 completely.
Q. Okay. And at that point, the facility is no longer operational? Is that the right word?
A. Yes.
Q. Okay. When does it shift or does it ever shift to a reclamation project or am I just using the wrong term, wrong phase for your facility versus a mine?
A. Yeah, it's the wrong term.
Q. Okay.
A. But there are still plans to bring the plant back.
Q. Yes, sir. Okay. I'm just trying to find out my lack of knowledge.
Does reclamation come in when you're dealing with Bluestone Coke at all or is that a term of art that's something completely different that's really over at the coke facilities over there?

Page 21

A. I wouldn't use the term reclamation, because I think of that as a mining, restoring the land back to --
Q. That's what I thought. I didn't know if that also covered the coke plant, but you don't believe it does?
A. No, no. I can tell you there is a coke plant on the end of Finley Boulevard, Arkadelphia side that's still there, and it has been -- I don't know when it shut down. It was shut down when I went to it in the '90s.
Q. Gotcha.
A. And it's still there.
Q. What's the address of the Bluestone facility?
A. 3500 35th Avenue North.
Q. Okay. So I appreciate you giving me the history. Now my question is: Let's take it from when 3, 4, and 5 were down. So we can call it September, October, November. Don't care. They're down at the end -- towards the fall of '21. From then forward, how many employees?
A. There may have been about seventeen

after it was all down.
Q. What type of positions?
A. Mostly ex-operators and foremen.
Q. In '22 did that number change?
A. It has changed periodically ever since that date to last December.
Q. December --
A. December a year ago.
Q. December of '23?
A. Right.
Q. Beginning December of '23, were we down to the three that you currently have or were there more?
A. We were down to three, but one of those individuals was not one of the three.
Q. Okay. Who was the third?
A. Mark Scott.
Q. And who was not there?
A. Charlie Franks.
Q. Gotcha. So from the end of '21 to the end of '23, it slowly dropped from seventeen down to three; is that fair?
A. Correct.



Q. Do you know Rob Fowler?
A. I do.
Q. Was 3, 4, and/or 5 shut down prior to him coming on if you know?
A. I don't know the date that he started.
Q. Okay.
A. My involvement with him, I think, started after the plants were down.
Q. Okay.
A. And by the way, I do not include Rob in those numbers.
Q. Absolutely. Absolutely.
I'll ask another question. I've seen some e-mails, and I don't want to get into your personal business. You were out with some medical issue maybe in November of '21?
A. I had --
Q. I don't want to --
A. Yes.
Q. I don't want to know your personal --
A. Yes, I had a procedure.
Q. Were they shut down then?



A. Yes.
Q. Okay. Since the shutdown, what goes on at the facility? What do you have to do?
A. That changed -- it changed over time.
Q. Yes, sir.
A. I mean, initially, after we shut down, we did some remedial cleanup.
Q. Okay.
A. But after we got done or got that done, it all shifted to what I've explained earlier in maintenance of grounds, security, environmental.
Q. There are still environmental requirements at the facility?
A. Yes.
Q. I jump to Mr. Fowler. Mr. Fowler comes in. Do you know what his title was?
A. No. It would just be guesses if I gave you something.
Q. Prior to Fowler, prior to Rob coming on, who was your supervisor?
A. Freddie Revis and Tiger Lambert.
Q. When did -- what were their positions



and when did they leave, approximately?
A. They were co-general managers, I guess. They were over the facility. Tiger left first. I don't even remember. That's probably -- probably mid to end of '22.
Q. Okay.
A. And Freddie, Freddie technically -- I'm sorry. Tiger left, that would have been '21. Freddie technically is still there. I still have communications with him. He's just not at the facility.
Q. Where is he now?
A. Either Kentucky or West Virginia.
Q. Okay. Are you the highest ranking individual at the facility?
A. Repeat your question.
Q. Are you the highest ranking individual at the facility?
A. I'm going to answer yes, because the other two guys won't take that responsibility.
Q. Gotcha. Gotcha. Y'all all stand in line, and they step back, and you end up standing there?

