FILED
2026 May-13 PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

Docket No. 6:12-CV-00091-GFVT-HAI

NEW LONDON TOBACCO MARKET, INC.,     )
and FIVEMILE ENERGY, LLC,            )
                                     )
          Plaintiffs,                )
v.                                   )
                                     )
KENTUCKY FUEL CORPORATION and        )
JAMES C. JUSTICE COMPANIES, INC.,    )
                                     )
          Defendants.                )
_____)

DEPOSITION OF STEPHEN W. BALL

MAY 19, 2022

LORA R. BOATMAN, LCR, CCR

GATEWAY COURT REPORTING & VIDEO, LLC
606 West Main Street, Suite 270
P.O. Box 950
Knoxville, Tennessee   37901
(865)804-2500

Page 2

APPEARANCES:

FOR THE PLAINTIFFS:

John A. Lucas
W. Edward Shipe
R. Cuyler Haskins
BROCK, SHIPE, KLENK, PLC
265 Brookview Centre Way, Suite 6
Knoxville, Tennessee   37919
(865)338-9700

FOR THE DEFENDANTS:

Steven R. Ruby
CAREY, DOUGLAS, KESSLER & RUBY, PLLC
707 Virginia Street, East
901 Chase Tower
Charleston, West Virginia   25301
(304)345-1234

ALSO PRESENT:

Will Brownlow

Page 3

INDEX OF EXAMINATIONS

                                    Page No.
By Mr. Lucas                           5

INDEX OF EXHIBITS

Exhibit                             Page No.
16   JCJC's Real Property Transfers     14
     for No Consideration - Exhibit U
17   3/31/2022 Email from Linda Byrd    69
18   Requests for Production of         71
     Documents
19   2014 - 2019 Tax Form 1120S -       95
     Exhibit P
20   2020 Tax Form 1120-S              95
21   Asset Purchase Agreement         129
22   Assignment of Leases             129

Fowler v. Justice Family Group LLC
2:23-CV-01180-GMB-
Date 5/4/2026 Jury Trial
Plaintiff Exhibit Label No. 93

Page 4

STIPULATIONS

The deposition of Stephen W. Ball, herein, called at the instance of the Plaintiffs, taken pursuant to all rules applicable to the Tennessee Rules of Civil Procedure, and taken by notice on the 19th day of May, 2022, beginning at approximately 10:23 a.m., at the law offices of Brock, Shipe & Klenk, PLC, 265 Brookview Centre Way, Suite 604, Knoxville, Tennessee, before LORA R. BOATMAN, Licensed Court Reporter, pursuant to stipulation of counsel.

It being agreed that LORA R. BOATMAN, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewritten form.

All objections except as to the form of the questions are reserved to on or before the hearing.

It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, excluding the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

Stephen W. Ball                                                                    2 (5 - 8)

Page 5

STEPHEN W. BALL,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LUCAS:

Q.      Sir, would you go ahead and for the record state your full name and residential address?

A.      Stephen Wayne Ball, 1050 Hawthorne Hall Road, Fincastle, Virginia.

Q.      Is Fincastle right near Roanoke?

A.      It's 20 miles north of Roanoke.

Q.      Okay.  How far off the interstate?

A.      Probably -- it's where Route 220 and I-81 intersect.  So probably ten miles off of 81.

Q.      Okay.  Where are you employed, sir?

A.      I have offices in Roanoke, Virginia, and White Sulfer Springs, West Virginia.

Q.      Okay.  And who is your employer?

A.      Encore Leasing, LLC.

Q.      Okay.  And they -- how would you describe Encore's business?

A.      Really, Encore serves two functions.  It owns at least an aircraft, maybe two, but I'm not for sure on that.  And then it provides the payroll services to what I would call the corporate functions of the coal and farming business of the

Page 6

Justice organization.  And by "corporate," I mean its accountants, lawyers, engineers, things like that.

Q.      Jay -- and we were in the habit yesterday of using first names for a lot of things.  Are you comfortable if I just refer to Jay and Jill instead of by their last names?

A.      Yes.

Q.      Okay.  Jay yesterday testified at some length about how that worked with Encore doing payroll and just the whole process.  And my question is, is the process that Encore follows for the payroll and where it gets the money to meet payroll for the various companies -- is that process and your procedures the same as it was before Encore filled that particular role?

A.      The process -- what I would describe as the process of, I guess, collecting time and processing the payroll for the employees that are on that payroll, that part is the same.  Prior to, the employees were directly on what I would describe as an operating entity's payroll.  So like Blackstone Energy is where several of the corporate employees were technically employed.  There was a time where Bluestone Industries, Inc. served that function.

Page 7

But the process is the same.

Q.      The way as I understood it that Jay described it -- and I'm going to give you my understanding of what he said.  Obviously, I'm paraphrasing, and correct me if I'm wrong.  That if a -- if an employee works exclusively for a particular company, then all of the costs for that employee will be charged to and absorbed by that company.  Am I right so far?

A.      Yes.

Q.      Okay.  And that if an employee actually performs services for multiple companies, such as the lawyers and I'm assuming other people in the corporate office, that in that case, that Encore basically eats the cost and doesn't attempt to allocate out 5 percent to Company A, 20 percent to Company B, and so forth.

Is that a correct understanding?

A.      Just so I'm clear, you're saying in some instances there's no allocation of that?

Q.      My understanding of Jay's testimony was that in some instances for an employee that works for multiple companies, that the cost of that employee -- salary, benefits, whatever -- are not allocated to the multiple companies that he or she

Page 8

works for, but they are just absorbed by Encore.

Do you agree with that?

A.      Um, I don't know.  I -- I don't think of Encore as absorbing anything.  Jay may look at it differently than I do, but I look at Encore as -- essentially just as a passthrough.  And my understanding is to, you know, to as accurately as we can, capture overhead costs on income statements that we do allocate.

But if Jay thinks there's instances where they're not allocated, I'm -- I'm not sure what he -- I just don't know what that situation would be.  Because I think that the situations I'm aware of, they do get allocated.

Q.      Okay.  So let me kind of rephrase it, then.  Is it your understanding that if an employee works for, let's say, just hypothetically, five different companies but he's being paid by Encore, will that -- will the cost of that employee then be charged proportionately to each company that he or she works for?

A.      No.  No, I do not think it's that specific.

Q.      Okay.  How does it work, then?

A.      I guess what I'm thinking of is, is

Stephen W. Ball                                                      3 (9 - 12)

Page 9

like today, for example, you know, I do work for all of the companies. But my understanding is, I would be allocated to Bluestone's books because Bluestone is the primary operating company today, and that's where those overhead costs would be...

Q.    Okay.

A.    That's where they would be reflected. So like on nonoperating entities, I don't think we are attempting to capture like what I'm calling overhead costs, these corporate overhead costs. I don't think we're attempting to capture those on any idle companies or nonoperating companies.

Q.    Okay. Well, for companies that are not idle, that are operating companies, do you attempt to allocate overhead costs that are paid by Encore to each company for which a particular employee may provide services?

A.    Not that I'm aware of. My general understanding is, I think today it is all being captured on Bluestone's books.

Q.    Okay. And is that true for everybody that is paid by Encore?

A.    I don't know.

Q.    Why Bluestone?

Page 10

A.    Bluestone -- today, Bluestone and its subsidiaries are the majority of the coal operations within the organization.

Q.    Well, what -- are there employees who provide services for, say, the farming or timber operations?

A.    Yes.

Q.    How are their costs allocated?

A.    I don't know.

Q.    Does Encore handle the payroll and other costs for the Justice Family Group, the hospitality group?

A.    No.

Q.    Who does?

A.    The Greenbrier Hotel handles their own payroll.

Q.    Okay. Thank you.
      Is the procedures that you understand are now in place concerning the allocation of costs -- strike that.
      My understanding also from Jay's testimony was that prior to Encore fulfilling this role, it was performed in prior years by James C. Justice Companies and for some period of time by Justice Management Services. Is that correct?

Page 11

A.    Generally. But like I said, there's also been times where corporate employees have been directly on one of the operating entity's payrolls. We've not always had a separate entity like Encore or Justice Management Service processing payroll. But I would agree that at certain times those two entities have done it as well.

Q.    Let me ask you something I intended to ask you at the top. Share with me, then, without obviously revealing any specific discussions that you've had with counsel, what have you done to prepare to give your testimony today?

A.    I -- I met with Mr. Ruby yesterday. Spent some time on the phone with Mr. Ruby the day before. We had at different times discussed the deposition in prior weeks, just different parts of it.
      As far as documents, I reviewed the orders that are referenced in your discovery -- your recent discovery requests to us. I reviewed not the tax returns but the -- like the org charts that we submitted as part of those discovery responses, I reviewed those.

Q.    Are you talking about these org charts that have been marked as Exhibit 5?

Page 12

A.    Yes.

Q.    Okay.

A.    I reviewed the -- I think it was Exhibit O from the Haskins declaration, if that's what it was called.

Q.    (Displaying document.)

A.    Yes.

Q.    Referring to Exhibit 1?

A.    Yes.

Q.    And I'm going to set these exhibits in front of you -- they're not necessarily in order -- in case you need to refer to any of the exhibits that we've used so far.

A.    Okay.
      MR. LUCAS: We'll just -- all right with you if we just continue to use consecutive numbering?
      MR. RUBY: Sure.
BY MR. LUCAS:

Q.    Okay.

A.    All of these are -- I'm going to give you the exhibit number or letter from the Haskins declaration because that's what I had fresh in my mind.

Q.    Sure.

Stephen W. Ball
4 (13 - 16)

Page 13

A.    I reviewed R, S, T, and U from that declaration.

Q.    R is a disposal report, right?

A.    Yes.

Q.    And then S -- by S, do you mean the series of exhibits of S1 through 16?

A.    Correct.

Q.    And T is a deed of South Carolina property to Jay?

A.    Correct.

Q.    And I don't recall off the top of my head what Exhibit U was.  Do you?

A.    I was thinking it was a summary of the real property disposals.  And if I got that exhibit letter wrong...

Q.    Are you looking at Exhibit 14?

A.    Yeah.  The copy I had was landscaped format, so it looked a little different.  But I think that was Exhibit U.  But this is -- this is generally -- no, it was actually -- Mr. Lucas, it was a little different now that I think about it.

Q.    Okay.

A.    But I think it was U.  It was a similar document, but it's a little bit different.

Q.    Did you review any documents other

Page 14

than what you've described?

A.    I can't -- I can't think of any off the top of my head.

MR. LUCAS:  Can we mark this?

I'll substitute it, if you have no objection, a copy later that's not three-hole punched.  But if we can mark this as the next exhibit, which will be, what, 16?

THE STENOGRAPHER:  Sixteen.

(Exhibit 16, JCJC's Real Property Transfers for No Consideration - Exhibit U, marked for identification.)

BY MR. LUCAS:

Q.    I'm handing you what the court reporter has marked as Exhibit 16, which was Exhibit U to the Haskins declaration.

Is that what you reviewed?

A.    Yes.

Q.    Compare it, if you would, to Exhibit 14, and maybe we can just get it down to where we're looking at one document.

May I look at U again for a minute?

Other than the footnotes that are on Exhibit 16, does it appear to be the same data that

Page 15

is on Exhibit 14 for the Items 17 through 31 at the bottom, and 12 through 14 in the top portion?

(Witness reviewing document.)

THE WITNESS:  I think so.  They're in a little bit different order, but I think they're generally the same.

BY MR. LUCAS:

Q.    Okay.  Thank you.

As you reviewed those, did you see anything on any of those exhibits that you thought was inaccurate?

A.    I didn't really -- I didn't really review it for accuracy.  I was really just reviewing it for familiarizing myself with what was on it.  So I -- and I don't know how to answer it because it has the "unknown" under transferee.  So I don't know how -- I don't know how to describe that as accurate or inaccurate.  I mean, I don't think it's inaccurate for what you all presented, but...

Q.    All right.  For those transferees that are unknown, and it's on Exhibit 14, it would be Item 17 through 31, do you know who the transferees are in each case?

A.    Um, no.  There's a couple of them I can't tell.

Page 16

Q.    Well, which ones -- which ones can you tell?

A.    Like No. 30, for example, I believe that's the same as No. 14.

Q.    All right.  Why do you think that?

A.    It was just -- and maybe it's just -- when I was looking at what is now Exhibit 16, maybe it's just the acreage.  But given they were the exact acreage, I thought they were the same.

Q.    They do have different dates, two years apart.

A.    Okay.

Q.    Does that change -- had you noticed that?

A.    I had not noticed that.  So that would change my view on that.

Q.    Okay.

A.    But just generally when I went down the list, like No. 18 -- I can't tell what No. 17 is on Exhibit 14.  Number 18, my understanding is the Ayash Farms, which is located in Greenbrier County, West Virginia, is owned by Justice Farms of North Carolina.

Q.    Okay.  Are you saying that the transferee was Justice Farms of North Carolina or

Stephen W. Ball
5 (17 - 20)

Page 17

that it's now owned by them or both?

A.        It's -- I know for sure it's now owned by them.  I'm not aware of any intermediate transfer.

Q.        Let me ask you also to take Exhibit 12, because the ones we're looking at there that have "unknown" on Exhibit 14 were all taken from that property disposal report, which is Exhibit 12.

A.        Okay.

Q.        And I will represent to you, and you can see on the bottom it has a Bates number for JCJPost starting with 909.  And this was a document that you all produced to us in discovery.  And so if you look, for example, on 1231 for Item No. 17, if you go to the page that's numbered 5, Bates No. 912, you'll see that $800,000 transaction there.

Do you see that?

A.        Yes.

Q.        Okay.  And then -- but it doesn't identify the transferee.  So do you know who that land was transferred to in 2015?

A.        No.

Q.        How would -- what would we have to look at to know that?

Page 18

A.        I don't know.

Q.        Well, can you think of anything that would give the answer to that?  Any documents?

A.        No.

Q.        Okay.

Let's look at the next one, Land-Ayash Farms.  See if we can find that.  It's three million three.  And it's on the last page of Exhibit 12.  You probably see it highlighted there.

In two thousand -- in 2015, who was it transferred to?

A.        That's -- that's the property that we were -- or I mentioned a second ago.  I know today it's owned by Justice Farms of North Carolina.  I'm not aware of any intermediary or intermediate transfers.  I can't say for sure by looking at this document, but I believe that Justice Farms of North Carolina was the transferee.

Q.        Okay.  Next one is Land-Black River, and I think you will find that on the first page of Exhibit 12, a million one.  Who was the transferee of that in 2016?

A.        I don't know.

Q.        Do you know where we could -- what we would look at to find that out?

Page 19

A.        No.

Q.        All right.  The next one is Land-Westvaco for a million two.  And that is at the top of the second page of the exhibit.  Do you know who the transferee was on that?

I'm sorry.  Cuyler pointed out to me I said the next one was Westvaco.  I misspoke.  The next one is Huber.  So Huber is just above Westvaco on Exhibit 12.  So for the Huber land, do you know who the transferee was?

