IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LEXON INSURANCE COMPANY,      )
                              )
            Plaintiff,        )
                              ) Case No.
                              ) 3:23-cv-00772
      v.                      )
                              ) District Judge Crenshaw
JAMES C. JUSTICE II,          )
                              )
            Defendant.        )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

BENCH TRIAL DAY 2

August 21, 2025

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES ON THE FOLLOWING PAGE

Fowler v. Justice Family Group LLC
2:23-CV-01180-GMB-
Date 5/4/2026 Jury Trial
Plaintiff Exhibit Label No. 94

PREPARED BY:
            LISE S. MATTHEWS, RMR, CRR, CRC
            Official Court Reporter
            719 Church Street, Suite 2300
            Nashville, TN 37203
            lise_matthews@tnmd.uscourts.gov

APPEARANCES:

For the Plaintiff:          Jason M. Halper
                            Sara E. Brauerman
                            Timbre Shriver
                            VINSON & ELKINS LLP
                            1114 Avenue of the Americas
                            New York, New York 10036

                            W. Brantley Phillips, Jr.
                            BASS, BERRY & SIMS PLC
                            21 Platform Way S
                            Suite 3500
                            Nashville, Tennessee 37203

For the Defendant:          Peter C. Robison (No. 27498)
                            LEWIS THOMASON, P.C.
                            427 Church Street
                            Suite 2500
                            Nashville, Tennessee 37219

                            Steven R. Ruby
                            David R. Pogue
                            CAREY DOUGLAS KESSLER
                                 & RUBY PLLC
                            707 Virginia Street E.
                            Suite 901
                            Charleston, WV 25301

I N D E X

Thursday, August 21, 2025


INDEX OF WITNESSES


WITNESSES:                                                      PAGE


WILLIAM MULLER
     DIRECT EXAMINATION BY MS. SHRIVER                            6
     CROSS-EXAMINATION BY MR. POGUE                              65

STEPHEN BALL
     DIRECT EXAMINATION BY MR. POGUE                             77
     CROSS-EXAMINATION BY MR. PHILLIPS                          133
     REDIRECT EXAMINATION BY MR. POGUE                          156

I N D E X

Thursday, August 21, 2025


EXHIBITS

| JOINT EXHIBITS | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 74 | Stipulations | 76 | 76 | |
| 75 | Portion of Deposition of Stephen Ball (ID only) | 164 | | |

The above-styled cause came on to be heard on August 21, 2025, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

THE COURT:  All right.  Be seated.

All right.  Good morning.  Is the plaintiff ready to proceed?

MR. POGUE:  Yes.

MR. HALPER:  Yes, Your Honor.

THE COURT:  And the defense?

MR. RUBY:  Yes, Your Honor.

THE COURT:  All right.  Let's get Mr. Muller on the stand.

MS. SHRIVER:  Good morning, Your Honor.  Lexon calls William Muller.

THE COURT:  All right.

COURT DEPUTY:  If you'll come to the podium first to be sworn in.

Please raise your right hand.

WILLIAM MULLER,

called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the

record.

THE WITNESS:  William John Muller III.

COURT DEPUTY:  Spell your last name.

THE WITNESS:  M-u-l-l-e-r.

COURT DEPUTY:  Thank you.

You can have a seat at the witness stand, and watch the ramp.

                    DIRECT EXAMINATION

BY MS. SHRIVER:

Q.   Good morning, Mr. Muller.

A.   Good morning.

Q.   What's your current job title?

A.   Vice-president of North American controls.

Q.   And that's with Sompo?

A.   That's correct.

Q.   And when did you begin in that role?

A.   March of this year.

Q.   What title did you hold before that?

A.   Vice-president of surety operations.

Q.   And how long did you hold that position?

A.   Let's see.  That was seven years, I guess it was.

Q.   And that was with Sompo?

A.   Sompo, yes.

Q.   And when did you start at Sompo?

A.    June of 2018.

Q.    Was that around the time that Sompo acquired Lexon Surety Group?

A.    Yes, it is.

Q.    And how long did you work at Lexon Surety Group before it was acquired by Sompo?

A.    It was another probably six years.  I joined July of 2012.

Q.    And what positions did you hold while you were at Lexon?

A.    Assistant chief operations officer.

Q.    And you worked at other surety companies in the industry before that, right?

A.    Yes, I did.  I've got 34 years.

Q.    You were in operations roles for most of that time?

A.    Yes.

Q.    Can you briefly describe your post-high school education?

A.    I was a double major in finance and accounting with an MBA.

Q.    Okay.  So for today we're going to focus on your role as vice-president of surety operations from 2012 to March 2025, okay?

A.    Okay.

Q.    All right.  So what were your responsibilities as V-P of surety operations?

A.   I oversaw a lot of the -- what we call the underwriting assistants, who did all the billing in our system, whether it was new renewals, adjustments, and stuff on bonds.  I oversaw the collections and cash application team, responsible for, you know, obviously collection activity and any kind of cash applications.

Q.   And what does that entail?

A.   Collections.  That team really focused on, you know, what's outstanding, what's due, what's past due, and trying to work back with people to get the -- get payment.

And then the cash application team focuses on, when payment's received, applying it in our systems.

And then also I oversaw a reporting team that built various different and generated various different reports for us.

Q.   Did your job responsibilities involve tracking premium that became due on bonds?

A.   Yes, it did.

Q.   And is that also called premium accrual?

A.   Yes, it is.

Q.   And what was that role?

A.   That was more of an oversight -- again, overseeing the collections and cash applications team.

Q.   And were you setting up processes for tracking as well?

A.   Yes.

Q.    Did your job responsibilities also include tracking premium payments that were made?

A.    Yes, I did.

Q.    And what was your role with respect to premium payments that were made?

A.    Again, more of an oversight, making sure that the cash applications were getting done properly.

Q.    And did you supervise employees in these functions?

A.    Yes, I did.

Q.    About how many?

A.    There was about 30 in total.

Q.    And did they report directly to you?

A.    No.  They were -- managers reported to me.

Q.    So ultimately you were responsible for tracking premium accrual and payments, right?

A.    Correct.

Q.    How often does Lexon charge premium on a bond?

A.    Most bonds renew annually.

Q.    And does that mean that premium is charged annually?

A.    Yes, premium would be charged annually.

Q.    Are you aware of bonds held by the subsidiaries of the James C. Justice Companies?

A.    Yes, I am.

Q.    And if I refer to the James C. Justice Companies and its subsidiaries as "the Justice Companies," will you understand

what I'm referring to?

A.    Yes.

Q.    Are you familiar with Lexon's relationship with the Justice Companies?

A.    Yes, I am.

Q.    And do you recall when you first became aware of Lexon's relationship with the Justice Companies?

A.    Shortly after I joined Lexon in July of 2012.

Q.    Did you and your team ever track premium accrual on the Justice Companies' bonds?

A.    Yes, we did.

Q.    And when did you first become responsible for tracking that?

A.    Again, shortly after I joined, around July of 2012.

Q.    Did the Justice Companies ever fall behind on premium payments?

A.    Yes.

Q.    Was there anything unique in terms of tracking the Justice Companies' premium payments?

A.    They were frequently delinquent, and a lot of -- the handling of that account usually had me get our CEO involved. He would make a phone call, then get us some payments, and then we would apply those payments.

Q.    And that CEO was David Campbell?

A.    Yes, it was.

Q.   When those payments came in, were they generally lump sum payments?

A.   Yes.

Q.   How did that affect how Lexon attributed the payments to the premiums owed?

A.   Yeah.  I mean, typical people pay us on kind of a statement and say, "Here's the bonds we're paying."

Because we were getting lump sum payments, we were typically applying it on the oldest bonds first.

Q.   And you testified that, as V-P of surety operations, you were responsible for ensuring that a record of premium charges and payments were maintained.

Do I have that right?

A.   Correct.

Q.   All right.  If we could pull up JX 75 -- 71, sorry.

Mr. Muller, I'm showing you what's been admitted as Joint Exhibit 71.

Do you recognize Joint Exhibit 71?

A.   Yes, I do.

Q.   Did you create it?

A.   Yes, I did.

Q.   At a very high level, what is it?

A.   It's -- shows all the premium accruals and outstanding balances on those bond terms over the period of time.

Q.   Do we refer to this as "the premium tracker"?

A.    Yes, we do.

Q.    All right.  We're going to circle back to the information contained in this exhibit here in a minute.  But before we do that, let's quickly talk about how the exhibit was created.

You generated this report from internal data that Lexon maintains, right?

A.    Correct.

Q.    And why did you create this report?

A.    Because you requested it.

Q.    I asked you to calculate how much premium the Justice Companies owe, right?

A.    Correct.

Q.    Did I tell you how to generate it?

A.    No, you did not.

Q.    And you've generated versions of this same report at my request, right?

A.    Yes.

Q.    And when did I first ask you to calculate how much premium the Justice Companies owe?

A.    It was probably July of 2023.

Q.    What data sources did you pull that report from?

A.    We use a couple different reports for this.  One is our exposure report that just lists all the bonds that were in force during that period of time.  An aging report shows the

outstanding balances for -- related to those bonds.  And then a cash payment report to show where the -- how much money was received and applied.

Q.    Are the entries made on those systems that you just mentioned made at or near the time that payments came due?

A.    Yes.

Q.    And were entries made on those systems at or near the times that premiums came due?

A.    Yes.

Q.    Who enters premium and payment information into those systems?

A.    So the underwriting assistants do all the bond processing, whether it's new premiums, billings, renewals, adjustments.  And then the cash application team is the one that applies the payments.

Q.    And this record is updated as bonds are renewed?

A.    Yes.

Q.    When did you prepare this particular version of this report?

A.    It was around July of this year.

Q.    Okay.  So, just to orient us with this report, let's start with the "Parameter" tab, Tab Number 3.

        Your Honor, it might be easier to follow along on the screen.  It's fairly interactive.

        THE COURT:  And I know everyone likes that.  But

is this going to be an exhibit?

MS. SHRIVER:  It's a --

THE COURT:  Is this version -- is the electronic version -- because all I'm going to have is 71.

MS. SHRIVER:  I believe we submitted it as a thumb drive.

THE COURT:  Okay.  All right.  We'll give it a try.

BY MS. SHRIVER:

Q.   Okay.  So what does this "Parameter" tab show?

A.   This is from our exposure report in terms of how I got the outstanding bonds during this period of time.  The first tab -- we had to run two versions of this report and combine them together.

The first tab is -- shows all open bonds during that period of time.  And then the second tab looks at what was kind of closed or canceled during that period of time, from July -- or sorry -- from --

THE COURT:  I'm going to slow you down --

THE WITNESS:  Sorry.

THE COURT:  -- for me and the court reporter.

THE WITNESS:  Okay.

So the second tab is the -- for the closed and canceled bonds from the period of time, from February of 2019 through June 30th of 2025.

And the fact that it says "closed" doesn't necessarily mean the bond was actually closed or released. It was just -- more of a term of how the renewal happens. Once we renew the bond, the previous term closes out.

Q.   Okay.  Let's please turn to the "Bond Detail" tab.

And, Your Honor, this is on the first page of the exhibit that you have.  So if you would like to follow along on paper, we can walk you through that.

THE COURT:  Go ahead.

BY MS. SHRIVER:

Q.   We're going to talk about the various columns in a minute.

But, to cut to the chase, what does this tab ultimately show?

A.   This shows all the bonds that were outstanding during this period of time and the remaining outstanding current past due balances and balance dues.

THE COURT:  As of July of 2025?

THE WITNESS:  As of July 30th of 2025, yes, sir.

BY MS. SHRIVER:

Q.   And where can we see the total amount of outstanding premium that was owed by the Justice Companies as of June 30th, 2025?

A.   If you scroll all the way to the right and all the way down column X there, the gross balance as of 6/30/2025 shows

11.1 million.

And column Y is the portion of that 11.1 million that is over 60 days as of 6/30/25 for 10.3 million.

THE COURT:  Okay.  Again, you're going to have to be a little bit slower.

THE WITNESS:  Okay.  Sorry.

BY MS. SHRIVER:

Q.  Mr. Muller --

THE COURT:  I'm sorry.  So column Y is over 60 days?

THE WITNESS:  It's over 60 days, a portion of that 11.1 million, yes, sir.

THE COURT:  And what's column X?

THE WITNESS:  X is the total outstanding at that time.  So basically everything less than past due of 60 days is included in that balance.

THE COURT:  Okay.

THE WITNESS:  So current to 59.

THE COURT:  Go ahead.

BY MS. SHRIVER:

Q.  So, to summarize, this tracker shows how much premium has accrued and how much money was paid on bonds held by the Justice Companies?

A.  Correct.

Q.  Okay.  Let's walk through how to do that.

How would I sort this tracker to see premium accrual in chronological order?

A.   If you scroll over to the "Effective Date" column --

Q.   Is that column F?

A.   Yes.  And then, if you click down on the drop-down arrow there and go oldest to newest, this will put the report into a chronological order based on effective date from oldest to newest.

Q.   And can you please explain what the effective date means?

A.   The effective date is -- well, the original effective date is the date that the policy was first issued by the -- requested from the obligee, and then the "Effective Date" column here typically represents each renewal effective date thereafter.

Q.   And you testified earlier that premium accrues when a bond renews, right?

A.   Correct.

Q.   And that's annual for these bonds?

A.   For the most part, yes.

Q.   When does a bond stop renewing?

A.   When we're either released from the obligee, for the most part, or the bond gets canceled.  But a lot of times it requires a release or adjustment from the obligee.

Q.   What's the first date of renewal shown here?

A.    2/4 of 2019.

Q.    Is it fair to say that this shows how much premium has accrued on bonds that renewed on and after February 4th, 2019?

A.    Yes.

Q.    Let's talk about how to get to that premium balance that we talked about earlier.

So this is itemized by bond, right?

A.    By bond term, yes.

Q.    And those bond numbers are in column A?

A.    Yes.

Q.    What's the meaning of a hyphenated number recorded in column A?

A.    So that dash-7, 7 means we've renewed this particular bond for seven years.

THE COURT:  So where will I find that bond in Exhibit 71?

MS. SHRIVER:  Column A over on the right-hand -- or left-hand side.

THE COURT:  Right.  But the first one here is 12108-17.  But I gather we're looking at 1069826-7.

MS. SHRIVER:  We just --

THE COURT:  Where is that?

MS. SHRIVER:  Apologies.

THE COURT:  That's okay.

MS. SHRIVER:  We just -- we just filtered this and sorted oldest to newest in the "Effective Date" column.  So it's in chronological order now.

THE COURT:  All right.  Hold on.

MS. SHRIVER:  We would have to look at the exhibit and tell you what row this first column that's showed on the screen is shown on the hard copy.

THE COURT:  So the bond numbers are in chronological order?

THE WITNESS:  I think that was the --

MS. SHRIVER:  We just sorted them into chronological order.

THE COURT:  The bond numbers.

THE WITNESS:  No.  I think the original version was based off bond policy order number, I believe.

MS. SHRIVER:  Your Honor, we can submit a version in chronological order after this.

THE COURT:  Hold on.  Hold on.  I might be getting close.

MS. SHRIVER:  Your Honor, that's located on row 2664, I'm told.

THE COURT:  I just found it.  You found it, like, 2 seconds before I did.

MS. SHRIVER:  You're very quick.

THE COURT:  Okay.

Now let's talk.  Go ahead with the question, rather.

BY MS. SHRIVER:

Q.   Okay.  So let's talk about how we get to that premium balance that we talked about earlier.

This is itemized by bond, right?

A.   Yes.  By bond term.

Q.   And those bond numbers are in column A?

A.   Correct.

Q.   And what's the meaning of the hyphenated number recorded in column A?

A.   So the dash-7 represents we renewed this bond for seven terms.

Q.   When is the bond number first assigned?

A.   Initially, when the bond gets requested from the obligee.

Q.   And what's the significance of the term number?

A.   That shows how many terms we've renewed it.

Q.   Is that -- or can you please explain what is shown in columns B through E?

A.   So B through E -- I'll start with E -- is the principal name.  That's the ultimate entity that was issued on the bond policy.  And then that's the -- also the subsidiary of Justice, where column C shows the relationship where it rolls up to the parent company of James C. Justice.

And then B and D are just internal system unique identifiers to those entities.

Q.    In the next three columns there are a few dates listed.

We already covered the effective date listed in column F, right?

A.    Yes.

Q.    So what's the expiration date in column G?

A.    G is -- again, most of these bonds are set up for an annual term.  So G becomes the date, really, where we set the -- to renew the bond.

Q.    And in column H?

A.    H represents the original effective date, basically Term 1 that that bond was issued.

Q.    And the bond issued on the date in column H has been renewing every year since then, right?

A.    Correct.

Q.    And the renewal dates for that bond are shown in column F?

A.    Correct.

Q.    And the number of years it's been renewing, is that term number shown after the dash in column A?

A.    Correct.  Seven -- seven terms in this case.

Q.    In columns I through K, what's shown there?

A.    That's the obligee information, basically the entity that requested the bond.

So J is kind of the main obligee.  Sometimes the obligee we have in our system has a division name associated to it as well.  And then column I is, again, our unique identifier in the system for that entity.

Q.   What does column L show?

A.   L shows the amount of the bond exposure, the bond liability.

Q.   And how is the -- and that's the bond amount, right?

A.   Yes.

Q.   How is the bond amount determined?

A.   By the obligee.

Q.   What's in column M?

A.   M is the total premium that we charge for that particular bond based on that bond amount.

Q.   And Lexon charges that premium bond renewal of a bond?

A.   Yes, subject to the obligee making any adjustments to the bond amount.

Q.   And you testified earlier that bonds on the Justice accounts are renewed annually?

A.   Correct.

Q.   So the Justice Companies were obligated to pay premium on each of these bonds annually?

A.   Yes.  As they renewed.

Q.   Does the premium amount stay the same year over year?

A.   It depends on the obligee.  If they change the bond

amount, that will impact the amount of premium.

Q.   And is sometimes that amount reduced?

A.   Yes, it is.

Q.   In what circumstances?

A.   If a partial release was done on the -- on the bond from the obligee or the obligee released the bond in total.

Q.   And what's in column N?

A.   N is a Kentucky surcharge.  Any obligations running to the State of Kentucky requires a 1.8 percent surcharge.

Q.   Are the Justice Companies as the principal responsible for the Kentucky tax?

A.   Yes, they are.

Q.   And if the Justice Companies don't pay the premium owed on a particular bond, does Lexon have to pay the Kentucky surcharge?

A.   Yes.

Q.   What does column O show?

A.   O shows, if there was a payment on that particular bond term, the date that that payment was applied.  And if there's none, that means there was no record of any payment on that bond term.

Q.   So here, if we're looking at row 16, Bond Number 1135173-1, that means that no payment was made on that particular bond renewal?

A.   Correct.

Q.    And if there is a date, does that mean the premium was paid on that date?

A.    Correct.

Q.    All right.  Rounding out to columns P through Y, can you briefly explain what's shown in these columns?

A.    These represent the different periods of time that you requested in terms of when we generated the report.

So column -- we'll start with column P is the gross balance due as of 6/30/2023.  So that was the total amount outstanding at that time, where column Q, "Gross Balance Due Over 60," shows how much of that balance from P is past due of 60 days or more.

And then all the rest of the columns go through each period of time, from 3/31/24, to 6/30/24, to 3/31/25, and then to the last report of 6/30/2025.

Q.    So, if the Justice Companies paid premium owed on a particular bond, column O would reflect the date of payment and column P through Y would equal zero?

