FILED

2026 Jun-01  PM 10:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# PX-1

Executive Employment Agreement between Bluestone Resources, Inc., Southern Coal Corporation, Justice Family Group, LLC and Robert P. Fowler

This EXECUTIVE EMPLOYMENT AGREEMENT (this "Agreement"), is made effective as of November 16, 2021 (the "Effective Date"), by and between Bluestone Resources, Inc., Southern Coal Corporation, Justice Family Group, LLC (the "Companies"), and Robert P. Fowler, a resident of Jefferson County, Alabama ("Executive").

WHEREAS, the Companies desire to ensure that Executive's unique and expert services will be available to the Companies and that Executive is willing and able to render such services according to the terms of this Agreement;

WHEREAS, Executive wishes to be employed by the Company subject to the terms of this Agreement; and

WHEREAS, the Companies desire to provide assurances to the Executive regarding length of employment, salary, bonus and a severance package.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Companies, intending to be jointly liable for this Agreement, and Executive agree as follows:

Section 1.     Employment. Subject to the terms of this Agreement, the Companies hereby jointly employ Executive as their Executive Vice President of Environmental Engineering and Regulatory Compliance. Additionally, Executive from time to time may hold the position of General Counsel for Environmental Affairs, and Executive hereby accepts such employment.

Section 2.     Term. The term of employment under this Agreement shall begin on the Effective Date, and, unless sooner terminated as provided in Section 7, shall conclude on June 16, 2031 (the "Term"). The term of employment shall be extended for additional consecutive one (1) year terms ("Renewal Terms") unless the Companies jointly or Executive give to the other written notice not less than ninety (90) days prior to the end of the Term or any Renewal Term that such party or parties do not wish to extend the term of employment.

Section 3.     Duties. Executive shall serve as Executive Vice President of Environmental Engineering and Regulatory Compliance and shall report to solely to Mr. James C. Justice III ("Jay Justice"), currently President of Bluestone Resources, Inc., and Southern Coal Corporation, and Manager of Justice Family Group, LLC. Executive shall perform such duties as are customary for Executive's position (including, environmental permitting, bonding, and compliance) as well as duties necessary to oversee the Companies' environmental legal program (i.e., oversee regulatory negotiations for fines, penalties, consent decrees, compliance programs, etc.) and shall also perform such additional duties as are appropriate, which may reasonably be assigned to him from time





EXHIBIT

1|4|25   JD

1

Justice



JUSTICE168962

to time by Mr. Jay Justice. Due to the amount of travel involved with Executive's duties, Executive shall have the use of corporate planes when scheduling permits. Executive shall:

(a)  conduct himself at all times with integrity and in an ethical manner;

(b)  devote substantially all of his effort, working time, energy, and skill (vacations and absences due to illness excepted) to the duties of his employment hereunder, it being acknowledged and understood, however, that Executive shall be permitted to commit reasonable time and effort to civic, charitable and community causes and activities, handle minor legal matters for friends and family, manage real estate and realtor matters, and manage family owned businesses as long as they do not interfere with his obligations to the Companies;

(c)  perform his duties hereunder faithfully, loyally, and industriously, subject to the supervision of the Mr. Jay Justice; and

(d)  follow and implement diligently all lawful management policies and decisions of the Companies that are communicated to him.

Section 4.    Compensation. The Companies shall pay Executive a base salary (the "Base Salary") of Eight Hundred Thousand Dollars ($800,000) per fiscal year, effective November 16, 2021, in such installments and at such times as Bluestone Resources, Inc., pays its other salaried employees. Commencing as of January 1, 2023, and on each January 1st thereafter, the then effective Base Salary shall be increased (but not decreased) by least an amount which shall reflect the increase, if any, in the cost of living during the previous 12 months by adding to the Base Salary an amount computed by multiplying the Base Salary by the percentage by which the level of the Consumer Price Index for the area including Birmingham, Alabama, as reported on January 1st of the new year by the Bureau of Labor Statistics of the United States Department of Labor has increased over its level as of January 1st of the prior year. Any additional salary increase will be based on the performance of the Executive and the performance of the Companies. The Companies shall deduct or cause to be deducted from Executive's compensation and benefits set forth in this Section 4 and in Sections 5 and 6, all taxes and amounts required by law to be withheld.