Page 26

A. Yeah.
Q. I get it. At what point would that have started, you being, for lack of a better word, the highest ranking?
A. When Freddie left, and I -- if I had to put a date, it would have been in '22, but I can't tell you what part of the year.
Q. That's fine. After Freddie left, who did you report to?
A. Even before Freddie left, I dealt with Jay and Freddie.
Q. Okay.
A. I've never seen anything that says, Here's a chart.
Q. Okay. So you were dealing with Jay and Freddie, and then once Freddie leaves, it was Jay?
A. Primarily Jay.
Q. Okay. At any point in time did anyone ever tell you that Rob was your supervisor?
A. No.
Q. You've been at the coke facility a

Page 27

long time. Have you worked at any other facilities for Bluestone or the Justice family or any of their entities other than the coke plant?
A. No.
Q. Do you have any knowledge of what Mr. Fowler's duties were related to the coke plant?
A. I would -- that's an assumption, but it had to do with our environmental affairs.
Q. Okay. You reported to Jay and Freddie, and then Jay, and I've learned from taking Jay and Steve Ball's deposition last week that Jay kind of or does run the day-to-day operations of the coal and coke companies. Do you agree with that?
A. I don't have that knowledge. I mean, I don't -- I've never worked under the coal and coke or coal mining.
Q. Fair enough. For the coke operation, he is hands on. He kind of -- isn't he --
A. Yes, he's hands on.
Q. -- to run the operation?
A. Yes.
Q. Involved in all decisions?

Page 28

A. Major decisions, yes.
Q. Involved in major decisions, but also involved in any decisions that deal with spending even a dollar?
A. Yes.
Q. So all decisions related to expenditures, big and small?
A. In that way, yes, all expenditures, yes.
Q. And I would assume you can't do any of your environmental stuff and compliance stuff without his approval? You can't go hire those engineers; you can't do the testing that is required; you can't move hazardous waste?
A. I'm not going to agree with your statement.
Q. Give me which ones you can do that Jay --
A. I think --
Q. -- is not involved in.
A. I'm sorry for interrupting you.
Q. No.
A. I think it's more in general than to

Page 29

just say this or this or this. I mean, it's my responsibility to see that our DMRs are taken care of.
Q. What are DMRs?
A. Discharge monitoring reports for the state on our water side.
Q. So you -- we're going to take that. It's your responsibility to ensure they're done?
A. Yes.
Q. Do you physically do them?
A. No.
Q. Who does that?
A. I make certain that Enersolv, who is our water compliance sampling third party, that they do the testing, that they get the results. They put it into the state system.
Q. Yes, sir.
A. And then I would go in and certify it. But that can be done even without a payment to be made.
Q. No. Enersolv stopped working at some point and withheld data, as did Pace, as did Resource Aquatic, as did Regenesis. I can keep

Page 30

going.
You had consultants over the years at the coke plant that withheld data, withheld testing, and stopped testing because they were not being paid pursuant to their contracts, didn't you?
A. Not at the coke plant. I must clarify your statement there.
Q. Please, please. That's what we're doing here. I'm trying to learn.
A. They did the work. Take an example, Enersolv, the first one we're talking about, they did the work. Yes, they held the data to put it into the state until it got paid or an understanding of when they would get paid.
Q. Perfect. We'll take Enersolv. So they did the work, but they withheld the data. So the reports aren't being done because they're not being paid.
So even though you're responsible to ensure those reports are done, you can't ensure they're not being done if Enersolv is not being paid, right?

Page 31

MR. FRANKS: Objection. Compound.
Q. You can answer.
MR. FRANKS: You can answer.
A. In Enersolv -- your questioning leads to believe that there's a report due all along the lines. It's not. It's a one-time report due on the 28th of the month.
Q. I know. And it's due every month?
A. Every month.
Q. All right. And you know as well as I do --
A. Sorry.
Q. You know as well as I do that Enersolv, we'll take that one, refused to do the work because they weren't getting paid, or do you know that? I have e-mails to that effect. I'm asking do you know that?
A. Yeah, I know that at times they would not fill out the report so that I could certify it until they got paid.
Q. Right. So let's take Aquatic Resources. Do they have any dealings at -- I'm asking do you know any of that at the coke plant?