A.        On Huber and Westvaco, I believe the transferee is Bellwood Corporation.

Q.        When you say -- when you say "I believe," you know that forces me to ask what's your level of certainty in that?

A.        Well, I know that's who it's owned by today.  And similar to the Ayash Farm we just discussed, I'm not aware of any intermediate transfers.

I'll just be transparent with you.  The only reason I keep giving you that qualification is, for example, when we had the hearing in Frankfort, when you pointed out to me the day on that Black River deed, I was unaware of the intermediate deed that was the same day that you

Page 20

pointed out between Black River to JCJ, then to James C. Justice, III.  That's the only reason I'm giving you those qualifications.  But my understanding is, it went to Bellwood and Bellwood still owns it today.

Q.        I understand.  And I thank you for the clarification.

MR. RUBY:  He thinks you're going to pull out a document and say "gotcha."

MR. LUCAS:  No.

BY MR. LUCAS:

Q.        Both Westvaco and Huber you think went to Bellwood?

A.        Yes.

Q.        What was the reason for that?

A.        It was part of refinancing that was being done with Carter Bank.

Q.        How many refinancings have there been with Carter Bank?

A.        I don't know the specific number but there have been several.

Q.        Were there multiple refinancings in the same year at any time?

A.        Possibly.  I can't -- I can't recall the specific dates right off the top of my head, but

Stephen W. Ball                                                      6 (21 - 24)

Page 21

there was -- obviously, there's the one that involved Justice Farms of North Carolina that we talked about before.  There was one that involved Bellwood Corporation.

Going all the way back to 2014 when Kentucky Fuel and Virginia fuel were spun off from Southern Coal, that was a Carter Bank refinancing. So I'm sure some of these overlapped as far as being in the same year.  There was a refinancing that involved Oakhurst Club.  So there's been a few of them.

Q.        All right.  Were there multiple refinancings in 2016?

A.        I don't recall.

Q.        All right.  Tell me why these two properties -- or were there any other properties besides those two, Huber and Westvaco, that were transferred to Bellwood Corporation?

A.        I believe so.  Those two properties are located in Monroe County, West Virginia.  The Bellwood properties that are pledged to Carter Bank include some smaller tracts that were acquired over time.  And my recollection is, they were not originally acquired in Bellwood's name.  So I believe they would have been transferred as well.

Page 22

Q.        Well, there's one here, it's Item 26, Land in Monroe County.  Was that transferred to Bellwood, or do you know?

A.        I don't know.  I can't tell from that description.

Q.        Okay.  Well, the other smaller parcels that you described went to Bellwood, they went from JCJ -- can we call James C. Companies Inc. JCJ?

A.        Yes, that's fine with me.

Q.        Did they go from JCJ to Bellwood?

A.        My -- my recollection is they did. I guess the only thing I don't know is were maybe those properties being carried accounting-wise as part of what they described as Huber and Westvaco.

I mean, I know technically speaking, like in my mind, Huber and Westvaco were two distinct properties.  Those just reference the names of the buyers when the Justice organization originally acquired them.  And then over -- like I said over time, smaller tracts that were adjacent to those were acquired.

So I think if you looked at the deed, it's going to have multiple tracts on it.  I don't -- I just can't say for certain from an

Page 23

accounting standpoint where they may be aggregating all of those into the Huber and Westvaco description.

Q.        And I'm not asking you necessarily from an accounting point of view.  But from a transactional point of view, were there other deeds of other parcels to Bellwood that you know of other than Items 20 and 21 to the Huber and Westvaco tracts on Exhibit 14?

A.        My recollection is the property in Monroe County was conveyed to Bellwood.  I -- my recollection is it was a single deed.  I don't remember multiple deeds.

Q.        When you say "a single deed," there's Huber and the Westvaco.  Was that in one deed?

A.        That's my recollection, yes.

Q.        Okay.  And Item 26, a moment ago when I asked you about it, land in Monroe County, you said you didn't know who the transferee was.  Do you now think that that was Bellwood too?

A.        I can't tell for certain with that description, but my belief is if it was in Monroe County, West Virginia, and JCJ transferred it, it would have -- unless there was some third-party sale

Page 24

that I'm not recalling, I believe it would have been transferred to Bellwood.

Q.        Okay.  Why was property transferred from JCJ to Bellwood in order to facilitate a refinancing?

A.        Most of the refinancings were the result of Carter Bank had lending limits.  They increased over time.  But as part of being able to borrow more money to try to help with liquidity in the organization, Carter Bank over the years would come up with these suggestions of if there was a separate entity, they could loan -- that entity could have its own lending limit.

Q.        What were the lending limits you recall?

I think you -- I don't want to put words in your mouth, but I thought you testified in April that it was 60 million.  Is that right?

A.        I think very early on in the relationship it was less than that.  But I think by 2015, it was in the high 50s or -- it did eventually get to 60, and actually went above 60.

As it was explained to me by Carter Bank, it had something to do with their equity.  And so as their equity in the bank increased, their

**Page 25**

lending limits would crease some.

Q.        And was it your understanding that that was -- those lending limits were -- keyed, as you said, to the bank's equity or capital that they were a function of federal regulations as opposed to just the bank's own internal policy?

A.        Yes.

Q.        Okay.  And who told you that?

A.        When Worth Carter was alive, I dealt directly with Mr. Carter a decent amount.  And then my primary other contact was Phyllis Karavatakis. But all of my communications were with them.

MR. LUCAS:  Do you need that spelled, Lora?

THE STENOGRAPHER:  Yes, please.

THE WITNESS:  Every other letter is an A, it seems like.  K-A-R-A-V-A-T-A-K-I-S.

BY MR. LUCAS:

Q.        What was the first name?

A.        Phyllis.

Q.        Did you have any questions in your mind about the proprietary of setting up another lender when all of the companies were -- came under the Justice Family umbrella with common ownership -- strike that.  Let me ask you this.

**Page 26**

These other companies that were set up as a separate borrower, am I correct that all of them were under common ownership of the Justice Family?

A.        Yes.

Q.        And did you have any questions about the proprietary of that plan, to basically evade the lending limits by lending to a new company even though it was under common management with the prior borrower?

A.        No.

MR. RUBY:  Object to evade.

BY MR. LUCAS:

Q.        Did you seek any legal opinions on that issue?

A.        No.

Q.        Do you know if Carter Bank did?

A.        I don't know.  It was always their idea.  They are the ones that proposed it to us. And so, I mean, I don't think it ever occurred to us that they were doing something that would violate their rules and regulations.

Q.        Has it occurred to you since then that that could be the case?

A.        Um, yes and no.  On the one hand, we

**Page 27**

still have an ongoing relationship with them.  They seem to be more apt to just combine everything into a single lending relationship today.  And so that -- that makes me think they're not worried about that structure.  But then at the same time, you know, as part of the disputes and you look back at it, I mean, sure, you question it, but -- but I'm not aware of them having a legal opinion.  We never had one.  And they seem to just obliterate that today.

Q.        I understand.

Well, you said, sure, you questioned it.  Who did you discuss that questioning with?

A.        No one.  I'm just meaning in my mind.  When you think about it today, in some conversations -- in some conversations that I had when they first retained Troutman Sanders to start representing them in all matters that relate to our relationship, there was a lawyer at Troutman, his name was Jonathan Houser.  He made a couple of comments to me -- that's probably the first time, actually, I ever thought about it is he made some comments to me that the way that Mr. Carter was structuring those probably wasn't the best way.  But then right on the heels of that, he would come in with a request about wanting to cross-collateralize

**Page 28**

and demanding cross-collateralize.  And I would question him about, "Well, look, if you have concerns about what Mr. Carter was doing by creating these separate entities, it seems like to me you're blurring the lines even worse today by wanting to treat it as a single enterprise."  And that -- his -- he never really gave me an answer to that, frankly.  But since Troutman's involvement, they've actually been very aggressive about cross-collateralizing/cross-defaulting, treating it as a single relationship.

Q.        Okay.  The next item that we haven't discussed yet was Item 22, Beckley Office Building.

Who was the transferee of that?

A.        I believe it was James C. Justice, III.

Q.        And what was the purpose of that transaction?

A.        It was -- it was also related to Carter Bank refinancing.

Q.        So was James C. Justice, III, was he a borrower so that some of these loans were put in his name and then he put the money back into the companies?

A.        Yes.

Stephen W. Ball                                                             8 (29 - 32)

Page 29

Q.        So just like Bellwood Corporation would be a new borrower, then Jay would be a new borrower.  Is that fair to say?

A.        Yes.  His -- as I recall, his loan was never nearly as large as the entity loans.  But the Beckley office building and the land that it was on, the Black River Farm we've talked about before, those all became collateral for a loan he had with Carter Bank.

Q.        Okay.  And was that a personal -- a loan for personal use or a loan for business purposes?

A.        It was certainly used for business purposes.

Q.        Who did it go to?

A.        I don't have a specific understanding of that.  But generally, it just went back into the business.  It was used for business purposes.

Q.        Do you know which business it went into?

A.        Not specifically.

Q.        The next entry, Item 23 is Land-Beckley Office.  Is that just the real estate that the office building sat on?

Page 30

A.        Yeah.  And I think more, there was an adjacent lot that was a part of that office building.  I think some of the parking lot was on it.  So there were two different tracts.

Q.        Well, it shows that the value of that land was something over $2 million in Beckley.  What conclusions would you draw about the size of the property from that and your knowledge of where it was located?

A.        It's definitely a good location in Beckley.  It's on Eisenhower Drive, which is one of the busier roads in Beckley.  My recollection is it was three or four acres.  It actually was part of -- I think some of that value -- the office building and the lot, I mean, they're seamless if you were to look at them in person.  But part of the lot was -- there was a drainage project that came through, and it was a large -- a really large culvert was put in and then covered.  And you could use the lot for anything, but you could never build on that part of it.  But I think it was somewhere in the three and a half to four acre range.

Q.        Okay.  Number -- or correction.  Number 24, the Land-Custom Wildlife, who was the transferee of that?

Page 31

A.        My recollection is that was part of one of the transactions that was done with Farmland Partners.

Q.        Well, look at Exhibit 12.  And Farmland Partners was a transferee in the normal course of business to a non-related party, correct?

A.        Correct.

Q.        All right.  And they typically paid what everybody would agree on was fair market value for the property, right?

A.        Yes.

Q.        Okay.  Look at the Land-Custom Wildlife on the second page of Exhibit 12, and it indicates that there's no net proceeds.

Do you see that?

A.        Yes.

Q.        Does that change your answer?

A.        I still believe that property was transferred to Farmland Partners.  But as it relates to Exhibit 12 and Exhibit 14, I guess it's possible maybe there was an intermediate transfer.  So I can't say specifically that I know, based on looking at Exhibit 12, who the transferee was for the transaction described on Exhibit 12 and summarized on Exhibit 14 as No. 24.

Page 32

Q.        All right.  So is it your understanding that that land described as Custom Wildlife would have been transferred to some intermediate transferee, as shown on Exhibits 14 and 12, and then that transferee transferred it to Farmland Partners?

A.        I don't have an understanding of that.

Q.        Well, what is your understanding?

A.        Well, my understanding is my initial answer, which is it was transferred to Farmland Partners.  You directed me to Exhibit 12 and asked me if that changes my answer.  It doesn't necessarily change my answer, but it -- it certainly makes me question whether there could have been an intermediate transfer.  But I'm not aware of one.

Q.        All right.  Well, let me try to come at it this way.  The transferee that's shown on 12/31/16 on Exhibit 12, Land-Custom Wildlife worth -- or with an acquired value of $476,000 with no net proceeds.  Who did JCJ transfer that property to?

I'm not asking who ultimately wound up holding it, whether it was Farmland Partners or anyone else.  But who did JCJ transfer it to on

Page 33

December 31, '16?

A.    I don't know.

Q.    Do you believe that it is now owned by Farmland Partners?

A.    Yes.

Q.    And what is the basis for your belief?

A.    That a transaction was entered into with Farmland Partners. And that property -- my understanding is that property also goes by the name of Dials Bay, and I believe Dials Bay was part of the Farmland Partners transaction.

Q.    What documents have you seen that give you that understanding?

A.    That's just a general understanding of mine.

Q.    What documents would we need to look at to answer that?

A.    I guess ultimately we would need to look at the document with Farmland Partners.

Q.    Is that -- are you referring to a contract?

A.    I don't know what it was.

Q.    Okay.

A.    At a minimum, it would have been a

Page 34

deed. But I don't know if there was a contract associated with it or not.

Q.    The next entry is Eagle Rock Land, $55,000. And that -- you can refer to the third page of Exhibit 12, and you will see also there were no proceeds for that. So who received that land from JCJC?

A.    I don't know.

Q.    The next one we've already talked about.

So Number 27, the Budget Inn Motel, 238,000. Who was that transferred to by JCJ? And if you need it, it's on the page numbered 7 of Exhibit 12, Bates No. 914.

A.    My understanding is that was transferred to Oakhurst Club.

Q.    What's the basis of that understanding?

A.    There was a Carter Bank refinancing that involved Oakhurst Club. It involved properties located in Greenbrier County, West Virginia, and I believe this is one of the properties.

Q.    When was that refinancing?

A.    Um, I believe it was in 2016.

Q.    Do you know when in 2016?

Page 35

A.    My years are running together. Can I ask him something? I mean, I'll do it on the record.

THE WITNESS:  Do you remember when the flood -- what year was the flood?

MR. RUBY:  '16.

THE WITNESS:  I think it was in the March/April time frame of 2016.

BY MR. LUCAS:

Q.    Okay. Well, this indicates that the date this property was disposed of was roughly eight or nine months later, on December 31, 2016. So what was the purpose of this transfer of the Budget Inn Motel?

A.    It was part of the Carter Bank refinancing.

Q.    The refinancing that occurred seven or eight months earlier or eight or nine months earlier?

A.    Yes.

Q.    Okay. Can you explain that to me?

A.    I believe -- let me just -- this is just a guess, but I believe these disposals were probably done at yearend in the accounting system just based on how many of them are 12/31. Part of

Page 36

yearend cleanup, things that weren't captured in realtime throughout the year.

Q.    Okay. The next entry, Item 28, 881 acres of land, who was the -- who did JCJ transfer that property to?

A.    I don't know. I can't tell what that property is based on that description.

Q.    All right. The next one is Crestwood Estates, Item 29. Who was that transferred by JCJ to?

A.    I believe that was part of the Jay Justice/Carter Bank restructuring.

Q.    And which was that?

A.    Crestwood Estates. I believe that's a property in Raleigh County, just outside of Beckley.

Q.    So you think that went to Jay Justice?

A.    Yes, as part of the Carter Bank loan we described in conjunction with the Beckley Office above.

Q.    Okay. The next one is Item 30, 710 acres in -- it doesn't say where it is in. These are all on the same page, page 914 Bates number of Exhibit 12. Do you know who the

Page 37

transferee of that $2 1/2 million piece of property was to?