A.    Correct.

Q.    And what if they didn't make a payment owed on a particular bond?

A.    Then you would see respective balances in P through X, depending on when the balance became due or accrued, as to when it may have hit in a particular period.

Q.    And what if for one reason or another the bond was only

partially paid?

A.   You would see in column O a paid date, and then you would see a balance in potentially P through X.

Q.   So, if we scroll all the way down to the bottom, all the way to row 3817 --

Your Honor, that's the last page of this giant document that you're looking at.

THE COURT:  All right.

BY MS. SHRIVER:

Q.   -- we see some totals.

Can you please describe what the total in column N includes?

A.   That's $13.1 million, which is the total premiums that accrued since 2/4/2019 through 6/30/2025.

Q.   And what's the total in column N?

A.   That's the Kentucky tax related to that same period of time accrued over that period of time.

Q.   Earlier you walked us through columns P through W.

Those are just historical balances, right?

A.   Correct.

Q.   And have the Justice Companies made any payments between June 30th, 2023 and June 30th, 2025, to your knowledge?

A.   No.

Q.   So those balances are stale now, right?

A.   Correct.

Q.   Okay.  So, for ease of viewing, let's go ahead and hide those columns, P through W, okay?

So remind us which columns show the most recent balance owed by the Justice Companies.

A.   So column X is the gross balance due as of 6/30/2025, which is 11.1 million.

And then column Y shows the gross balance over 60 days as of 6/30/2025 for 10.3 million.

Q.   Do the balances in X and Y take into account the payments that the Justice Companies have made?

A.   Yes.

Q.   And how do you know that?

A.   Well, from the payment summary, that's where we outline all the different bonds, terms that were paid, and when they were applied.

Q.   Is there a way to see that payments were applied to the outstanding premium owed in this tab, though?

A.   Oh, yes.  So if you, again, go back to the bonds that had payments, they had a paid date associated to them. Scrolling up to the top, you can see that -- again, that first bond that we were looking at before, might have had a total premium of $1,753, with a $31.55 Kentucky surcharge. There is no balance due on that.

Q.   And it shows a paid date in column O?

A.   Yes, of 12/31/2019.

Q.   Okay.  So I think you started with this.

But is there another way to view the payments that have been made by the Justice Companies?

A.   Yes.  The "Payment Summary" tab shows a summary of all of the different payments and bond terms they were applied to.

Q.   Okay.  And so that's the second tab?

A.   Correct.

Q.   We're already there.

Your Honor, this is -- oh, I'm sorry.  Go ahead.

THE COURT:  No.  You go ahead.

MS. SHRIVER:  This is the smaller document that's attached to the (indiscernible).

THE COURT:  So, before we go there, just to make sure I'm understanding -- yeah.  So let's go back to where she started.  I guess it's line 2664.

MS. SHRIVER:  I believe we're there.  Are we looking at Bond Number 1069826-7?

THE COURT:  Right.  Okay.

So, for this particular bond at line 2664, the maximum exposure was $103,100?

THE WITNESS:  Yes.  $103,100 was the bond exposure, yes, sir.

THE COURT:  So that's the amount that was requested, I gather, by the Commonwealth of Kentucky.

THE WITNESS:  Correct.

THE COURT:  Okay.  And the 1,753 is the yearly premium?

THE WITNESS:  The annual premium, yes, sir.

THE COURT:  And that becomes due on the expiration date?

THE WITNESS:  On the effective date.

THE COURT:  On the effective date.

THE WITNESS:  Yes.

THE COURT:  So what's the expiration date?

THE WITNESS:  That's just when we -- the annual renewal.  The term runs for a year, and then we'll renew it.  And the renewal term will become due on that next effective date.

THE COURT:  So, for this particular bond, the -- the effective -- the next -- this says the next -- the expiration date was 2/4/2020.

THE WITNESS:  Correct.  That's one year from the effective date.  So they renew annually.

THE COURT:  Oh, I see.  Column F.

THE WITNESS:  Yeah.  F is the effective date, when the -- basically, the policy starts or that bond term starts, and expiration date is when that bond term ends.

THE COURT:  So since 2020 there have been no further premium payments on this particular bond?  If this is

as of July of 2025?

THE WITNESS:  There -- if we sorted column A in this exhibit, you would see by the bond term there's been multiple renewals of that.  So there's probably a Term 8 and Term 9.

THE COURT:  Oh.  So this is only for the renewal -- the seventh renewal.

THE WITNESS:  For the seventh renewal, yes, sir.

THE COURT:  Okay.  Where is the renewal as of July 2025?

THE WITNESS:  If you can capture that -- go to the drop-down in bond number, and type in that bond number, 1069826, and then hit "Enter," here is where you'll see all the different subsequent terms and renewals of that policy. So from Term 7 through Term 13 now.

THE COURT:  Okay.  Which is somewhere on those line numbers indicated?

THE WITNESS:  Correct.

THE COURT:  Okay.

THE WITNESS:  And then, if you -- still looking over at "Bond Amount," you'll see annually it's all been 103,100 --

THE COURT:  Hold on.  Say that again.

THE WITNESS:  The "Bond Amount" column here, where it's $103,100, so each annual term, that number stays the

same.   The total premium, $1,753 has stayed the same.

THE COURT:  Right.

Now, when you first talked about this, does that premium column ever change?

THE WITNESS:  It depends on the obligee.  So, if the obligee were to reduce, say, that bond, because maybe they've done some partial reclamation of it, they may release say, $50,000 of it, then they would send us -- we would get some notification to reduce that bond amount, and that would adjust our premium payments.

THE COURT:  And that would be reflected in column M?

THE WITNESS:  Yes.  But the fact that the bond amount has not changed, there's been no adjustment, to our knowledge, on that particular bond.

THE COURT:  So the line 2664 only speaks to the seventh renewal that occurred in 2020?

THE WITNESS:  Correct.

THE COURT:  So this -- the entire exhibit does it year by year?

THE WITNESS:  Yes, sir.

THE COURT:  For each bond.

THE WITNESS:  For each bond.

THE COURT:  Okay.  And going back to line 2664, the 2020 premium was paid?

THE WITNESS:  Correct.

THE COURT:  Is that correct?  Is it the 2020 premium --

THE WITNESS:  Well, the 2019, so the 2019 for the 2020 term premium was paid.

THE COURT:  Right.

THE WITNESS:  Yeah.  So on this exhibit here, now you can see filtered down to that bond, that first row, Term 7, where the balance is due --

THE COURT:  I'm sorry.  You're talking too fast.

THE WITNESS:  Sorry.

THE COURT:  And what row are you on?

THE WITNESS:  In your -- what was that number? 26- --

THE COURT:  2664.

THE WITNESS:  Yes.  So that Term 7 there, right where the columns X and Y showed zero balances due, that means it was paid.

THE COURT:  For 2019 to 2020?

THE WITNESS:  Yes.

THE COURT:  I'm sorry.  2019 to 2020?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  And then on the screen here, where we've got it showing all the different bond terms related to

that one, you can see in column X and Y there's been no payments.  The paid date is none.  And then the balance due in X and Y shows reflectively what's not been paid.

THE COURT:  So could this be printed out per bond?

THE WITNESS:  We could do a -- if you're not interested in the term level, we could do a summarization of this by the bond number.

THE COURT:  What do you mean, if I'm not interested in the term number?

THE WITNESS:  I would have to redo this report a little bit to get us down to just the bond number without that hyphen number.  So you could see a consolidation of, say, Bond Number 1069826, how much total number we billed on it and how much total premium is outstanding on it.

THE COURT:  From 20- -- what, 2019 to --

THE WITNESS:  Yeah.  I could summarize this at that, again, minus that term --

THE COURT:  Yeah 2019 to 20- --

THE WITNESS:  To 2025.  Yes.  I could do that kind of summary.  That just takes some time to redo this report a little bit.

THE COURT:  I'm not asking for it.  I'm just trying to understand.

THE WITNESS:  Yeah.

THE COURT:  So, going back to line 2664, they made

payment on the 2019 renewal on 12/31/2019?

THE WITNESS:  Correct.

THE COURT:  Are they all -- they have different due dates?

THE WITNESS:  Yes.  Each term will have a different due date.

THE COURT:  And then column P says zero because they in fact paid the premium.

THE WITNESS:  Correct.

THE COURT:  Now, what was the purpose of columns Q through W?  What am I supposed to gain from these columns?

THE WITNESS:  Those are just the different periods of time that counsel have requested what the balance was, I think, as we were going through this process.

THE COURT:  All right.  So on this -- on line 2664, I guess it shows zero all -- that means they always paid the premium?

THE WITNESS:  Well, once the premium is paid, it's -- it's paid.  Right?  So the only time a balance might reappear is if the obligee made some adjustment to that bond that affected that term.  So, once they paid it on 12/31/19, that term has been paid in full and doesn't have another balance show up.  That's where we do the renewal terms --

THE COURT:  So what is the import of columns Q through W?  What -- I'm not -- what am I supposed to be

learning?

MS. SHRIVER:  Your Honor, if I may?

THE COURT:  Sure.

MS. SHRIVER:  Those are the dates we requested Mr. Muller run this report.

THE COURT:  Right.

MS. SHRIVER:  So the significance of column P through Q are the date that the demand was based off of, that we sent in July 2023.

THE COURT:  The amount -- the amount outstanding and old.

MS. SHRIVER:  The amount that was outstanding as of July 2023 when we filed this complaint.

THE COURT:  Okay.

MS. SHRIVER:  And then columns S and T are the outstanding balance that was owed when we produced this document for summary judgment.

THE COURT:  Okay.

MS. SHRIVER:  And U and -- oh, apologies.  I'm sorry.  Columns R through S are the date that we produced this during discovery.

THE COURT:  Okay.

MS. SHRIVER:  And columns T through U are the versions that we produced for summary judgment.

THE COURT:  Okay.

MS. SHRIVER:  And V and W are the versions that we produced earlier this year during the discovery period leading up to this trial.

THE COURT:  Okay.

MS. SHRIVER:  And then, as you know, X through Y is for trial, today.

THE COURT:  So this -- your chart is as of July the 30th, 2025?

THE WITNESS:  June 30th.

THE COURT:  June 30th.

THE WITNESS:  Yep.

THE COURT:  All of these numbers would change -- well, they did change on July the 30th --

THE WITNESS:  Yes.  As renewals happen in July, yeah.  So that -- the balance shown that we talked about is now growing.  It continues to grow.

THE COURT:  By what number?

THE WITNESS:  I don't know the monthly number off the top of my head.  But annually it's running at about a $2 million renewal clip.

THE COURT:  All of this?

THE WITNESS:  All of this.

THE COURT:  So is it Plaintiff's position that you're seeking a judgment as of July the 30th, 2025?  I'm sorry.  June the 30th, 2025?

MR. HALPER:  Your Honor, that's the evidence we've put in figuring -- you know, we're asking for an award of money and a sum certain.  And so we, given when the trial was, decided to put in evidence where we stood as of June 30th.

THE COURT:  So what are -- what, if anything, do you propose to do from July the -- from June the 30th until everybody's been to Cincinnati and everything becomes final?

MR. HALPER:  We have not proposed anything -- we haven't sought anything after June 30th other than postjudgment interest.

THE COURT:  Right.  So that's all you're requesting from me?

MR. HALPER:  We have requested the approximately, in premium, 10.3 million that was owed -- owed and unpaid for at least 60 days in terms --

THE COURT:  As of June the 30th.

MR. HALPER:  Exactly.

THE COURT:  So you just want to freeze everything as of June the 30th, 2025?

MR. HALPER:  Look, nothing's frozen.

THE COURT:  Right.

MR. HALPER:  Obviously the premiums keep accruing and the obligations are what they are in the GAIs.

THE COURT:  Right.

MR. HALPER:  On the other hand, we would like a judgment in this case someday that's going to have a number associated with it.  And so our thinking, frankly, was we needed to give the Court some -- some cutoff date in order to award a judgment with a number in it.

THE COURT:  Okay.  And, without waiving any of your defenses, what does the defense say?

MR. POGUE:  Obviously we have a different view of the term of the agreement.  But if their view prevails, I understand that Lexon is claiming damages through -- or premium damages through June 30th, 2025.

THE COURT:  And then, as he mentioned, the number changes every day, presumably.

What do we do about that, if anything?  Or you're just not asking me to do anything about that right now?

MR. HALPER:  Well, Your Honor, obviously we're happy to submit an updated number.

THE COURT:  But you'll have to submit one every day almost.

MR. HALPER:  You know, look, it also depends when we get to the end here.

THE COURT:  Right.

MR. HALPER:  So, if Your Honor's making a decision -- I'm picking this out of thin air, right? -- but say October 1st, we can provide Your Honor with an updated

figure based on exactly the methodology Mr. Muller's testifying to as of, say, you know, September 15th or something like that.

THE COURT:  Mr. Pogue, what do you -- without waiving any defenses, just tell me what you think.

MR. POGUE:  Well, I much prefer their first position, which was just cut it off on June 30th, 2025.

However, if --

THE COURT:  I don't -- when you say -- I'm not reading him to say they're waiving any damages after June 30th.

MR. POGUE:  Not -- as I understood -- and counsel can correct me if I'm wrong -- as I understood it, though, he said for purposes of this lawsuit, they were just seeking the premium through June 30th, 2025.

And then after that, they're not saying premium wouldn't continue to accrue, but it would accrue under the GAIs and that they would expect payment under the GAIs.

MR. HALPER:  Well, it's not -- what we're seeking is what's in our complaint.

What I said, I think, I hope, is that for purposes of giving the Court clarity so as to award a judgment, we put in evidence as of a date reasonably close to the trial, you know, for purposes of -- for that purpose.

We haven't waived our right to seek that premium.

And if, again, we -- would be happy to submit an updated figure.

THE COURT:  So let me restate it.  You want me to enter a judgment as of a certain date without waiver of any -- of Plaintiff's rights to further damages, the parties recognizing that this number changes on at least a monthly basis?

MR. HALPER:  Can I just talk -- confer with Mr. Sentman for one second?

THE COURT:  Who?

MR. HALPER:  Our corporate representative.  I believe so, Your Honor, but --

THE COURT:  Sure.

MR. HALPER:  -- look --

THE COURT:  All right.

MR. HALPER:  So, Your Honor, look, I think I got most of it right.

THE COURT:  Okay.

MR. HALPER:  Yes, we would like the Court to award a sum certain as of the most recent date possible to that award.

THE COURT:  Okay.

MR. HALPER:  If it is possible to -- for the Court to retain jurisdiction after that, for the possibility to come back if premiums continue to accrue, great.  But our

primary goal is to obtain a judgment for what we're owed reasonably close to whenever Your Honor rules.

THE COURT: Right. And when I rule -- I think y'all have reserved the right to file posttrial findings of fact and conclusions of law. I think y'all asked for that.

MR. POGUE: It was my understanding from one of the status conferences that we had that Your Honor had ordered us to submit posttrial proposed findings and conclusions within 30 days after the transcript became available.

THE COURT: Right. Except I think it came up on your request, which I'm fine with. But it doesn't matter.

MR. HALPER: It was my --

THE COURT: And then maybe when you give the posttrial conclusions of law -- I think we said you were going to do it simultaneously.

MR. POGUE: I believe that's right.

THE COURT: Then you could give me the number as of that date, after you share it with the defense.

MR. HALPER: Sure. We can -- I'm just -- it won't be that date. Because Mr. -- the books have to close, and there's always going to be a little lag. But yes, a more recent date.

THE COURT: Go ahead.

MR. POGUE: We would just like to reserve the

right to review the updated spreadsheet and updated --

THE COURT:  Oh, that's why I meant -- oh, I agree. You all should share that.  The plaintiff should share that with defense before you give me that number.

MR. POGUE:  Okay.

MR. HALPER:  Yes, Your Honor.

THE COURT:  So I think that's workable.  And we'll -- I'll issue a decision.  You'll give me the number as of that date.  And that will cover everything except attorney fees.

Correct?

MR. HALPER:  That is correct.  That's going --

THE COURT:  Correct, Mr. Pogue?

MR. POGUE:  Yes, Your Honor.

THE COURT:  Okay.  And on that issue, after we're done here, I am going to ask you all to meet and confer.  It seems like you -- you can find some agreement at some point in time, and then the Court take it up from there, if needed.

Does that make sense?

MR. HALPER:  Sorry, Your Honor?

THE COURT:  On the attorneys' fees.

Because, I mean, we need to get a final judgment. And I need to address all issues.  That would be one of them.

MR. HALPER:  We're happy to try and work with counsel.  We have a good working relationship.  I can't

guarantee we're going to agree, obviously.

THE COURT:  And I'm not asking you to agree on everything from the beginning of time to today.  But I am trying to say from the beginning of this to some point in time.

Mr. Pogue, without -- look like you can reach some agreement there?  Or Mr. Ruby?

MR. RUBY:  Your Honor --

THE COURT:  Generally I just have one lawyer talk at a time.

MR. RUBY:  I know, Your Honor.  I thought, since they had two on this one, I might be able to jump in.

THE COURT:  Okay.  We just --

MR. RUBY:  Does the Court mean an agreement on what the cutoff date would be for the premiums?  Or --

THE COURT:  Oh, no.  I'm talking about attorney fees now.  I'm trying to narrow the issue on attorney fees so I can -- to the extent you all can agree, that as of -- I don't know -- January 1, 2025, we agree the attorney fees are X.  And then I can take up from that point to -- to the date of the judgment.

MR. RUBY:  And we're certainly happy to discuss that with them.

THE COURT:  Well, I don't want you wasting your time.  Do you think that's a good use of time?

MR. RUBY:  I don't want to prejudge it, Your Honor.  I know the attorney fees they've submitted from then -- we're talking big bills.  They obviously have staffed the case more heavily than we have.  And so we would have to take a look at that and see if we can agree that they're reasonable.  But we're certainly happy to try.

THE COURT:  Okay.

All right.  Just so to repeat, make sure we're on the same page, at some point when you file your posttrial findings of fact and conclusions of law, which will be 30 days -- I think Mr. Pogue is right, we said 30 days after the transcript becomes available.  And the transcript will probably be available in three weeks.

And then you'll do that, and you'll give me an updated premium number after you've shared it with the defense.  And, without waiving any defense, this is the -- you all agree that number is accurate based on this.

And I see Mr. Ruby --

MR. RUBY:  Yes, Your Honor.

THE COURT:  -- nodding correct.

MR. RUBY:  Yeah.

THE COURT:  And that works for the plaintiff?

MR. HALPER:  It does.  Thank you.

THE COURT:  Okay.

MS. SHRIVER:  Your Honor, do you have any further

questions on the "Bond Detail" tab?

THE COURT:  Oh, I probably do.  But let's go to this -- the 8 1/2-by-11 paper now.

MS. SHRIVER:  Great.

Q.   If we could turn to the "Payment Summary" tab, Tab 2.

Mr. Muller, can you tell us, high level, what is shown here?

A.   This shows by bond term how much was applied and which date it was applied.

Q.   And if we sort this list by date, oldest to newest, can we see a chronology of payments made by the Justice Companies?

A.   Yes.

Q.   And how would we do that?

A.   From column B, now that it's sorted, goes back to 10/16/2019 and it goes forward.  So, you can see -- looking at 12/31/2019, you can see multiple payments were applied to those various bond terms.

THE COURT:  The oldest -- you applied it to oldest premiums first?

THE WITNESS:  Correct.

THE COURT:  Now, does the defendant disagree with doing that?

MR. POGUE:  Well, Your Honor, --

THE COURT:  Without waiving any defenses, that

does sound like a logical way to apply it.