Section 5.    Incentive Compensation.

(a)  Sign-on Bonus. On or before the Effective Date, the Companies shall pay Executive a cash sign-on bonus of Three Hundred and Forty Thousand Dollars ($340,000), deducting or causing to be deducted from this amount all taxes and amounts required by law to be withheld. If Executive leaves prior to end of the Term, Executive agrees to repay sign-on bonus based on the following schedule:  100% repayment ($340,000) if within one year of the Effective Date, 66% repayment ($224,400) if within 2 years of the Effective Date, and 33% repayment ($112,200) if within 3 years of the Effective Date.

JUSTICE168963

(b)     Cash Annual Bonuses. The Companies shall pay Executive an annual minimum cash bonus of ten percent (10%) of Base Salary for the Term on or before the March 31st for performance during the prior year. The amount of the performance bonus may be increased based on performance of Executive and/or performance of the Companies.

Section 6.     Fringe Benefits and Expenses.

(a)     General. In addition to the compensation described in Sections 4 and 5 of this Agreement, Executive shall have the right to participate in any medical, hospitalization, dental, disability, life or other similar insurance plans maintained by the Companies from time to time to the extent that Executive's position, tenure, salary, age, health and other qualifications make him eligible to participate, and such other fringe benefits as are provided to the other senior management employees of the Companies.

(b)     Paid Vacation. Executive shall be entitled to four weeks paid vacation per calendar year, plus such additional days paid sick leave in accordance with the Companies sick leave policy. Executive shall take vacation at such times and intervals as shall be appropriate and consistent with the proper performance of Executive's duties hereunder. In all other respects, Executive shall be subject to the Companies vacation and sick leave policies that are in effect during Executive's employment. Each year during the Term or Renewal Term of the Agreement, Executive shall be entitled to the use of two rooms for seven nights each at the Greenbrier Resort in Sulphur Springs, West Virginia.

(c)     Expenses. Companies shall promptly (and in any event within sixty (60) calendar days of submission of a request for reimbursement) reimburse Executive for reasonable business expenses incurred by Executive in the performance of his duties under this Agreement, provided Executive incurs and accounts for such expenses in accordance with all policies of the Companies in effect from time to time. These businesses expenses include, but are not limited to, all expenses related to Executive maintaining his current law licenses and court admissions (licenses, courses, continuing legal education, bar memberships, etc.). Further, the Companies shall reimburse Executive for reasonable moving expenses, storage, etc. for costs associated with relocating from his current office to a yet to be determined office location in Birmingham, Alabama.

(d)     Key Man Insurance. The Companies may obtain, in the name and for the benefit of Companies, such life, disability and other insurance policies on Executive as Companies may from time to time determine to be in the interest of the Companies. Executive shall take such medical and physical examinations as are required to obtain such insurance policies.

Section 7.     Termination. Executive's employment hereunder may be terminated at the end of the Term or any Renewal Term as provided in Section 2, or earlier as follows:

JUSTICE168964

(a)     Death. Executive's employment hereunder shall terminate upon the death of Executive. However, the Base Salary compensation provided by the Companies in Section 4 shall continue for one year after the date of death of the Executive.

(b)     Disability. In the event any physical or mental disability renders Executive substantially unable to perform his duties hereunder, and such disability is expected to be lengthy or of indefinite duration (in any instance, this must be greater than 180 days) or any such disability entitles Executive to recover benefits under any long-term disability plan or policy maintained by him or the Companies, the Companies may terminate Executive's employment and its obligations under this Agreement ends.