Page 32

A. I don't know who they are.
Q. Okay. Pace?
A. Pace? Enersolv took Pace's position.
Q. And before when Pace was doing it at the coke plant, they stopped collecting data and withheld data because they weren't getting paid.
A. I don't know about stopped collecting data, because we never once missed the collection of a sample. But withheld data, I do know that Pace withheld data.
Q. One Stop Environment, is that an entity? And I might have the name wrong. Do you know that? I can pull it. They deal with disposals at Bluestone Coke, which is an ADEM requirement. They had past due stuff in May through September of '22, and they would not perform work.
A. I don't know the name One Stop Environment, so are they a parent for somebody else?
Q. I can look. You don't know that one?
Regenesis, did that have anything to do with the coke plant or is that the other

Page 33

facilities?
A. No, Regenesis has to do with the coke plant.
Q. They stopped work, because they weren't getting paid in '22.
A. Incorrect.
Q. I've got e-mails that say Regenesis not paid, and they are not going to perform work -- any further work until they are paid. So that's not correct?
A. Stop work? Regenesis never started a job until they got paid.
Q. What job was Regenesis doing?
A. Underground injection.
Q. Who was doing it if Regenesis wasn't?
A. Regenesis is the only person that has ever done it.
Q. Okay.
A. At the coke plant.
Q. And when did that start?
A. Before we shut down.
Q. Okay. Well, let's take Regenesis. Let me show you what I'm going to mark as Exhibit

Page 34

2 to your deposition. It's an e-mail dated from you to Rob dated July 21st, 2022, Bates Number Justice 73566.

(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification and a copy of same is attached hereto.)

Q. Take a look at that for me.

MR. FRANKS: Rocco, you said this was Exhibit 2 on the record?

MR. CALAMUSA: It's 1. Did I say 2? I meant 1.

(Whereupon, a discussion off the record was held.)

Q. (BY MR. CALAMUSA:) That's an e-mail from you to Rob laying out trying to get a new contract for the second phase of the underground injection pilot study that has to be done?

A. That's what it appears, yes.

Q. And those are a list of dates where you've tried to get the contract signed and/or paid, and it wasn't done?

A. Yes.

Q. And without it, that would be EPA

Page 35

violations?

A. No.

Q. Well, let me show you Exhibit 2, Bates Number 73394 and 73395. This is a string of e-mails also from July of '22 from Steve Ball, Rob Fowler, Polly Hansen.

(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification and a copy of same is attached hereto.)

Q. The first e-mail at the top, do you agree that Regenesis did not complete the second phase of the underground injection pilot study?

A. They had not at that time, no, but they have.

Q. Okay. And do you dispute that the EPA issued -- demanded stipulated penalties in the amount of one million two hundred seventy-seven thousand five hundred dollars for failures?

A. I've never seen that.

Q. All right. You agree that Regenesis' work was necessary to maintain compliance?

A. Yes.

Page 36

Q. All right. And I'm not going to -- I'm going to show you -- I asked you about One Stop Environmental, and you didn't know that entity. Do you know Vacuum Truck Services?

A. No, sir. I mean, it's been video --

Q. Well, I'm going to show you a stack, and -- let me do this: Who was responsible -- what entity did y'all need to dispose of wood waste?

A. That would have been ADEM.

Q. ADEM themselves would do it?

A. No. You said what entity?

Q. Yeah. Who would -- who would actually move the wood waste?

A. I don't remember who did actually move the wood waste. I would have to research, but I will agree that we did have wood waste removed offsite after we shut down.

Q. Yes, sir. And part of that waste deals with that RCRA program you named earlier?

A. It would fall under either RCRA and/or ADEM's land.

Q. Let me show you what I'll mark as

Page 37

Exhibit 3 and 4 to your deposition.