A.      No.

Q.      How about the next one, Item 31, 2,100 acres for 11 1/2 million?

A.      I believe based off of the -- what's in the serial number column of Exhibit 12, the reference to Brandon, I believe that's the Upper Brandon Farm that was transferred to Upper Brandon, LLC.

Q.      What's Upper Brandon, LLC?

A.      It is -- it's an entity wholly owned by Jim Justice.

Q.      All right.  And what was the purpose of that transfer?

A.      It was -- I don't remember the specific reference or purpose.  It was related to Carter Bank once again, because it remained pledged to Carter Bank.  But I don't recall Upper Brandon ever having a separate loan with Carter Bank.  So I -- I know it was something done with Carter Bank, but I just don't know the specific purpose.

Q.      Who would we need to talk to find that out?

A.      Jay would be the best person to know

Page 38

that, I think.

Q.      What about Jim?

A.      In my dealings, Jay has done most of the dealings with Carter Bank.  So I still think Jay would be the -- even though it was a Jim-owned entity, I still think Jay would be the best person.

Q.      But Jim was the sole shareholder of Brandon, LLC?

A.      Upper Brandon, LLC.

Q.      Upper Brandon.  I'm sorry.

A.      Yes.

Q.      And what you just described for the 2,100 acres, does that apply also to the 710 acres, Item 30, there on Exhibit 14?

A.      Until you pointed out to me the discrepancy earlier, I thought that it would have, but I don't -- I don't know now.  And the reason I say that is -- I mean, I'm aware of 710 acres in Prince George County.  And I would have thought it would have been part of or related to Upper Brandon, but I -- after that discrepancy you pointed out to me earlier, I just can't say for certain.

Q.      I take it from your explanation you gave a moment ago that these 12/31/16 might be accounting cleanup dates.  Am I correct, then, to

Page 39

infer from your answer that in looking at all of these transactions, Items 17 through 31, you can't tell from the disposal report, Exhibit 12, the actual dates of any of those transfers, correct?

A.      Correct.

Q.      And, in fact, can we even know for sure that the ones -- all the ones listed for 12/31/16, and there's a bunch of them, do we even know that all of those occurred in 2016?

A.      I don't know.

Q.      All of these, regardless of who the -- who the transferees were, all of them did involve JCJ, correct?  They were the transferor in each case?

A.      Yes.

Q.      Okay.  Can you share with me why none of these transactions were disclosed in your discovery responses other than the ones that are -- you know, some information is provided on Exhibit 12.

A.      I -- I don't know.

Q.      We went down that long rabbit trail after you identified some of the documents you did in connection with my preliminary question, "What did you do to prep for today?"  So let me go back to

Page 40

that.

A.      Okay.

Q.      As part of your preparation, did you review any transcripts of your prior testimony, either depositions or your testimony on April 18?

A.      Only -- yeah.  I missed that.  Only the April 18th.

Q.      Okay.

A.      I didn't review any prior deposition or the evidentiary hearing.

Q.      Okay.  Did you see anything in that April 18 testimony that you think was incorrect or a mistake that you need to correct?

A.      I -- I don't recall anything jumping out at me that was a mistake.

Q.      Okay.  Let me ask you just generally about the businesses.  Would it be accurate to say in terms of just the family businesses generally, that the businesses are thriving?

A.      No.  Certainly not the ones I'm involved in.

Q.      Is that just the coal businesses?

A.      I mean, I work on things for The Greenbrier, but I'm not in the day-to-day at The Greenbrier.

Stephen W. Ball                                              11 (41 - 44)

Page 41

Q.        Well, when you were referring to the ones that you're involved in, were you referring to everything other than The Greenbrier with the understanding you do a little bit of work for them?

A.        Predominantly, yes, sir.

Q.        Okay.  So the rest of the businesses are not thriving?

A.        No.

Q.        Okay.  In terms of the fundamentals of the business, do you think the fundamentals of your family businesses, the ones that you're involved in, are strong?

A.        Give me an idea of what you mean by fundamentals.

Q.        Just the common ordinary English use of it.

A.        Okay.  Well, so like Bluestone, for example, is a metallurgical coal company.  I think being in the metallurgical coal business today is -- that's a good place to be.  So I think there.  And Bluestone controls a significant amount of coal reserves.  You know, long enough that you could have a long-term mine plan.

So, you know, when you look at the fundamentals of that business, in theory, it should

Page 42

be really good.  The reality is, Bluestone is really suffering from the Greensill bankruptcy.  It's just really strapped for cash.  So if everything doesn't fall into line perfectly, it has a hard time overcoming that.  Like when equipment breaks down and things like that, there's just not enough cash to keep it operating.

The farming business has been significantly scaled back compared to what it was 15 years ago.  I think the small element of what's being farmed today, I mean, I think that has a potential of being a good business.  But, you know, unfortunately, you do have some companies that have significant legacy liabilities associated with them, like mining reclamation and things like that.  So there's a lot of diversity in there where it's kind of hard to broadbrush it.  You know, the whole thing is being fundamentally strong, but there certainly are some pieces of it that have the ability to be strong based on how they're positioned.

Q.        Okay.  Well, let me -- I'm just trying to get a feel for the overall picture, the macro picture.

A.        Yeah.

Q.        As you might imagine, Jay and I

Page 43

discussed some of the details at length.  But in terms of if you were just going to describe to someone -- and I'll limit it -- I started to say I would limit it to the businesses that transact with Carter Bank or that have a relationship with them.  Would that be all the coal businesses, coal and timber?

A.        It would not directly include Bluestone because Bluestone's debt with Carter Bank was refinanced by Greensill.  So Bluestone is caught up in Greensill instead of Carter Bank.

Q.        Okay.  Does it have any relationship with Carter Bank in terms of collateral it's given that bank or anything else?

A.        At one time all of Bluestone's assets were pledged to Carter Bank.  But since it refinanced with Greensill, and it was a series of refinancing in 2018 and '19, none of Bluestone's assets are currently pledged to Carter Bank.

Q.        Okay.  Well, in terms of the businesses that deal with Carter Bank and Bluestone combined, if I suggested to you that the fundamentals of the businesses were the strongest that they've been in years, would I be correct?

MR. RUBY:  Just object to the form

Page 44

on "fundamentals."

THE WITNESS:  Not -- not in -- they don't -- they don't feel like they're the strongest ever to me.

BY MR. LUCAS:

Q.        Okay.  Let me ask you a little bit about the role of the various shareholders and directors.  Is Governor Justice involved in any way since he became governor -- since 2017 until the present, is he involved any way in either the management or the control of JCJ or Kentucky Fuel?

A.        He's not involved in the management in any way.  He has retained his ownership as a shareholder.

Q.        Yeah, and that -- let me kind of explain the context of that because Jay and I had the same discussion.  I said I know he's a shareholder, and shareholders are certainly entitled to express their opinion.  I can express my opinion to the CEO of IBM, and he can either choose to ignore it or not.

A.        Yeah.

Q.        And so I understand shareholders are entitled to talk and entitled to express their opinions.  So my questions really go to whether the

**Gateway Court Reporting & Video, LLC**

Page 45

governor is involved in any way in the management or control, which is a little bit different than just making your views known or offering advice, and I had said initially of either Kentucky Fuel or JCJ. I'll broaden that to any of the companies in the family umbrella.

A.        Not -- not to my knowledge. Not with anything I deal with. You know, I do still have to deal with the governor some just from the standpoint he has personally guaranteed the Carter Bank debt, and he's also personally guaranteed the Greensill debt. And so anytime we're working through those issues, you know, he can be involved in those conversations. But I've -- since he's been in office, I've not had any conversations with him about the day-to-day business.

Q.        Were you involved in the preparation of the disclosures statement of his holdings that he had to file with the West Virginia Ethics Commission?

A.        Not directly. Terry -- I believe Terry Miller did that because Terry asked me a few questions, but they were specific questions about entities. But I wasn't involved in the actual preparation of it.

Page 46

Q.        I know he's no longer a director or an officer of either of our defendants, Kentucky Fuel or JCJ. Is he a director or officer of any of the family companies?

A.        Not that I'm aware of.

Q.        Could you tell me why -- when he became governor, why did he step down from his positions as officer and director of the many companies that he was either an officer or director of?

A.        I never had a specific conversation with the governor about that. My conversation was with Jay Justice. It was just advising me that when he took office he was going to step down in those positions, and for me to work with, you know, our people to make sure we reflected that in change of status-type reports with the Secretary of State's Office, and then internally do new shareholder resolutions nominating the new board and board resolutions reflecting that.

Q.        As a practical matter, did you have an understanding that that was just to try to reduce any potential for a conflict of interest with -- between his role as a manager of any of the companies and his role as governor of the state?

Page 47

A.        Yeah, as a practical matter that was my understanding. I never spoke to the governor directly about it, but that was certainly my understanding that that was the purpose of that.

Q.        And so it's your understanding that's the reason he's no longer involved -- in a nutshell, that's the reason he's no longer involved in the management or control of the companies; is that fair?

A.        Yes.

Q.        Okay. Who runs the mining companies on a daily basis?

A.        Jay.

Q.        I know that Jill is a director but not an officer. What does she do?

A.        Jill does not do anything on a daily basis with any of the coal companies.

Q.        As a practical matter, does she do -- I know she signs resolutions in lieu of meetings and board minutes and the like. My understanding is those meetings don't actually take place. They are basically papering the file. Is that fair?

A.        Yeah. We do not do -- given how many times, pretty much every day, that the family talks to one another, we do not do formal board

Page 48

meetings, and so we do those agreements in lieu of meetings.

Q.        Does Jay talk to Jill regularly about the business of either Kentucky Fuel or JCJ?

A.        I don't know. I know he talks to Jill regularly, but I don't know the -- I don't know the extent of those conversations.

Q.        Do you know any decisions on behalf of either defendant, Kentucky Fuel or JCJ, that Jill has offered input in connection with making any significant decision?

A.        No.

Q.        Do you think that she doesn't or do you think, well, she probably does but I'm just not aware of it?

A.        I -- I just don't know the extent of her and Jay's conversations.

Q.        Okay. Jay -- I take it you would agree with this, he describes himself as a pretty hands-on guy.

A.        Yes.

Q.        Involved in operations a lot.

A.        Yes.

Q.        How often does he visit the mines?

A.        Multiple times a week. I don't know

Page 49

that you could say every single day, but it's certainly multiple times a week.

Q.   You've got now, what, seven or eight active operating mines?

A.   Um...

Q.   I know a couple of them go idle for short periods of time and then resume again. But counting those as operating, how many operating mines do you have?

A.   I think seven's right.

Q.   Okay. And does Jay visit -- even the ones that may be idle, does he visit those regularly also?

A.   Not nearly as regularly, but yes. If we have something going on from a reclamation standpoint, like in Southwest Virginia there's only one mine currently running in that area, but I know he has gone down there to meet with the Virginia Department of Mines and Minerals director. They've met down there. So he does things like that too.

Q.   Well, when he goes out to mines that are operating, just as a practical matter, he's president and CEO, what does he do when he goes out there?

A.   You know, I -- I can only base it on

Page 50

the times I've been with him, which is not so much recently. But when I'm with him, he will meet with the foremen on site. Ask them, you know, how things are going. He'll check with them on, "Do you have any equipment running?" and things like that. He always checks with them to see if they've had any safety issues or safety complaints. And then normally we'll ride around the job with the foremen to look at the next areas of work, to kind of ask them, "What's your game plan for when you move over there?" and things like that.

If he sees something that's not consistent with his prior visit, you know, he'll ask them, "Why is this different than what we had discussed last time?" Those kind of conversations.

Q.   And you said he does -- he visits typically the operating mines multiple times a week?

A.   Yes.

Q.   Is he pretty much doing these visits five or six days a week?

A.   Um, I'd say four or five days for sure, I would say.

Q.   And the mines are, what, in both West Virginia and Virginia?

A.   (Witness moves head up and down.)

Page 51

Q.   Any in Kentucky?

A.   There's one in Kentucky.

Q.   So they're spread out over three states. How does he get there? Does he use a helicopter?

A.   Occasionally. I do know he uses that some. The mines in West Virginia, he will drive to those sometimes because five of the seven mines are in West Virginia and they're all very close in proximity. So he'll occasionally drive to those. I think he typically does use the helicopter for the Virginia and Kentucky mine.

Q.   Does he ever use it for the West Virginia mines, or does he always drive?

A.   Oh, no, he definitely uses it some for West Virginia. But there are times -- you know, the helicopter is very weather dependent. There's time if weather won't allow it and he wants to go to West Virginia, he'll drive.

Q.   When he's making these visits, what -- in terms of hours, what does the day look like? Is this a leave in the morning, come back late in the afternoon? Generally, what's the timetable?

A.   More late in the morning or

Page 52

midafternoon, or early afternoon to late in the evening.

Q.   Okay.

MR. LUCAS: I'm going to go into an entirely different subject area. Would this be a good time for a short break?

MR. RUBY: Yes, it would.

(Whereupon, a recess took place from 11:24 a.m. until 11:36 a.m.)

BY MR. LUCAS:

Q.   You wear two hats. One is general counsel for multiple companies, and another one is as an officer, correct?

A.   Yes.

Q.   And for -- let's take Kentucky Fuel and JCJ. What officer position do you hold with those companies?

A.   Vice president.

Q.   Jay at one time I think was the executive vice president. Are you the executive vice president?

A.   I'm sorry. I didn't mean to jump in there. Yes, I am.

Q.   Okay. Are there other vice presidents?

Stephen W. Ball                                                                14 (53 - 56)

Page 53

A.    Not officers.  We have a few people that have like a "vice president of" title, but they're not officers of the company or companies.

Q.    Okay.  So it's just a title?

A.    Yeah.

Q.    Who are the officers of the company besides -- of Kentucky Fuel besides you and Jill?

A.    The officers are me and Jay.

Q.    I'm sorry.  I misspoke.  I didn't mean to do that.  You and Jay.  Anybody else?

A.    And Terry Miller is the secretary.

Q.    What about for JCJ?

A.    Yes, the same thing for JCJ: Myself, Jay, and Terry Miller.

Q.    All right.  What role does Terry Miller have in connection with any litigation?

A.    None.  And he has no role with either of the companies.  He's a longtime Justice Family employee.  Just being honest with you today, I do the secretary role.  I was formally the secretary, and it ties in with the general counsel-type role anyways.  So Terry Miller does have that title, but I do all the secretarial functions.

Q.    Does he do anything?

Page 54

A.    He works day-to-day at The Greenbrier, but he does not do anything on the coal or ag businesses.

Q.    What does he do at The Greenbrier?

A.    He's had different roles over time.  I believe today he is -- it's -- I want to say his title is vice president of operations.  But his primary responsibilities are, he looks over the warehouse at The Greenbrier and the security function.

Q.    Okay.  How do you, just in your own mind, distinguish between what you do as general counsel and what you do as vice president or executive VP?