MR. POGUE:  I think there's a couple distinctions here, and I can talk about it now or get into it on cross.

But, one, I think this shows the date that they applied the payments, not the date that the payments were made.

Number two, the total here, I do not believe, captures all of the payments that were made.

THE COURT:  Oh.

MS. SHRIVER:  And we'll get to that.

THE COURT:  Okay.

BY MS. SHRIVER:

Q.   So, Mr. Muller, you just testified the first date of payment showed on this is October 16th, 2019, right?

A.   Correct.

Q.   And do you know whether the Justice Companies made payments before that date?

A.   Yes, they did.

Q.   And those earlier payments, are they shown in this report?

A.   No, they are not.

Q.   And why is that?

A.   Because this report was generated from a February 4th, 2019, bond -- bond term level.

So the payments that were made prior to this

are -- we only included payments on this tab related to the bonds that show up on the "Bond Detail" tab.

Q.   And those bonds that show up on the "Bond Detail" tab are bonds that renewed on or after February 4th, 2019, right?

A.   Correct.

Q.   Okay.  So, to summarize, this payment summary tab only showed payments that were applied to premium that came due after February 4th, 2019?

A.   That's correct.

          THE COURT:  Does this reflect any -- any -- "surplus" is not the right word -- but any premiums -- any premium payments paid before February 2019?

          THE WITNESS:  Not --

          THE COURT:  It does not?

          THE WITNESS:  Not on this exhibit.  There's another exhibit that we cover that.

          THE COURT:  The ones before February?

          THE WITNESS:  Yes.

          THE COURT:  Okay.  Of 2019?

          THE WITNESS:  Yes.

          THE COURT:  Okay.

          MS. SHRIVER:  We're heading that way.

Q.   And you testified to this earlier, but can you please just remind us how payments made are applied to reduce the premium that's owed?

A.    Yeah.  We always apply to the oldest bonds first. Again, they pay us in a lump sum, and we go back to the oldest-age bond terms and do that application.

Q.    And, so premiums -- premium payments made on bond renewals before February 2019 -- February 4th, 2019 -- excuse me -- are not shown here?

A.    Correct.

Q.    Because this particular version of the premium tracker shows only premium accrual after February 4th, 2019?

A.    Correct.

Q.    And is there another report that shows the payments that were applied to bond renewals before February 4th, 2019?

A.    Yes, there is.

MS. SHRIVER:  Let's go to JX 70.

THE COURT:  70.

BY MS. SHRIVER:

Q.    Mr. Muller, I'm showing you what's been admitted as Joint Exhibit Number 70.

Do you recognize it?

A.    Yes, I do.

Q.    And what is it?

A.    It's a similar tracker for a different -- longer period of time.

Q.    Is this the version that you were just referring to?

A.    Yes, it is.

Q.   And did you create this version?

A.   Yes, I did.

Q.   Was this report prepared in the same way as the 2019 version, JX 71, that we just reviewed?

A.   Yes, it was.

Q.   And when did you prepare this report?

A.   I prepared this report in conjunction with all the other exhibits on the 2019 version.

Q.   And so let's look at column F.

     And, again, if we sort oldest to newest, what's the bond effective date range for this report?

A.   This report runs from October 1st, 2015, through 6/30/2025.

Q.   And if we could scroll all the way back to the top.

     So the first bond shown on this version is 1079308-4, right?

A.   Correct.

Q.   And I asked you to --

     THE COURT:  Am I looking --

     MS. SHRIVER:  We sorted this by date again, Your Honor, and we're on the "Bond Detail" tab.

     THE COURT:  Okay.  All right.

     MS. SHRIVER:  And that's, in Your Honor's version, of 5140, row 5140.

     THE COURT:  I don't have row numbers.  My first

column starts with "Bond Number."  I did it the last time by going through it chronologically.

MS. SHRIVER:  Okay.

THE COURT:  I don't have row numbers.

(Respite.)

THE COURT:  Why don't we just use -- just for the sake of time, just use the top one here, 1002108 -- or 06? 08 -- 1002108-4.  Let's just use that as --

MS. SHRIVER:  Your Honor, we can do that.  The purpose of this was to show the date range applicable to this particular version.  And -- so it requires us to sort by date.

THE COURT:  Okay.

MS. SHRIVER:  But --

THE COURT:  All right.

MS. SHRIVER:  We're looking for a page number. . .

THE COURT:  So which one do you want to talk about?  Which one do you want to talk about?  I'll just follow on the chart.

MS. SHRIVER:  I'm sorry about this, Your Honor.

THE COURT:  That's all right.  Which -- which row -- which bond number?

MS. SHRIVER:  So we're looking at row number 2, Bond Number 1079308-4.

THE COURT:  All right.  Go ahead.

BY MS. SHRIVER:

Q.   Okay.  So we've sorted oldest to newest here by column F.

And that's the effective date, right?

A.   Correct.

Q.   And, again, what's the bond effective date for this report -- the range, excuse me?

A.   The range is from 10/1/2018 to 6/30/2025.

Q.   And I asked you to generate the second report, right?

A.   Correct.

Q.   And do you recall for what purpose?

A.   To just show the -- a longer history and to be able to account for all of the Justice payments.

Q.   And that's to show all payments made by the Justice Companies after February 4th, 2019?

A.   Correct.

Q.   And why did you have to go all the way back --

THE COURT:  Do you mean February 4th, or do you mean October --

Q.   February 4th, 2019 --

THE COURT:  You said all payments from the beginning.  That would be 2015.

MS. SHRIVER:  Yes.  Excuse me, Your Honor.

THE COURT:  Okay.

MS. SHRIVER:  This shows --

Q.    Mr. Muller, you just testified that this shows all payments made from 2016 -- or 2015?

A.    Well, the effective date ranges from 10/1/2015 through 6/30.  So we ran it this way to make sure we could account for all the different payments that were, I guess, in the "Payment Summary" tab.

THE COURT:  From what date?

THE WITNESS:  Can you go to the "Payment Summary" tab?

If you can sort by column B.

So from 6/9/2016 through 5 -- or 6/2 of 2025.

THE COURT:  All right.  Go ahead.

BY MS. SHRIVER:

Q.    If we could quickly go back to the "Bond Detail" tab.

Mr. Muller, why did you have to go all the way back to 2015 to show that the Justice Companies' payments made after February 4th, 2019, were applied to their premium account?

A.    Because of the, I guess delinquency, in terms of how sometimes far back we had to go to make payment applications.

THE COURT:  And that would be the date you received the first payment from the --

THE WITNESS:  Correct.

THE COURT:  Yeah.

BY MS. SHRIVER:

Q.   Let's do just a quick overview of the "Bond Detail" tab in this version.

Are the column labels in this version the same as those in Joint Exhibit 71?

A.   Yes, they are.

Q.   And can you please explain how this report differs from Joint Exhibit 71?

A.   It just goes back further in time from the bond -- effective bond terms.

Q.   And can I see a chronological list of every premium that's accrued over this longer effective date range?

A.   Yes.  That's, I think, currently sorted by the effective date.

Q.   And where can I see how much premium became due during this longer date range?

A.   If you -- if you scroll to your right a little bit and all the way down, going to the total premium, column M.  So column M shows total premium accrual over this period of time of $20 million.

Q.   And that number is larger than the 2019 version that we just looked at, right?

A.   Correct.

Q.   Okay.  So where can I see the balance of unpaid premium that's accrued over this time period?

A.    If you scroll all the way to the right, again, column X is the gross balance as of 6/30/2025 for 11.1 million, and then column Y is the gross balance over 60 related to that 11.1 million of 10.3 million.

Q.    And that balance is the same as the balance of column Y and column X in the 2019 version that we just looked at, right?

A.    That's correct.

Q.    But the balance in column M increased?

A.    Correct.

Q.    But columns X and Y stayed the same because you subtracted the Justice Companies' payments over time from the premium that came due, right?

A.    That's correct.

Q.    So where can I see all payments that were applied to the Justice Companies' accounts?

A.    Under the "Payment Summary" tab, will show us all of the different bond terms where we've applied it and when we applied the payment.

Q.    And just a moment ago we sorted this by date range -- or date, oldest to newest, right?

A.    Correct.

Q.    Okay.  And so why do payments begin on June 9th, 2016, in this version?

A.    This was just to align all the payments respective to

the bond terms shown on the "Bond Detail" tab.

Q.    And does this version include all payments made by the Justice Companies on or after February 4th, 2019?

A.    Yes, it does.

Q.    Is there a way to isolate only payments made after February 4th, 2019?

A.    If we sorted column B -- or filtered out column B by taking out the 2016, the 2017, the 2018, and then January of 2019, that will give you the full list of the different bond terms that were applied.

Q.    And it appears that the first payment after February 4th, 2019, was on February 28th, 2019.

        Do I have that right?

A.    That's correct.

Q.    And I see that multiple payments on February 28th, 2019, are applied.

        Does that mean that the Justice Companies made several payments that day?

A.    No.    They pay us in a lump sum, and this just shows the actual bond terms where we applied that lump sum payment to.

Q.    And just again, can you please walk us through how payments made by the Justice Companies were applied to reduce the premium owed?

A.    We were always applying it to the oldest balances outstanding.

Q.    And this first February 28th, 2019, payment that we see on the screen is for $1,297.95.

Do you see that?

A.    Yes.

Q.    And it was applied to Bond Number 1064809-8?

A.    That's correct.

Q.    Is there a way to see where that payment was subtracted to reduce the amount of premium owed by the Justice Companies?

A.    If you -- if you copy that bond term number and then go to the "Bond Detail" tab, and then filter column A by that bond term number, and then scroll up, and to your left.

So this is where you can see, at least on this bond term, column O shows the paid date of 2/28/2019, and the balances to your right are zero.

Q.    And -- go ahead.

A.    Well, I was going to say, I don't remember the number on the payment summary.  But the total premium plus the Kentucky tax matches the payment -- the total payment that was on the "Payment Summary" tab.

Q.    And does the paid date on this "Bond Detail" tab match the applied date on the "Payment Summary" tab?

A.    Yes, it does.

Q.    Okay.  So how do you know that it was credited to reduce the amount of premium owed by the Justice Companies?

A.    Because P through Y show zero balance due.

Q.    And do the paid date and the applied date match the actual date that the Justice Companies made a payment?

A.    Not when their -- say their check -- or the date they issued their check.  This shows the date that we actually received it and applied it into our system.

Q.    Okay.  So let's go back to the "Summary Payment" tab.

If I wanted to see the sum of all payments made and applied by Lexon after February 4th, 2019, how would I do that?

A.    You could use an Excel function called a pivot table to summarize this data and then group it by basically applied date.

Q.    But is there a way to sum that up on this tab before we apply another Excel function?

A.    Yes.  If you scroll to the bottom and then click on the 9.4 million column, if you go up into the formula, where it says "Sum from C2 to -2874," if you change that to the beginning of this one -- that was 1576, I think it was --

Q.    Can we just scroll to the top briefly before we --

A.    Make sure we got the --

Q.    Get the right row number.

A.    1578.

And if you hit "Enter," that shows that $2.4 million has been paid from that period of time.

Q.    And the resulting total is for payments made between February 4th, 2019 to June 30th, 2025?

A.    Correct.

Q.    And that's how much exactly?

A.    $4.- -- or $4,203,086.76.

Q.    And using this report, is there a way to see the total amount of payments credited to the Justice Companies by month?

A.    Yeah.  That's where we would use the pivot table to apply it against this sum.

Q.    And what is a pivot table?

A.    A pivot table is an Excel function that allows you to take a dataset and do the analytics around that dataset.

Q.    And, high level, how do you create one?

A.    You basically select the entire dataset range, and then there's an option in the tabs up at the top that -- just for -- for pivot tables to create that.

And then, once it gets created, you're just taking and dragging the columns into how you want to organize it to slice and dice the data.

Q.    So, to make it a bit easier, let's go to JX 72.

Mr. Muller, do you recognize what's been introduced -- or admitted as Joint Exhibit 72?

A.    Yes, I do.

Q.    And what is it?

A.   This is basically a portion of the pivot table that I generated off of the previous dataset that we were just looking at.

Q.   And can you please explain generally what the pivot table shows?

A.   This shows the amount of the gross -- basically lump sum payment by the applied date, and years and months.

Q.   And did you create this?

A.   Yes, I did.

Q.   How did you generate the pivot table?

A.   Again, using the Excel functions off of -- or using Excel function to summarize that "Payment Summary" tab that we were looking at.

Q.   And this shows all payments made by the Justice Companies after February 4th, 2019?

A.   Yes, it does.

Q.   How much does Lexon credit the Justice Companies for payments according to this pivot table?

A.   $4.2 million, $4,200,747.85.

Q.   Do you recall about how much the Justice Companies lump sum payments were?

A.   They ranged from mostly 135,000 to 200,000, depending on the time.

Q.   And looking at the summary of payments for 2019, why were the Justice Companies credited less than $200,000 in

July of 2019?

A.   Most of the Justice bonds had run through three primary agencies that we've dealt with:  Thomas Rutherford, Simkiss, and Old Hickory.

So, when I was doing the compilation of this and looking back to reconcile against the payments that were made, we noticed a discrepancy there with the July.  There was one bond that was issued processed through Smith Manus Agency, another one of our agencies that was not included initially in the data extract that we were doing.

Q.   So you missed this bond because it is -- was issued through a different agent?

A.   Correct.

Q.   And why were the bonds related to Smith Manus left out?

A.   Just as we were trying to filter out all of our exposures, payment data, sometimes we have to do it by an agency.  And we were excluding kind of the -- we were only including in our dataset for this analytics the agencies that were related to Justice.

Q.   But you confirmed that Lexon applied that full $200,000 payment to the Justice account, right?

A.   Correct.

Q.   And just to confirm, that bond, it was left out of this report.  It doesn't appear anywhere in this tracker, right?

A.   Correct.

Q.    Okay.  So any premium that accrued on this bond is not added to the balance owed by the Justice Companies, right?

A.    Correct.

Q.    Could there be any other bonds missing?

A.    I don't believe so.  We've reconciled to the balances, as you can kind of see, from the range of 135,000 to 200,000 on the gross payment applications.  We covered all of the payments that they have -- that they made.

Q.    And just further to that.  You said "about."

Some of these entries aren't round numbers that -- and they don't exactly match the payment amounts, right?

A.    Correct.

Q.    And why is that?

A.    Again, the complexity of trying to do the payment applications where we're going backwards in time, they're giving us a lump sum of, say, $200,000, against the total premium amounts on the bond terms that don't sum up to 200,000.

So we're trying to get as close to that 200,000 as we can.  And then the system automatically writes off plus or minus 25 or $50.

Q.    And when you say "write off," what does that mean?

A.    The system -- when we're finishing up that payment application, the system just writes off those remaining balances, just basically clears it without payment.

Q.    And are these normal course adjustments?

A.    Yes.

Q.    Okay.  So why are there negative balances in December of 2019?

A.    These were -- would be return premiums that they got generated.  Again, from an obligee releasing a bond or reducing a bond.  There was a bond that they maybe paid; the bond amount got reduced; we reduced the premium; it generated a credit; and we use those credits to offset other outstanding balances that were owed.

Q.    Do you know approximately when the Justice Companies stopped paying premium altogether?

A.    The March 2021.

Q.    Okay.  Let's go back to the "Payment Summary" tab of Joint Exhibit 70.

So if we can scroll up to the row -- yep -- about right there.  At March 1st, 2021.

Mr. Muller, why are the Justice Companies credited for payments after March 2021?

A.    These again relate to obligee adjustments on the bond terms where payments were -- were made previously, and now we've returned -- or reduced the amount of exposure.

So, similar to the other credit, we were taking those amounts and offsetting them -- offsetting credits with additional balances due.

Q.   And those red numbers in parentheses, are those negative numbers?

A.   Yes.

Q.   Does that mean the payments were deducted from the Justice Companies?

A.   Yeah.  Those represent a previous payment on that particular bond term where it now generated a credit, and then we use that credit to offset other positive balances.

Q.   And, in other words, are you saying that Lexon would have paid the Justice Companies the amount in red, but, because the Justice companies still owed money, those amounts were applied as a credit to the outstanding premium owed?

A.   Correct.

Q.   Can you point to an example on the screen of where this process that you're describing happened.

A.   Yeah.  If you look at -- I guess November 29th, 2023, there's three payments that were applied there.  There was a minus-336 credit that was used to offset the other $204 balances on those other bond terms.

Q.   And -- I mean, I'm doing math on the fly, so please excuse me.  But it looks like there's two payments of 204 applied, but that equals a bit more than the $336.60.

        Why is there a discrepancy there?

A.   We likely wrote off the remaining balance just to clear out the bond term balances.

Q.   Okay.  So, if we compare this filtered total of all payments applied to the Justice account after February 4th, 2019, from JX 70 to the total on the pivot table at JX 72 -- if we could just pull those side by side -- are those totals the same?

A.   No, they're a little bit different.

Q.   And approximately what's the difference in totals?

A.   $3,000.

Q.   And which of these two exhibits shows a higher total?

A.   I guess that's J- -- is that 70?  The one on the right.

Q.   And why is that?

A.   That just shows we applied more of the credits and offset some of the additional balances.

Q.   So JX 72 is limited to credits applied for actual payments received from the Justice Companies, right?

A.   More or less, because there's some write-offs in there.

Q.   But it doesn't include the credits that Lexon applied?

A.   Correct.

Q.   So let's go back, briefly, to JX 71 and the "Bond Detail" tab.

        Mr. Muller, while the Justice Companies were making the large payments of $135,000 to about $200,000 to pay down the past due amounts, is it your understanding that new premiums continued to accrue during that time?

A.   That's correct.

Q.   And if the Justice Companies wanted to bring that account current today, what would they have to pay?

A.   As of 6/30/2025, the gross balance due was the $11.1 million.

Q.   And that's in column X?

A.   That's in column X, yes.

Q.   And does column X account for any dollars previously paid by Justice?

A.   Yes, it does.

Q.   And what if they wanted to pay only premiums that are 60 days or more past due?

A.   That's column Y of 10.3 million.

Q.   And, again, does column Y account for any dollars previously paid by Justice?

A.   Yes, it does.

            MS. SHRIVER:  Thank you.

            THE COURT:  All right.

            MR. POGUE:  Can we connect my computer to this?

            THE COURT:  Why don't we take our morning break and give you a chance to set up.

            MR. POGUE:  I'm ready now, but we can take a break.

            THE COURT:  Okay.  Let's take a break.

            (Recess.)

            THE COURT:  All right.  Be seated.

All right.  We're ready for the cross-examination.

CROSS-EXAMINATION

BY MR. POGUE:

Q.    Good morning, Mr. Muller.

A.    Good morning.

Q.    You testified that the Justice Companies made lump sum payments, correct?

A.    Correct.

Q.    Did the Justice Companies control how Lexon applies those lump sum payments?

A.    They never directed us to.

Q.    Okay.  So when you would point to a particular bond in your -- in your spreadsheet and say that they didn't pay the premium for that bond or that renewal period, the Justice Companies didn't intentionally not pay that renewal, correct?

A.    I guess I'm not sure what their intent was.  They just paid us a lump sum, and we applied it based on the oldest to newest.  They never gave us any direction in terms of what bond terms to apply it to.

        THE COURT:  Did you ask for direction?

        THE WITNESS:  I don't recall.

BY MR. POGUE:

Q.    You testified about a Kentucky surcharge, correct?

A.    Correct.

Q.   Is that surcharge due on premium accrued or premium paid?

A.   Premium accrued.

Q.   How does Kentucky know how much premium has accrued?

A.   We report to them.

Q.   Okay.

THE COURT:  And they tell you what tax -- the tax is?