(c)     By the Companies for Cause. Executive's employment may be terminated at any time by the Companies for Cause. For purposes of this Agreement, "*Cause*" means (i) a breach by Executive of any provision of this Agreement, which, if curable, is not cured within 10 days after Executive's receipt of written notice from the Companies; (ii) any conduct, action or behavior by Executive that has or may reasonably be expected to have a material adverse effect on the reputation or business of the Companies (including, without limitation, the commission of any felony or a lesser crime involving dishonesty, fraud, misappropriation, theft, wrongful taking of property, embezzlement, bribery, forgery or extortion) or which results in gain or personal enrichment of Executive to the material detriment of the Company Group (iii) commission of any act by Executive of gross negligence or malfeasance that is materially injurious to the Companies; (iv) dereliction of duties or misconduct that is materially injurious to any member of the Company Group; (v) breach of Executive's duty of loyalty to the Companies; or (vi) substance abuse, ongoing illegal drug use or habitual insobriety that is materially injurious to any member of the Company Group; (vii) willful failure to comply with any valid directive of Mr. Jay Justice; (viii) willful failure to perform his duties; (ix) Executive's material failure to comply with Companies policies that cause harm to the Companies.   The failure to include any fact in a termination notice that contributes to a showing of Cause does not preclude Companies from asserting that fact in enforcing its rights under this Agreement.  If Companies terminate Executive for Cause, within twenty (20) days after termination the Companies shall pay Executive a lump sum in the amount equal to (A) Executive's accrued but unpaid Annual Base Salary, (B) any accrued and unused vacation pay and (C) any earned but unpaid Performance Bonus (the "Accrued Obligations").

(d)     By the Companies without Cause. The Company may terminate Executive's employment at any time without Cause effective upon written notice to Executive and subject to the Termination payment in Section 8 of this Agreement.

(e)     By Executive. Subject to the cure provisions provided below, and at his option, Executive may terminate his employment hereunder for "Good Reason" (as defined below) by giving thirty (30) days written notice to the Company. For purposes of this Agreement, "Good Reason" shall be defined as:

JUSTICE168965

(i)     a material diminution in the nature or scope of Executive's duties, responsibilities, authority, powers or functions;

(ii)     a reduction in Executive's compensation payable in accordance with Section 4 hereof, or failure to make scheduled bonus payments to Executive in accordance with Section 5 above;

(iii)     the Companies' material breach of any provision of this Agreement;

(iv)     a requirement that Executive relocate or have his principal place of business beyond thirty-five (35) miles of the city limits of Birmingham, Alabama;

(v)     the voluntary or involuntary transfer of greater than 50 percent ownership of one of entities in the Companies to any entity (individual or company) not owned or controlled by at least one of the Companies that is a party to this Agreement.

The foregoing notwithstanding, if the Companies cure the condition giving rise to the termination notice within fifteen (15) days following receipt of Executive's notice of termination, Executive's employment will not terminate. If the Companies fail to cure the condition, the termination for Good Reason shall become effective on the date specified in Executive's notice of termination. If Executive does not give notice of termination to the Companies timely as provided above after the occurrence of the Good Reason, then Executive's right to terminate his employment based upon such occurrence shall be waived; provided, however, that the failure of Executive to terminate his employment based upon the occurrence of a Good Reason shall not be deemed a waiver of Executive's right to terminate his employment upon the subsequent occurrence of a Good Reason.

Section 8.     Termination Payments and Benefits.

(a)     Executive Election Not to Extend, Termination for Cause, Termination without Good Reason, Termination Because of Death or Disability. If Executive's employment under this Agreement is terminated (i) by the election of Executive not to extend his employment at the end of the Term or any Renewal Term, (ii) by the Companies for Cause, (iii) by Executive without Good Reason, or (iv) by Executive's death or disability, all salary and bonus (which shall be prorated based upon his length of service during such fiscal year) payments and all other benefits and allowances hereunder shall cease at the termination, except as provided in Section 7.

(b)     Termination for Good Reason, Termination Without Cause, Companies Election Not to Extend. Upon the termination of employment (i) by Executive for Good Reason or (ii) by the Companies without Cause, then Executive shall become entitled to receive as a termination settlement an amount of Three Million Dollars ($3,000,000) (the "Termination Payment"). The Termination Payment shall be payable in periodic payments spread over the six (6) month period immediately following the effective date

JUSTICE168966

of the termination in accordance with the Companies standard payroll practices and shall be subject to such deductions and withholding as are required by law or the policies of the Companies. In addition to the foregoing, the Companies shall continue (at its cost) Executive's health benefits for a period of twelve (12) months from the date of termination of Executive's employment.