(Whereupon, Plaintiff's Exhibit No. 3 was marked for identification and a copy of same is attached hereto.)

(Whereupon, Plaintiff's Exhibit No. 4 was marked for identification and a copy of same is attached hereto.)

Q. 3 is Bates Number --

MR. CALAMUSA: You need to take these down, D.G., or we can get them later, because these are my only copies.

Q. (BY MR. CALAMUSA:) 3 is Justice 58786 through 58792, a string of e-mails, August of '21, May of '22, and May of '22.

And Exhibit 3, Bates Number 58960 through 58965, again, string of e-mails --

THE REPORTER: That's 4.

MR. CALAMUSA: 4, yes, ma'am.

Q. (BY MR. CALAMUSA:) A string of e-mails in May of '22. I'm going to start by -- let me show you both, and I want you to look at Exhibit 4 first, because you are the one writing those e-mails.

Page 38

MR. CALAMUSA: Ray, that's my only copy. Do you mind if I stand?
MR. FRANKS: No.
A. Okay.
Q. (BY MR. CALAMUSA:) I'm showing you that so you'll see it says One Stop Environmental.
A. Okay.
Q. And see if that refreshes your recollection that that's the entity. And I don't expect you to know all of these off the top of your head.
A. Yeah, I didn't -- now I know why. If you would have said Ambipar --
Q. Give her the spelling.
A. A-m-b-i-p-a-r, that, I probably would have remembered it.
Q. Okay. Perfect.
A. I know what that one is.
Q. And this is the -- Exhibit 3 is, again, e-mails dealing with One Stop Environmental. They will not quote a disposal estimate until they're paid money that's past

Page 39

due.
Does that refresh your recollection that it was One Stop Environmental doing work that was necessary for compliance?
A. Can I look at this before you ask me a question?
Q. Absolutely.
A. Okay.
Q. My question was simply: One Stop Environmental was necessary to perform work to maintain compliance?
A. Yes, or somebody. The job was necessary.
Q. Thank you. That's a better way of saying it.
And as to Enersolv, you had to -- you sent multiple e-mails trying to get them paid so they could do the reports necessary for compliance? I think we've touched on this already.
A. Yeah, but I would like to speak a little more on that.
Q. Well, answer my question first. You

Page 40

sent multiple e-mails related to them not getting paid tasks that were necessary for compliance, right?
A. Again, I would like to answer, and that would give you an answer.
Q. Go ahead.
A. I start the week after the 28th sending a request for Enersolv to be paid knowing that it's going to be the 28th or around that when they get paid.
Q. The 28th --
A. So there will be an e-mail almost for every day or day of the week that I work, but it doesn't mean that that dollar figure is behind or that that work is behind.
Now, I will agree there have been times in the past that I had to say, This needs to be done or we won't -- or the MRN on the 28th.
Q. And there are times where they weren't paid and you had to keep on and do -- they weren't able -- because they weren't paid, they weren't either doing the work necessary or weren't turning over the data necessary for

Page 41

compliance issues.
Let me show you Exhibit 5, 22059 and 56, a host of e-mails from the November, December of '21 time period you're involved with.
(Whereupon, Plaintiff's Exhibit No. 5 was marked for identification and a copy of same is attached hereto.)
Q. Here we have a situation where below is a communication from Donnie Lane of Enersolv concerning NPDES compliance and payment that went to Sherry today. He sent a similar e-mail on Tuesday with no reply. Just not sure what to do.
On a separate note, Terracon went ahead and collected November samples this week for the quarterly as per RCRA order compliance despite not getting paid yet also. I feel like I'm digging a hole by being a broken record about these items.
You had trouble getting people paid, fair enough?
A. Yes, I will agree with that statement or question.
Q. All right. And getting people paid

Page 42

for items that were necessary, and I'm going to use the umbrella, for compliance, right?

A. Yes.

Q. Okay. And what's brought us down this little trail was you said you were over that and was to make sure they got done, but you couldn't make sure they get done if they weren't getting paid or if the company was refusing because of Jay's decisions.