A.    I mean, there are certain things that are easier to distinguish than others.  In the executive vice president role, you know, sometimes I'll work on projects that clearly aren't legal in nature.  And then there are things like, you know, when you're involved in litigation and things like that, that's clearly legal in nature.  So it's not always a bright line.  So I don't know that I really think about things that way in my head as I'm working on them.

It's a long-winded answer.  There

Page 55

are some things that are clearer to me than others when I'm doing that.

Q.    Was Roger Hunter previously the general counsel?

A.    Yes.

Q.    And do you fill the role that Roger used to fill?

A.    Yes.

Q.    Okay.  You hesitated a little bit when you said that.  Is there any qualifications to that?

A.    Roger, where he was solely focused on legal, you know, there's probably some legal things that -- Roger reported to me.  But like Mr. Hatfield, for example, he does some things that Roger used to do.  So I don't do -- my only hesitation was I don't do everything that Roger did.  But when he left, I took the general counsel title back.  But as far as filling his job duties, that's been more Pat's work.

Q.    Okay.  Who does -- what is it that Roger Hunter did that you don't do?

A.    So like the -- some of the direct litigation, like what Mr. Hatfield does today, I don't do any of that.  Roger was physically based at

Page 56

The Greenbrier Hotel, and so he did more day-to-day legal things at the hotel than what I do today.  He was way more involved with human resources and advising them on things that they were dealing with.  I do that only when it rises to the level of like a grievance or an arbitration.  But as far as meeting with HR on a weekly basis, I don't do anything like that, and he did stuff like that.

Q.    Okay.  You said that you don't do direct litigation like Mr. Hatfield.  What did you mean by that, "I don't do direct litigation"?

A.    I really don't make appearances in court cases.

Q.    Oh, okay.

A.    I mean, I have on occasion, like if we have a really small -- especially prior to Mr. Hatfield starting.  If we had a really small matter in West Virginia that we just needed to get an answer filed or something like that, I would occasionally do that.  So it's not like I've never made an appearance.  But if it's something that's going to be protracted litigation, I don't make appearance in that.

Q.    Do you ever -- in either small matters or bigger matters, do you ever prepare

Page 57

pleadings or motions or anything that's going to be filed with the Court?

A.    No.

Q.    Now, who else is in the legal department besides you and Mr. Hatfield? Dustin Dean?

A.    No longer. He was in the legal department from, uh, the end of 2012 through the beginning of 2018.

Q.    Okay. And what was his role?

A.    He was associate general counsel. And, I mean, basically, was kind of a catchall for things that Roger needed help on, or at the time H.A. Dudley was there. If they needed help, he would assist with that. He did make -- he is a Virginia-licensed lawyer. He would make appearances in some matters in Virginia. And on occasion he would help me if I was working on a commercial matter and just needed an extra set of hands. But he was more -- he was more involved with litigation matters than commercial matters.

Q.    All right. And how many lawyers do you have now in your legal department?

A.    Myself. Ron Hatfield. And then there is one lawyer that's based in Birmingham,

Page 58

Alabama. His name is James Seal, S-E-A-L.

Q.    What does he do?

A.    He just -- he's a younger lawyer. And for the most part, he just handles the smaller litigation that we have in Alabama.

Q.    Only in Alabama?

A.    Only in Alabama.

Q.    Okay. And does Ron Hatfield report to you?

A.    Yes.

Q.    And what's his role?

A.    Ron is in charge of all litigation in West Virginia and Kentucky.

Q.    Who are his clients?

A.    He's -- he's handled a handful of Greenbrier matters. Obviously, Kentucky Fuel and James C. Justice Companies. He's made appearance in some Bluestone cases and a case involving Tams Management. So, basically, the Justice organization.

Ron started with the -- with the -- what I'll just generically call the Justice Companies in September of '21. In his private practice prior to that, he was doing some criminal work. And so he's had a couple of those criminal

Page 59

matters he continues to do outside of the Justice organization. But the intent is, once those wrap up, he would exclusively be in-house to the Justice organization.

Q.    Does Ron have experience in commercial litigation in what you or I might call complex litigation?

A.    I believe so, yes.

Q.    Okay. What kind of complex litigation has he ever been involved in?

A.    When he was in private practice, he was involved in several asbestos cases. He predominantly did insurance defense work. And so I know he handled several asbestos cases. And he also handled some commercial matters involving coal companies, things like that. But, I mean, that's just what I learned from interviewing him.

Q.    What kind of commercial matters involving coal companies has he had experience in?

A.    The ones that he mentioned to me, they were -- as I best recall, they involved like land disputes. Like, um, I guess, a mineral -- mineral dispute. And I think -- I'm trying to think now. I think another one was an employment dispute. I called it commercial, but he -- it was for a coal

Page 60

company, but I think it was an employment dispute.

Q.    All right. Do you know if he ever handled any commercial cases -- I'm carving out the "asbestos" word. Any commercial cases where the amount in controversy was over, say, $5 million?

A.    No. I've heard him talk about a couple of med-mal cases he had that had large exposure, but I don't recall him specifically discussing a commercial case that had that type of exposure.

Q.    Any over, say, a million dollars? Commercial cases; not med-mal or personal injury or the like.

A.    I don't know.

Q.    Okay. Do you know if he was ever involved in any cases that required significant document management involving the production of more than, say, 5,000 pages of documents?

A.    Not specifically, no.

Q.    Do you have that kind of experience?

A.    Not as a direct litigator, but we certainly have involved -- been involved in a couple of cases that had significant discovery.

Q.    And when you say "significant discovery," what do you -- how do you define that?

Stephen W. Ball                                        16 (61 - 64)

Page 61

A.    Just, um, I guess substantial production is what I was thinking of.

Q.    Well, in "substantial production," some people think -- some lawyers may think 500 documents is substantial production.  Some may not think it's substantial until you hit 50,000.  What's your --

A.    Well, I'm not thinking of 50,000, but I'm thinking of, you know, more than 5,000.

Q.    Okay.  Well, tell me how you manage your document production in big document production cases.

A.    Typically, it's handled through the lawyers.  I mean, we're asked to collect certain documents, and we collect those and give them to the lawyers.

Q.    You're referring to outside counsel?

A.    Yes --

Q.    Okay.

A.    -- predominantly.

Q.    How do you go about -- hang on.  I'll withdraw that.  I'll come back to that in a minute.

You said earlier Ron Hatfield reports to you.  Does he also -- is he authorized

Page 62

and does he communicate directly with the principals of the companies as his clients, or does he always have to go through you?

A.    No.  He -- I mean, he -- he typically does go through me.  But, I mean, there are times I will ask him to reach out directly to Jay, you know, especially if that's -- if I'm going to be unavailable for something and something is time sensitive, I'll have him reach out directly to Jay on things like that.  I'm not aware of him ever -- I don't think he's ever communicated with the governor, and I don't know if he has ever directly communicated with Jill.

Q.    When he's been authorized or when he has talked to Jay, is that -- is your approval always required for that, or just as a practical matter, does he have the authority to pick up the phone or walk into the office and talk to Jay about any particular -- if it's a significant issue in a case?

A.    I don't think the channels are that formulized.  I mean, I've certainly never told him, "Don't you ever talk to Jay without me."  I think given his newness, he tries to always go through me first.  But I've never told him, "You can't go

Page 63

directly to Jay."

Q.    Okay.

A.    And I will tell you, I think he always tries to go to me first.  And so far -- I mean, he's, you know, he's been here less than a year.  So far, it's only been when I've told him he needs to go directly to him just because I'm tied up.  That's the only times I'm aware of him going directly to him.

Q.    I'm not asking the substance of any communication between him and, Jay, but do you know whether or not he has communicated directly with Jay about any of the matters in this lawsuit?

A.    Not to my knowledge.

Q.    Okay.  Has he been forbidden from doing that in any way?

A.    No.

Q.    In your view, knowing everything you know about the case -- and I'm not suggesting an answer on this.  I just want to know.  In your view, has he in any way dropped the ball?

A.    No.

Q.    Has anyone else dropped the ball?

A.    I guess the best way I could answer that is, I certainly have a different view today of

Page 64

the April 2021 order than I did at that time.

Q.    Okay.  Can you explain that to me?

A.    Um...

Q.    Do you need to refer to the order to answer that?

A.    No, no.  So here's all that I would say about that is --

MR. RUBY:  Without going into specific conversations between counsel.

THE WITNESS:  Yeah, without going into specific conversations.  After that April order, I understood that we needed to provide additional information.  I did not personally read the order at that time.  The only thing I read was -- I don't even know what you call it.  When the Court sends out one of their electronic communications and sometimes there's like a summary in the body of the email.

BY MR. LUCAS:

Q.    The ECF notice?

A.    Yeah, whatever was in the body of that email from -- on that ECF notice, I read that.  And then I worked with Chris Schroeck to collect the documents.

Page 65

Q.        Okay.  Well, you said your -- well, strike that.

You read the ECF notice that basically sent out that April discovery order?

A.        Yes.

Q.        Okay.

A.        It was -- I believe it was either cut-and-pasted in an email to me or forwarded to me.

Q.        Okay.  And you understood from that that the Court had granted our motion to compel and compel the production of additional documents.  Is that fair?

A.        Yes.

Q.        Okay.  Is there any particular reason why you didn't read the order itself?

A.        No particular reason other than I -- it's just not something I typically do.  It's not my primary focus.  It's not something I typically do.

Q.        Okay.  You said you have a different understanding now than you had then.  What's your -- what's your understanding now and how is it different?

A.        My understanding after -- so that understanding has changed, I guess, gradually over time after your all's motion to compel was filed

Page 66

last fall.  And then -- or motion for sanctions, I'm sorry.  And then reading Judge Ingram's March of this year order, the one that basically ordered these depositions, I did read that order.  And...

I don't know how to answer it any further than that without getting into further conversations.

Q.        I don't want you to characterize any conversation that your lawyer had with you.  Obviously, I'm not entitled to that at this point.  All I want to know is how you now understand that original, I'll call it the discovery order, from April of 2021.

A.        I guess the best way I can characterize that is how insufficient the Court has deemed our May and June supplementation to have been.

Q.        All right.  Take a look at Exhibit 7.

A.        Okay.

Q.        Look back -- and this is one you said you had read, correct?

A.        Correct.

Q.        Okay.  Flip back to page 10.  In the middle -- or above the middle of the page, after

Page 67

that quotation and the cite to D.E. 505, it reads, "Clearly, the Court ordered discovery of information related to the hundred-plus business entities the Justice Family claimed to own."

Were you aware of that before you read this order?

A.        No.

Q.        Okay.  At the risk of stating the obvious, you were aware of it after you read the order, correct?

A.        Yes.

Q.        And what -- what follow-up procedures were taken after you read this order?

Phrased another way, what did you do as a result of it?

A.        So shortly after we received this order, we received your discovery requests, I guess in advance of these depositions.  And so the fact of the matter is, we're very, very thinly staffed from a resource standpoint.  It's very difficult to keep up with our -- what I'll call our day-to-day normal activities, you know, in addition to when you get something in like this for discovery.  And so it's just hard to -- from a resource standpoint, it's hard to get to all of it.  And so we initially

Page 68

focused on the discovery requests and supplementing the information that we have previously provided.  And so that's what we've been able to do so far.

Q.        Well, this order was entered in May -- excuse me, in April of this year.  What supplements have you provided since then?

A.        I believe this was in March.

Q.        I'm sorry.  I misspoke.  You're correct.

A.        So in addition to what I'm calling the discovery responses that you -- I forget exactly when you issued them, but like a week or two after this.  So we did that.  And then --

Q.        Wait a minute.  I didn't understand that.  You said the discovery responses that we issued.

A.        Or the discovery requests that you issued.

Q.        Okay.

A.        Like, shortly after this order came out, we received discovery requests, which I think they were only requests for production of documents.  And so what I'm saying is, from a resource standpoint, we focused on those first.  And then after we provided those responses -- after we

Page 69

provided those responses, my understanding is we provided some additional tax returns and bank statements and things like that, which were intended to be supplements to our May and June of '21 supplemental disclosures.

Q.        You did give us some supplements, and you did it on the 29th day of April --

A.        Okay.

Q.        -- of this year. And that was a -- you gave us a supplemental response to the document request.

MR. LUCAS:  Can I get a sticker from you there, please?

(Exhibit 17, 3/31/2022 Email from Linda Byrd, marked for identification.)

BY MR. LUCAS:

Q.        I'm going to show you what's been marked as Exhibit 17. And you'll see the first page is an email from Linda Byrd to Mr. Hatfield, which actually transmitted the discovery requests. The second page is a letter that she mailed to him doing the same thing. The actual discovery request begins on the third page. And you will see that it is -- and take a minute and read it to the extent you need

Page 70

to.

You can see from the title and then reading the body on the first page, that it is a request for supplementation both of your prior interrogatories and the document requests. And the period for which supplementation is requested is between -- if you look in the middle of the texts there, between May 17 as well as June 7, which was the date of your third supplemental response, and the date that the supplementation is provided. So it was roughly a -- roughly, a one-year period that we were requesting supplementation both of your prior interrogatory response and prior document requests. Do you see that?

A.        Yes.

Q.        All right. And you are correct, you did provide a supplement to the document requests.

There's been nothing provided in connection with the requests for supplementation of the interrogatories. No answer, no objections, no nothing. Can you tell me why that is?

A.        No.

Q.        Now, that was all what you did in response to this discovery request, Exhibit 17. My question originally was, what did you do -- let me

Page 71

ask you this. I'm going to rephrase it slightly.

After we filed the sanctions motion that you referred to, which was filed in August of last year. As a result -- did you read that motion?

A.        Yes. But can I clarify one thing?

Q.        Sure.

A.        This isn't actually the request I was referring to. I mean, I understand why you went through this with me. But in my prior answer, there was -- I think there was like an eight or nine item request for production of documents. And that's the one I -- when I said we got to work on that first, that's the one I was referring to. And then after we finished -- then after we finished that, we started working on supplementing prior responses. I just wanted to make that clear.

Q.        And thank you for that clarification. All right.

(Exhibit 18, Requests for Production of Documents, marked for identification.)

BY MR. LUCAS:

Q.        I'm going to hand you a copy of what has been marked as Exhibit 18. And that one is just a request for production of documents; not an

Page 72

interrogatory. And so if my earlier question misled you by mixing the two together, I apologize for that.

Your response was a response to -- when I said "what did you do as a result," I was asking you as a result of the March sanctions order. And you referred to that supplementation. But that was actually in response to this discovery that's been marked as Exhibit 18, correct?

A.        Yeah, that's what we got to work on first was this Exhibit 18. We got to work on that first, and then -- and then we worked on supplemental document production.

Q.        Okay.

A.        At least I don't think they were produced at the same time. I wasn't involved in the physical production of them. I think there was a later production of documents that was not in response to Exhibit 18.

I think -- I don't recall really seeing Exhibit 17 before. I don't think I've seen that. But I -- but I knew that a request had been received.

Q.        Okay. You knew that a request had been received, referring to Exhibit 17, even though

Stephen W. Ball                                                                    19 (73 - 76)

Page 73

you hadn't actually seen it?