THE WITNESS:  They -- Kentucky sets --

THE COURT:  The formula?

THE WITNESS:  It's a formal fee that they set in advance so all surety companies know how much to apply.

BY MR. POGUE:

Q.   Could you look at -- well, here, I'll pull it up for you.  This is Exhibit 71.  And the payment summary table.

Column B shows -- it's labeled "Applied Date," correct?

A.   Correct.

Q.   And that shows the date the premium is applied, not necessarily the date that the Justice Companies made the payment, correct?

A.   Correct.

THE COURT:  I'm sorry.  You said column?

MR. POGUE:  B on the tab that's labeled "Payment Summary."

THE COURT:  Oh.  Go ahead.

BY MR. POGUE:

Q.   Turn to Exhibit 72, please.  And this is the pivot table that you testified about.

And the total amount applied at the bottom is $4,200,747.85, correct?

A.   Correct.

Q.   And the parties have stipulated in this case that the Justice Companies made a total -- or paid a total of premium after February 4th, 2019, of $4,210,000, which is higher than the number that's stated on Exhibit 72, correct?

A.   Correct.

Q.   Lexon isn't disputing that -- its stipulation that the Justice Companies paid a total of $4,210,000 after February 4th, 2019, are they?

A.   Not to my knowledge.

Q.   Okay.  So what's -- what explains why this number is lower than the $4,210,000 figure the parties stipulated to?

A.   I don't know offhand.  I would have to look into it.

Q.   Okay.  I would like to turn back to --

A.   Oh, if I could come back to that.  I guess -- I forgot -- right on the July 2019 payment where we talked about before, about $190,000, that bond that was missing, that may account for that difference.

Q.   Okay.  So turning back to Exhibit 71 -- and this is the

premium tracker for -- I believe it's for bonds that were effective on and after February 4th, 2019; is that correct?

A.    Oh, is that what's on the screen?  Just --

Q.    Yeah.  And I'll go back to the bond detail.  But, just generally, is that a correct description of Exhibit 71?

A.    I'm sorry.  Could you repeat your question?  Because --

Q.    Sure.  Is Exhibit 71 the premium tracker for bonds that were in effect as of February 4th, 2019?

A.    Yes.  And through June 30th of 2025.

Q.    Okay.  Now, the obligation to pay premium arises when a bond is issued, correct?

A.    Whether it's when it's issued or when it's renewed.

Q.    Okay.  So -- but the initial obligation to pay premium would arise for a particular bond when that bond is issued?

A.    Correct.

Q.    And column H on this spreadsheet is labeled "Original Effective Date," correct?

A.    Correct.

Q.    Is that the bond issue date?

A.    Yes.

Q.    Okay.  And do the dates -- or -- strike that.

        Some of the dates in this column H date back to 2003, correct?

A.    Correct.

Q.    And we can look through them if you want.

But are most of the dates in this column before 2018?

A.    From the original effective date, yes.

Q.    And are there some dates in this column that are after 2019?

A.    I would have to scroll through to the bottom to see.  I don't know what order this is.

Q.    I can sort it by date for you and then scroll to the bottom.

Does that answer your question?

A.    Yes.

Q.    So some of the dates in this column are, in fact, after 2019?

A.    Correct.

Q.    So there's no running balance in this premium tracker, is there?

A.    I mean, not line by line running balance, if that's what you're getting at.  Just the totals at the bottom.

Q.    So there's no entry in this spreadsheet, there's no particular box that I could look to to see what the balance was on, say, March 31st, 2019?

A.    No.

Q.    Okay.  And if the Justice Companies made a payment of 200,000 on, let's say, February 28th, 2019, this spreadsheet doesn't show that 200,000 being subtracted from whatever

balance was owed immediately before that payment?

A.    This 2019 tracker does not.

Q.    Okay.  Well, since you answered it that way, let's look at the other tracker, which I believe was Exhibit 70.

So, even with this tracker, there's not a tab or a box in this tracker where I can look to see if a payment was made on February -- February 28th, 2019, and see that $200,000 being subtracted from the total?

A.    You could probably get close if you filtered down by the payment date to what was on 2/28, and then if you subtotaled the total premium and Kentucky tax, it's probably going to be pretty close to that.

Q.    So you would have to do some math?

A.    Yes.

Q.    But there's no box that shows what the balance was before the payment and what the balance was after?

A.    No.

Q.    Okay.  I would like to turn to Exhibit 50.

This is an email dated August 26th, 2021, from Pat Hennesy to multiple recipients, with a Microsoft Excel spreadsheet attached, correct?

A.    I assume so.

Q.    And do you know who Pat Hennesy is?

A.    Yes, I do.

Q.    Who is he?

A.   He's an S-V-P at Sompo Surety.

Q.   And did you create the spreadsheet that was attached to this email?

A.   Yes, I did.

Q.   I'm going to pull that up on this screen.

In the tab that's labeled "Agency Summary" -- well, before I get into that, the first line of this email that is Exhibit 50, Mr. Hennesy describes the attached spreadsheet as an "updated AR report showing 2.7 million-plus of premium owed."

Is that an accurate description?

A.   Yes.

Q.   So, looking at the first tab of the spreadsheet labeled "Agency Summary," the grand total in the column labeled "Sum of Total Amount Due" is $2,746,138.06, correct?

I can scroll over for you.

A.   Correct.  That's on a net basis.

Q.   Okay.  Does that number represent the total amount of premium that companies affiliated with the Justice family owed to Lexon as of August 26th, 2021?

A.   On a net basis, not gross.

Q.   And what -- what are you -- what's the distinction between net and gross here?

A.   Net is typically, when we're billing our agencies, they -- they remit to us on a net basis.  But when we're

doing a direct bill, like we do in the case of Justice, the Justice Companies would pay us on a gross basis, and then, once we receive the gross payment, we in turn remit the commission back to the agency.

Q.   So can you tell from this spreadsheet how much more would be for the gross?

A.   Not on this tab.  On the "Gross View" tab, you can.

Q.   Okay.  So where would I look on here to see --

A.   You scroll all the way to the bottom.

Q.   Went too far.  Okay.

A.   So the gross would be the column R, "Premium," of $3.3 million, plus the column T, "Kentucky Surcharge" of $30,000.

Q.   Okay.  So that would be the amount of gross premium that would have been due as of August 26th, 2021?

A.   Correct.

Q.   Okay.  Can you tell from this spreadsheet what amount was more than 60 days past due as of August 26th, 2021?

A.   Not on this spreadsheet.

Q.   If we look -- and I understand this is net premium.

But if we look at the first tab that's labeled "Agency Summary," would the amount of net premium that's more than 60 past -- 60 days past due as of August 26th, 2021, be the subject of the last three numbers before the total in the row labeled "Grand Total"?

A.    Yes.   On a net basis.

Q.    Okay.   And those add up to $2,135,000 and some change?

A.    Yeah.

Q.    And do you have any way of estimating what the gross premium would be based on that net amount?

A.    I mean, high level, sometimes we're usually paying agent commission around 30 percent.  But I don't know -- if you go to the "Aging" tab, that one probably doesn't show it either. But there would be other ways to calculate it.  Probably not necessarily from this spreadsheet, though.

Q.    But you think at most you would be adding 30 percent to this?

A.    That's a rough ball park.  I don't remember what Simkiss or Thomas Rutherford had for commission rates off the top.

Q.    Do you know how much premium would have been 60 or more days past due by October 1st, 2021?

A.    Sorry.  Repeat that again.

Q.    Do you know how much premium would have been 60 or more days past due by October 1st, 2021?

A.    October 1st -- from this spreadsheet?

Q.    Yeah.

A.    It's kind of tough to tell from this spreadsheet because a portion of probably column D might roll over into that.  I just don't know offhand how much of that 145- would probably roll over.

Q.    So certainly column B wouldn't roll over, right? Because that was the amount that was currently due as of October -- as of August 26th, 2021?

A.    Correct.  Assuming no payments were made.

Q.    So the most that would be added would be the two numbers in row 4 of column C and D?

A.    Correct.

Q.    Okay.  Does a portion of the premium that accrues typically get paid as commission to a broker or agent?

A.    Yes.

Q.    Okay.  Do you know what -- for the Justice accounts -- what the amount of the agency commissions were?

A.    Again, not off the top of my head in terms of percentage-wise.  When we were on the "Gross" tab, you could see, of that $3.3 million range, they were getting $600,000.

Q.    Let me -- let's look at Exhibit 60, please.

And this is an email chain where the top email is dated October 18th, 2022.  If you look at the third page, there's an email from Clint Diers saying that Marsh is owed $2,319,000 and some change of premium.

Do you see that?

A.    Yes.

Q.    And in the next email up the chain, Pat Hennesy responds that Marsh is owed 17.5 percent of the $2.3 million figure, correct?

A.    Correct.

Q.    Does it comport with your understanding that the commission owed to the Marsh McLennan Agency was 17.5 percent of premium?

A.    Again, I don't recall specifically offhand.

Q.    Do you have any reason to doubt Mr. Hennesy's representation here that Marsh is owed 17.5 percent?

A.    No.

Q.    And the amount that he has calculated based on that 17.5 percent is about 405,000, correct?

A.    Correct.

Q.    So, if the Justice Companies had paid this $2.3 million figure discussed in this email, would Lexon have paid that $405,000 over to Marsh?

A.    Correct.

Q.    And if Lexon recovers an amount in excess of 2.3 million in this lawsuit for premiums, is Lexon going to pay 405,000 of it over to Marsh?

A.    Yes.

            MR. POGUE:  I think that's all I have, Your Honor.

            THE COURT:  All right.  Redirect?

            MS. SHRIVER:  No further questions, Your Honor.

            THE COURT:  All right.  You can step down.

                    (Witness excused.)

            THE COURT:  All right.  Any further witnesses from

the plaintiff?

MR. HALPER:  No, Your Honor.  The plaintiff rests its case.

THE COURT:  Do you all want to jointly move to make the stipulations an exhibit so that's in our record?

MR. HALPER:  Yes.

MR. POGUE:  Sure.  Yes, Your Honor.

THE COURT:  Okay.  We need to give it a number.

MR. HALPER:  It would be --

THE COURT:  Joint Exhibit 74 would be the stipulation.  Admitted.

(Whereupon, Joint Exhibit 74 was marked for identification and received in evidence.)

MR. POGUE:  Thank you, Your Honor.

THE COURT:  So do you want to call your first witness now?

MR. RUBY:  Yes, Your Honor.

Your Honor, the defendant calls Stephen Ball.

COURT DEPUTY:  Please raise your right hand.

STEPHEN BALL,
called as a witness by Defendant, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the

record.

THE WITNESS:  Stephen Wayne Ball.

COURT DEPUTY:  And spell your last name.

THE WITNESS:  B-a-l-l.

COURT DEPUTY:  You can have a seat at the witness stand, and watch the ramp.

THE WITNESS:  Oh, thank you for that.

DIRECT EXAMINATION

BY MR. POGUE:

Q.   Good morning, Mr. Ball.  Thank you for being here.

A.   Good morning.

Q.   Are you employed by the -- the Justice Group of Companies owned by the Justice family?

A.   I am.

Q.   And what -- what is your position with those companies?

A.   General counsel and, for a limited group of companies, executive vice-president.

Q.   Are you executive vice-president for the Justice coal companies?

A.   Yes.

Q.   And how long have you held those roles?

A.   I've been general counsel for various Justice entities since 2001.  I've been executive vice-president for the coal entities since 2017.

Q.   So, focusing on the past ten years or so, how would you describe the general health of the coal industry in general over that time?

A.   It's been difficult.  The coal market over that period for the most part has been depressed, I would say.

Q.   And how has that affected the finances of the Justice coal companies?

A.   It's had a detrimental impact on the finances.

Q.   How would you describe the current condition of the finances of the Justice coal companies?

A.   Dire.

Q.   Are you familiar with a company called Lexon, Mr. Ball?

A.   I am.

Q.   Have the Justice coal companies had a business relationship with Lexon?

A.   They have.

Q.   And did that relationship include mine reclamation bonds?

A.   Yes.

Q.   Have you been involved in agreements that the Justice Companies have entered into with Lexon?

A.   I have been.

Q.   Did there come a time in early 2018 when the Justice Companies were behind on their payments to Lexon?

A.   Yes.

Q.    And did that problem, Mr. Ball, did that relate to the financial challenges that you discussed a moment ago?

A.    It did.

Q.    Was there an agreement that was reached with Lexon to try to address those challenges?

A.    There was.

Q.    Mr. Ball, I'm going to -- somewhere up there there should be a set of exhibits marked "JX" for -- for Joint Exhibit.

A.    Okay.

Q.    Do you see that?

A.    I -- I think so.  It doesn't say "JX," but it says "Joint Trial Exhibits."

Q.    There you go.

A.    So this is it.

Q.    Yep.  And I am going to ask you, Mr. Ball, to turn to Exhibit Number 3 in the joint exhibits, please.

A.    Okay.

Q.    Hang on.  I've got to zoom this thing down.  That's not going to do it.

        Your Honor, I may have to ask for help here from Madam Clerk.

        THE COURT:  Okay.

        MR. POGUE:  I don't know if that's --

        THE COURT:  That's fine.  It looks good now.

MR. POGUE:  Okay.  It's fine.  All right.

Q.   Mr. Ball, do you recognize this document?

A.   I do.

Q.   Is this an agreement that was made between the Justice Companies and Lexon in March of 2018?

A.   It is.

Q.   And were you personally involved in reviewing and interpreting this document for the Justice Companies?

A.   Yes.

Q.   Was this an agreement that would allow the Justice Companies to try to get caught up with Lexon?

A.   In part, yes.

Q.   Which party was the primary drafter of this agreement, Mr. Ball?

A.   Lexon.

Q.   I want to direct you to begin with -- to the -- excuse me -- to the third whereas clause, down toward the bottom of -- or -- I don't know -- about below the halfway point of page 1.

Do you see that, Mr. Ball?

A.   I do.

Q.   And if you're looking at your screen, I just marked a couple of highlights there to make sure we're in the same place.

That says (as read):

Whereas, the Collateral Justice Companies and/or the Principals currently owe premium to Lexon in the amount of THREE MILLION DOLLARS ($3,000,000.00), (the "Indebtedness").

Do you see that?

A.   I do.

Q.   Now, at the end of that, do you see where it says "three million dollars" in all caps?

A.   I do.

Q.   And then after that it says $3,000,000 in numeral form, correct?

A.   Correct.

Q.   And then after that it says in parentheses, the, quote, Indebtedness.

Do you see that?

A.   I do.

Q.   With a capital I, correct?

A.   I do.

Q.   And are you an attorney, Mr. Ball?

A.   I am.

Q.   Are you familiar with interpretation of contracts?

A.   I am.

Q.   Do you know what a defined term is in a contract, Mr. Ball?

A.   I do.

Q.   Where this contract says $3 million, and then, after that, it says in parentheses, the, quote, Indebtedness, with a capital I, what does that mean?

A.   That would be a defined term, as you just referenced. And for purposes of this agreement, the parties have agreed to define Indebtedness with a capital I as $3 million.

Q.   Was that your interpretation of this document at the time the Justice Companies entered into it?

A.   Yes.

Q.   And by the way, was this document -- was this the source of the requirement to pay premiums to Lexon by the Justice Companies, or did that requirement come from somewhere else?

A.   No.   The -- I guess the -- the requirement to pay a premium or the premium emanates from a separate document. This document did not create that obligation.

Q.   Would that requirement to pay premiums, would that have existed then even if this document never existed?

A.   Yes.

Q.   I want to direct you, Mr. Ball, to the third page.

Do you see the -- I guess "subparagraph" maybe is the right word for that -- that begins with -- with a lower case "d"?

A.   I do.

Q.   And that says (as read):

In the event the Indebtedness, capitalized, is

not paid in full within two months of the Effective Date, either through the sale of the Equipment or otherwise, then and in such event, the Collateral Justice Companies agree to pay the balance owed Lexon within five business days in cash or its equivalent.

Do you see that?

A.   I do.

Q.   So, according to this, Mr. Ball, what was the deadline for the Justice Companies to pay the Indebtedness, capital I?

A.   Two months and five business days.

Q.   Okay.  I'm going to ask you to go back a page to page 2, paragraph 2.

Do you see that?

A.   I do.

Q.   And if you want to look at the screen, I've just marked -- it's a long paragraph.  And I've just marked a portion of it that begins, "If the Collateral Justice Companies fail to provide."

Do you see that?

A.   I do.

Q.   And take a look at that.

Am I -- my first question is, was there also a part of the agreement that we're looking at that had to do with collateral, as opposed to premiums?

A.    Yes.

Q.    And according to this paragraph, paragraph 2 on page 2, what was the deadline for the Justice Companies to perform on that part of the -- that part of the agreement, the collateral portion?

A.    On the six-month anniversary of the effective date.

Q.    Does this agreement, Mr. Ball, contain any deadlines later than six months from the effective date of the agreement?

A.    No.

Q.    So, when this agreement was entered into, when did the Justice Companies intend for it to be fully performed?

A.    No later than the six-month anniversary.

Q.    Was there a guaranty that was associated with this agreement, Mr. Ball?

A.    Yes.

Q.    I'll ask you to turn to what's been marked and admitted as Joint Exhibit Number 3.

A.    I think we were just in 3.

Q.    You're correct.  Joint Exhibit Number 2.

A.    Okay.

Q.    Are you familiar with this document, Mr. Ball?

A.    Yes.

Q.    Was there an exhibit to the agreement that we just looked at?

A.   Yes.

Q.   Were you personally involved in reviewing and interpreting this document?

A.   Yes.

Q.   And which party primarily drafted this document, sir?

A.   Lexon.

Q.   The title of this document up there at the top in bold letters is "Limited Commercial Guaranty," right?

A.   Correct.

Q.   Was the word "limited" in the title for a reason, Mr. Ball?

A.   Yes.

Q.   And what was that?

A.   To differentiate this from an unlimited guaranty, so to make -- make sure it is limited to a specific amount as set forth in the agreement.

Q.   Now, is it the case that the Justice coal companies have a number of reclamation bonds with different bonding companies?

A.   Somewhat, but the majority of the bonds are with Lexon.

Q.   Was it typical in your experience to be asked for a personal guaranty in connection with a reclamation bond?

A.   No.

Q.   I want to direct you in this document, sir, to paragraph 4(e).  And because this was an exhibit, the page numbering

carried over from the original -- or the -- the main document, which was the agreement, and this document begins to be numbered at page 11, this specific exhibit.

Paragraph 4(e) specifically, which is on page 14.

A.    Okay.

Q.    Do you see that, Mr. Ball?

A.    I do.

Q.    Okay.  And that says (as read):

Notwithstanding anything contained herein to the contrary, the obligations of Guarantor shall be limited to a total sum equal to 5 million U.S. dollars plus the amount of the Indebtedness specified in the Underlying Agreement.

Do you see that?

A.    I do.

Q.    Now, who was the guarantor on this -- this guaranty agreement, Mr. Ball?

A.    James C. Justice II.

Q.    And were you also counsel to Senator Justice in connection with this guaranty?

A.    Yes.

Q.    The language that I just read, is that a limit on the amount of the guaranty that Senator Justice was making under this agreement?

A.    It is.

Q.   Now, there's two pieces of this, Mr. Ball.

The first one says -- and this is little "i" in that paragraph or subparagraph "e."

Do you see that one?