(c)     Public Statement Regarding Termination. In the event Executive's employment terminates for any reason, Mr. Jay Justice and Executive shall agree upon a public statement pertaining to termination of Executive's employment, and the terms of said statement shall not be subject to subsequent modification by either party unless required by law. In the event Mr. Jay Justice and Executive are unable in good faith to agree upon such a statement, the Companies may make such public statements as are necessary to comply with the law.

(d)     No Other Benefits. Except as specifically provided in Section 7 or this Section 8, Executive shall not be entitled to any salary, bonus, allowance, severance payment, or other compensation or benefits from the Companies upon the termination of his employment under this Agreement regardless of the reason for the termination.

Section 9.     Companies Proprietary Information. This Section 9 imposes certain obligations upon Executive with regard to "Companies Proprietary Information" (as defined below), but this Section does not limit in any way Executive's obligations or duties arising elsewhere in this Agreement or under the law with regard to such Companies Proprietary Information.

(a)     Companies Proprietary Information. For purposes of this Agreement, "Companies Proprietary Information" means technical, business, customer, sales, and other information of Companies, whether or not recorded in writing, electronic media, or otherwise, which derives value from not being generally known to the public or to other persons or entities who can obtain value from its disclosure or use, and includes, without limitation, technical and non-technical data, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, designs, product plans, lists or information concerning actual or potential customers or suppliers, information regarding business plans and operations, methods and plans of operation, marketing strategies, sales and distribution plans or strategies, cost information, pricing strategies, acquisition and investment plans, and other strategic and tactical plans prepared by the Companies or their employees. Companies Proprietary Information includes information which is produced or held by Companies' affiliates and which is generated by third parties for the Companies and that the Companies treat, or are obligated to maintain, as confidential. Companies Proprietary Information shall not include any record, data, or information which is in the public domain provided the same is not in the public domain as a consequence of disclosure by Executive in violation of this Agreement.

(b)     Fiduciary Obligations. Executive agrees that Companies Proprietary Information is of critical importance to the Companies and agree that he holds and shall

JUSTICE168967

hold all Companies Proprietary Information and information related thereto in a fiduciary capacity for the sole benefit of the Companies.

(c)     Non-Use and Non-Disclosure. Executive shall protect the confidentiality of all Companies Proprietary Information at all times, both during and after the Term and any Renewal Terms. Executive shall not during the Term, any Renewal Term or at any time thereafter, (i) disclose, directly or indirectly, any of Companies Proprietary Information to any entity or person other than the Companies or authorized employees thereof who at the time of such disclosure, in the reasonable judgment of Executive, need to know such Companies Proprietary Information for valid business purposes of the Companies or such other persons to whom Executive has been specifically instructed to make disclosure by the Board, or to the extent required in the course of Executive's service to the Companies, (ii) disclose any of Companies Proprietary Information except as required by law, or (iii) use any Companies Proprietary Information, directly or indirectly, for his own benefit or for the benefit of any person or entity other than the Companies. At the termination of his employment, Executive shall deliver to the Companies all notes, letters, documents and records (whether contained in written, electronic or any other media) which may contain Companies Proprietary Information which are then in his possession or control.

Section 10. Severable Provisions. The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision. In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

Section 13. Notices. All notices hereunder shall be in writing and shall be deemed to have been duly given on the date of personal delivery; or on the date of electronic confirmation of receipt, if sent by facsimile transmission or electronic mail; or three (3) days after deposit in the United States mail, if mailed by certified or registered mail, return receipt requested (postage prepaid); or one (1) day after deposit with a reputable overnight courier for overnight delivery (delivery charges prepaid), as follows:

If to the Companies:    Mr. Jay Justice
                        ████████████████
                        Roanoke, VA 24011-1710

If to Executive:        Robert P. Fowler
                        ████████████████
                        Birmingham, AL 35226
                        ████████████

JUSTICE168968

Any person or entity entitled to notice may change the address to which notices shall be delivered or sent to him or it by notice given in accordance with this Section 13.