While you're over making sure the reports get done and certifying them, you don't have any control over whether that company performs the work when Jay is refusing, do you?

MR. FRANKS: Object as to form.

A. It is my responsibility to make certain Jay knows what needs to be done.

Q. Yes, sir. That's different than you have the responsibility to ensure that the work is getting done and you have the autonomy and authorization to get the work done, isn't it?

MR. FRANKS: Object as to form.

Q. Those are two different things.

A. Yes.

Page 43

Q. Explain -- I've seen the word tossed around. I have some knowledge, but you clearly have more than me on permits. There are certain permits that are necessary. Are the permits necessary for the coke plant or is that just coal?

A. No, it's the coke plant, too.

Q. All right. What's necessary to get a permit?

A. Permits had to be in place when I got there.

Q. Yes, sir. Any updated permits? Did you have to update them? Any of the testing, any of the -- is there any data, anything that goes to getting a permit done at the coke plant or is that a one-time permit, we're good to go?

A. Well, start with, there's not just one permit.

Q. Absolutely.

A. I don't -- there is a test, a bag house test for the air permit, but I don't remember any other testing for that.

Q. Okay.

Page 44

A. And you do have to apply for a renewal.

Q. Thank you. All right.

A. Water, yes, there is testing that's needed to do for water, and you have to apply for renewal.

Q. Okay. And to apply for renewal, you have to have data and information for that?

A. For the water, yes.

Q. We'll take water. Yes.

What about air?

A. No. We didn't have to do air testing for that permit application.

Q. Okay. Is there any air testing that's done to maintain the permit or is that just a one-time application, it's good until it has to be renewed?

A. Before we shut down, there was air testing done daily.

Q. Yes, sir.

A. After we've shut down, there's no air testing.

Q. Are there fees that go along with the permits?

Page 45

A. There is an application fee, and then there can be what you call operating fees for air.

Q. What about for the water?

A. Water, there is application fees.

Q. You had no control over the payment of those permit fees, did you?

A. In your terms, no. But it was my responsibility to make certain the people above me knew what needed to be paid.

Q. Uh-huh (positive response). Your responsibility that they knew this was coming due, but you had no authority or authorization to get it done, right?

A. I could not make payment.

Q. You need electricity at the facility post -- even post-shutdown, right, for compliance for water treatment?

A. Electricity can be -- can be gotten in different ways.

Q. Yes, sir. We have Alabama Power.

A. Yes.

Page 46

Q. Okay. And what's another way, generators?
A. Generators.
Q. All right. But you need it in order to run a compliance program, and to keep the facility in compliance, you need some sort of power?
A. I haven't had power in a while. We're still in compliance.
Q. Well, you can't run water treatment tests and your water treatment system without your generators, because I've got a stack of e-mails from you begging for four hundred and fifty dollars for a part.
MR. FRANKS: Objection. Argumentative.
A. I don't remember which part that was, and I would like to see it. But we do not do the testing on-site, so we don't have to have power to do any compliance testing. That's done through a third party.
Q. All right. What do you need power -- does your third party need power to do the

Page 47

testing?
A. Not on-site, no.
Q. Okay. Well, I've got a stack of e-mails where you're asking for fuel. You're asking for diesel to operate machines to keep the power on, to run the generators. I've got four hundred and fifty dollars to run a generator part needed for water treatment.
You had to regularly ask for those things, correct?
A. I have to ask for everything.
Q. Yes, sir.
A. I can't buy anything.
Q. Yes, sir. And --
A. We've made that point.
Q. Electricity, running water, we'll use those two, water treatment, do you believe they're necessary at the facility?
A. Up until here recently, no.
Q. Okay. So here recently it's not or here recently it is? I didn't understand your answer. I apologize.
A. Up to here recently, there is now a

Page 48

need for electricity.
Q. And why is there a need for electricity now?
A. To put a pump back in service.
Q. Okay. And why is the pump being put back in service?
A. For the environmental concern.
Q. I'll show you a stack of documents I'm marking as Exhibit 6. These are a stack of e-mails. They are Bates Number 42236 through 238, 44041 and 42, 44257 through 9, 44530 through 32, 4496 -- excuse me -- 44936 through 39.
(Whereupon, Plaintiff's Exhibit No. 6 was marked for identification and a copy of same is attached hereto.)
Q. Mr. Wiggins, these are e-mails in March, February of '22 where you requested a fuse for a generator of four hundred and fifty dollars. Those are e-mails where you repeatedly requested four hundred and fifty dollars to fix the generator necessary for the water treatment system?
A. That's what they appear to be, yes.