A.    Correct.

Q.    Did you ask to see it when you learned it had been received?

A.    No.

Q.    Any particular reason why not?

I mean, was there some thought process where you made a conscious decision not to look at it?

A.    No.  No.

Q.    Okay.  When we filed the sanctions motion last August, did you read that motion?

A.    Yes.

Q.    And as a result of reading that motion and seeing the complaints that we had raised about the sufficiency of your compliance with the Court's April of 2021 discovery order, did you take any follow-up action to provide the additional discovery about which we were complaining?

A.    Yes.

Q.    What?

A.    I think the -- I think the majority of that all related to bank statements.

Q.    Anything else other than providing some additional bank statements?

Page 74

A.    I know as part of putting our responses together, there were certain transactional documents that we included in some of those responses.  I don't recall any other information specifically off the top of my head.  But I think as part of our responses, we did provide some information to address those points that you all had made.

Q.    Are you able to be any more specific than that?

A.    I recall collecting the Mechel transaction document.  I recall getting some additional information on the 2018 Blackstone transaction document with Kentucky Fuel and several other entities.  That's all that I specifically recall.

Q.    And that information you actually put in a -- you put some of the -- you attached some of those documents to your affidavit that you filed actually in response to our sanctions motion.  Is that correct?  Is that your recollection?

A.    I believe that's correct, yes.

Q.    And after the Court entered the order on our motion for sanctions, which it did this past March, March 23, and it's Exhibit 7.  I think

Page 75

you've got it in front of you.

A.    Yes.

Q.    Did you do anything else to provide additional discovery in response to that order?

A.    The supplemental information or supplementation information I was talking about earlier, I guess you could -- in your mind, you may have been looking at it as being a response to Exhibit 17.  But in my mind, it was -- I guess it is in response to Exhibit 17, but it's also in response to additional information.

Q.    Okay.

Did there come a time in this process where you realized that the companies had a significant problem on their hands?

A.    Yes.

Q.    When?

A.    After, um, Exhibit 7.

Q.    Exhibit 7 being the order that was entered roughly two months ago?

A.    Yes.

Q.    What did you do -- did you brief Jay or give him a copy of that order once you realized that the companies had a significant problem on their hands?

Page 76

A.    I did not give him a copy of the order.

Q.    Without telling me anything that might be attorney-client privilege, did you brief him on it?

A.    I briefed him on what the order says.

Q.    Okay.  Did he give you any instructions as to what to do as a result of it?

A.    No.

Q.    Prior to this, had you briefed or otherwise made Jay aware either of our motion to compel or the April 16, 2021, discovery order which granted, in part, that motion to compel, or -- let me just stop with those two.

Had you made him aware of either of those?

A.    Generally, the April order, um, at that time I wasn't aware -- I hadn't read the order myself.  But he was aware that we had to provide additional information.

Q.    Okay.  How was he made aware of that?

A.    I told him that.

Q.    Okay.  Did he ask to see a copy of

Page 77

the order or to know any details about it?

A.      No.   He actually -- he told Chris Schroeck not to mess around with it because -- well, because it's something that your all's side would take advantage of.

Q.      Other than saying don't mess around with it, did he ask for any details just about what the order said?

A.      No.

And I'll share with you.  I mean, the reason he was -- I know I discussed it with him is we were actually at --

MR. RUBY:  Let me stop you there.  Is this something we should talk about?

I just don't want you to get into details of conversations that you had with Jay.

THE WITNESS:  Um...

MR. LUCAS:  If it's confidential.

MR. RUBY:  Sure.

THE WITNESS:  This is more about why I remember the conversation.

MR. RUBY:  Okay.  Go ahead.

THE WITNESS:  We were at an arbitration hearing in Jacksonville, Florida,

Page 78

on a coal matter.  And myself and Chris Schroeck and Hunter Naff were all there.  In the evenings, we were -- Jay was only there for one evening.  We were there for three days.  But while he was there in the evenings, we were working on the responses that we submitted in May.  And he just asked us what we were working on, and that's what led to the conversation about it.

MR. LUCAS:  Okay.

Let me -- let's go off the record for a minute.

(Whereupon, an off-the-record discussion took place.)

BY MR. LUCAS:

Q.      In January, and I believe it was January 7 of last year, there was a telephonic conference with the magistrate judge that preceded the motion to compel.  Under this Court's procedures, you have to have that kind of conference and get permission to file a motion to compel.  During that conference the magistrate ordered the parties to obtain the audio recording of the conference, and then to make their clients aware of it.  Mr. Schroeck submitted an order to obtain the

Page 79

audio of the conference.

Did he make you or anyone else aware of what transpired at that conference and what the magistrate said?

A.      Not -- I know that a motion to compel ultimately issued, but I don't -- I don't have any recollection about that particular telephone conference other than I do know -- like I said, I know that the Court ultimately allowed the motion to compel.

Q.      Well, the magistrate had ordered him to obtain a copy of the audio.  Did you ever listen to the audio?

A.      No.

Q.      Subsequently, there was a transcript ordered and filed.  Did you ever read the transcript?

A.      No.

Q.      Are you aware that the magistrate asked that the lawyers each advise their clients of what transpired at that conference?

A.      I am now.  I didn't know that at the time.

Q.      When you say you are now, you mean as a result of my questioning, or have you learned

Page 80

that before today?

A.      I learned that before today as part of the -- and I can't remember if it was in one of the orders or not.  But I know as part of the discovery, the recent request for production of documents, the discovery requests, we searched through Chris's files to try to obtain that audio recording.  Because we could see -- my understanding from Ron is we could see that he had ordered it, but we have -- we can't find a copy of it in our office.  And I'm not aware of him playing it for anyone at the time.  So I just don't know if he received it and didn't do anything with it.  I just don't know how that played out.

Q.      All right.  I'm going to -- I've got the transcript here, and I'm going to read you some portions and just ask you if you were made aware of these requirements.  I'm not trying to argue with you about any of them.  I just want to know if you were made aware of what the magistrate was saying he wanted.

MR. RUBY:  John, just for the record, this is the transcript of the January 2021 telephone conference with the magistrate judge?

Page 81

MR. LUCAS: Yes, sir. It's January 7, 2021. And I'll call out the -- you all probably have the transcript. I'm sure you do somewhere. I'll call out just for the record the pages I'm looking at on the transcript.

BY MR. LUCAS:

Q.     On page 18, he's talking about -- this was all in the context of us saying your discovery, your, the company's discovery responses were insufficient, and we wanted to file a motion to compel. And the magistrate said, talking to Mr. Schroeck:

"So what you're responsible for creating, Mr. Schroeck, is a record, a record of how every single request was reviewed, every single person that your clients -- that you spoke to about them, every single person that was asked to gather information, every single item of information that was provided to you by your client."

And so my question is, was that done?

A.     I don't know. I wasn't aware of that.

Page 82

Q.     I'll read you one more. And I'm not going to read this whole thing. It kind of permeates the whole transcript. But he said, kind of building on that:

"I'm not going to invade any attorney-client privilege or work product domain, but eventually I will need to see a narrative of what happened, how your clients responded to these discovery requests."

Was that type of narrative of what happened and how the clients were responding, was that ever done?

A.     Not to my knowledge.

Q.     He said:

"So the clerk's office will provide you, Mr. Schroeck," this is at page 26, "with a copy of the audio file of this call so that you will have that record as you formulate your response, and can make it available to your clients so that they understand the Court's expectations."

Was that ever done?

I take it from your answer it was not. By that I mean was the audio file made available to your clients so that they could

Page 83

understand the Court's expectations?

A.     Not that I'm aware of.

Q.     When you -- when you go about collecting documents for production, you said earlier -- you used the phrase "we collected the documents." Tell me what your procedures and protocols are for identifying the documents, doing the search, and making sure that you're providing all of the documents that have been requested or ordered.

A.     Typically, I will -- it can either be in person or sometimes by email, but the lawyer, whether it's Mr. Schroeck or it's an outside lawyer, will tell me the information that we need to collect. And then based on the type of information, you know, I'll start I guess distributing those requests to the people I think are best suited to answer them.

Q.     Okay. And in this case, I'm going to limit it to our case, who were these requests and whatever instructions you gave with it, who were they distributed to?

A.     Predominantly Summer Dean for bank accounts and also for accounting records. Sometimes I would go -- or I can't say in this case, but

Page 84

sometimes I will go directly to some of the accountants if Summer's not available. Will Morset helped with that in this case. John Prekker helped with that.

Q.     How do you spell his name?

A.     P-R-E-K-K-E-R.

Q.     Thank you.

A.     And then Valerie Hamlet helped with the tax returns.

Q.     Okay. Did you send -- did you send the requests or instructions about collecting documents to anyone other than those three plus Summer Dean?

A.     On some of the organizational documents, I think I primarily collected those myself. But Hunter Naff assisted with that as well. And Polly Hanson, who is a paralegal, she has assisted with some of the -- some of the corporate documents.

Q.     Was all of this oral or did you send -- are there emails in existence that embody these instructions?

A.     A little bit of both.

Q.     Okay. Where are the emails?

A.     The emails that we have were

Stephen W. Ball                                                    22 (85 - 88)

Page 85

provided as part of our recent document production.

Q.        Were there any instructions given about how to collect the documents that were required other than the redacted emails that were produced to us late last month?

A.        No.  And I typically don't provide them instructions anyways.  It's more need the income statement for this entity for this time period.

Q.        Well, if you want to get, say, the documents -- all the documents pertaining to the Mechel transaction, who do you ask for and what do you tell them to collect?

A.        I would -- I would just handle that one myself.

Q.        And how would you go about getting all those documents?

A.        I most likely would have that document saved to my folder on our server, or I also use Dropbox.

Q.        When you say "that document," what are you referring to?

A.        The Mechel transactional document that you referenced.

Q.        Well, my question, though, was

Page 86

broader than that.  It was all documents related to the Mechel transaction.

A.        .    Um, I'm just trying to think what else that would entail.  Can you give me an example?

Q.        Sure.  Emails.

A.        I would search emails between -- like Paul Sullivan and Jeff Hallos at Frost Brown Todd handled that transaction.  So I would search emails with them to see what documents were included.

Q.        How would you search their emails?

A.        I would search our system for incoming emails from the Frost Brown Todd email address.

Q.        Okay.  How -- just tell me how you would search your system.  What would you do and what would you look at?

A.        I would -- so we do not have a record of emails prior to 2012.  But since 2012, emails are stored on an archiver.  It's called Barracuda.  And within Barracuda you can do these search terms that you kind of think of when you think of search terms.  And so I would go in there and look for all emails to and from Paul Sullivan, Jeff Hallos.  I would probably expand that to all,

Page 87

you know, @FBTlaw.com email addresses and look for anything that has that keyword or search word in it.

Q.        All right.  Keep in mind -- and I appreciate your trying to help with what you might do, but tell me what you remember that you did in this case.  That's what I'm focusing on, or trying to.

A.        In this case, all I remember doing is collecting the actual transaction document.

Q.        Okay.  In addition to, for example, emails with Frost Brown Todd or other outside counsel, did you search on any of the transactions -- on any transactions that either Kentucky Fuel or JCJ have been involved in since 2012, did you search for intracompany emails, for example, between Jay and somebody else in accounting or Summer Dean or anyone?

A.        The only email searches that I have done in this case were for the most recent document production.  And I searched both external and internal emails as part of that production.

Q.        What keywords did you use to -- or what search terms did you use?

A.        New London.  I'm trying to think.  I think New London and Brownlow were the two primary

Page 88

search terms that I used.  And I used a date parameter of the January 7th hearing date to whatever the day of the production was.

Q.        Have you ever done a search for emails, either external or internal, to the companies for any emails in response to any document production other than the one you just described?

A.        No.

Q.        Has anyone else ever done that for the company?

A.        Not that I'm aware of.

Q.        Okay.

MR. LUCAS:  Why don't we break for lunch?  Does that suit you all?

MR. RUBY:  Uh-huh.

MR. LUCAS:  Okay.

(Whereupon, a lunch recess took place from 12:38 p.m. to 1:22 p.m.)

BY MR. LUCAS:

Q.        I want to ask you about some documents that we didn't get in terms of -- I think these are just JCJ subsidiaries at different times.  And I'm not sure, some of these may be newer companies.  But we had requested financial statements, income statements, and balance sheets.

Stephen W. Ball                                                23 (89 - 92)

Page 89

I'm not going to bore you with all this detail.  We got them for some years but not for others.

So, for example, for Black River Coal, LLC, we got -- we didn't get balance sheets or financial statements -- by that I'm including income statements -- until 2016.

Do you know any reason why those weren't produced?

A.        Black River Coal is a single site underground mine.  We did not operate it very long.  I don't know the specific reason why you didn't get those.  I also don't know that it had financial statements for the other periods.

Q.        Okay.  How about Bluestone Resources, Inc.?  It had them, did it not, prior to 2016?

A.        The Justices reacquired -- well, Bluestone Resources wasn't formed until 2015.  And it was formed -- it's possible it was formed in December of '14.  But it was formed for the purpose of reacquiring the Bluestone assets.  So there would not have been anything prior to 2015.  I don't know why you don't have anything for 2015.

Q.        Okay.  What about Dynamic Energy, Inc.?

Page 90

A.        It's part of the Bluestone group, so it would have that same time period.

Q.        Okay.  Did it have financial statements and balance sheets before 2015?

A.        Yes.

Q.        Okay.  Justice Highwall Mining, Inc., when was it formed?

A.        It's also part of the Bluestone group.  It's a fairly old company, though.  I'm going to say it was formed in the early 2000s.

Q.        Okay.  Do you know why we didn't get any financial statements or balance sheets for it prior to 2016?

A.        Just the same answer as Bluestone and Dynamic for prior to 2015.

Q.        But you said it had been in existence.

A.        Yeah, but it was -- it was part of the reacquisition in 2015.

Q.        Okay.  But did it have financial statements for the period 2010 through '14?

A.        Not that we have.

Q.        Okay.  Justice Low Seam Mining.  Do you know why we don't have -- we had statements that are starting 2012, but not for '10 and '11.  Do you

Page 91

know why that is?

A.        I think it's one of the entities that we ran into a problem with the accounting software.  Some of the entities -- we were able to overcome that.  But for whatever reason, I don't think we could get '10 and '11 to generate out of the system.

Q.        Do they exist in electronic form but you just can't print them?

A.        I don't know the answer to that.

Q.        What about Kentucky Fuel?

A.        What time period?

Q.        Prior to 2016 -- oh, I'm sorry.  I misspoke.  For '10 and '11.

A.        I think it would -- it's the same issue.

Q.        National Resources, Inc., we don't have anything prior to 2016.

A.        It's part of the Bluestone group.  So we don't have anything prior to 2015.  I don't know why '15 wasn't included.

Q.        Okay.  Is the same true of Nine Mile Mining, Inc.?

A.        No.  Nine Mile Mining, Inc. is a subsidiary of Virginia Fuel Corporation.  So it

Page 92

would not -- it wouldn't have the same issues as the Bluestone companies.