A.   I do.

Q.   That says -- that one is $5 million; is that right?

A.   Correct.

Q.   Was that $5 million, was that related to the collateral portion of the underlying agreement?

A.   That's correct.

Q.   And then the second piece of this, under little ii, it says "the amount of the Indebtedness," capitalized, "specified in the underlying agreement."

Do you see that?

A.   I do.

Q.   And did we see a few minutes ago in the underlying agreement the amount that was specified as the defined term "Indebtedness"?

A.   We did.  "Indebtedness" was defined as $3 million.

Q.   Mr. Ball, would you have ever recommended that Senator Justice enter into this guaranty if it did not contain the limit that's shown here?

A.   No.

Q.   In the event, Mr. Ball, were the Justice Companies able to make all of their payments under the agreement that we

just looked at?

A.    They were not.

Q.    And did that relate to the financial circumstances that you talked about earlier?

A.    It did.

Q.    And did there come a time as a result of that when the Justice Companies' agreement with Lexon was amended?

A.    Yes.

Q.    All right.  Let me see if I can get my exhibit numbers straight this time, Mr. Ball.

      I'm going to ask you to turn to Joint Exhibit 18, please.

A.    Okay.

Q.    Are you familiar with this document, Mr. Ball?

A.    I am.

Q.    And is -- is this the amendment to the -- the 2018 agreement that you mentioned just a moment ago?

A.    It is.

Q.    Which party primarily drafted this document, Mr. Ball?

A.    Lexon.

Q.    Let's go to page 5.

      Do you see here, Mr. Ball, where there is a heading with an underline underneath of it, it says "The Premium"?

A.    I do.

Q.    All right.  And do you remember when we were talking about the earlier version of the agreement that there were two parts, one for collateral and one for premiums?

A.    Correct.

Q.    Was this agreement set up the same way?

A.    It was.

Q.    Okay.  We'll come back to the collateral part in a minute, but I want to start with the part about premiums. And I'll ask you to look at paragraph 3, which is right under the heading that you were looking at, Mr. Ball.

Do you see that?

A.    I do.

Q.    And let's walk through this.

Do you recall just a minute ago the $3 million premium figure from the 2018 agreement?

A.    I do.

Q.    Have the Justice Companies paid most of that off by the time this amendment was done?

A.    Roughly two-thirds of it had been paid.

Q.    How much of it was left to be paid?

A.    $1,025,000.

Q.    And were there also some new premiums that had come up since the 2018 agreement?

A.    There were, yes.

Q.    All right.  So this paragraph puts those two things

together, and says (as read):

The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75.

Do you see that?

A.    I do.

Q.    And then it says, in parentheses, quote, Total Indebtedness, end quote, capital T, capital I.

Do you see that?

A.    I do.

Q.    Was that a defined term in this agreement?

A.    That is another example of a defined term.

Q.    And based on the dollar figure that is listed just before that defined term, what did you understand Total Indebtedness, capital T, capital I, to be defined as in this agreement?

A.    $3,538,400.75.

Q.    And did that term, defined term Total Indebtedness, have significance elsewhere in the document?

A.    Yes.

Q.    And I'm going jump ahead just a minute.

Was there an amended guaranty that Senator Justice did execute in connection with this amended agreement?

A.    Yes.

Q.    And did this defined term, Total Indebtedness, have significance in that amended guaranty?

A.    It did.

Q.    Would you have recommended that the company sign this agreement if Total Indebtedness had not been a fixed, known number, Mr. Ball?

A.    No.

Q.    Would you have recommended that Senator Justice sign the amended guaranty if Total Indebtedness had not been a fixed, known number?

A.    No.

Q.    If you would, Mr. Ball, go down -- we're going to stay on the same page here, page 5.  And go down to (b)(i).

       Do you see that?

A.    I do.

Q.    And this is long, and I won't -- I won't read the whole thing.

       But do you see the portion that says that (as read):

              The Companies agree to pay Lexon the sum of
              200,000 U.S. dollars per month?

A.    I do.

Q.    And what was the beginning date of that obligation?

A.    February 28th, 2019.

Q.    Now, as it turned out, were the companies ultimately able to accomplish that?

A.    Not quite.

Q.   And, again, did that relate to the business challenges that we discussed?

A.   It did.

Q.   But when the agreement was signed was that what the Justice Companies intended to do?

A.   Yes.

Q.   And so, under the schedule that was contemplated in this amended agreement, when would the amount specified for Total Indebtedness have been paid off?  Roughly.

A.   In 18 months.

Q.   Which would have been what?

     And I hate to put you on the spot doing math, Mr. Ball, but. . .

A.   August of '19 -- or August of '20, I mean.  I'm sorry.

Q.   And, as it turned out, about how long did it actually take the Justice Companies to pay off that amount that was defined as Total Indebtedness?

A.   It ended up taking roughly 20 months.

Q.   Until when?

A.   October of 2020.

Q.   Okay.  If you turn the page, Mr. Ball, to page 6, we're going to look at subparagraph (c).

     Do you see that?

A.   I do.

Q.   Okay.  And take a look at that.  That subparagraph (c)

continues over to the next page.

So just take a minute and look at that, and then I'm going to ask you a couple questions about it, okay?

A.   Okay.

Q.   Let me know when you're ready.

A.   Okay.

Q.   Did you understand this paragraph to mean that New Indebtedness under the agreement could increase if there were premiums that -- that became past due in the future?

A.   Yes.

Q.   And, in particular, how long past due did those premiums have to be before they would be added to new indebtedness?

A.   Sixty days or more.

Q.   Did this -- this paragraph or subparagraph, did it mention the defined term Total Indebtedness at all?

A.   No.

Q.   Did it change the amount that Total Indebtedness had already been defined to mean as a defined term in this agreement?

A.   No.

THE COURT:   Well, what about on page 5 that refers to "The Remaining Indebtedness together with the New Indebtedness equals the 3 million-5 Total Indebtedness"?

THE WITNESS:   The defined term Total Indebtedness is the dollar amount.

THE COURT:  What about the defined term New Indebtedness?

THE WITNESS:  So, for purposes of that paragraph, it's the $2,513,400.75.

THE COURT:  But New Indebtedness is a defined term.

THE WITNESS:  Yes.  It has the quotes around it, just like Total Indebtedness does.

THE COURT:  Okay.  Go ahead.

BY MR. POGUE:

Q.   Mr. Ball, was there also a part of this agreement that had to do -- this amended agreement that had to do with collateral?

A.   Yes.

Q.   We're jumping around, but I'm going to ask you to go back to page 4.

The -- at the bottom there's a paragraph numbered lower case iv, little iv.

A.   Okay.

Q.   Do you see that, Mr. Ball?

A.   I do.

Q.   And does that paragraph have to do with the collateral part of the agreement?

A.   It does.

Q.   And according to the last sentence of this paragraph,

which spills over on to the fifth page, when was that payment due?

A.   On or before April 1st, 2021.

Q.   Was that deadline, April the 1st, 2021, the latest deadline that was in this agreement?

A.   Yes.

Q.   And do you recall a side letter that was later entered into that extended that deadline?

A.   I -- generally, yes.

Q.   How long was that extension?

A.   My recollection is it was for -- I believe six months. Late September or October.  Later that year.

Q.   And so did you understand the last deadline that existed under this agreement as modified by the side letter to be October the 1st, 2021?

A.   Yes.

Q.   And we've touched on this already, Mr. Ball, but there was -- I think you said there was an amended guaranty by Senator Justice that went along with this amended agreement; is that right?

A.   Yes.

Q.   I'm going to ask you to turn to Joint Exhibit 17, if you would, sir.

A.   Okay.

Q.   Are you familiar with this document, Mr. Ball?

A.    Yes.

Q.    Is this the amended guaranty that you just mentioned?

A.    It is.

Q.    And which party primarily drafted this document, Mr. Ball?

A.    Lexon.

Q.    Were you involved in reviewing and interpreting this document?

A.    Yes.

Q.    The document is titled --

THE COURT:  Were you involved in editing the document, giving back-and-forth to create a final document?

THE WITNESS:  I don't specifically recall any edits.  I wouldn't rule it out, but I --

THE COURT:  Right.

THE WITNESS:  But I don't recall specifically any.

THE COURT:  That was part of your job to protect the defendant's interest, is to review and make edits and changes to protect his interests?

THE WITNESS:  Sure.

THE COURT:  Go ahead.

BY MR. POGUE:

Q.    The document, Mr. Ball, is titled "Amended and Restated Limited Commercial Guaranty."

Do you see that?

A.    I do.

Q.    And was that word "Limited" important?

A.    Yes.

Q.    Did you understand this to be a limited guaranty?

A.    I did.

Q.    Does that mean that you did not understand it to be an unlimited guaranty?

A.    That's correct.

Q.    Would you have recommended that Senator Justice sign it if it did not have a limit?

A.    No.

Q.    And there's a couple things in here that I want to look at, Mr. Ball.  One is in the third whereas clause, which is pretty long and complicated.  But I'll direct you -- and I'll mark it on the screen -- to about the fifth line down, where it begins sort of a new clause that says "Collateral Obligor and Indebtedness Obligor."

          Do you see that?

A.    Okay.

Q.    And that says (as read):

              Collateral Obligor and Indebtedness Obligor
          shall pay the Beneficiary in cash or its
          equivalent the sum of 200,000 U.S. dollars per
          month, due and payable commencing on
          February 28th, 2019.

Are you with me?

A.    Yes.

Q.    (As read):

-- and on the last day of each month afterward, until the Total Indebtedness (including any new premiums becoming due during the term of the Amended Underlying Agreement) is paid in full.

Do you see that?

A.    I do.

Q.    Now, that's lengthy, so I want to take that apart a little bit.

Were there new premiums that would arise under the original bond agreements while these -- what I'm going to call catch-up agreements were being carried out?

A.    Yes.

Q.    And was that something that happened independent of the catch-up agreements?

A.    Yes.

Q.    And so the statement in this whereas clause that the companies had to pay new premiums as they came up, was that accurate?

A.    Yes.

Q.    And it's a little confusing, so let's focus on it up close.

Was Total Indebtedness, capital T, capital I, was

that already defined in the amended agreement?

A.    Yes.

Q.    And was it defined in a way that would change as new premiums came up after the amended agreement was signed?

A.    No.

Q.    Was it defined to be a specific number?

A.    It was.  It was that 3.5, plus or minus, number we looked at.

THE COURT:  So help me understand.  Given the language that you just went over, "the New Indebtedness shall be increased in a like amount," how can you testify that's a defined number?  Since the indebtedness number is changing to be added to the total.

THE WITNESS:  Because our view is that the defined term Total Indebtedness is that specific dollar amount.

THE COURT:  And it never, ever changes.

THE WITNESS:  Never changes.

THE COURT:  Notwithstanding the wording in Exhibit Number 18?

THE WITNESS:  For purposes of that defined term, Total Indebtedness, that number never changes.

THE COURT:  So what would you have me do with the words in -- on page 6 and 7 that say "Agree that the New Indebtedness shall be increased in a like manner," and "Additional amounts of premiums under the subparagraph are

those premiums that are 60 days or over," and then it goes on to say in (d) "At such time as the Total Indebtedness is paid in full, the Collateral Justice Companies and Beech shall pay"?  What am I to do with that language?

THE WITNESS:  That -- that New Indebtedness gets paid in accordance with that second paragraph.

THE COURT:  What's the second paragraph?

THE WITNESS:  The two ii's or romanette ii, however you refer to it.

THE COURT:  So how would the payment be paid?  Go ahead.

THE WITNESS:  It would be the -- I'm sorry.  I may be on the wrong page.  I'm sorry.  I'm -- I meant to say -- well, let me get the right page here.

I may -- what exhibit are you on, Your Honor?

THE COURT:  I'm on 18.

THE WITNESS:  Okay.  Yeah.  Let me --

THE COURT:  The new --

MR. POGUE:  You're on the amended agreement, Your Honor.

THE COURT:  Amended agreement.

MR. POGUE:  And, Judge, are you on the romanette ii --

THE COURT:  I'm on subsection (d).

THE WITNESS:  Yes.

MR. POGUE:  And that's page 7?

THE COURT:  Correct.

THE WITNESS:  Yes.  So I -- I misspoke when I said romanette ii, Your Honor.  I meant subsection (d).

THE COURT:  Okay.

THE WITNESS:  So that New Indebtedness would be paid in accordance with subsection (d).

BY MR. POGUE:

Q.   Do you mean paid $200,000 a month, Mr. Ball?  Is that what you're saying?

A.   Or the greater of the additional premium that is due in that month.

THE COURT:  So what does "additional premium" mean?

THE WITNESS:  That would be -- as I take that, that would be the amount that is referenced in paragraph (c) above, where it talks about "additional amounts for premium under this paragraph means anything that's 60 days or more past due."

THE COURT:  But that's added to New Indebtedness.  "Amounts of premium over 60 months [sic] is added to New Indebtedness."  That's the way I read it.

THE WITNESS:  Yes, for --

THE COURT:  Right.

THE WITNESS:  For -- for the term "New

Indebtedness", yes.

THE COURT:  And -- but you're saying that's not part of Total Indebtedness?

THE WITNESS:  No.

MR. POGUE:  Your Honor, could I --

THE COURT:  Why is that?

THE WITNESS:  Because Total Indebtedness is that specific number.

THE COURT:  And it never changed.

THE WITNESS:  And it never changes.

MR. POGUE:  Your Honor, if I could direct on that a little bit, I might be able to clear up what I think the witness's view is.

THE COURT:  Sure.

MR. POGUE:  Or understanding was.

Q.    Mr. Ball, if you focus on that subparagraph (d) -- and I want to try to pick apart how this would work from your understanding, your interpretation of the agreement.

It starts out, "At such time as the Total Indebtedness is paid in full."

Do you see that?

A.    I do.

Q.    And what does Total Indebtedness --

THE COURT:  Maybe we should go back, just to help me a little bit more.  Go back to page 5, the premium,

paragraph 3, the last sentence.

What do you understand that sentence to say?

THE WITNESS:  The Remaining Indebtedness, which is an amount from above --

THE COURT:  The million -- the million-25,000?

THE WITNESS:  Correct.  Together with the New Indebtedness, is equal to $3,538,400.75.  And that dollar amount is defined as the Total Indebtedness.

THE COURT:  And you agree that Remaining Indebtedness is a defined term?

THE WITNESS:  It's capitalized.  I don't see the quotes around it just in that paragraph, Your Honor.  But it -- it seems to me it's intended to be a defined term.

THE COURT:  Well, let's go to page 1.

THE WITNESS:  Okay.

THE COURT:  The second "Whereas."

Now, you see the quotes?

THE WITNESS:  I agree.  Got it.

THE COURT:  Okay.

THE WITNESS:  As I said, just on that page, it appeared to me it was intended to be, but I didn't see the quotes, but I agree with --

THE COURT:  And New Indebtedness -- I think you've already agreed, but you may -- maybe I misunderstood -- is a defined term?

THE WITNESS:  Yes.

THE COURT:  And do you believe that defined terms have the same meaning throughout the agreement?

THE WITNESS:  Yes.  As -- once it's defined, unless the parties change the definition, it would have the same definition.

THE COURT:  And the parties are free to do whatever they want to do?

THE WITNESS:  Yeah.

THE COURT:  Yeah.  Okay.

THE WITNESS:  Yeah.

THE COURT:  All right.  Go ahead.

BY MR. POGUE:

Q.   Let's stay with this sentence, Mr. Ball.

THE COURT:  Which sentence is that?

MR. POGUE:  The one that you were just on, Your Honor.

THE COURT:  Okay.

MR. POGUE:  The last sentence in that main paragraph 3 before you get to the 3(b), on page 5.

THE COURT:  Sure.

BY MR. POGUE:

Q.   It says (as read):

          The Remaining Indebtedness together with the New Indebtedness is equal to $3,538,400.75 (the

Total Indebtedness).

Now, Mr. Ball, would it change your interpretation of this sentence if it didn't contain the number?  In other words, if it just said, "The Remaining Indebtedness together with the New Indebtedness is equal to the Total Indebtedness"?

A.    It would.

Q.    In that case would it be your view that the Total Indebtedness number could be a variable number?

A.    Yes.

Q.    And so is it -- is it significant to your interpretation of the term Total Indebtedness that the specific dollar figure is included as part of the definition of the term?

A.    It is.

THE COURT:  Unless otherwise modified in the agreement.

THE WITNESS:  Which it's not, to my knowledge.

THE COURT:  In your reading.

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. POGUE:  All right.  Your Honor, I'm going try to find my place here.

THE COURT:  All right.  Sorry.

MR. POGUE:  No, no.  No, it was a good question.

THE COURT:  I think you were on 6 and 7 -- I think

we're at the top of 7, but start wherever you like.

MR. POGUE:  I think you're right, Judge.

Well, no.  I think we were -- well, let's see.  Yeah.  We were on (d).  Yeah, (d).

Q.   On page 7, Mr. Ball.

A.   That same exhibit or a different exhibit?

Q.   Same one.  It's the -- we're back on the agreement.

A.   Okay.

Q.   So we'll go back to the amended guaranty in a second.

A.   Okay.

Q.   But right now we're back on the agreement.

A.   Okay.  So (d) on page 7.

Q.   Yep.

A.   Okay.  I'm there.

Q.   So that says, "At such time as the Total Indebtedness is paid in full."

That's how it starts, right?

A.   Correct.

Q.   And what do you interpret "Total Indebtedness" to mean there?

A.   The $3.5 million number we just discussed.

Q.   Okay.

THE COURT:  So as a matter -- tell me, was the Total Indebtedness of 3.5- ever paid?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. POGUE:

Q.   And so (as read):

> At such time as the Total Indebtedness is paid in full, then the Companies -- and glide over the long name -- shall pay Lexon any additional premiums due or 200,000 U.S. dollars per month, whichever is greater.

And my question is this.  And I think this goes to your interpretation of the agreement, Mr. Ball.  If there was New Indebtedness that had accumulated, what would -- what would be the relationship between those $200,000 payments and the New Indebtedness?

A.   It would be applied to the New Indebtedness.

Q.   After the Total Indebtedness had been paid?

A.   Once it had been paid.

THE COURT:  But if New Indebtedness is a defined term, and it means the same thing throughout the agreement -- which you agree, right?

THE WITNESS:  Well, there's -- it is amended later in the agreement.

THE COURT:  Exactly.

THE WITNESS:  Yeah.

THE COURT:  It's amended to say can increase.

THE WITNESS:  Yes.  It gives a hypothetical, but

yes.

THE COURT:  Right.  That you all agreed on.  That you and defendant agreed on?  You agreed on that wording in the --

THE WITNESS:  Yes.  Yes.  It's in the agreement.

THE COURT:  So why wouldn't the defined term for New Indebtedness and the defined term for Total Indebtedness and the defined term of Remaining Indebtedness, why wouldn't that number also change?

THE WITNESS:  Because the parties made no effort to --

THE COURT:  Change --

THE WITNESS:  To put the other language in there that it would also increase.

THE COURT:  But you wouldn't have known.  Because premiums -- as I've learned since yesterday -- not as much as you know -- but the premiums --

THE WITNESS:  That's not --

THE COURT:  -- are changing daily, monthly.  The amount of premiums due is ever changing.  So you couldn't put in a number.  No one would know the number.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  That's okay.

THE WITNESS:  But we could put in similar language to what was put in for the New Indebtedness.  So, "for

purposes herein" --

THE COURT:  Oh.

THE WITNESS:  -- "Total Indebtedness can increase by a like amount of New Indebtedness."

But that wasn't done, because there -- there was no intent to change the definition of Total Indebtedness and to make it a variable amount.  But it could have been done.