Section 14.   Miscellaneous.

(a)   Entire Agreement, Modification. This Agreement constitutes the entire agreement between the parties hereto with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral. This Agreement may not be amended, revised or waived, except by a writing signed by the parties.

(b)   Assignment and Transfer. At Executive's election and subject to the termination payment in Section 8 hereof, this Agreement shall not be terminated by the merger or consolidation of the Companies with any corporation or other entity or by the transfer of all or substantially all of the assets of the Companies to any other corporation, firm or entity. Neither this Agreement nor any of the rights, duties or obligations of Executive shall be assignable by Executive, nor shall any of the payments required or permitted to be made to Executive by this Agreement be encumbered, transferred or in any way anticipated, except as required by applicable laws or permitted by this Agreement.

(c)   Captions. Captions herein have been inserted solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

(d)   No Conflicting Agreements. Executive represents and warrants to the Companies that (i) there are no restrictions, agreements, or understandings whatsoever to which Executive is a party which would prevent or make unlawful Executive's execution of this Agreement or Executive's employment hereunder; (ii) the execution of this Agreement and Executive's employment hereunder shall not constitute a breach or violation of any law, contract, agreement or understanding, oral or written, to which Executive is a party or by which Executive is bound; (iii) Executive is free and able to execute this Agreement and to enter into employment with the Companies; (iv) to Executive's knowledge, he has not violated nor is he in violation of any law, regulation, rule, order, stipulation or the like relevant to the Companies' business; and (v) this Agreement is Executive's valid and binding obligation, enforceable in accordance with its terms. The Companies represent that this Agreement is its valid and binding obligation, enforceable in accordance with its terms.

(e)   Attorneys' Fees. In the event that any suit or action is instituted arising out of or relating to this Agreement or the employment relationship between the parties, the prevailing party in such dispute shall be entitled to recover from the losing party all reasonable fees, costs and expenses of such suit or action, including without limitation, reasonable fees and expenses of attorneys and accountants, and including, without limitation, all reasonable fees, costs and expenses of appeals.

JUSTICE168969

(f)　Governing Law, Jurisdiction. This Agreement shall be construed under and enforced in accordance with the internal substantive laws of the State of Alabama. The Companies and Executive agree that this Agreement is entered into in the State of Alabama and contemplates and requires performance in the State of Alabama. Each party consents to the personal jurisdiction of the State of Alabama for any and all actions arising out of or relating to this Agreement.

(g)　Waiver of Breach. Except as provided herein, failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver and specifically referencing this Agreement.

(h)　Independent Advice from Counsel. Each of the parties has received independent legal advice from legal counsel of his or its choice with respect to the advisability of entering into this Agreement and its terms. The terms of this Agreement are the result of negotiations between the parties, and the provisions of this Agreement shall be interpreted and construed in accordance with their fair meanings, and not for or against either party, regardless of which party may have drafted this Agreement or any specific provision.

(i)　Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(j)　Potential Conflict of Interests. The Companies recognize that giving Executive the titles and duties of Executive Vice President of Environmental Engineering and Regulatory Compliance and that of General Counsel for Environmental Affairs could lead to a potential conflict of interest and that Executive could be prohibited from performing certain duties based on this conflict. The Companies have agreed to waive this potential conflict for purposes of entering into the Agreement.

[Signature Page Follows]

JUSTICE168970

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the Effective Date.

For Bluestone Resources, Inc., Southern Coal Corporation, and Justice Family Group LLC:

Signature: _____

By:    Mr. James C. Justice III
Position: President of Bluestone Resources, Inc., and Coal Corporation and Member of Justice Family Group, LLC

Date:   October 19, 2021


For Executive:

Signature: _____

By:    Robert P. Fowler

Date:   October 19, 2021

JUSTICE168971