Page 49

Q. And the water treatment system was necessary, and you were seeing an increase in pH due to it being down, correct?
MR. FRANKS: Objection. Compound.
Q. I'll break that up.
There was an increase in pH due to a biological treatment facility being down, not been able to run it, right? I'm reading your e-mail.
A. I don't remember that, but if you have an e-mail there, then I will agree to it.
Q. Okay. Well --
A. I would like to state --
Q. Exhibit 6 --
MR. FRANKS: I'm sorry. Did you finish your answer? Go ahead.
THE WITNESS: No, I didn't.
Q. (BY MR. CALAMUSA:) Go ahead.
A. I would like to say that that was in the period of time when we were still doing some cleanup and sending water that needed the BTF. Yes.
Q. Yes, sir. I'm not --

Page 50

A. But that may not be the case today. Things change.
Q. Yeah. Fair enough. But you were sending e-mails as part of Exhibit 6 where you said it was necessary, and your pH levels were increasing and that this was necessary, correct?
A. Correct.
Q. And you would agree in this time period this water treatment system, which you couldn't even get approval for a four hundred and fifty dollar part for, was necessary in order to remain in compliance?
MR. FRANKS: Objection. Argumentative. You may answer.
A. I will agree to that.
Q. Is what we just saw the fuse -- fuses for the water treatment system, as I understand biological treatment facility, is that different than a water pump?
A. Yes.
Q. All right.
A. Water pump could be a part of -- I don't know what you've got there.

Page 51

Q. Yes, sir. Exhibit 7, two e-mails, one Bates numbered 37008 and the other 36574.
(Whereupon, Plaintiff's Exhibit No. 7 was marked for identification and a copy of same is attached hereto.)
Q. The top one is an e-mail from Rob to Jay dated February the 4th of '22. The bottom one is an e-mail between you and Rob. I don't believe they go together, but they're two separate issues. Am I right?
A. I disagree with that.
Q. You think they go together?
A. I think they go together.
Q. Perfect. Well, that's why I clipped them together to begin with, but now I'm thinking they're not, because the second one he asks: Is the generator up, he being Rob to you, and the answer is, No, have not paid for tech to inspect it, right?
A. Correct.
Q. So the generator wasn't up because they wouldn't pay for the tech is what that says, right?

Page 52

A. They had not paid for the tech to come out and inspect the generator.
Q. Correct. Then the one on top of Exhibit 7, the first document, deals with the water pump and the generator. You've been sending requests, and the office has no power, because it hasn't been approved. That's what this says, correct?
A. I've never seen the top one, but correct.
Q. All right.
A. And this has nothing to do with the BTF.
Q. Correct, these are different. Now we're about to stack times where you couldn't even get simple things to do water, power, and compliance.
I have a host of e-mails that you need fuel from Great Lakes Petroleum, diesel, including fuel necessary to be able to do cleanup and water pumping necessary for compliance issues.
And so you know, these e-mails from

Page 53

you are almost daily from June of '22 through September of '22. Do you recall that?
A. I'm sure what you've got in your hand --
Q. All right.
A. The process has been and always has been submit a request. If it doesn't get paid, submit a request, and that's what I'm assuming you have copies of all my submittals, because I usually just forward the previous day's.
Q. Correct. You had no diesel to put into the equipment during this time period, equipment that was necessary to do compliance work, right? Fair enough?
A. Not having seen it, I would agree.
Q. Do you want me to mark it and look at them?
A. No. Sorry.
Q. I've got more. I've got needing gas for pumps, mowers, and trucks where you were requesting almost daily through 2022 fuel that was necessary in order to do compliance work at the facility, right?