Q.        Do you know why we didn't get balance sheets and financials statements for Nine Mile Mining, Inc. prior to 2016?

A.        No.

Q.        Okay.  Do they exist?

A.        I don't know.  I don't have any reason to believe they don't, but I -- I've not specifically seen them before.

Q.        Okay.  What about Nufac Mining, Inc.?  The same period of time, prior to 2016, we don't have anything.

A.        It's part of the Bluestone group.  We don't have any records prior to 2015.  I don't know why '15 wasn't included.

Q.        Okay.  What about Pay Car Mining, Inc.?  It's also part of Bluestone, right?

A.        Correct.

Q.        The same answer?

A.        The same answer.

Q.        Okay.  Second Sterling Corp?

A.        The same answer:  Part of Bluestone.

Q.        Okay.  Nothing prior to '15.  And don't know why we don't have '15?

Page 93

A.    Correct.

Q.    Okay.  There's several others here.  Sequoia Energy, Southern Coal Corp, and Virginia Fuel Coal Corp.  And again, we don't have anything for those for '10 and '11.  Same answer about the computer issues?

A.    Yes.

Q.    But we do have them for that period of time for JCJ.  So why do we have them for JCJ but not for the others?

A.    I -- I don't know the technical answer there.  I don't know why JCJ -- because they're all in -- my understanding is they're all in the same mass/Sage accounting software.  So I don't know why JCJ was able to generate and the others weren't.

Q.    Who would know that?

A.    Summer Dean.

Q.    Going back briefly on a couple of things we've talked about.  Do you all have any in-house IT people?

A.    No.

Q.    Do you have an external IT firm you use?

A.    Yes.

Page 94

Q.    Have you ever used them or sought their assistance in connection with searching for documents to respond to discovery?

A.    We have.  We've attempted to use them a time or two, but they don't specialize in that type of thing.  They're more of network-type people, setting up computers and things like that, and it just didn't -- they tried, but it's just not what they do.

Q.    Okay.  Did you ever consider retaining some other of these specialty firms that does specialize in assisting companies in electronic discoveries?

A.    I don't know.  I've never been asked to do that, but I don't know if anyone else considered it or not.

Q.    Well, who would ask you?

A.    The lawyers.

Q.    The outside lawyers?

A.    The outside lawyers, or Mr. Hatfield or Mr. Schroeck.

Q.    Okay.

MR. LUCAS:  Let me see the exhibit -- we've got some already.  We're off the record.

Page 95

(Whereupon, an off-the-record discussion took place.)

(Exhibit 19, 2014 - 2019 Tax Form 1120S - Exhibit P, marked for identification.)

BY MR. LUCAS:

Q.    I'm going to hand you what has been marked as Exhibit 19.  It's excerpts of JCJ's tax returns from 2014 through '19.

MR. LUCAS:  I need '20 also.  We're going to add 2020 to this.  I'll make 20 a separate exhibit.

(Exhibit 20, 2020 Tax Form 1120-S, marked for identification.)

(Whereupon, an off-the-record discussion took place.)

BY MR. RUBY:

Q.    Okay.  What I wanted to ask you about is on Exhibit -- if we start with Exhibit 19.

All right.  Exhibit 19 is a collection of the first page of the tax return for JCJ, together, with the page that comprises a Schedule L.  It's for each of those years, 2014 to '19.  Do you see that?

A.    Yes.

Page 96

Q.    I want to start on each of them on Schedule L.  Loans to shareholders for 2014 is zero, correct?

A.    Correct.

Q.    And similarly in 2015, there are no loans to shareholders, are there?

A.    No.

Q.    All right.  And in 2016, if you go to the same line on Schedule L, it shows at the beginning of the year there's no loans to shareholders.  And at the end of the year, there are in round numbers 22 million.  Do you see that?

A.    Yes.

Q.    And let's just keep paging through it to get us oriented.

In 2017 -- and I have a question on this.  It was shown on 2016 that the loans to shareholders were at the end of the year, which would be December 31, $22,266.  Do you see that?

A.    Yes.  22 million?

Q.    I'm sorry.  22 million, yeah.  And then 266,735.  And then, yeah, I see that's picked up at the beginning of the next year.  I thought for a minute there was an inconsistency, but they look the same.

Stephen W. Ball                                                    25 (97 - 100)

Page 97

And then by the end of 2017, the loans to shareholders had increased to 29 million. Right?

A.    Yes.

Q.    And then in 2018, the loans to shareholders started at that 29.9 million, and were $31,740,101 at the end of 2018. Right?

A.    Yes.

Q.    And then in 2019, it stayed constant at that figure. Do you see that?

A.    Yes.

Q.    And then look on Exhibit 20, for right now just the second page of the exhibit, and it's still at $31,740 -- $31,740,101, right?

A.    Yes.

Q.    Okay. Can we just for ease of discussion just refer to that as a round of $32 million?

A.    Sure.

Q.    All right. Who were the shareholders who were liable for what's shown there as loans to shareholders?

A.    Based on the document we went through during the April 18th hearing that summarized that, I think those are James C. Justice,

Page 98

III.

Q.    Okay. And let's just refer to that so we're all on the same wave length. I don't think it's an exhibit yet, so let's make it an exhibit.

MR. RUBY: I thought it was two.

Are you looking for the Schedule L detail?

MR. LUCAS: Oh, wait, wait, yes, Schedule L. I think it is Exhibit 2. Let's see.

Yeah. Yeah, it is. Thank you.

BY MR. RUBY:

Q.    Okay. Look at Deposition Exhibit 2. You got it there?

A.    Yes.

Q.    Is that what you were referring to?

A.    Yes.

Q.    Okay. As far as you know, are there any loans to any of the shareholders by JCJ other than the loans to Jay Justice?

A.    I mean, I think the shareholder loan account goes up and down, like we discussed at the hearing that day. So, I mean, I'm sure there have been adjustments. And I'll say this, I don't know as we sit here whether Jill Justice has ever loaned

Page 99

money. I can't say that for sure.

Q.    I'm not asking loans by shareholders.

A.    Yeah.

Q.    I'm only asking about loans made to shareholders.

A.    Right.

Q.    Because the Line 7 on Schedule L is, quote, "loans to shareholders." So that would be from JCJC's point of view a receivable from the shareholder, right?

A.    Right. And the only point -- and maybe I'm splitting a hair here, but the only point I'm making is let's take Jim Justice's shareholder loan account. In my experience, there usually are debits and credits to that account. So while it may not be showing on this tax return as a loan to Jim Justice, I mean, there are certainly times that those accounts go both ways. That's the only point I'm making. But on these -- on that tax return, the only loan to a shareholder is Jay Justice.

Q.    Okay. Well, I'm -- forgive me. I'm confused by your answer, because you said for Jim Justice they could go back and forth.

Let me limit it to the most recent

Page 100

information we have, which in documents is at the end of 2020. On what's shown as loans from shareholders, were any of those loans due from Jim Justice?

A.    No. None of -- not that 31 -- or what we're generally calling the 32 million.

Q.    Okay. Was any of that 32 million loans to Jill Justice?

A.    No.

Q.    Okay.

And I know you and I had a dialogue the other day, or in April, about whether they were loans or something else. I'm calling them loans for right now only because that's the way they're characterized here.

If I change that terminology to say receivables from shareholders, would your answers be any different?

A.    No. It's the same account on the books.

Q.    Okay. So whether you call it a loan or receivable, that rounded 32 million is all owed by Jay, correct?

A.    Yes.

Q.    Now, are there other loans or loans

Page 101

to or receivables from Jill Justice at any time, from 2010 until the present, that are not shown? Because we know they're not shown on Line 7 of Schedule L.

A.    Not that I'm aware of.

Q.    Okay.  Did the companies ever make loans or advance moneys so that they had a receivable owed by Jim Justice?

A.    No.

Q.    Okay.  I thought you said a moment ago -- and maybe I misunderstood you, so correct me. I thought you said that his shareholder loan account had both debits and credits.

A.    It wouldn't be uncommon for it to go up and down.  And I guess I was just trying to -- and maybe this goes back to what Mr. Ruby said earlier about making sure there's not a "gotcha" moment.  I think technically those would be a repayment of a loan previously made.  But I'm just saying it's possible that any of these shareholder loan accounts could fluctuate up and down.  And I guess it's how you look at that payment from the company to the shareholder when -- I mean, I would just look at it as a repayment of a loan that was made.  But I was just trying to make the point that

Page 102

there are instances that maybe aren't captured here, because at the end of the year, maybe the accounts ended up in a net loan to the company.  But you would have some fluctuation in the shareholder loan account.

Q.    Okay.  Well, let me ask you this.  I may have -- I may be guilty of having asked a bad question when I asked about debits and credits in the account, because that could result from payments as well as advances.

My question is did -- other than as repayment for a loan made by the shareholder to the company that the company is repaying, did the company ever make distributions to Jim Justice where it was loaning money or advancing money to him?

A.    No.

Q.    Okay.  The same question for Jill.

A.    No.

Q.    So the only one that's taken out really any loans from the company is Jay; is that correct?

A.    And I don't think -- I don't think that -- I mean, when we got into this in the hearing, I've never known any of the Justices to just take a loan from the company.  I mean, these

Page 103

records are what they are.  I'm not saying they don't say what they say.  But just in my experience, I've never known the companies -- I've never known any of the Justices to be in a net position where they owed the companies money, because they're constantly putting money back into the companies.

Q.    Then why is it -- since the books and tax returns are on a net basis, why is it shown as a rounded $32 million receivable from Jay Justice?

A.    I can't answer that.

Q.    Since that's a net.

Would you agree with me that because you keep your books on a net basis, that that -- on its face, that would indicate that he owes the company $32 million, correct?

A.    On its face.

Q.    If the tax returns are correct.

A.    Yes.

Q.    Okay.  Do you have any reason to believe that the tax returns for these years that we've looked at are not correct?

A.    Yes.  I've not been involved in it directly.  But I know after the hearing in April and then in preparation for Jay's deposition, that

Page 104

number has been looked into more.  And I know Jay believes that it's in error.  But I have not been involved in the analysis of it.

Q.    Who has?

A.    I don't -- I don't know who Jay is working with on that.

Q.    Okay.  If I ask you any other questions about the details of that, would you know them?

A.    No.  I just know that it was a surprise when it was pointed out to me.  And I advised Jay of it as part of preparing for his deposition, or maybe I advised Mr. Ruby.  But either way, Jay became aware of it, and I know he's had someone looking into it.

Q.    Let me ask you this.  This was raised as early as August of last year in our motion for sanctions about undisclosed transactions, and we mentioned receivables from or loans to shareholders.

Do you recall that being in that motion for sanctions?

A.    Not specifically.

Q.    Do you want to see it?

A.    I can look at it if you want.  I just don't have a specific recollection of it.

Page 105

Q.      Well, here's my question -- if you need to look at it, I'll certainly let you look at it. My question is, if these tax returns were incorrect, why wasn't that looked at then and then responded to when you filed -- when you, the companies, filed their responses to our motion for sanctions?

A.      I don't know.

Q.      Do you need to see it to elaborate on that at all?

A.      No. I don't know why it wasn't addressed at that time. I have no reason to doubt that it was included in the motion. I just don't specifically recall it.

Q.      Did you look at a draft of your response to that motion? And your response would have been filed in September of last year. Did you look at it in order to approve it before it was filed?

A.      Not that I recall. I typically only do that if I'm asked to do it. And even then, it usually is just a specific section. But I've -- I don't do that in the ordinary course.

Q.      In the -- pardon me.
        In the April 18 hearing, you

Page 106

testified -- I'm paraphrasing, but you testified that you believe the $32 million was an account receivable, as I understood your testimony, not from a cash advance but from a real estate transaction where property was transferred to Jay and that he owed that. Do you recall that?

A.      Yeah.

Q.      Was that your belief at the time?

A.      Yeah.

Q.      Is it your belief today?

A.      I think that property transfer is definitely reflected in his shareholder loan balance. I mean, as we determined in the hearing, it's not the total amount. But I do know that the intention of the Black River transfer was to be a reduction in his shareholder loan account.

Q.      Okay. I'll come back to the Black River transfer. But my question then is, was that -- strike that.
        Based on what you just said, what I'm hearing is that he got the Black River property, what you're describing as the Black River property, and instead of paying cash for that, that the consideration was a reduction in -- was it a reduction in what the companies owed him, will we

Page 107

see that on the books, or was it the generation of an account receivable from Jay?

A.      No, my understanding is that at time the company owed him more than $13 1/2 million, and it was a reduction in that amount that the company owed him.

Q.      Okay.
        Well, your testimony on -- in the 18th was that this was related to the $32 million -- or, excuse me, yeah, to the $32 million receivable. That it was part of that. And, you know, through our dialogue together then, you acknowledged that it was 13 1/2 million and it wasn't the whole thing, right?

A.      Right.

Q.      But as I recall, you didn't know where the balance came from.

A.      Right.

Q.      Okay. But you were saying it was part of the 32 million that was shown as a receivable. So is that correct?

A.      Yeah, there's only one shareholder loan account. So any transaction up or down would be part of that. I mean, the entire history of money he's loaned to the company and anything that

Page 108

the company has given back to him in reduction of that, or an outright loan, it's all part of that 32.

Q.      Well, did he pay any cash in exchange for that $13 1/2 million South Carolina property?

A.      Not that I'm aware of.

Q.      If you are looking at what -- were you calling it the shareholder loan account? Is that what you called it?

A.      That's just what I generally call it.

Q.      Okay. If you're looking at the shareholder loan account -- and in this case, we see that the shareholder loan account, according to the tax returns, is showing that Jay owes the company rounded 32 million, correct?

A.      Correct.

Q.      How do you know -- in looking at that account, since you're only seeing that number, how do you know how much of that is comprised of advances to Jay as opposed to how much of the account is -- how much of the net effect is a result of payments by Jay?

A.      I don't. All I know is all activity between Jay individually and the company is

Page 109

reflected in that account. And what you're seeing there is the balance on the books and records as of the 12th -- whatever the first year was it went to 31. But that's -- as of that date, that's the balance of all activity.

Q.    Well, is that -- and I think my question was a bad question. But is that account, the shareholder loan account that you're describing -- on JCJ's records, are all of the debits and credits reflected on that where you can look at one or two or however many sheets of paper and see everything that's happened in that account?

A.    In theory, yes. But in reality, there are times where there's a -- similar to what we saw on a disposal sheet, sometimes there are yearend true-ups that are done in bulk. But in theory, yes. But I'm just telling you in my experience. I know in reality there are also sometimes bulk entries at the end of the year.

Q.    Well, during the year as any event occurs or any transaction occurs that would be reflected in the shareholder loan account, is it input into the system contemporaneously with the transaction itself?

A.    It should be.

Page 110

Q.    Well, is it though?

A.    It doesn't always happen.

Q.    And sometimes it doesn't happen until the end of the year?

A.    Yes. That's what I'm referring to when I say the bulk transfers.

Q.    Okay.

A.    But if everyone is doing their job, and sometimes it's just a matter of being shorthanded, but the accountants should do that in the month that it happens.