THE COURT:  And because it wasn't done, you -- you say Total Indebtedness -- the number for Total Indebtedness just never changed?

THE WITNESS:  Correct.

THE COURT:  And even though the number for New Indebtedness did change and does change, you -- you construed (d) as the terms of payment of the New Indebtedness?

THE WITNESS:  Yes.  So New Indebtedness would continue outside of Total Indebtedness, and that Section (d) is how the New Indebtedness would be paid.

THE COURT:  All right.  Well, you know, I'm told to look at the words.  What words in subsection (d) support your conclusion that I am to construe that as you just said?

And I'm going to find as a matter of law New Indebtedness shall be paid according to subsection (d).  Help me get to that conclusion.

THE WITNESS:  Because once the --

THE COURT:  No.  No.  I'm not cutting you off.

But I start with words in -- that you all agreed on.

THE WITNESS:  So that paragraph contemplates that the Total Indebtedness has been paid off.  So, once the Total Indebtedness has been paid off, the only thing that can remain is either New Indebtedness or -- well, and it's self-defined, but additional premium is New Indebtedness under this agreement.

THE COURT:  Where do -- where do I conclude from those words, that -- that don't even say "New Indebtedness" -- shall be paid off then?

I mean -- because "at such time as the Total Indebtedness is paid in full, the Collateral Justice Companies and Beech Creek shall pay the New Indebtedness," blah, blah, blah.  It doesn't say that.

THE WITNESS:  That's all that would be left.  It does not say that, but that's all that would be left.

THE COURT:  So how do I get to that conclusion without words to support it?

THE WITNESS:  I --

THE COURT:  I'll let the lawyers put it in their brief.  But I don't see how you get there.  I want to get where you are, but I don't see how I get there.

Okay.  Go ahead.

BY MR. POGUE:

Q.    Mr. Ball, if the -- and I'm going to stay with this

subparagraph (d) for just one more minute.

If Total Indebtedness included all the past due premium, the 3.5 million plus the -- the accruing new indebtedness, and that was paid off, then what reason would there be to require $200,000 a month payments going forward?

A.    There would be no obligation left.

Q.    All right.  Mr. Ball, let's go back to --

THE COURT:  I'm sorry.  Before we leave (d) --

MR. POGUE:  I'm sorry, Your Honor.

THE COURT:  Again, the words "any additional premium due" you say refers to premiums over 60 days?  Yes or no?

THE WITNESS:  I would say yes.

THE COURT:  So, is that not double counting?  If you go to the last sentence of (c), "Additional amounts for premiums under the subparagraphs are those premiums that are 60 days or more past due."

And at least the plaintiff says one reading of that is that goes into New Indebtedness, 60 -- premiums over 60 days -- over 60 days or more become part of New Indebtedness.

Are we going to add that again?  That seems to me, if it means the same thing, we're adding that twice, and you still have premiums that are under 60 that need to be paid.

THE WITNESS:  Agreed.  And this may be where we

were struggling -- or I was struggling to explain to Your Honor a second ago.

But once -- as it's -- as those additional premiums are defined above, my reading is, once the Total Indebtedness was paid, all that would remain is New Indebtedness.

Your Honor just made a fair distinction about the ones below 60 days, although I don't know if they're due yet if -- but that distinction you just made, I understand the distinction, but I --

THE COURT:  Okay.

THE WITNESS:  -- had not really thought about that.

MR. POGUE:  Thank you, Your Honor.

THE COURT:  I'm done.

MR. POGUE:  And I'm going to ask one more question, if that's all right, to try to get at this double-counting point that the Court mentioned.

Q.   Mr. Ball, if Total Indebtedness means, as you've testified previously in your interpretation, the approximately $3.5 million that was included in that sentence we looked at earlier, and Total Indebtedness is paid in full, then, if future payments are allocated to either new premiums that are past 60 days or new premiums that are not past 60 days, would there be any double counting?

And that's a long and not very well-worded question. But do you see what I'm getting at? I can try it again if not.

THE COURT: You should try it again for me because I didn't understand the question. I don't know what you think, but I've --

THE WITNESS: I'll take it. Thank you.

THE COURT: I lost it there.

BY MR. POGUE:

Q. So I think the Court's question, Mr. Ball, was, if Total Indebtedness also includes post-agreement premiums that have gone more than 60 days past due -- okay?

A. Okay. Yes.

Q. -- which is different than the interpretation that you've testified about. But if Total Indebtedness included those past due -- new or past due payments, and Total Indebtedness -- if they're included there and if they're included in any additional premium due under Number 1, would that result in double counting?

Do you understand the question that the Court was asking there?

A. I think so.

Q. If Total Indebtedness is limited to the $3.5 million that was stated in the sentence where it was defined, would that eliminate any problem with double counting?

A.    Yes.

THE COURT:  Well, let's try one more time.

Do you think it's possible that in (d), when it says, "Any additional premiums due" -- "any additional" -- the word "any," that's referring to premium payments that are 60 days or less?

THE WITNESS:  I don't see that.

THE COURT:  Okay.  All right.  Fair enough.

Then what do we do -- going back to your theory, you've got the second sentence that neither Mr. -- Mr. Ruby or I have talked about (as read):

Such payments shall be due on the last day of each month.

What is "such payments"?  What is that referring to?

MR. POGUE:  Your Honor, could I ask the Court --

THE COURT:  Oh, in (d).

MR. POGUE:  (d).  Okay.

THE COURT:  (d).  Page 7.

MR. POGUE:  I see.  Thank you, Your Honor.

THE COURT:  Because your theory is, your interpretation, subsection (d) states the agreed terms of payment for additional premiums.

THE WITNESS:  Correct.

THE COURT:  Okay.  So you're saying those

additional premiums would be due on the last day of each month?

A.   So I -- the payments that would either be made under (d) --

THE COURT:  (c) or (d)?

THE WITNESS:  (D)(i) or -- or (ii).  I think "such payments" is referring to those payments.

THE COURT:  Under (i) or (ii)?

THE WITNESS:  Yes.

THE COURT:  (ii) or (i)?

THE WITNESS:  Yes.

THE COURT:  And that would be for additional premiums?  That's your take?

THE WITNESS:  Yeah.  Any -- any payment made under Section (d) is for additional premiums.

THE COURT:  Okay.

THE WITNESS:  But the amount is determined by whether it's greater than $200,000 or not.

THE COURT:  And the plaintiff wouldn't get any payments of any of those premiums, those new premiums, until the defendant decided to pay the Total Indebtedness?  Right?

THE WITNESS:  Well, the defendant -- until the Total Indebtedness is paid, the defendant has to pay $200,000 a month.

THE COURT:  Under (d)?

THE WITNESS:  Not under (d), but just under the agreement in whole.

THE COURT:  And what does that 200,000 go to?

THE WITNESS:  Total Indebtedness.

THE COURT:  But if it's been paid, you wouldn't continue to pay it?

THE WITNESS:  Well, I guess -- it's hard for me to look at that provision of the agreement without looking at the agreement as a whole.

THE COURT:  Sure.

THE WITNESS:  And so from the effective date, $200,000 a month was to be paid towards premiums.  But the first 3.5, whatever, million dollars, which is the Total Indebtedness number, the 200,000 goes to that first.  And then, once that is paid, any remaining New Indebtedness or additional premium that would become due are paid in accordance with Section (d).

THE COURT:  So I think I've missed it.  Where does it say the 200,000 goes first to the 3.5 million?  First? Where does that say. . .

THE WITNESS:  Let's see.  Section --

THE COURT:  And we're talking about premium, not collateral.

THE WITNESS:  Correct.  In 3(d)(i), where it talks about the $200,000 per month until the Total Indebtedness is

paid in full, and then it's defined as the premium payments.

MR. POGUE:  That's page 5, Your Honor.

THE COURT:  Oh, I see it.

So you're agreeing now, then, that New Indebtedness does include premiums?

THE WITNESS:  Well, I think New Indebtedness --

THE COURT:  I'm going to ask for a "yes" or "no" or "I don't know" on that one.

THE WITNESS:  I guess best one I can give you is I don't understand the question.

THE COURT:  That's a fair question.

Well, what about it?

THE WITNESS:  Well, there are two definitions of New Indebtedness, and then there's references to "premium" that's not a defined term.  So I'm just trying to understand that.  So. . .

THE COURT:  Well, you just tell me then.  On the last day of each month, that paragraph that -- you're saying that that $200,000 goes to pay for premium payments?

THE WITNESS:  Back in paragraph (d)?

THE COURT:  No.  On page 5, (b)(i).

THE WITNESS:  (b)(i).

THE COURT:  I thought that's what you were referring to.

THE WITNESS:  Yeah.  So the last day of the month,

agree to pay $200,000 per month until the Total Indebtedness is paid in full.

THE COURT: Yeah. We're on. . . What are you reading from now?

THE WITNESS: Page 5, (b)(i).

THE COURT: Okay. So part of the -- the Total Indebtedness includes premiums?

THE WITNESS: Yes.

THE COURT: Okay. And I guess it's premiums fixed at the time that the Total Indebtedness number was created?

THE WITNESS: Yes.

THE COURT: It would not have included any premiums that became due and owing after that?

THE WITNESS: No.

THE COURT: And -- and the plaintiff wouldn't get a dime until that Total Indebtedness, the 3.5-, was first paid?

THE WITNESS: Correct.

THE COURT: Even though the premiums were due and owing?

THE WITNESS: Yes.

THE COURT: That amount would just have to wait?

THE WITNESS: Yes.

THE COURT: Until payment of the total indebtedness? Of 3.5-?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.

BY MR. POGUE:

Q.   And I'll just ask a clarifying question on that, Mr. Ball.

Was there an obligation separate and apart from this agreement under the underlying bond agreements to pay new premiums as they came due?

A.   Yes.  And the 200,000 was discussed as part of the negotiations because cash flow was a problem.  There was no way to pay the entire premiums all at once.  And so numerous conversations with Lexon about, well, what can you pay?

And, you know, I'm -- given that the 200,000 was the extent, and it's also why we were looking at selling equipment to maybe get it paid quicker, but it was just the quickest we could pay it.  And this is how the parties agreed to allocate it, given that that was the quickest we could pay it.

THE COURT:  And then, to follow up on Mr. Ruby's question, this agreement, Joint Exhibit Number 18, overrides the -- what they admitted into evidence yesterday -- I think they called it the general insurance --

THE WITNESS:  General indemnity agreement.

THE COURT:  There you go.  You know more than I do.

So this agreement trumps the general indemnity agreement.

THE WITNESS:  For purposes of payment, it amended the payment terms.

THE COURT:  I understand.

BY MR. POGUE:

Q.    Mr. Ball, let's go back to the -- the guaranty, the amended guaranty, which is what's on the screen.

And we were getting ready -- we had just started to talk about this language in the third whereas clause, the little ii, first page.

THE COURT:  And before he starts, I want to follow up on a question.

He described it as "long and complicated."  I think that's a good -- why did y'all put that in there?  Why would you put this long and complicated, all these words in here in a whereas clause?  And this is the personal guaranty.  So I would -- for Mr. -- for Senator Justice.

I would assume you would have had -- you would have reviewed this thing with a microscope.  Why put all that long and complicated language in here?

THE WITNESS:  I -- I don't recall in the specific negotiations about the whereas clauses.

THE COURT:  It has to have some purpose, or you wouldn't put it in there.  But if you don't know, that's

fair.  Okay.

BY MR. POGUE:

Q.   Mr. Ball, to the best of your recollection, did you draft this whereas clause or did Lexon?

A.   Lexon drafted it.

THE COURT:  But you're a lawyer.

THE WITNESS:  Yes, sir.

THE COURT:  You're Senator Justice's lawyer.

THE WITNESS:  At the time.

THE COURT:  Oh, you're not now?

THE WITNESS:  Just separation of --

THE COURT:  You're not his personal lawyer now?

THE WITNESS:  Well, I -- we have --

THE COURT:  You do certain things and not others.

THE WITNESS:  Yeah.

THE COURT:  Okay.  Fair enough.

THE WITNESS:  Certain things are walled off today, is all I'm trying to say.

THE COURT:  Oh, that's fine.

But regardless of who wrote it, you would not let him sign it unless you thought it was appropriate?

THE WITNESS:  Yes.

THE COURT:  Right.  Okay.

You hesitate.  Why?

THE WITNESS:  No.  I'm saying, Your Honor, I'm

just struggling.  I've got this cough drop in my mouth.

THE COURT:  That's all right.

THE WITNESS:  It wasn't meant for anything other than I was trying to speak clearly.

THE COURT:  And he can do it.  It's right behind him.

THE WITNESS:  Oh, thank you.

THE COURT:  I assume you've got much more to go.

MR. POGUE:  I've got a few more pages, Your Honor.  Not a ton.

THE COURT:  We can continue, or if you all want to break.  It's a bench trial.  I can be -- I'm fine.  Whatever you want to do is fine.

MR. POGUE:  Are you talking about a lunch break, Your Honor?

THE COURT:  Right.

MR. POGUE:  I would say I've got -- I don't think more than another 15 minutes --

THE COURT:  Oh, let's do it.

MR. POGUE:  -- on the direct.

THE COURT:  Yeah.  Let's do it.

If that's okay with the plaintiff.

MR. HALPER:  Yes, Your Honor.

THE COURT:  Okay.  Let's do it.  Go ahead.

BY MR. POGUE:

Q.   Let me get us reoriented Mr. Ball.

THE COURT:  We're in the third "whereas," and I interrupted you, and I'm not going to do it any more.

MR. POGUE:  No, Your Honor, I appreciate your -- I'd rather you ask your questions now than wonder what I was talking about when you get back to chambers.

Q.   "Total Indebtedness," Mr. Ball, third line.

Well, let's see.  Midway through that little ii clause.  It says in substance that the companies have to pay $200,000 a month until the Total Indebtedness, including any new premiums becoming due during the term of the underlying -- the Amended Underlying Agreement, is paid in full.

Do you see that?

A.   Yes.

Q.   All right.  And was Total Indebtedness already defined in the amended agreement?

A.   Yes.

Q.   Was it defined in your interpretation -- and we've gone through this, obviously, already -- but was it defined in your interpretation to be a specific dollar amount?

A.   It was.

Q.   And New Indebtedness, was that term also defined under the amended agreement?

A.   Yes.

Q.   And do you recall that New Indebtedness was defined to include premiums that went more than 60 days past due?

A.   I do.

Q.   Okay.  Now, this phrase here, "any" -- "any new premiums becoming due during the term of the Amended Underlying Agreement," is that limited to the ones that are past 60 days due?

        THE COURT:  I'm sorry.  Where are you reading from?

        MR. POGUE:  It's the --

        THE COURT:  In the whereas clause, right?

        MR. POGUE:  It's in the whereas clause, Your Honor.  This --

        THE COURT:  Oh, okay.  I see it.  Okay.

BY MR. POGUE:

Q.   Right there.

        So this language, "any new premiums becoming due during the term of the Amended Underlying Agreement," is that limited to premiums that are past 60 days due?

A.   No.

Q.   So would -- would that language even be a correct statement of what New Indebtedness means under the amended agreement?

A.   No.

Q.   So, given all of that, Mr. Ball, did you interpret that language to in any way redefine any of the defined terms that were in the amended agreement?

THE COURT:  Before you answer that, because I want to make sure it's a fair -- don't we need to include the word "including"?  New -- Total Indebtedness, paren, including any new premium?  You didn't say that in your question --

MR. POGUE:  And that's what I'm getting at, Your Honor.

THE COURT:  Right.

MR. POGUE:  Is -- is whether -- and the -- I think -- well, let me ask the question again.

THE COURT:  Yeah.

MR. POGUE:  I don't want to testify.  I would love to.  But I'm sure Your Honor would prefer I not.

Q.   Given that -- given that, Mr. Ball, that this was not even a correct statement of what New Indebtedness means under the amended agreement, did you interpret this language to redefine any of the defined terms that were in the amended agreement?

A.   No.

Q.   Did you interpret this as an observation that the companies would have to pay new premiums as they came up?

A.   Yes.

THE COURT:  Well, that contradicts what you just

said a few minutes ago.  He said new premiums would wait until all the Total Indebtedness was paid.

MR. POGUE:  Well, and that was the -- that was why I asked what I hoped -- perhaps wasn't -- Your Honor, a clarifying question.  Which is whether there was an obligation under the underlying bonds to pay the premiums.

THE COURT:  Right.

MR. POGUE:  Separate and apart from the obligations in this catch-up agreement.

THE COURT:  Right.  He said that.  Okay.

BY MR. POGUE:

Q.   Mr. Ball, if you turn to page 4, paragraph 5(e).  Do you see that, Mr. Ball?  It spills over to the next page.

A.   I do.

Q.   And it starts out (as read):

Notwithstanding anything contained herein to the contrary, et cetera.

Is this a limitation paragraph similar to the one that we looked at a little while ago in the first guaranty, the 2018 guaranty?

A.   It is.

Q.   All right.  There's two pieces of this.

The first one, which is, again, just like in that previous guaranty limit that we looked at, there's a little i and a little ii -- well, there's two little ii's in here, but

we're focused on the first one.  All right?

"Notwithstanding" --

THE COURT:  Somebody did that on purpose because they saw we were going to be in court.

MR. POGUE:  Just to trip us up, Your Honor.

THE COURT:  They knew we were going to be here.

MR. POGUE:  (As read):

Notwithstanding anything contained herein to the contrary, the obligations of Guarantor --

Hold on.  Got to get my screen straight.  (As read):

The obligations of Guarantor shall be limited to a total sum equal to 15 million U.S. dollars, plus (ii) the amount of the Total Indebtedness specified in the Amended Underlying Agreement.

Do you see that, Mr. Ball?

A.   I do.

Q.   All right.  Now, we're going to take those one at a time.

The first one says $20 million, right?

A.   15-.

Q.   Sorry.  15 million.  It goes on to say 20 million later on.

A.   It does.

Q.   I got ahead of myself.  It says $15 million.

Was that related to the collateral payment?

A.   Yes.

Q.   And the second one says "The amount of the Total Indebtedness," capital T, capital I, "specified in the underlying agreement."

Do you see that?

A.   I do.

Q.   And a few minutes ago, did you tell us what the amount was that was specified as the Total Indebtedness, capital T, capital I, in the underlying agreement?

A.   I did.

Q.   What was it?

A.   It was the $3.5 million, plus or minus.

Q.   And was there any amount -- amount -- specified for Total Indebtedness anywhere in the amended agreement?

A.   In the --

Q.   The underlying agreement?  Was there any amount -- other than the 3 1/2 million, was there any amount specified for Total Indebtedness anywhere in that agreement?

A.   No.  Just in that one spot.

Q.   And then, if you go to the end of that paragraph -- and this is where I got ahead myself, Your Honor -- it says that in the event of a default that the guaranty limit is a total sum equal to (as read):

(i) 20 million U.S. dollars plus (ii) amount of

the Total Indebtedness specified in the Amended Underlying Agreement.

Do you see that, Mr. Ball?

A.   I do.

Q.   And, again, this is Total Indebtedness -- the capitalized defined term, correct?

A.   Correct.

Q.   And so, in your interpretation, what did this mean when it said "the amount of the Total Indebtedness specified in the Amended Underlying Agreement"?

A.   The $3.5 million, approximately.

Q.   Would you have ever recommended that Senator Justice enter into this guaranty if it did not contain that limit?

A.   No.

Q.   Would you have ever recommended that Senator Justice enter into this guaranty if it could make him liable for premiums that could accumulate forever?