Page 54

A. I think compliance would be a little loose on that one. I mean, if you wanted to say so that I could move around in a truck is making certain it's compliance, but to put into a truck and put into a mower, there's no requirements on permits for that.
Q. Pumps, pumps, mowers, trucks.
A. The pumps that that was referring to was to pull water out of a sump, not for compliance.
Q. Okay.
A. For rain issues would be my -- that would be my recollection of that.
Q. Would you agree or not that Rob Fowler did not have -- could not authorize equipment rental or repair of pumps necessary for compliance at the coke plant?
A. I'm waiting on you to stop.
Q. I paused. I'm guilty as they come.
A. I would agree.
Q. That he could not authorize major, minor repairs to construction equipment that were necessary for compliance issues?

Page 55

A. I would agree.
Q. Electricity for pumps or chemicals necessary to treat the ponds, he could not authorize that?
A. I agree.
Q. Couldn't authorize environmental consultants; do you agree?
A. He could not authorize them to start the work, but it would have been his responsibility just like mine to present the request.
Q. And when he was there, that was what you did then, too. You would present requests up to Jay, even when Rob was there.
A. Yes.
Q. Did your duties change from when Rob was around versus when Rob wasn't as far as what authority you had or what you had to do to get things done?
A. No.
Q. Okay. Did you do any fish tissue sampling?
A. Yes.

Page 56

Q. Similar to your other tests and sampling, Rob didn't have the authority or authorization to have that done?
A. No.
Q. He didn't have the authorization to get consultants to assist in disposal of industrial or hazardous waste?
A. Couldn't authorize it to do, no.
Q. Couldn't -- didn't have the authority or authorization to get temporary staff to assist with permitting and reporting?
A. I -- that's beyond my knowledge. I don't -- I didn't deal with his staffing.
Q. I appreciate that. All right. Didn't have the authorization or authority to get safety equipment or repairs, air monitoring, water monitoring, environmental studies, hazardous waste storage containers?
A. I would agree.
Q. Were there periods of time in late '21 into '22 and '23 where the facility didn't have power? I think you told me there was, right?

Page 57

A. Yeah. I don't remember the exact date. I want to say it was -- this right here will help me.
Q. Those are '22?
A. '22. So it would have been -- that's February. It was either January of '21 or December of -- excuse me. January of '22 or December of '21 when the power and water was taken off.
Q. Are there indoor bathrooms at the facility?
A. Not usable.
Q. Okay.
A. Well, let me rephrase my answer.
Q. Go ahead.
A. There are bathroom facilities inside the buildings that if -- they're usable, but you have to bring your own bucket of water.
Q. All right.
A. So, technically, you can use them.
Q. Gotcha. Portalets?
A. Yes.
Q. All right. Heat?

Page 58

A. In the buildings?
Q. In the buildings.
A. No.
Q. All right. Has there ever been an environmental manager at the coke facility?
A. I think I know what you're referring to.
Q. Perfect. That will jump me ahead three pages of the four I have left.
A. But the manager of technical services really, which I was, was over environmental program.
Q. Okay.
A. And I did have someone below me.
Q. Who was that?
A. Charles Jones.
Q. All right. Yeah, you're skipping ahead on my pages. All right. Anybody ever -- what was Charles Jones' title?
A. I don't remember. I mean --
Q. Charles Jones was laid off at some period of time?
A. Yes.