Q.    Well, if they're trueing it up at the end of the year, what documents are they looking at in order to know what's the net number that should go in there at the end of the year?

A.    Typically, what would lead to that is part of their yearend closing process. If there's something that's an outlier, like they have a deposit that they haven't identified and they just put it in a certain account, or a piece of property was disposed of and they don't find that it was inputted in the month it happened. It's usually part of the yearend process. That's why it happens there instead of -- we don't really do quarterly type like you would -- like a public company does

Page 111

quarterly reporting. We don't really do that. So it all gets caught at the end of the year, if at all.

Q.    Well, if money was advanced to Jay or money was distributed to Jay in the form of either a repayment of what the company owed Jay or as a loan to Jay, what record is going to be created at the same time that the accountants can look at it at the end of the year to true it up?

A.    For cash, it would be a bank statement. They would look at a bank statement to see either a deposit or outgoing.

Q.    What about for noncash?

A.    For property, um, usually where property gets caught if it wasn't caught at the time is Valerie, who does the tax returns, she also does the property taxes. When the assessments are coming out for the following year, she does a doublecheck to make sure we still own all the properties that we get tax tickets for. So sometimes that would get caught there. The equipment, I don't really know what other document you would have on a piece of equipment.

Q.    I want to make sure I understand this because I may misunderstand you. Is it your

Page 112

belief and understanding that the $32 million shown as a loan to Jay is actually a result somehow of transfer of property to Jay?

A.    I think that that shareholder account captures property transfers to Jay, which we know has happened. And so I think a part of that 32 million includes any property transfers to Jay.

Q.    Okay. When you say it includes property transfers, explain that. If they transfer property to Jay, is the purchase price of that property then going to show up as a receivable owed by Jay?

A.    It -- it should just be either -- it should be a plus or a minus in his shareholder loan account. It's not a specific receivable per se. It's just an adjustment to his shareholder loan account for that amount.

Q.    Well, if property -- I'm trying to understand what you mean by the property transfers would be reflected in this account. So let's say there's $13.5 million worth of property transferred to Jay. How will that transaction show up in the shareholder's loan account?

A.    Just to make an example. If yesterday the company owed Jay $13,500,000 and then

Stephen W. Ball                                          29 (113 - 116)

Page 113

today the company transferred to Jay a piece of property valued at $13,500,000, today his shareholder loan account would be zero. That's what I mean by its -- that number captures that transaction. And maybe I'm not saying it correctly, but that's what I mean when I'm saying that.

Q.      I understand that. But in the real world, what we've got is that the account is not zero. It's 31,740,000. So how did it get to that?

A.      By -- I don't know how many transactions, but by all of the transactions between Jay and JMC Justice Companies.

Q.      Well, can you tell me what any of the transactions are that have generated this $32 million receivable from Jay?

A.      Not -- other than the Black River property, not specifically.

Q.      Okay.

A.      And I -- because my understanding is that was -- the consideration for that was intended to be a reduction in the loan that he made to the company. But I don't know specifically what else makes up that.

Q.      But if that was to reduce the loan that he made to the company, that wouldn't result in

Page 114

a payable by Jay. So my question is, how did this Black River property transaction result in a payable by Jay?

A.      I agree with the -- I agree with what you're saying. I mean, I agree with the first part of what you said exactly. I guess I don't know how else to say it. But I agree with what you're saying. The way that we looked at that, there was a loan payable to JCJ, to Jay at the time of the Black River transfer. That's my understanding.

I've never known the Justices -- if it were zero, if his shareholder loan account was zero, I've never known the company to transfer something to one of the shareholders for a receivable. I've just never known that.

Now, how the account got all the way up to $32 million, I don't know specifically what caused that.

Q.      Well, I don't want to beat this to death, but I'm just trying to understand what happened.

A.      Sure.

Q.      And I understand what you're saying. If the company owes Jay -- let's say they owe him $13 1/2 million, and they say we're going to pay

Page 115

that debt off by transferring to him $13 1/2 million, that results in the company's account payable going from 13 1/2 down to zero, right?

A.      Correct.

Q.      In this case, though, what we have -- what we're seeing on this entry, this $32 million entry is not money owed by the company. We're seeing money owed by Jay to the company. So how is the Black River transaction, $13 1/2 million transaction, how does it result in this number other than the fact that it's just part of the whole net mix that somehow comes out in the wash as a $32 million receivable?

A.      It doesn't. That's the only way that it contributes to that.

Q.      Okay. So it contributes to it in the same way, then, that every other transaction involving Jay contributes to it. Is that fair?

A.      No, that is exactly what I've been trying to say.

Q.      Okay.

THE WITNESS: Are you at an okay spot for a bathroom break?

MR. LUCAS: Sure.

THE WITNESS: Thank you.

Page 116

(Whereupon, a recess took place from 2:08 p.m. until 2:21 p.m.)

BY MR. LUCAS:

Q.      Are you ready?

A.      Yes.

Q.      All right. Going back to our old friend the New Lead transaction. Jay said you were kind of the point guy for that. Is that right?

A.      Generally. Myself and Roger Hunter.

Q.      Okay. Am I correct that whether in the original agreement or in any of the amendments to it, that the consideration flowing from New Lead to Kentucky Fuel was intended to include both cash and later, pursuant to an amendment, a certain amount of New Lead stock, correct?

A.      Yes.

Q.      And that amendment or the New Lead stock was not in the original agreement. That was in a later amendment. Do you recall that?

A.      Yes.

Q.      And do you recall the amount of the New Lead stock?

A.      I don't.

Q.      Does $175,000 sound about right to you?

Stephen W. Ball                                                    30 (117 - 120)

Page 117

A.    Yes, I think it does.

Q.    Okay.  Do you need to see the documents?

A.    No.

I was just thinking for a second, but I think that's right.

Q.    Okay.  Was that stock actually transferred?

A.    I believe so, yes.

Q.    Okay.  And was it then immediately sold?

A.    I don't know about the timing, but I'm sure it was sold.

Q.    Okay.  What was done with the proceeds?

A.    I don't know.

Q.    Who would know that?

A.    I don't -- I don't know.

Q.    In addition to that $175,000 of stock, do you recall that there was also payments of cash or cash equivalents owed by New Lead to Kentucky Fuel in the principal amount of $8 1/2 million?  Or, excuse me, in the principal amount of $7 1/2 million.

A.    I think that's right, yes.

Page 118

Q.    And with interest and various other charges they totaled, I think you testified previously somewhere, in the approximate $8 1/2 million range.  Do you recall that?

A.    Yeah, I think that's right.

Q.    Did any of those payments -- I'm not talking the stock.  Did any of those payments go to Jay Justice?

A.    I don't know.

Q.    Have you ever looked at that?

A.    I -- I know this issue has come up, and I know some money flowed to Jay and Justice Management from prior conversations.  And I feel like we have looked at this at some point, but I just don't recall the specifics of how much went to Kentucky Fuel, how much went to Jay, how much went to Justice Management.  I don't recall the exact details of that.

Q.    All right.  You gave two answers that, forgive me, are slightly inconsistent.  When I asked if any money went to Jay, you said, "I don't know."  I wasn't asking the amounts, but just if any money.  But that's not really what you meant, was it?

A.    Well, I just couldn't tell by the

Page 119

sequencing of your questions if one was -- I don't know if what went to Jay was the stock or cash.  That's why I said I don't know.

Q.    Okay.

A.    I know I've been asked about money that went to Jay.  I think money.  But I don't -- as we sit here, I don't know whether it was cash or it was stock that went to Jay.

Q.    Okay.  So you, as we sit here today, don't have any idea whether Jay received any cash in connection with that?

A.    No.

Q.    In connection with the discovery responses in this case, have you looked at any of the recent, meaning postjudgment, have you looked at any of the documents relating to that transaction?

A.    No.

Q.    In order to find out if any money in fact did go to Jay that was owed to Kentucky Fuel?

A.    I haven't, no.

Q.    Has anyone else from the company looked at that?

A.    Not that I'm aware of.

Q.    Okay.  Any reason why that could not have been done?

Page 120

A.    Not that I'm aware of.  I think we did it as part of, um, either getting ready for or part of the evidentiary hearing, I think it was done.  So I can't think of any reason why it couldn't have been done again.

Q.    Okay.  No reason why that couldn't have been provided in a discovery response as a transaction that you would identify, right?

A.    Not that I can think of, no.

Q.    Are you -- I'm sure you are.  You're familiar with a suit brought in the Western District of Virginia by the United States of America versus a whole bunch of companies, starting with Southern Coal and A&G and on down in Kentucky Fuel, seeking to compel enforcement of a consent judgment.  This is actually a motion in the case to comply -- to compel compliance with a consent judgment.

Do you recall that suit and the consent judgment?

A.    Um, does that relate to the Department of Labor MSHA violations?

Q.    It does.

A.    Yes, I'm familiar with it.

Q.    I'm not trying to ask you a "gotcha" question.  You can look at these if you want.

Stephen W. Ball                                    17183                    31 (121 - 124)

Page 121

They've got some highlighting on them, but it's not a big deal.

This recites that the -- pursuant to the consent judgment, the defendants had to make an initial payment of, rounded numbers, $213,000 by April 15 of '20, and thereafter monthly payments of $102,442 by the first of each subsequent month.

Do you see that?

A.    Yes.

Q.    And my -- you can --

A.    No, I'm good.  I'm familiar with it.

Q.    My very, very rough math on this indicates this was about a four-year payout.  Is that consistent with your recollection?

A.    That seems right, yes.

Q.    All right.  How much is still owed on this?  Do you know?

A.    I don't know off the top of my head, but we're a month or two behind on the payment schedule.

Q.    Okay.  Well, you were a month or two behind, which was why on March 31 they filed this motion to compel you to comply by making the payments you were behind on.  My understanding from looking at the docket and your responses, the

Page 122

response recites that the defendants have now paid the March 2022 installment.  I assume you have no reason to disagree with that?

A.    No.  And they immediately filed something similar for being late for April.

Q.    Okay.  Have you paid April?

A.    Not to my knowledge.

Q.    Okay.

A.    Possibly.  And I think they've already put us on notice for May as well.  That's what I mean by a couple months.

Q.    Okay.

A.    One or two.  But, yeah, we made the March payment.

Q.    The total here is roughly 5.1 million.  Without getting to a precise figure, have you paid roughly half of that?  We're two years into the deal now.

A.    Um, based on the math, yeah, I think that's probably right.

Q.    Okay.  Which of the companies has actually been making these payments on behalf of all of them?

A.    Either Bluestone or Blackstone.  They're the only two with any even potential

Page 123

revenue.

Q.    Why is Bluestone paying the penalties levied against Kentucky Fuel?

A.    MSHA has the ability to shut your mines down for past due -- lack of payment of past due penalties.  And all of those mines are linked -- if you go into MSHA's data retrieval website, they link mines by controllers.  And Jay and Jill are listed as the controllers for all of those entities.

Q.    I gotcha.  So it wouldn't be just Kentucky Fuel's mines being shut down, but it could be any controlled by Jay or Jill?

A.    Correct.

Q.    Okay.

A.    Because they link all of them by what they call the controller.

Q.    Okay.  I understand.

Am I right that you recently settled a claim for other fines or penalties that had kind of a screwy and excessive interest rate in them?

A.    Yes.

Q.    And that was thanks to the good offices of your counsel, Mr. Ruby, you were able to work that out, right?

A.    Correct.

Page 124

Q.    And when you settled that, was there an upfront payment that you had to make in connection with the settlement?

A.    No.

Q.    How much did you -- when did you settle it?

A.    The original settlement or what Mr. Ruby worked on?

Q.    The latter.

A.    I think the -- well, I -- I don't know.  I don't know.

Q.    Are there installments, payments being made now on that liability?

A.    Not that I'm aware of.

Q.    Okay.

A.    It doesn't mean it hasn't happened.  I've not worked very closely with Mr. Ruby on that case.  But my last involvement was what he had won was the screwy interest charge that you referred to.  And I know he's been talking directly to the state about settling the remaining penalty.  But as we sit here, I can't tell you whether that's actually been resolved or not.

MR. RUBY:  We didn't settle it.  I just beat them.

Stephen W. Ball                                                           32 (125 - 128)

Page 125

MR. LUCAS: That was on the interest rate, right?

All credit to you for that because you were looking at a pretty stiff interest rate, weren't you?

THE WITNESS: Very stiff interest rate. So the amount that's left is -- had we fully performed, there was a discount in the penalties that should have been or would have been charged. But where we did not timely perform under the consent decree, they are arguing that it triggered the balance, basically the discount that we would have gotten.

And my understanding is that that amount is still sitting out there, although I know we're in conversations to try to resolve that. Because the other piece of that that's really probably a bigger issue for us today is they're trying to revoke all the permits and reclamation bonds for the permits that we didn't timely perform on.

BY MR. LUCAS:

Q.    What court is that in?

A.    Franklin County Circuit Court. I

Page 126

don't know the -- I don't know the designations in Kentucky, but it's in state court. I think it's Franklin County.

Q.    And who are the parties?

A.    Commonwealth of Kentucky and Kentucky Fuel Corporation. It's several entities in addition to Kentucky Fuel. But I think it's Kentucky Fuel Corporation, A&G Coal Corporation, Virginia Fuel, Sequoia Energy, Infinity Energy, and then Jim and Jay personally.

Q.    Okay.

A.    There probably are a few more entities in there. There's a handful of them.

Q.    Something I was intending to ask you about after April 18, talking about New Lead and the UCC1. You said it wasn't a violation of the UCC1 to take the proceeds because that was a sublease and not an assignment. Did I understand you correctly on that?

A.    Yes.

Q.    My understanding -- and I want you to correct me if I'm wrong; and if you need to look at the documents, we've got them here -- is that in the New Lead transactional documents, it was both an assignment and a sublease, sort of belt and

Page 127

suspenders. Am I right on that?

A.    That's not my recollection. I think there was an assignment of the mining permits, but I don't recall the lease being assigned.

Q.    Okay. Let me see. You may be right. Let me just see.

I'm looking here -- and you're welcome to look with me. And we can make this as an exhibit if we need to. This is the original Asset Purchase Agreement, which of course originally was with Williams Industries. And that's the one that ultimately was assigned to New Lead, right?

A.    Correct.

Q.    And this original Asset Purchase Agreement is dated May 10, 2012. And if I turn over to page 6, under Article 2 for the Purchase and Sale of Assets, it says:

"Upon the terms and subject to the conditions contained in this agreement, seller," which is Kentucky Fuel, "shall or shall cause its affiliate to sell, assign, transfer and convey to buyer, and buyer shall purchase, acquire, and accept from seller, accept from seller or its affiliate, all of seller's or its affiliate's, right, title, and

Page 128

interest in and to the following assets."

Did I read that right?