A.   No.

Q.   All right.  Last exhibit, Mr. Ball.  This is way in the back, Joint Exhibit 73.

Did you find it, Mr. Ball?

A.   I did.

Q.   And do you recognize this as a summary of payments that the Justice Companies made to Lexon in and after October of 2018?

A.    Yes.

Q.    And does this summary match your understanding of the premium payments that the Justice Companies made to Lexon in that period of time?

A.    It does.

Q.    And I think this just explains a little bit.

You testified earlier, I believe, that the 3.5 million that was in the sentence defining Total Indebtedness, that that was paid off by October the 6th, 2020; is that right?

A.    I don't think I had said the 6th earlier, but looking at this spreadsheet, I believe that's the payment that fully satisfied the Total Indebtedness.

Q.    And that was going to be my next question.

If you add up the numbers on this spreadsheet that were paid to Lexon, does that confirm your earlier testimony as to when the approximately $3.5 million figure was paid?

A.    Yes.

Q.    And if you go to the -- the second page, Mr. Ball, do you see there's a -- a figure that says "Total Premium Payments Made after February 4th, 2019"?  Do you see that?

A.    I do.

Q.    And this says $4,210,000, correct?

A.    Correct.

Q.    Is that consistent with your understanding of the total

amount of payments that were made by the Justice Companies to Lexon after February 4th, 2019?

A.   Yes.

THE COURT:   To what date?   From February the 14th to today?

BY MR. POGUE:

Q.   Mr. Ball?

A.   I believe that would be accurate, yes.

THE COURT:   Okay.

BY MR. POGUE:

Q.   Mr. Ball, you testified earlier about the financial condition of the Justice Companies.

As we sit here today, do the Justice Companies have any ability to make payments to Lexon for premiums?

A.   No.

Q.   Does that relate to the business challenges that you talked about earlier?

A.   It does.

Q.   So, if the term of the amended agreement were to last until the companies paid $14,250,000 in new collateral, how long would it last?

A.   That would be indefinite at this point.

Q.   And if the term of the amended agreement were to last until the companies paid all premiums that had accrued since February 4th, 2019, how long would the term last?

132

A.    Same answer.  That would be indefinite at this point.

MR. POGUE:  That's all I have for right now, Judge.

THE COURT:  All right.  Why don't we take our lunch break.  I assume Plaintiff has some questions.

How much time do you all want?

MR. POGUE:  As quick as you want us back, Judge. We're fast eaters.

THE COURT:  Whatever you want.

What does the plaintiff want?

MR. HALPER:  Forty-five minutes?

THE COURT:  Sure.  All right.  We'll be back in 45 minutes.

MR. POGUE:  Thank you, Your Honor.

(Whereupon, a lunch break was observed.)

THE COURT:  All right.  Be seated.

So we're ready for the cross-examination.  But before you start. . .

You can come on to the podium.  Mr. Ruby, I forgot to let you report.

MR. RUBY:  Yes, Your Honor.

We did -- the senator doesn't really use email, so we had a telephone call last night.

THE COURT:  Nothing wrong with a telephone call.

MR. RUBY:  And communicated to him the Court's

order, including the specific language that the order directed us to communicate.

The senator authorized us and in fact directed us to convey to the Court his sincere apology.

THE COURT: Good. All right.

MR. RUBY: And asked us to say that he -- it was certainly never his intention to convey any disrespect to this Court or the judiciary or the rule of law.

THE COURT: Good. All right. Thank you. It's certainly accepted.

And let's move on. You can get started.

MR. RUBY: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PHILLIPS:

Q.   Mr. Ball, I'm Brant Phillips. I'm a lawyer here in Nashville. I'm one of the lawyers for Lexon.

It's nice to meet you.

A.   Nice to meet you as well.

Q.   I didn't get a chance to meet you before today. And the Judge asked a lot of questions that I was interested in asking you.

But I do have some additional questions that I would like to cover with you.

A.   Okay.

Q.    And I'll try to be efficient because I'm sure you're ready to get home.

A.    Thank you.  No more than anyone else, though.

Q.    I want to begin by making sure I understand the roles you play at the companies that are owned by Senator Justice and his family.

       As I understand it, you're the executive vice-president and general counsel for Bluestone Resources, Inc., correct?

A.    Yes.

Q.    And Bluestone Resources is primarily a holding company for several of Senator Justice's mining interests, correct?

A.    Yes.

Q.    And Senator Justice has a majority ownership in Bluestone Resources?

A.    He does.

Q.    And Bluestone Resources owns 100 percent of Bluestone Minerals?

A.    Correct.

Q.    And that was a company that signed on to the amended agreement in 2019, correct?

A.    Yes.

Q.    And you're the executive vice-president and general counsel at Bluestone Minerals?

A.    Yes.

Q.    And as I understand it, you serve as the executive vice-president and/or the general counsel for all of the Justice-related companies that signed the amended agreement, right?

A.    Can you restate that?

Q.    Sure.  Well, we'll just go through them one by one.

A.    Yeah.

Q.    You're the executive vice-president and general counsel for James C. Justice Companies, Inc.?

A.    Yes.

Q.    You're the executive vice-president and general counsel for the Southern Coal Corporation?

A.    Yes.

Q.    You're the executive vice-president and general counsel for Kentucky Fuel Corporation?

A.    Yes.

Q.    You're the general counsel for the Justice Family Group, LLC?

A.    Correct.

Q.    And you're the executive vice-president and general counsel for Beech Creek Coal Corporation?

A.    Correct.

Q.    And each one of those companies I just named, Bluestone Resources, Bluestone Minerals, James C. Justice Companies, Southern Coal Corporation, Kentucky Fuel Corporation,

James -- excuse me -- Justice Family Group, LLC, and Beech Creek Coal Corporation, all of those companies are owned either directly or indirectly by Senator Justice and members of his family?

A.   Just so we're clear, the one exception, Senator Justice does not have any ownership in Beech Creek Coal.  But his family owns it.  So the general statement that him or his family owns all those entities is correct.

Q.   Okay, great.

And also, just so we're clear, none of the companies that I've just named has ever filed for bankruptcy?

A.   Correct.

Q.   None of those companies is in bankruptcy?

A.   Correct.

Q.   Okay.  Now, you have been involved with all of these businesses for a long time; fair to say?

A.   That's fair.

Q.   And, as I understand it, you came to work for the Justices right out of law school in 2001?

A.   Correct.

Q.   Okay.  And you have been employed by the family in connection with one or more of their businesses ever since that time; is that right?

A.   That's correct.

Q.   You have not been employed outside of a Justice-related

company since 2001?

A.   No.

Q.   Okay.  So it's fair to say that you owe your entire career and livelihood to the Justice family, right?

A.   I don't know that I owe my entire career to them.  But certainly working for their families has allowed me to have a livelihood.  So I think that's a fair -- I guess I would take some issue with the characterization.

Q.   Well, I didn't mean to -- I didn't mean to cast any aspersions.  I'm lucky that Bass, Berry & Sims took me in. Lord only knows where I would be but for that.  So we all owe our livelihood to someone or some organization.

     Throughout your employment with the various Justice-related companies you've always worked in an in-house legal capacity?

A.   Yes.

Q.   And your boss at the Justice Companies is Mr. Jay Justice, the senator's son, correct?

A.   Yes.

Q.   And Mr. Jay Justice is the president of all of the Justice-related companies that we're talking about in this case, right?

A.   With the exception of Justice Family Group.

Q.   Okay.

A.   I do not believe he's the president of Justice Family

Group.

Q.    Is he responsible for its operations though?

A.    He is involved, but not to the same level that he is with the coal operations.

Q.    Okay.  Well, it's fair to say that Mr. Justice, Mr. Jay Justice, is not a hands-off boss, is he?

A.    No.

Q.    In fact, you told us at your deposition that he's the opposite of that; he's a very hands-on boss, right?

A.    Yes.

Q.    And that he's very involved and oversees all aspects of these businesses?

A.    Correct.

Q.    Okay.  Now, given the executive vice-president and general counsel roles that you hold, it's fair to say that you're familiar with the businesses and operations of these various companies, right?

A.    Yes.

Q.    And, as a result of that familiarity, you're also aware that the various companies loan money back and forth to each other when needed, right?

A.    There are -- yes, there are related-party and intercompany transactions.

Q.    And I was going to ask you that.

       You call those intercompany loans, right?

A.    We do, yes.

Q.    Okay.  And just to kind of give that some more context, for example, if the Southern Coal Corporation has a bill to pay but doesn't have the cash on hand to pay it, Beech Creek Coal Corporation, for example, might pay that bill and book it as an intercompany loan to Southern Coal Corporation, right?

A.    It's possible, yes.

Q.    Okay.  And in your experience at the companies, these intercompany loans occur on a regular basis, right?

A.    I -- yeah, I would certainly say they're not infrequent. So I think that's fair.

Q.    Okay.  And as I understand it from reading your deposition, that these loans, when and why they're needed is a function of cash flow, right?

A.    Yes.

Q.    The money gets moved around from one company -- or -- well, actually, let me back up.

So, if the -- the companies that have cash on hand or cash coming in from operations pay their bills, and, if needed, they pay the bills of the other companies.

A.    Sometimes, yes.

Q.    Yeah.  Not infrequently, as you just said.  The money gets moved around from one company to another depending on where it's needed, right?

A.    Yeah.  Sometimes.  I mean, more times than not, unfortunately, there's more need than there is money.  So it's not as simple as just saying there's a need over there, so send money over there.  There's not always enough money for all of the needs.

Q.    Sure.  Understood.

But -- but with regard to the process, cash is fungible within the Justice organization?  It can be moved around, and you do move it around when you need to or -- to pay a bill that might be immediately due?

A.    I don't think it's fungible, but it does get moved around and recorded as one of the intercompany transactions we've talked about.

Q.    Okay.  And you sort of alluded to this in one of your answers just a minute ago, but, as I understand it, again from your deposition, these intercompany loans are not always paid back, right?

A.    No.  They're -- they're paid back when -- when cash is available.

Q.    I was going to say, whether they get paid back and when is also a function of cash flow?

A.    Yes.

Q.    And if the company that gets one of these intercompany loans doesn't have the cash to pay it back, the loan just continues to sit out there as a credit on that company's

books and a debit on the loaning company's books, correct?

A.   I get credits and debits confused in my head sometimes, but, yes, it remains on the two sides' books, and I'll accept your credit and debit description as accurate.  But it just sits out there on the books; I think that's a fair statement.

Q.   Well, I feel a responsibility to be transparent, that accounting was my worst grade in college.  So hopefully I've used the terms "credit" and "debit" correctly.

But we understand each other, I think.

A.   Yeah.

Q.   And this process of intercompany loans, that's been a practice that's been observed at these Justice-related companies as long as you've worked at them, right?

A.   Yes.

Q.   And since at least 2017, the person who decided when and how these intercompany loans are made within the organization is your boss, Mr. Jay Justice, right?

A.   Correct.

Q.   No one else makes that decision?  He makes those decisions?

A.   Correct.

Q.   Now, I want to talk a little bit more about the work you do in your role as in-house general counsel at the Justice Companies.

You told us at your deposition that early on in

your tenure with the companies that your work was focused on drafting, reviewing, and negotiating coal sales contracts.

Do you remember that?

A.   I don't remember that, but I think that's a fair statement.

Q.   Okay.  And that's still true in the work that you do for the companies today?  You look at the companies' contracts?

A.   As a general rule, yes.  Not -- not all of them, but most of them.

Q.   Okay.  But there are many instances where they continue to rely on you to prepare and review the contracts that the company operates under?

A.   Sure.  Yes.

Q.   Okay.  But, as you explained to us at your deposition, virtually all the time it's Mr. Jay Justice that negotiates the contracts.  He's the one who sets the commercial terms that the companies are going to agree to, and then it's your job to review the definitive agreements to make sure that they accurately reflect the terms that he's expecting to see from those negotiations, right?

A.   Yes.

Q.   That's the typical process at the companies?

A.   That's typical, yes.

Q.   Okay.  And you also told us at your deposition that whenever the Justices are asking you to review documents in

that way, they are definitely asking you to do it as one of their lawyers, right?

A.    Correct.

Q.    Okay.  And that was true for the contracts with Lexon, right?

A.    Yes.

Q.    You told us at your deposition that with respect to all the contracts with Lexon that we're talking about here in this case:  the 2018 agreement, the 2019 amended agreement, the two guaranties that Senator Justice signed, the two side letters -- that Jay Justice negotiated all the commercial terms associated with those contracts, right?

A.    Yes.

Q.    And you told us in your deposition that you don't remember anything about the negotiation for those documents because that wasn't your role, right?

A.    Right.

Q.    So earlier today, when you were talking with Mr. Ruby and were talking about the $200,000 figure and that you remembered it being discussed as a part of negotiations, you only know that because that's what Jay Justice told you?

A.    Not specifically.  Because there were broader group conversations around repayments.  We -- we had several meetings where Mr. Sentman and Mr. Beggs -- and there would sometimes be another individual or two there -- but I'm

familiar with those conversations from my own involvement, just in general conversations and meetings with Lexon. The specific dollar amount would be something that Mr. Justice would have relied on. But what led to that being in the agreement, I was involved in meetings where that was discussed.

Q. But even in those meetings and discussions, he's taking the lead, Mr. Justice?

A. Absolutely.

Q. Okay.

A. Yeah.

Q. You were asked by Mr. Ruby several times this morning about your interpretation of these documents.

Do you remember that?

A. I do.

Q. You'll agree with me, won't you, that your interpretation doesn't really matter because you didn't negotiate the contracts, right?

A. I don't agree with that.

Q. Well, but if we really want to understand who -- what the intent of the contracts was and the interpretation, don't we need to talk to Mr. Justice, Mr. Jay Justice, because you just told me he's the one who led the negotiations?

A. Not on the document itself. They had conversations regarding the -- for lack of a better description --

commercial terms, but he did not lead the conversations on negotiating the document.

Q.   Okay.  So you were involved in finalizing the documents and getting them signed, yeah?

A.   Yes.

Q.   Okay.  And you reviewed those documents and you signed off on them before either Jay Justice or Senator Justice signed them, right?

A.   Yes.

Q.   In fact, you told us in your deposition that you are confident that Senator Justice would not have signed those contracts with Lexon unless he had been assured that you had looked at them and blessed them, right?

A.   Yes.

Q.   And there's nothing wrong with that, of course.  You've worked for them for a long time.  They know you, they trust you.  That's a good thing.  I'm just trying to make sure the record's clear about the role you played in this process and what you know and what you don't know.

I also want the record to be clear about the Justices' responsibility to review the agreements and the guaranty.

Let's take a look at the 2018 agreement.  That's Joint Exhibit 3 in that binder that you've got in front of you there.  And specifically I want to look at paragraph 10

on page 6.  And if you go to the sixth line down, you'll see here where the -- Mr. Jay Justice is representing and warranting that he has carefully read and fully understands the terms of this agreement.

Do you see that?

A.   I do.

Q.   Okay.  And when the 2018 agreement got amended in 2019, that same representation and warranty carried over to the amended agreement, didn't it?

A.   I believe so, yes.

Q.   Okay.  Well, let's just be sure.  Let's take a look at Joint Exhibit 18.  And it's on page 1.  And if you'll look at the first whereas clause there, it makes reference to the 2018 agreement.

And then it mentions that (as read):

The terms of that Agreement, except as modified, have been incorporated herein as fully set forth in full.

Do you see that?

A.   I do.

Q.   Okay.  So the representation and warranty in the 2018 agreement that Mr. Jay Justice has read and understands the terms of this contract have carried over to this contract, right?

A.   Yes.

Q.   Okay.  And there's similar language in the guaranty contracts, right?

A.   It wouldn't surprise me.

Q.   Okay.  Well, let's take a look.  I want to be sure the record's clear about it.

A.   Sure.

Q.   Let's take a look at Joint Exhibit 17 in that binder in front of you, and specifically at the fifth page.  And in paragraph 6 on this page, there's another set of representations and warranties.

          And let's -- you'll -- it's the last line -- excuse me -- second-to-last line in this paragraph, subsection (e), where it says (as read):

              The Guarantor -- that's Senator Justice -- has
              received and reviewed the Underlying -- Amended
              Underlying Agreement.
              Do you see that?

A.   Yes.

Q.   So Senator Justice is saying in this document that he has read the amended agreement that he's guaranteeing, correct?

A.   It says "reviewed."  I don't know that that's the same thing as "read."  I mean, I --

Q.   Okay.

A.   But --

Q.   Well, he had an obligation to look at it before he signed it, right?

A.   Yeah, it -- well, again, I mean, I think you can review things in different ways.  But -- but I think it -- it says "received and reviewed."  And he's representing that.

Q.   Okay.  Well, even if he didn't read it, it wouldn't matter, would it?  The contract's binding as long as he signed it?

A.   Yeah.  I don't think there's any -- anything there that would change the fact that he signed it.  Yeah.

Q.   We spent a lot of time yesterday and earlier today looking at the amended agreement.  That's Joint Exhibit 18 in front of you.  And in particular, the term New Indebtedness that appears in paragraph 3 on page 5.

Let's go back to Joint Exhibit 18 and pull that up, please.

Now, this term, New Indebtedness, you had some back-and-forth with Mr. Ruby and His Honor about this this morning.

You told us at your deposition that you do not recall having any discussions with Lexon about this term.

Do you remember that?

A.   I don't.

Q.   Okay.  Well, I'm going to hand you a copy of your deposition.

May I approach, Your Honor?

THE COURT:  Sure.

BY MR. PHILLIPS:

Q.   If you'll turn to page 162.

A.   Okay.

Q.   And we'll start there at line 2.  Ms. Brauerman -- she was Ms. Bussiere at that time.  But she asked you the question, quote (as read):

Just as additional premiums come due, those get added to the definition of, quote, New Indebtedness, end quote.

Do you see that?

A.   Yes.

Q.   No, I'm sorry.  That's your answer.

And then her question next follows is (as read):

Question:  Do you recall having any discussions with Lexon about this provision?

And your answer is no.

Do you see that?

A.   Yes.

Q.   And then she asks you the next question (as read):

Do you recall any discussions with Jay Justice about this provision?

And your answer is no.

Do you see that?

A.    I do.

Q.    Does that refresh your recollection?

A.    Not really.

Q.    Okay.  Well, it's there in black and white.

A.    The only reason I say no is because I don't view that as talking about the New Indebtedness in paragraph 3.  It looks like we were discussing the additional premiums.  So that's -- I mean, I don't dispute what I said in my deposition.

Q.    Well, you made a big deal when you were talking to Mr. Ruby about how things are defined terms and defined terms mean what they mean and they don't change.

        And both in your answer and in the questions here, it looks very clearly from the transcript that you are discussing the concept of New Indebtedness.

        Do you see that?

A.    I do.

Q.    Okay.  So I think the record will speak for itself on that.

        Let's also -- if you look at your answer there at the top of page 162, you say in response there that (as read):

        As new additional -- excuse me -- as additional
        premiums come due, those get added to the
        definition of New Indebtedness.

Those are your words, right?

A.   Yes.

MR. POGUE:  Your Honor, just an objection.  I'm not sure what he's being impeached on at this point.  Just showing in his transcript and asking if those are your words, I'm not sure he's given an answer at this point that's inconsistent with what he's just testified to.  So it's not proper impeachment.

THE COURT:  Well, I'll say the Court finds it helpful.

BY MR. PHILLIPS:

Q.   Looking at that answer on page 162, Mr. Ball, it's -- it's correct, isn't it, that the term New Indebtedness does not refer to a fixed sum, does it?