Page 59

Q. Do you know when?
A. Probably early '22.
Q. Okay. It would be fair to say there was a push by you and Rob to get him hired back?
A. Yes. You could probably find some e-mails about that.
Q. Yes. And what was he needed for, he being Charlie Jones?
A. Well, Charles knew the environmental better than I did, what needed to be done on a day-to-day basis.
Q. Okay. On the ground at the facility?
A. Yes.
Q. Okay. And Rob wasn't authorized to hire, was he?
A. Not to my knowledge, no.
Q. And despite you and Rob agreeing he was necessary, he being Charles Jones was necessary at the facility in order to do environmental compliance hands-on on a daily basis, he was not hired?
MR. FRANKS: Object as to form.
A. I don't remember exactly how it went

Page 60

down, but I remember conversations with Charles and that he didn't want to come back. So even if we had the approval, he wouldn't have come back.
Q. Well, I've got a stack of e-mails where y'all are pushing for approval, and the answer was no, right?
A. I -- I don't remember if I got one back. If you have one there, then I did.
Q. You remember Jay going -- words to the effect of: Why the hell isn't Don doing it?
A. Yeah, I do remember that, yes.
Q. Okay. And you responded to both Rob and then to Jay, correct, what Charlie Jones would have been necessary for different than what you do?
A. Yes.
Q. And as far as you know, the approval was never given.
A. As far as -- I don't know that -- I don't remember it being given.
Q. Do you recall there were certain requirements -- and you help me. I don't know if they're state or federal or is there a

Page 61

difference -- from dealing with removal of waste on the site once the facility was shut down?
A. That would be state.
Q. Okay.
A. But generally there is requirements for removal of certain things.
Q. Okay. And those are compliance issues, environmental compliance issues, correct?
A. They can be.
Q. Yes. Did y'all get all the hazardous waste material moved within the ninety days from the date the facility shut down?
A. No.
Q. While we're on names, tell me -- Rich Weaver, do you know Rich?
A. I believe that to be an engineer that they hired to work with Rob.
Q. Okay. At the coke facility or elsewhere?
A. To do work at?
Q. Yeah.
A. Work for or work at?
Q. At.

A. To work at the coke facility, yes.
Q. Okay. And what did he do if you recall?
A. Let me rephrase my -- he was at the coke facility. Was that what he was told, I do not know.
Q. I gotcha. He was at the coke facility. What did he do while he was at the coke facility to your knowledge?
A. I don't know. I have no clue what he did.
Q. All right. What about Brian Toth, do you know that name, T-o-t-h?
A. I don't know that name.
Q. All right. Did I understand that no one ever told you you reported to Rob, right?
A. No one ever told me I reported to Rob.
Q. All right. And as far as you're concerned, you always reported to Freddie and Jay, and then when Freddie left, you reported directly to Jay?
A. The lines have always been fuzzy, but



I've never been told I would report to Rob. I've always felt that my immediate supervisor was either Tiger and/or Freddie and Jay.
Q. Gotcha. And that's true during the time Rob was there?
A. Yes.
MR. CALAMUSA: Let's take a break. We've been going -- let's take about five minutes.
(Whereupon, a brief recess was taken.)
MR. CALAMUSA: Mr. Wiggins, I appreciate you coming down here. That's all I have today.
THE WITNESS: All right. Thank you.
MR. FRANKS: I don't have any follow-up questions. The witness, I believe, will read and sign.

(Whereupon, the deposition was concluded at 10:25 a.m.)

FURTHER DEPONENT SAITH NOT



C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I HEREBY CERTIFY that the above and foregoing transcript was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness.

I FURTHER CERTIFY that I am neither of counsel, nor of any relation to the parties to the action, nor am I anywise interested in the result of said cause.

TANYA D. CORNELIUS, RPR
ACCR #378 Expires 10/1/2025
Notary Expires 9/13/26



To: Raymond S. Franks, Esq.
Re: Signature of Deponent Don Wiggins
Date Errata due back at our offices: 30 days

Greetings:
This deposition has been requested for read and sign by the deponent. It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please Email the completed errata/witness cert page to cs-southeast@veritext.com
or mail to
Veritext Production Facility
2000A Southbridge Parkway, Suite 400
Birmingham, AL 35209
800-808-4958

ERRATA for ASSIGNMENT #7106370

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.

___ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________



Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

Page _____ Line ______ Change _________________________

_______________________________________________________

Reason for change _____________________________________

_____________________________________

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of

_________________, _______.

__________________________________

NOTARY PUBLIC / My Commission Expires:_____________