A.    Yes.

Q.    Okay. And those assets include the leased real property. This is in subparagraph C on page 7:

"The leased real property related to the Fivemile Permit and identified on Schedule 2.1(c)," so forth and so on, "and including the Andy Tipple and the Strong Bothers Leased Property."

That's the subject property that's the subject of this lawsuit today, correct?

A.    Yes.

Q.    Okay. And so that property, pursuant to this agreement, was sold and assigned to New Lead pursuant to this contract, right?

A.    Yeah. But I view that language up there as just catchall language to make sure the interest is being adequately conveyed. Like I see that -- and maybe it's too overbroad, but I see that in contracts all the time. My understanding is the actual conveying document itself ended up being a sublease.

MR. RUBY: John, can I see what you

Stephen W. Ball                                                    33 (129 - 132)

Page 129

were reading from there just to make sure I have it in my notes?

MR. LUCAS:  Sure.

Let's go ahead and make what I was just reading from a -- we'll mark this as Exhibit 21.

(Exhibit 21, Asset Purchase Agreement, marked for identification.)

BY MR. LUCAS:

Q.    I'm going to show you a second document, which I'll mark as Exhibit 22.

(Exhibit 22, Assignment of Leases, marked for identification.)

BY MR. LUCAS:

Q.    We can look at it together.  It's an Assignment of Leases dated December 28, 2012, between Kentucky Fuel and Williams Industries.  And again, this is part of what became the New Lead transaction, right?

A.    Correct.

Q.    And it provides that after the whereases:  "Now, therefore, it's hereby agreed as follows, that the assignor --" and the assignor is Kentucky Fuel, right?

Page 130

A.    Correct.

Q.    "That Kentucky Fuel hereby transfers and assigned to assignee," which would be Williams Industries, "all of the assignor's right, title and interest to and under the leases."  And that's the leases that are on Exhibit A.  And if you look at Exhibit A, that's our old friends all of the Fivemile leases, right?

A.    Correct.

Q.    That are subject to this lawsuit today, or the subject of this lawsuit today?

A.    Yes.

Q.    Okay.  And so aside from whether there was also a sublease, can we agree that those leases were assigned by Kentucky Fuel to Williams Industries and later to New Lead?

A.    Can I see that?

Q.    Sure.

(Witness reviewing document.)

THE WITNESS:  It's not clear to me that this is Exhibit A.  Now, I know it's attached to this document, but I don't recall -- I mean, my recollection is the Fivemile leases were transferred by sublease, because we had made the purchasers aware that it

Page 131

required Mr. Brownlow's consent and we were never able to get his consent.

I guess it could have played out differently, but that's my recollection is that because we were unable to provide consent to a full assignment, we had to do a sublease.

And these Fivemile leases are titled "Amended and Restated Schedule 2.1(c)."  So it's not clear to me whether this Exhibit A is just these three leases, which we were able to get in Kentucky Fuel Corporation's name and that's why we were able to assign them.  So I -- it's not clear to me that that document is an assignment of those leases on the Amended and Restated Schedule 2.1(c).

BY MR. LUCAS:

Q.    Say that last part again.

A.    That title of that page that says "Amended and Restated Schedule 2.1(c)," that's not clear to me that's intended to be an Exhibit A to that assignment.

Q.    You're not saying it's not.  You're just saying you don't know.  Is that fair?

A.    Yeah.

Q.    There it is.  You can further read

Page 132

it if you want to.

Whether or not it's part of this particular Exhibit A, or Exhibit 22, that Schedule 2.1(c) is the property described in the Asset Purchase Agreement as being sold, assigned, transferred, and conveyed to the buyer, correct?

A.    Yes.

Q.    I had another question about -- are you familiar with the subpoenas that were recently issued to or directed to the three shareholders, Jim, Jay, and Jill Justice?

A.    Yes.

Q.    And I believe Mr. Houchens was retained to handle the objection to those.  Do you recall that?

A.    Yes.

Q.    Who retained him?

A.    As I said in the hearing, Mr. Houchens does a lot of work for the Justice organization.  He basically handles all of our Virginia cases.  And so when the subpoenas -- when we first got notice of the subpoenas, I can't recall how that happened, but either -- I guess we found out through Mr. Hatfield.  And I told Mr. Hatfield to send them to Mr. Houchens.

Stephen W. Ball                                                           34 (133 - 136)

**Page 133**

Q.    Okay.  Did you ever talk to Mr. Houchens?

A.    Yes.

Q.    What instructions did you give him pertaining to the subpoenas?

MR. RUBY:  Let me think about that for a second, John.

MR. LUCAS:  I'm not asking him about advice.  I'm just asking him about what instructions.

MR. RUBY:  That's fine.  Go ahead.

THE WITNESS:  When I sent them to -- I think Ron actually sent them to him.  But I just asked him to look at them and give me his thoughts.

BY MR. LUCAS:

Q.    Okay.  Did you give him any instructions about who to talk to or what he should do?

A.    No, not directly.

Q.    Did you do that indirectly?

A.    No.  But Aaron -- like I said, he does a lot of work for us, and he deals directly with Jay a lot.  And so I don't -- I don't really direct him per se.  As outside counsel, I forward

**Page 134**

stuff to Aaron and he handles it.

Q.    Who made the decision to object to those subpoenas?

A.    From my perspective, Mr. Houchens.

Q.    Okay.  Did he seek your approval to object to them?

A.    I mean, he and I discussed it.  I certainly believe they were objectionable, if that's the right phrase for them.  So he -- basically, he just told me he was working on objections to them.

Q.    Okay.

I know I'm paraphrasing, so I don't -- don't let me put words in your mouth that you're not comfortable with.  Was it basically he said, "I've got them, I'm working on the objections," and you said in so many words, "It sounds okay to me"?

A.    Yeah.  That's fair.

Q.    Did anyone ever discuss them with any of the shareholders?

A.    I don't know what conversations Aaron had.  I told Jay that we had received them and we are objecting to them.

Q.    Okay.  Did Jay have any questions about them?

**Page 135**

A.    No.

Q.    Did anyone ever discuss them with the governor?

A.    Not that I'm aware of.

Q.    I had asked you earlier about what sort of complex commercial litigation experience Mr. Hatfield had.  The same question about Mr. Schroeck.

A.    Mr. Schroeck, before he came to work for us, he was also predominantly an insurance defense lawyer.  He was with a firm in Nashville and they -- they did a lot of auto manufacturer work, and a lot of, oh, like 18-wheeler, like truck accident-type work.  But he did mostly insurance defense work.

Q.    Okay.

MR. LUCAS:  I am about done.  I've got one other sort of subject area that could be very short or a little longer.  But if you all will give me a few minutes here, I'll consult with my handlers and make a decision on that.  In any event, we'll be done today.

MR. RUBY:  Wonderful.

(Whereupon, a recess took place from 2:55 p.m. until 3:02 p.m.)

**Page 136**

BY MR. LUCAS:

Q.    Are you ready?

A.    Yes.

Q.    I want to talk to you a little bit about the transition between Mr. Schroeck and Mr. Hatfield.  When did Schroeck leave?

A.    I believe it was July of 2021.

Q.    Okay.  Why did he leave?

A.    He took another in-house job.  He stayed in Roanoke, but he went to work for a life insurance company.

Q.    Doing -- do you know what he's doing?

A.    It's still a general counsel role, but I don't know specifically what he's doing.

Q.    Did he move to Roanoke?  You mentioned he worked for a Nashville firm.  Did he move there from Nashville?

A.    Yes.

Q.    Okay.  When he left, did he leave on good terms?

A.    Um, yeah.

Q.    Was he asked to leave or was this his own idea?

A.    It was his own idea.

Page 137

Q.        Okay.  Did he give you a reason as to why he was leaving?

A.        The pace was quicker than he was expecting in an in-house role, and thought that the new position would be better suited for what he -- he had three little kids.  And he was thinking that an in-house role would allow him a little bit more time in that capacity, and it wasn't quite what he was expecting.

Q.        Did you tell him, by any chance, that he was lucky he wasn't working for Williams & Connolly?

A.        I -- I didn't tell him that.

Q.        That falls in the previous category of my wife's comments on my sense of humor, which, Steve, you weren't here, which is that nobody appreciates it.

He left in July.  When did Hatfield join?

A.        September.

Q.        Who was managing this litigation between those -- in that gap period?

A.        No one.  Chris's emails were getting forwarded to me.  And so -- well, I shouldn't say no one.  I would have to say during that period I was.

Page 138

And I had told Jay that if anything was filed and it would have came to Chris's email, I would be aware of it.  And actually, shortly thereafter you all filed the motion for sanctions.

Q.        When in September did he arrive?

A.        I don't remember the specific date.

Q.        Early September?  Late September?

Well, I can help you answer that. Hatfield's electronic signature is on your response to our motion for sanctions, which was filed on September 7.

A.        Okay.

Q.        So at that point he had been working for you for less than a week?

A.        I guess maybe he started in August, but I was thinking it was September.  I do know his first filing in this case, he had not been there very long at all.  So I do remember that.

Q.        As the guy -- as the general counsel, and you had been in charge during the interim period, including when the motion was filed in August, how did you get Hatfield up to speed in a case like this in time to, you know, prepare and file something on September 7?

A.        When I initially received the motion

Page 139

for sanctions, I actually sent it to Mr. Houchens initially.  And my intention was Mr. Houchens was going to handle that, but then Mr. Hatfield ended up handling it.  He worked on it more with Mr. Houchens than he did with me.

Q.        Okay.  During the interim phase, after it was filed but before Hatfield got there, did anyone either in the company, you, Houchens, anybody else, try to evaluate the discovery that had been provided in response to the motion to compel?

A.        I did not, but I do believe Mr. Houchens did.

Q.        Okay.  How much background did he have in the case at that point?

A.        He had some familiarity because he worked a lot with Mr. Schroeck on other matters, and they had discussed this case before.  But I don't know the full extent of his background at that point.

Q.        On Exhibit 5, which was the organizational chart for the Justice Family and various of their entities, turn to the second page of that, if you please.

A.        Okay.

Q.        There's a certification on the

Page 140

bottom, do you see there, for you to sign?  It's blank with no signature.  Do you know why this particular set of org charts was prepared and why they have this certification on them?

A.        This one was prepared for -- or at the request of Greensill Capital, and they required that certification on it.

Q.        Okay.  When you say "this one," this Exhibit 5 obviously is a collection of I think seven or so different pages.  Were all of these prepared at the same time for Greensill?

A.        No.  No.  Only page 2 was prepared for Greensill.

Q.        Okay.  They were provided to us in this order, as you can see from the Bates numbers. When and why were the other pages prepared?

A.        Almost all of these were prepared as part of financing or potential refinancing.  The top page, I had prepared.  Because at the time -- the top page and page 4 were prepared at the same time, which is the Justice Family Group page.  About a year or so ago, we were working on refinancing for The Greenbrier.  And as part of that refinancing, a lot of banks are somewhat anti-coal these days.  And so they like to see where your non-coal assets fit

Stephen W. Ball                                                                    36 (141 - 144)

**Page 141**

within the organization as related to coal assets. And so the top chart was intended just to give a picture of the overall organization. And then the Justice Family Group chart was intended to show them the structure of The Greenbrier assets.

Q.     All right. And so that's all that was given to -- who was the lender that asked for that?

THE WITNESS: Can I ask you about that real quick?

MR. RUBY: Can we step out?

MR. LUCAS: Uh-huh.

(Whereupon, off the record.)

MR. RUBY: That's under an NDA. Do you...

MR. LUCAS: The identity of the lender is under an NDA?

MR. RUBY: My understanding is that there was an NDA that was signed -- the loan was never consummated. So there was a NDA for the discussions with the lender about the possible transaction.

MR. LUCAS: I gotcha.

MR. RUBY: But it was never actually done.

**Page 142**

MR. LUCAS: Okay.

BY MR. LUCAS:

Q.     Let me try this. It wasn't Greensill?

A.     No.

Q.     It wasn't Carter Bank?

A.     No.

MR. LUCAS: I'm not sure I care which bank it was.

MR. RUBY: All right.

BY MR. LUCAS:

Q.     Was this a bank you didn't have a prior relationship with?

A.     Um, yes. And I don't know that they would technically be called a bank.

Q.     Okay. And did they decline to make the loan?

A.     Um, you know, I don't really know. I just know it didn't happen. I don't know how it reached that result, though.

Q.     All right. Well, you have accounted for a couple of the pages. How about the other pages, like the third page, which is the non-Bluestone Coal assets. When and why was that prepared?

**Page 143**

A.     I created it. I created all of these. I honestly do not recall why I made this chart. But when I was going through organizational charts that I have, I have this one. But I don't have a recollection of why I created this one.

Q.     Do you know roughly when it was created?

A.     Um, I don't.

Q.     How about the next to the last page, Bates No. 1149, that's JCJ and its subs. Do you recall when that was created?

A.     No.

Q.     Do you know why it was?

A.     I don't.

Q.     Are these org charts something that are created for various purposes from time to time but not on a regular basis?

A.     Yeah, not on a regular basis. Typically only upon request. And every instance I can think of has been related to either financing or potential financing.

Q.     Do you generally keep copies of them like these?

A.     I do, yeah.

Q.     Are there more?

**Page 144**

A.     No. These were the only ones that I found.

Q.     Okay.

MR. LUCAS: That's all I've got.

MR. RUBY: Okay. I don't have anything.

MR. LUCAS: Are you sure?

MR. RUBY: Positive.

MR. LUCAS: Go ahead.

MR. RUBY: He'll read and sign.

(Whereupon, the deposition concluded at 3:14 p.m.)

Stephen W. Ball                                                    37 (145 - 148)

Page 145

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF KNOX:

          I, LORA R. BOATMAN, Licensed Court
Reporter, in and for the State of Tennessee, do
hereby certify that the above deposition was
reported by me and that the foregoing pages of the
transcript is a true and accurate record to the best
of my knowledge, skills, and ability.

          I further certify that I am not related to
nor an employee of counsel or any of the parties to
the action, nor am I in any way financially
interested in the outcome of this case.

          I further certify that I am duly licensed
by the State of Tennessee Board of Court Reporting
as a Licensed Court Reporter as evidenced by the LCR
number and expiration date following my name below.

          IN WITNESS WHEREOF, I have hereunto set my
hand this the 30th day of May, 2022.


          LORA R. BOATMAN, LCR No. 106.
          Expiration Date: 6/30/2022.

Page 146

DEPOSITION ERRATA SHEET

Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____

SIGNATURE:_____ Date:_____
PRINT WITNESS NAME:_____

Page 147

DEPOSITION ERRATA SHEET

Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change: _____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____
Page No._____ Line No. _____ Change to:_____
Reason for change:_____

SIGNATURE:_____ Date:_____
PRINT WITNESS NAME:_____

Page 148

_____
SIGNATURE OF WITNESS

STATE OF:

COUNTY OF:


Sworn and subscribed to before me this _____
day of _____, 2022.


          _____
          Notary Public
          My commission expires:_____

**Gateway Court Reporting & Video, LLC**