A.   No.  See, I think we're going -- so these questions are about the term as it's set forth on pages 6 and 7.  And when you first brought it to my attention here on page 5, I think on page 5 it specifically refers to the $2.513 million.

And then on page 7 it says that "New Indebtedness also includes additional premiums."

So that -- that's the only thing I'm saying.  Is you're asking me about it, when in my deposition I was talking about its use in the next -- next two pages, not as it's set forth here on page 5.

Q.   Okay.  Well, I think you said in response to a question

from His Honor that the term New Indebtedness gets amended to allow for the addition of new premiums.  It's -- it's a moving number.  Can increase?

A.    That's what it says on page 7, yes.

Q.    Okay.  And, of course, if New Indebtedness is increasing, then the amount of Total Indebtedness would also increase by a like amount, yes?

A.    No.

Q.    Well, let's look at page 256 of your deposition.

THE COURT:  Do you have an extra copy of the deposition?

MR. PHILLIPS:  We can pull it up on the screen, Your Honor, if that will help you.  Can you see that?

THE COURT:  Yeah.

MR. PHILLIPS:  Okay.

Thank you.

THE COURT:  Okay.  There it is.

MR. HALPER:  May I approach, Your Honor?

THE COURT:  Yeah.

MR. PHILLIPS:  Thank you.  May I approach, Your Honor?

THE COURT:  Sure.

MR. PHILLIPS:  Thank you.

Q.    And on page 256 of your deposition, Ms. Brauerman was asking you, starting there at line 3, quote (as read):

And the Total Indebtedness that we looked at earlier was the premium payments that were outstanding as of the date of the agreements, but those continued to accrue over time?

Do you recall that?

And you respond there at line 9, say (as read):

Yes, I recall the definition.

And then you skip to line 16, and she asked you a further question, quote (as read):

Do you understand that the premiums that comprise the Total Indebtedness, those continued to accrue?

And you answered yes.

A.   Yes.

Q.   Do you see that?

A.   I do.

Q.   Okay.  Well, doesn't that confirm that Total Indebtedness is growing, it's not a static number?

A.   No.

Q.   Okay.  Well, I'm not sure how else to read that.

THE COURT:  Well, I'll ask the question.  Why?

THE WITNESS:  Just for what we've said earlier. The -- the Total Indebtedness defined term doesn't change. But we've always acknowledged that the premiums continue to accrue.

THE COURT:  Okay.  All right.  Go ahead.

BY MR. PHILLIPS:

Q.   Well, and just to that last point, let's look at Joint Exhibit 67.

Turn to page -- it would be page 3 of that document.  It's -- has a Bates label Justice 6466.  And looking at the third paragraph there, first line, you say (as read):

We understand there are premiums continuing to accrue on the bonds.

Do you see that?

A.   I do.

Q.   Okay.  And just so we're clear, this is a letter that you sent to Lexon on July 27th, 2023, in response to the notice of default that they had sent to you on July 23rd, 2023, correct?

A.   I -- it says their letter was July 24th, but I don't know if we misstated that or not.  I think you just said the 23rd.  But yeah.

Q.   No, you're right.  It's the 24th.

But it's the notice of default you got on the 24th of July, correct?

A.   Probably.

Q.   Okay.  And if you turn over to the next page, that's your signature at the bottom of this letter?

A.    Yes.

Q.    You wrote this letter?

A.    Yes.

Q.    Okay.  And if I read this letter correctly, what you're saying in this July 27th letter is that, as of the date of this letter at least, the Total Indebtedness had not been fully repaid, correct?

A.    I don't see where it says that anywhere.

Q.    Well, let me ask it a different way.

        The Justice Companies never got current on their bond premiums to Lexon that were owed under the amended agreement, did they?

A.    No.  There are still premiums outstanding.

Q.    Okay.  Do you know the amount?

A.    I don't.

Q.    Okay.  But the bonds associated with those unpaid premiums remain in place and in force today, right?

A.    To my knowledge, yes.

Q.    Yeah.  Lexon hasn't canceled any of those bonds despite the unpaid premiums, right?

A.    Not that I'm aware of.

        MR. PHILLIPS:  May I have a moment, Your Honor?

        THE COURT:  Sure.

        MR. PHILLIPS:  No further questions.  Thank you.

        Thank you, Mr. Ball.

THE COURT:  Redirect?

MR. RUBY:  Your Honor, I'm going to pull one document, if I can.

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. POGUE:

Q.  Mr. Ball, have you ever denied that premiums continue to accrue on the Justice Companies' Lexon bonds?

A.  No.

Q.  Is there a difference between the question of whether premiums continue to accrue, on the one hand, and whether those accruing premiums are added to the defined term Total Indebtedness in the amended agreement, on the other hand?

A.  Yes.

Q.  And so is it possible for premiums to continue to accrue but not be added to the defined term Total Indebtedness in the amended agreement?

A.  Yes.

Q.  And is that your interpretation of the amended agreement?

A.  It is.

Q.  When you gave the deposition testimony that counsel asked you about a moment ago, was that the interpretation that you were expressing?

A.    Yes.

Q.    And in the letter that you looked at in Joint Exhibit 67, a response to the demand letter that Lexon had sent to Senator Justice, when you said "premiums continued to accrue," was that what you meant?

A.    Yes.

THE COURT:  When do you all plan on paying the unpaid premiums?

THE WITNESS:  There's no way to pay them in large chunks.  Your Honor, I know -- I guess I'm allowed to say this in a bench trial.  I mean, Mr. Justice has had meetings with Lexon in an effort to try to resolve this or come up with a path forward.  But we've not been able to come up with anything that's doable.

THE COURT:  So when do you intend to pay any of the outstanding premiums?

THE WITNESS:  I don't know the answer to that.

THE COURT:  Do you want to pay them?

THE WITNESS:  It would be our desire to resolve the relationship with Lexon.  I mean, we remain in the mining business today, and they're a big piece of that.  So, yes, we would like to -- we would like to be able to pay them and keep bonds in place and try to keep operating coal mines.

THE COURT:  But I guess as a C-suite executive of the companies, plural, you don't think that this Exhibit 18,

the amended agreement, puts any obligation on the defendant to make payment at any particular time?

THE WITNESS:  Well, it -- just as it relates to the premiums?

THE COURT:  Yeah, the unpaid premiums.

THE WITNESS:  The Total Indebtedness, which, as we -- when we went through the payments --

THE COURT:  Not quite my question.

THE WITNESS:  Okay.  I'm sorry then.

THE COURT:  Let me -- I thought I phrased it really well.

So, yeah, as a member of -- an executive official of all of the defendants' companies, you don't think that Exhibit 18, which is the Amendment Number 1 to the agreement dated March 26th, dated February 4, 2019, puts any obligation on the defendant to make payment at any particular time?

THE WITNESS:  It put an obligation on him to pay the 3.5- --

THE COURT:  Not my question.  I'm talking about the outstanding premiums.

THE WITNESS:  So outside of that $3.5 million?

THE COURT:  The outstanding premiums that you all want to pay, you've talked about paying, but Joint Exhibit 18 puts no particular time that you want to make payment?

THE WITNESS:  It --

THE COURT:  That you think you're obligated to make payment.

THE WITNESS:  It puts no obligation on the defendant.

THE COURT:  Right.  To make payment of those additional premiums?

THE WITNESS:  Correct.

THE COURT:  And you can't tell me that the defendant has a plan to make payment any time soon?

THE WITNESS:  Well, the --

THE COURT:  Is that a "yes" or "no" or you don't know?

THE WITNESS:  Well, I don't think the defendant has an obligation under -- under that for the --

THE COURT:  No.  Put that aside.

THE WITNESS:  Okay.

THE COURT:  Forget that.

THE WITNESS:  Okay.

THE COURT:  Does the defendant believe he has any obligation to make payment of the additional premiums at any point in time?

THE WITNESS:  No.

THE COURT:  Ever?

MR. RUBY:  Your Honor --

THE COURT:  Let him finish.  He understands the

question.

THE WITNESS:  No.

I mean, I'm afraid I don't understand the question, though, Your Honor --

THE COURT:  What part don't you understand?

THE WITNESS:  Well, because I think as it relates to the premiums, the only thing that the defendant agreed to guarantee was the Total Indebtedness defined term.

THE COURT:  And I'm moving past that.

You've admitted there are additional premiums that are due and owing.

THE WITNESS:  Right.

THE COURT:  They are not subject to being paid at any particular time, according to Joint Exhibit 18.

THE WITNESS:  Right.

THE COURT:  And you can't tell me when Defendant plans on making payment of those outstanding premiums?

THE WITNESS:  I guess what I'm struggling with, Your Honor, is --

THE COURT:  Do you know when the defendant plans --

THE WITNESS:  Well, I don't know.  Because I don't I think he has an obligation to pay those.  Those are the obligation of the entities, not of --

THE COURT:  His guaranty doesn't cover the payment

of those premiums?

THE WITNESS:  Correct.

THE COURT:  Ever?

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. RUBY:  And, Your Honor, I'm not going to object to a question from the Court.

I would note for the record --

THE COURT:  If you want to clarify it, go right ahead.

MR. RUBY:  I just would note for the record that this witness -- obviously -- I don't know that from personal knowledge he can speak to what's in the -- in the head of an individual defendant.

THE COURT:  Okay.

MR. RUBY:  He's obviously an officer --

THE COURT:  Do any of the companies plan on making payment of the premiums?

THE WITNESS:  And that's where the meetings I referenced came up.  I mean, there -- yes.

THE COURT:  When?  When?

THE WITNESS:  There's no -- there's no ability to currently do that.

THE COURT:  So you can't say it's going to be the next 30 days? the next six months? the next three years?  You

don't know when?

THE WITNESS:  No.  Typically those conversations resolve around needing to sell some asset, which most of them are currently liened up with a senior lender.  But that's how -- that's the pathway to pay the premiums.

THE COURT:  You would agree Lexon deserves payment of the premiums?  Or are the surety bonds going to be free?

THE WITNESS:  I don't know that they're going to -- they shouldn't be free, but I do think Lexon -- I know it's not at issue here today, Your Honor, but I do think Lexon has done things that has caused harm to the entity defendants that those defendants should at least have the right of an offset against.

THE COURT:  Okay.

THE WITNESS:  So I do agree with the premise it shouldn't be free, but I do think, when you're looking at just the entities, their hands aren't clean necessarily.  And so that would have to be resolved.

THE COURT:  "The entities" referring to Lexon --

THE WITNESS:  "The entities" listed in here as the -- the Justice entities --

THE COURT:  Oh, okay.

THE WITNESS:  -- and -- and Lexon.

THE COURT:  All right.  Mr. Phillips?

MR. RUBY:  I'll start --

THE COURT:  Mr. Phillips was standing.  I didn't know --

MR. PHILLIPS:  Thank you, Your Honor.  I wasn't sure if I was going to need to object or not.  It seemed like we were heading down a path that Your Honor has already addressed in your summary judgment ruling, which is that, you know, any -- any alleged misconduct on the part of Lexon has been waived as a function of these guarantees.

THE COURT:  Right.  He was just telling me what he thinks.  That's all right.

Go ahead, Mr. --

MR. RUBY:  Excuse me.  Thank you, Your Honor.

Q.   Mr. Ball -- and I just want to make sure that we're clear on the record on your answer to the Court's questions.

In your mind, is there a -- as you understand it, is there a distinction between the obligations of the defendant as guarantor to Lexon, on the one hand, and the obligations of the Justice Companies to Lexon, on the other hand?

A.   Yes.

Q.   And do you agree that -- that the Justice Companies do have -- well, strike that.

I think I understand your position.

I have just one other thing to ask, Mr. Ball.

Mr. Phillips asked you a series of questions about

your role in the negotiation of the documents that we've been looking at.

A.    Yes.

Q.    Was the testimony that you gave in your direct examination about your interpretation of the documents themselves, as distinct from whatever happened or may not have happened in the negotiations?

A.    Yes.

MR. RUBY:  Can I have a moment, Your Honor?

THE COURT:  Sure.

I think we should make his deposition for ID purposes so our record's clear.

MR. RUBY:  No objection.

THE COURT:  Do you want to give it a number for ID purposes only?

MR. PHILLIPS:  Yes, sir.  I think it would be Joint Exhibit 75.

THE COURT:  For ID purposes only.

(Whereupon, Joint Exhibit 75 was marked for identification.)

MR. POGUE:  It might have a confidential --

MR. RUBY:  Mr. Pogue asked me to check if it's marked confidential -- it is marked confidential, Your Honor.

THE COURT:  Of course that's not binding on the Court.

MR. RUBY:  I understand, Your Honor.

THE COURT:  The Sixth Circuit is really, really, really clear on that.  Just because you all say it's confidential doesn't mean it's put under seal here.

MR. RUBY:  Could I have a moment to figure out why it's marked confidential?

THE COURT:  Yeah.

MR. HALPER:  Your Honor, I would just point out that most of the joint exhibits are also marked confidential.

THE COURT:  And they're not under seal.

MR. HALPER:  No, they're not --

THE COURT:  You're marking them confidential -- nobody's asked me to put anything under seal.

MR. HALPER:  Not for trial, no.

MR. RUBY:  Your Honor, there are portions of this -- and certainly this is not an exhibit that we understood was going to be put in the record prior to the trial.  There are portions of this I understand that refer to confidential business transactions involving the Justice Companies that could create a commercial sensitivity.

Nothing that -- none of the portions of the deposition that Mr. Phillips used are anything that we would object to having included in the record.

THE COURT:  So why don't y'all get together and make that portion for ID purposes.

MR. RUBY:  Yes, Your Honor.

Nothing further, Your Honor.

THE COURT:  All right.  You can step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Okay.  Call your next witness.

MR. RUBY:  We rest, Your Honor.

THE COURT:  Any rebuttal proof from the plaintiff?

MR. HALPER:  No rebuttal, Your Honor.

THE COURT:  All right.  So we're ready to talk about the final briefing here.

So what I was going to suggest, if we're going -- if you all should order the transcript, now, you'll need to make your own financial -- with the court reporter to get it -- arrangement, financial arrangements to get the transcript.

And she says it will be ready three weeks from today.  From today.

So what I would propose is 30 days from when you receive the transcript, file your final findings of fact and conclusions of law, and then 35 days after you receive the transcript, the plaintiff should go ahead and file -- follow the local rule and file its motion or petition or application for attorney fees, and then you all just follow the local rule in terms of responding to that so all that's before the

Court.

Does that work for the plaintiff?

MR. HALPER:  It does, Your Honor.  Thank you.

THE COURT:  Now, let me ask both parties.

For the plaintiff first, am I leaving out anything?

MR. HALPER:  I don't think so.

THE COURT:  Okay.  So do those timelines work for the defense?

MR. POGUE:  I just want to clarify, Your Honor, did you say 35 days from receipt of the transcript for them to file their petition or receipt of the ruling?

THE COURT:  The transcript.  I've already ruled on summary judgment.  And while I've read you all's brief -- go. . .

I think they're the prevailing party in some respect already as we sit here today.

MR. POGUE:  Okay.  I just wanted to clarify.  I'm not debating.  I just wanted to --

THE COURT:  Your colleague wants to add something before you speak.

MR. ROBISON:  I apologize, Your Honor.  I know we don't want to tag team as much as possible, but my understanding based on Local Rule 5401 is that the time to respond to a request for attorneys' fees is a 14-day window?

Am I correct about that?

And the reason I raise it is that I believe the volume may be relatively large, and I wonder if the Court would entertain a larger window to review and see if we --

THE COURT:  So review what?

MR. ROBISON:  Maybe I can help, Your Honor.  I think we've agreed that the defendant can have 30 days to respond to the petition we're putting in pursuant to the local rule.  And, Your Honor, I believe it's quite voluminous.  It's well over $1 million.

THE COURT:  I'm not following you.

MR. ROBISON:  As I understood it, Your Honor was addressing the request from the plaintiffs for attorneys' fees.

THE COURT:  Right.  Right.  It does say 14 days.

MR. ROBISON:  Yes.  And I'm just concerned that if we're looking at well over $1 million worth of attorneys fees and expenses and -- a volume that I think will be quite large that we would like a little extra time to be able to -- to review those, and 14 days is pretty quick.

THE COURT:  Okay.

MR. ROBISON:  I understand that a 30-day window is not objectionable for the plaintiffs.  Is that. . .

MR. HALPER:  Subject to Your Honor's views, of course, it's not objectionable to us.

THE COURT: So your -- I think by my count you should have the transcript by September the 11th. That would make your final findings and conclusions due somewhere around October the 10th, give or take a day. And then five days after that they can file their -- by the 17th, file their application.

And you're right, the local rule would give you 14 days to respond, would be the 31st.

So what -- you want to extend that 14 days?

MR. ROBISON: We would, Your Honor -- and I think it's unopposed. Would Your Honor allow us 30 days to file any objection or response, simply due to the volume?

THE COURT: Okay. Well, I do want to try to accommodate you, but you -- why can't you all at least in some part go ahead and provide the defendant with at least your attorney fees up to summary judgment?

MR. HALPER: We -- we have provided underlying --

THE COURT: Well, now he's making a funny face. So he probably needs it again.

MR. HALPER: Sorry. I'm wrong. This is the danger of me getting up sometimes. But we can -- we can provide --

THE COURT: Yeah.

MR. HALPER: -- our invoices and --

THE COURT: You could do that tomorrow because

Case 2:23-cv-01180-GMB   Document 132-16   Filed 05/13/26   Page 170 of 172

170

you're going to be free, no trial.  See, my concern is you're getting into the end of the year.  I know what's on my calendar.  And -- and although things usually calm down at the end of the year, I know I have several cases that are going to go, and I really need -- I want to get -- I need to get you all a decision before the end of the year.

MR. HALPER:  We're happy to provide those materials.

THE COURT:  Yeah.  Let's go ahead and get -- so that's going to be a big chunk right there.  And that should help you.  And then -- and then let's see if you need more time.  If you do, you'll file a motion, I'm sure.

MR. ROBISON:  Thank you, Your Honor.

THE COURT:  Okay.  So when can they expect to get that?

MR. HALPER:  Your Honor, probably within two weeks.  We just need to redact -- make sure we've redacted any privileged information in the bills.

THE COURT:  Okay.

All right.  So I'm going to leave the timetable as set forth in the local rules and what I've discussed, but if you need more time -- but just bear in mind -- just to keep my chambers moving in -- responsive to other cases, I need to get this to you all by the end of the year.

MR. ROBISON:  Understood, and we appreciate your

Case 3:23-cv-00772   Document 120   Filed 09/08/25   Page 170 of 172 PageID #: 2306

consideration, Your Honor.

MR. HALPER:  And we will do our best.  If we can do it sooner than the two weeks, we'll do it.

THE COURT:  All right.  So I'll enter an order to that effect.

Anything else?  From the plaintiff?

MR. HALPER:  I'm sorry, Your Honor, what?

THE COURT:  Anything else from the plaintiff before we conclude here?

MR. HALPER:  No.  Thank you, Your Honor.

THE COURT:  Or the defense?

MR. RUBY:  No, Your Honor.  Thank you.

THE COURT:  Well, I appreciate y'all coming from West Virginia to Nashville.  And your clients -- both clients were well served with the attorneys and your presentation. The Court found it helpful, and I look forward to the final briefing and try to get you an answer.

MR. RUBY:  Thank you, Your Honor.

MR. HALPER:  Thank you.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on August 21, 2025, in the matter of LEXON INSURANCE COMPANY v. JAMES C. JUSTICE II, Case No. 3:23-cv-00772; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 171) is a true and accurate record of said proceedings.

This the 8th day of September, 2025.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter