# PX-6

# DECLARATION OF ROCCO CALAMUSA, JR.

My name is Rocco Calamusa, Jr.  I declare under penalty of perjury that the following is true and correct and based on my personal knowledge and on my review of my firm's time and billing records kept in the regular course of business:

1.      I am a member of the law firm Wiggins, Childs, Pantazis, Fisher, Goldfarb ("Wiggins Childs").  I was admitted to the practice of law in the State of Alabama in September of 1993.  I am admitted to practice in the State of Alabama, the United States District Courts for the Northern, Middle, and Southern Districts of Alabama, and the United States Court of Appeals for the Fifth and Eleventh Circuits. I have also been admitted to practice in Federal Courts on a *pro hac* basis in Georgia, Mississippi, Louisiana, Florida, Tennessee, North Carolina, Virginia, Kentucky, Illinois, Indiana, Missouri, Texas, and Ohio, among other states.  I have practiced with the Wiggins Childs firm since 1993 and have been a partner/member since 2000. I oversee and supervise other attorneys in the firm and serve on the firm's Board of Managers.

2.      I have been engaged in the practice of law throughout the country since 1993.  Over the past thirty-two years, the vast majority of my practice (over 90%) has been in the fields of discrimination, wage and hour, civil rights, and employment disputes. I have represented plaintiffs in hundreds, if not thousands, of discrimination, civil rights, employment related, and FLSA actions in various Federal

Courts throughout the country on both an individual and class-wide basis and have handled numerous such cases in the appellate courts. I have been appointed class counsel, lead counsel, and/or co-lead counsel in a large number of class and collective actions, as well as complex and multi-Plaintiff, individual cases. I have participated in lectures and seminars in the areas of discrimination, wage and hour, civil rights, employment disputes, trial practice, and federal civil procedure, and have presented on all of these subjects. I also serve as a mediator in employment, FLSA, discrimination, and civil rights cases.

3. I am co-founder of the Alabama Chapter of the National Employment Lawyers Association and have served on the Board of NELA-Alabama. I have served as Chair of the Wage and Hour section of the National Trial Lawyers and on its Executive Committee. I have been recognized as a "Best Lawyer in America" in the area of employment law and a Top 10 trial attorney for wage and hour law.

4. I am knowledgeable as to the amount and type of work necessary to prosecute individual and class cases on behalf of Plaintiffs and the special expertise demanded by such work in order to be successful.

5. My firm, Wiggins Childs, is a major plaintiffs' litigation firm with offices in Birmingham, Alabama, DeLand, Florida, and Washington D.C. The firm has been recognized by U.S. News and World Reports as a first tier "Best Law Firm" for labor and employment litigation and as "Best Lawyers in America." The firm

emphasizes in individual, class, and complex litigation of all types, including discrimination, environmental liability, employment disputes, securities, Fair Labor Standards Act, anti-trust, contract, commercial, products liability, and civil rights.

6. Kevin Jent was admitted to the Alabama State Bar in September 1996. He is a member of the Eleventh Circuit Court of Appeals, the United States District Court for the Northern, Middle, and Southern Districts of Alabama. He has been admitted and have practiced in front of the Fifth Circuit Court of Appeals, the United States District Courts for the Northern, Middle, and Southern Districts of Georgia, the United States District Courts for the Northern and Southern Districts of Mississippi, the United States District Court for the Southern District of Indiana, the United States District Court for the Eastern District of Missouri, the United States District Court for the Northern District of Florida, the United States District Court for the Eastern District of Virginia, and the United States District Court for the Western Division of North Carolina, among others.

7. Mr. Jent began practicing law in 1997 working mainly in the area of Plaintiff's civil rights and employment law. Mr. Jent has been with the firm of Wiggins, Childs, Pantazis, Fisher & Goldfarb since April 2002 and is currently a member/partner with the firm. Since the time he began practicing law, Mr. Jent represented clients in employment discrimination, wage and hour, and employment

disputes cases, including numerous complex class and collective actions, across the United States.

8. D.G. Pantazis, Jr. is a partner/member at Wiggins Childs. For 16 years, his practice has predominately involved complex litigation involving federal regulations, employment practices, and consumer actions. He has litigated cases in state and federal courts in Alabama, Georgia, Mississippi, Tennessee, Florida, New York, New Jersey, California, Illinois, Louisiana, Pennsylvania, and Arizona. Prior to the entry of summary judgment, his work in this case involved legal research, discovery drafting, document review, technology protocols and implementation including ESI review, and motion practice.

9. All three of the attorneys for Plaintiff, Rob Fowler, have extensive experience in trial and appellate work. Throughout our careers we have been involved with, tried, briefed, and argued a multitude of cases at the trial and appellate levels.

**Standard for Awarding Attorneys' Fees**

10. As set forth by the Eleventh Circuit in *Dillard v. City of Greensboro*, the determination of a prevailing Plaintiff's entitlement to attorney fees consists of the following three step process: (1) determining whether the plaintiff has prevailed, (2) calculation of the "lodestar," or the number of hour spent in the legal work on the case multiplied by a reasonable rate, and (3) the adjustment of the "lodestar" to

account for considerations not made in the mathematical computation, including "the relation of the results obtained for the work done." 213 F. 3d 1347, 1353 (11th Cir. 2000).

## Plaintiff is a Prevailing Party

11. Fowler and Defendants Justice Family Group, Bluestone Resources, and Southern Coal Corporation entered into an Employment Agreement in October 2021. Fowler asserted that Defendants breached the Agreement. The Court entered summary judgment consistent with Rule 58 of the Federal Rules of Civil Procedure in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim. (Doc. 73). Section 14(e) of the Employment Agreement, provides:

> Attorneys' Fees. In the event that any suit or action is instituted arising out of or relating to this Agreement or the employment relationship between the parties, the prevailing party in such dispute shall be entitled to recover from the losing party all reasonable fees, costs and expenses of such suit or action, including without limitation, reasonable fees and expenses of attorneys and accountants, and including, without limitation, all reasonable fees, costs and expenses of appeals.

> (Exhibit A attached hereto).

As the prevailing party, Plaintiff is entitled to attorneys' fees, costs and expenses from Defendants.

## Plaintiff's Counsel's Hourly Rates

12. As set forth above, the Court's determination of Plaintiff's entitlement to attorneys' fees is a three-step process, with the second step being the calculation of the

"lodestar" fee to which a prevailing party is entitled. *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11ᵗʰ Cir. 2000). *See also Barnes*, 168 F.3d at 427. The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (quoting *Hensley*, 461 U.S. at 434); see also *Gay Lesbian Bisexual Alliance v. Sessions*, 930 F.Supp. 1492, 1494 (M.D. Ala. 1996). The lodestar calculation is meant to be "objective," and to produce "an award that *roughly* approximates the fee that the prevailing attorney would have received if she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551 (emphasis in original).

13. "The starting point in fashioning an award of attorney's fees is to multiply the number of hours reasonably expended by a reasonable hourly rate." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The figure obtained from calculating the number of reasonable hours by a reasonable rate is called the "lodestar." *Loranger*, 10 F.3d at 781. There is a strong presumption that the lodestar is the reasonable fee. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). Here, Plaintiff has provided the Court with information related to the number of hours worked on the contract claim and the hourly rates charged by Plaintiff's counsel.

14. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). The Court may rely on affidavits, time records, fee awards, and the skill, reputation, and experience of counsel. The Court may also consider the twelve factors from *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974) to determine "if the proposed rate actually reflects the true worth of counsel . . . in the rare cases where [the factors] are not fully captured in the lodestar." *In re Home Depot Inc.*, 931 F.3d 1065, 1091 (11th Cir. 2019). Though, the Court is not required to march through the *Johnson* factors in any given case because they are largely redundant. *See In re Home Depot Inc.*, 931 F.3d at 1091.

15. The Supreme Court has noted that the 12-factor test set out in *Johnson*, 488 F.2d at 717-19, has been superseded by the "lodestar approach" first pioneered in *Lindy Bros. Builders, Inc. Of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). *Perdue*, 559 U.S. at 551. "Most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," such as the novelty and complexity of a case and the quality of an attorney's performance are subsumed in the lodestar calculation." *Aventis CropScience, NV v. Pioneer Hi-Bred International, Inc.*, 2010 WL 2306677, (M.D.N.C. 2010) (quoting *Perdue*, 130 S. Ct. at 1662.)). After *Perdue*, the *Johnson* factors remain relevant to help the trial court determine the

reasonable number of hours and reasonable rate for the purposes of the lodestar calculation. *Aventis*, fn7 (quoting *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986)) ("The proper point at which the *Johnson* factors are to be considered is in determining the reasonable rate and the reasonable hours. A fee based upon reasonable rates and hours is presumed to be fully compensatory without producing a windfall.") *See also Blanchard v. Bergeron*, 489 U.S. 87, 91-92 (1989); *Hensley*, 461 U.S. at 434 n. 9.

16. The normal billing rates for the attorneys who worked on this case are as follows: Rocco Calamusa, Jr. $625, Kevin W. Jent $550, DG Pantazis $525. These amounts are in line with previous fee awards, market rates, the rates charged by other attorneys with comparable experience, and the work necessary to obtain a favorable outcome.

17. On August 13, 2025, Judge Cornelius awarded these same rates to Mr. Jent and myself in *Wanjohi, et al. v. Pioneer Investment & Development, et al.* 2:21-cv-00742-SGC (NDAL). The rates were supported by previous declarations from Calamusa, Jent, and Heather Leonard. The rate billed by Mr. Jent and myself in this case is similar to the rate we, and others in my firm with comparable experience, bill and have been previously awarded.

18. For this single plaintiff contract litigation, D.G. Pantazis' hourly billing rate is $525 an hour. He has had rates for class action and complex litigation approved as high as $900 an hour, and routinely bills more for complex and class

litigation. *See In Re Blue Cross Blue Shield Antitrust Litigation* (N.D. Al. MDL 2406, Doc. 3380). Representative cases reflecting his experience are as follows: *Forward Momentum, LLC v. Team Health, Inc*., 2022 U.S. Dist. LEXIS 158923; *Miller v. AutoZone*, (W.D. Tenn., Case No. 2:19-cv-02779 MSN-tmp); *King v. West Morgan-East Lawrence Water and Sewer Authority, et al*. (N.D. Ala., Case No. 5:17-cv-1833); *In re Riddell Concussion Reduction Litigation* (U.S. District Ct., District of NJ, Case No. 13-7585); *In re Blue Cross Blue Shield Antitrust Litigation* (N.D. AL., MDL No. 2406); *LaFleur et al v. Dollar Tree Stores, Inc.*, (E.D. Va. 2016, Case No. 2:2012cv00363).

19.  Here, Plaintiff's counsel's rates are appropriate considering Johnson factors such as the skill required to perform the legal services properly; the experience, reputation, and ability of the attorneys; the nature and length of professional relationship with the client; and awards in similar cases. *Johnson* at 717-19. "The trial judge should closely observe the attorney's work product, [his or her] preparation, and general ability before the court. The trial judge's expertise gained from experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.

The Court may also consider the following factors such as: customary fee; whether the fee is fixed or contingent; the skill required to perform the legal services properly; the experience, reputation, and ability of the attorneys; time limitations;

preclusion of other employment; nature and length of professional relationship with the client; and awards in similar cases. *Doucet* at 1260-1261.

20. The setting of hourly rates by the law firm of which I am a member and serve on the Board of Managers is based upon skill and experience in litigation and appellate practice; the economic forces of competition in the market place; the amount of expense and financial burden of undertaking the case; the nature and length of the professional relationship with the client; the prospect, amount and potential profitability of future employment by the client; the representation of the type involved; the preclusion of other employment due to the acceptance of the case; the time limitations typical of the circumstances involved in the case; the amount of time required by the representation; and the hourly rate necessary to attract lawyers to accept the offer of employment and to undertake the representation.

21. The requested hourly rates, which Courts in this district and others have awarded, are commensurate with the prevailing range of rates charged by attorneys in similar circumstances and with comparable skill and responsibility in similar areas of litigation in Alabama, as well as in the national legal market. Because we handle cases throughout the country, my firm routinely monitors the prevailing rates for experienced litigators in various forums statewide and nationwide. We also monitor rates being charged and awarded in employment matters in this district and the other federal districts in the state and in the 11th Circuit. As a guide in setting hourly rates,

we regularly review published hourly rates received in contingent and non-contingent fee litigation, including the rate survey conducted by the National Law Journal ("NLJ"). Based on these reviews and recent awards in this district, Plaintiff's counsel's rates are commensurate with hourly lawyers of similar experience. It is further my opinion based on my knowledge of the market for legal services in this state, that the hourly rates set forth in this declaration are reasonable for the responsibilities undertaken in this case and the level experience and expertise.

22. In this case, we began representation of the Plaintiff in May of 2024 and expended considerable time and money prosecuting Plaintiff's breach of contract claim. My firm has not received any compensation to date for our representation of Plaintiff. In order to attract competent counsel with vast litigation experience to undertake such representation, it is necessary that the fees awarded compensate for such disruptions.

23. Plaintiff's counsel undertook representation of Plaintiff on a fully contingent basis with no prospect of being paid for our time or expenses unless the case was successful. At the time that the representation was undertaken, I knew from past experience in this type of case that my firm would have to pay all out-of-pocket expenses necessary to prosecute the case with no prospect of reimbursement unless the case was won. It was also known at that time that the out-of-pocket costs and time necessary to prosecute this type of case could be expensive. Plaintiff's attorneys

in this case have undertaken the burden and risk of obtaining a favorable result; all of the risk related to expenses; and the risk of collection of any such awards. Without the willingness of myself and my firm to take such risks on behalf of Plaintiff, the results obtained could not have been achieved. The risk of loss of payment of the number of hours and expenses at issue in a case is so significant that most law firms would not take these cases without payment of retainers, expenses, or hourly rates sufficient to compensate for that risk. Competent counsel can obtain sufficient employment to keep them busy without undertaking contingent representation of plaintiffs in protracted and difficult cases like this. *Perdue v. Kenny A.*, 130 S. Ct. 1662, 1672 (S.Ct. 2010)("First, a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case.").

24. As noted, counsel began representation of Plaintiff in this matter in May of 2024. Counsel's representation of Plaintiff is limited to this one case and is not expected to produce regular or future employment. This factor justifies hourly rates at the higher end of the spectrum as compared to the rates of defense counsel who often reduce or discount their rates due to a long-standing relationship and the high probability of future work.

25. Plaintiff's counsel are highly experienced and highly capable attorneys who specialize in Plaintiff employment cases and business disputes. Attorney

Calamusa has been practicing for over 31 years; while Attorney Jent has over 25 years of experience and attorney Pantazis has over 16 years of experience.

26. The rates and fees sought by Plaintiff's counsel are reasonable and are in line with the regular rates charged by attorneys and paralegals with similar skill and experience in this district. In addition, the expenses incurred in this case are reasonable and necessary to the prosecution and resolution of Plaintiff's claims.

27. The requested rates are reasonable in light of awards to Plaintiff's counsel and other counsel in similar cases and the rates sought by Plaintiff's attorneys are similar to the rates, they and others in their firm with comparable experience, bill and have been previously awarded. Other attorneys in Plaintiff's counsel's firm with comparable years of experience have been awarded rates similar to those sought here for work on non-class cases. In August 2024, Judge Coogler in *Davis, et. al, v. Mar-Jac Poultry, LLC.*, 6:18-cv-01433-LSC, awarded a rate of $850 to Robert Wiggins and $550 to Robert Camp (a lawyer with 22 years of experience). (Doc. 201). (See cases and rates for lawyers in Plaintiff's firm cited therein).

28. Here, Plaintiff's counsel was able to obtain full relief for Plaintiff on his breach of contract claim. (Doc. 73). Plaintiff's counsel had to accurately analyze the claims and the law; properly communicate with Plaintiffs, Defendants' counsel, and the Court; marshal the necessary evidence; and do all work necessary, including discovery, depositions, and motions to obtain Judgment against both Defendants.

**Hours Expended in Representing Plaintiff**

29.     I have personal knowledge of the work reflected in the hourly time records of my firm for this case. This declaration addresses the time and expense spent on Plaintiff's breach of contract claim.  I have examined the case file and the time and expense records summarized in the Itemization of Time attached as Exhibits B and C to this declaration against the legal standards applicable to the award of attorney's fees and expenses and the factors set forth in *Perdue v. Kenny A ex rel Winn*, 559 US 542 (2010) and *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1300-1301 (11th Cir. 1988). The hours and hourly rates charged in this case are summarized herein in the attached itemizations. The facts and opinions which are contained in the balance of this declaration are known to me in reference to such time, expense, and standards.  I believe that the amount of time listed is reasonable in light of the tasks that had to be completed in order to prepare and litigate this case  and obtain the successful result.

30.     I, along with Mr. Pantazis and Mr. Jent, began representing Mr. Fowler in May of 2024.  Discovery included a massive amount of emails and documents, along with depositions. The parties then engaged in an unsuccessful mediation related to the breach of contract claim, Plaintiff filed for summary judgment as his breach of contract claim.  (Doc. 59, 60). The amount of time spent on the breach of contract claim is directly related to Defendants' actions and obstinance.   On October

2, 2025, this Court granted summary judgment in Fowler's favor as to the breach of contract claims he raised. (Doc. 73). Plaintiff now moves for entry of a Final Judgment and a damage award on such claim, including damages under the contract, interest, and attorneys' fees, under Sections 8(b) and 14(e) of the Employment Agreement. (Exhibit A).

31. Members of my firm and I have expended the following number of hours in handling the breach of contract claim for Plaintiff in this case:

| | |
|---|---|
| Attorney Rocco Calamusa, Jr. | 229.8 hours |
| Attorney D.G. Pantazis | 223.4 hours |
| Attorney Kevin W. Jent | 130.5 hours |

See Exhibit B attached.

32. Throughout the case, I and others in my firm have endeavored to represent the interests of Plaintiff in the most efficient way possible. I, along with my colleagues, were careful to avoid duplication of time or effort to the maximum extent possible. Because the case was handled solely on a contingency basis, I and my firm had no incentive to perform work that might ultimately go uncompensated. The time spent by Plaintiff's attorneys reflects the distinct contribution of each of us in this matter.

33. The hours billed in the attached Exhibit B are based on, and limited to, the time reasonable to achieve the results obtained in this case on Plaintiff's breach

of contract claim. I reviewed the hours using the "billing judgment" standards in *Hensley* and limited the number of hours billed to the time reasonable to perform the work that contributed to obtaining the benefits and results obtained. *See Hensley*, 461 U.S. at 434 ("In the private sector, 'billing judgment' is an important component in fee setting.").

34. Based on my experience and the law as it relates to attorney fees and my familiarity with the work done in this case and results obtained, the expenditures of time were reasonable for the tasks performed and the responsibilities undertaken for Plaintiff in this matter. After a review of the time records, I believe all the time submitted to the Court for compensation was reasonably necessary to give Plaintiff the best possible chance for a favorable outcome on his breach of contract claim, which was obtained. The time submitted is of the kind and character that firms would normally bill to hourly paying clients, as well as time that we normally track and seek to be paid at the conclusion of successful contingency litigation in cases of this type.

35. Plaintiff's counsel repeatedly attempted to resolve the case and the Parties engaged in 2 separate mediations with Judge Cornelius. Even after the Court's summary judgment opinion and order, Defendants refused to resolve the contract matters where Judgment had been obtained. Defendants' repeated failure to

adequately and in good faith attempt to resolve this case throughout litigation, resulted in Plaintiff's counsel having to incur increased time and expense.

36.    The former Fifth Circuit has noted that "in fixing the fee, the district court should be mindful that in complex civil rights litigation ... issues are overlapping and intertwined. In order to represent their clients adequately, attorneys must explore every aspect of the case, develop all the evidence and present it to the court." *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981). "Where evidence gathered in preparing an unsuccessful issue may also have been relevant to the successful claim, compensation should be provided for the time spent gathering that evidence." *Marion v. Barrier*, 694 F.2d 229, 232 (11th Cir. 1982). The concept of overlapping and intertwined evidence and work applies here to Plaintiff's contract claims and fraud claims. While there was some overlap of evidence in the breach of contract and fraud claims, the work performed and sought here was all necessary to prevail on the contract claim. Because Plaintiff obtained judgment in his favor as to his breach of contract claim, the Court should award the full requested lodestar amount, which constitutes a "reasonable attorney's fee" as set forth.

**Expenses and Costs Requested**

37.    Plaintiff's counsel requests $15,909.06 in expenses and costs, which are comprised of copy costs, depositions, travel, postage and research costs all of which were necessary to pursue the litigation and obtain the outcome awarded.  (Exhibit

C). The requested expenses and costs are fair and reasonable for the prosecution of this case and the outcome achieved.

## Conclusion

38.    Based on the foregoing, Counsel seeks fees and expenses against Justice Family Group, Bluestone Resources, and Southern Coal Company in the amount of $332,632.50 in fees and $15,909.06 in expenses for a total of $348,541.56. (Exhibits B & C).

Dated:  June 1, 2026.

_____
**ROCCO CALAMUSA, JR.**

# Exhibit A

<u>Executive Employment Agreement between Bluestone Resources, Inc., Southern Coal Corporation, Justice Family Group, LLC and Robert P. Fowler</u>

This EXECUTIVE EMPLOYMENT AGREEMENT (this "<u>Agreement</u>"), is made effective as of November 16, 2021 (the "<u>Effective Date</u>"), by and between Bluestone Resources, Inc., Southern Coal Corporation, Justice Family Group, LLC (the "<u>Companies</u>"), and Robert P. Fowler, a resident of Jefferson County, Alabama ("<u>Executive</u>").

WHEREAS, the Companies desire to ensure that Executive's unique and expert services will be available to the Companies and that Executive is willing and able to render such services according to the terms of this Agreement;

WHEREAS, Executive wishes to be employed by the Company subject to the terms of this Agreement; and

WHEREAS, the Companies desire to provide assurances to the Executive regarding length of employment, salary, bonus and a severance package.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Companies, intending to be jointly liable for this Agreement, and Executive agree as follows:

Section 1.    <u>Employment</u>. Subject to the terms of this Agreement, the Companies hereby jointly employ Executive as their Executive Vice President of Environmental Engineering and Regulatory Compliance. Additionally, Executive from time to time may hold the position of General Counsel for Environmental Affairs, and Executive hereby accepts such employment.

Section 2.    <u>Term</u>. The term of employment under this Agreement shall begin on the Effective Date, and, unless sooner terminated as provided in <u>Section 7</u>, shall conclude on June 16, 2031 (the "<u>Term</u>"). The term of employment shall be extended for additional consecutive one (1) year terms ("<u>Renewal Terms</u>") unless the Companies jointly or Executive give to the other written notice not less than ninety (90) days prior to the end of the Term or any Renewal Term that such party or parties do not wish to extend the term of employment.

Section 3.    <u>Duties</u>. Executive shall serve as Executive Vice President of Environmental Engineering and Regulatory Compliance and shall report to solely to Mr. James C. Justice III ("Jay Justice"), currently President of Bluestone Resources, Inc., and Southern Coal Corporation, and Manager of Justice Family Group, LLC. Executive shall perform such duties as are customary for Executive's position (including, environmental permitting, bonding, and compliance) as well as duties necessary to oversee the Companies' environmental legal program (i.e., oversee regulatory negotiations for fines, penalties, consent decrees, compliance programs, etc.) and shall also perform such additional duties as are appropriate, which may reasonably be assigned to him from time

to time by Mr. Jay Justice. Due to the amount of travel involved with Executive's duties, Executive shall have the use of corporate planes when scheduling permits. Executive shall:

(a)     conduct himself at all times with integrity and in an ethical manner;

(b)     devote substantially all of his effort, working time, energy, and skill (vacations and absences due to illness excepted) to the duties of his employment hereunder, it being acknowledged and understood, however, that Executive shall be permitted to commit reasonable time and effort to civic, charitable and community causes and activities, handle minor legal matters for friends and family, manage real estate and realtor matters, and manage family owned businesses as long as they do not interfere with his obligations to the Companies;

(c)     perform his duties hereunder faithfully, loyally, and industriously, subject to the supervision of the Mr. Jay Justice; and

(d)     follow and implement diligently all lawful management policies and decisions of the Companies that are communicated to him.

Section 4.     Compensation. The Companies shall pay Executive a base salary (the "Base Salary") of Eight Hundred Thousand Dollars ($800,000) per fiscal year, effective November 16, 2021, in such installments and at such times as Bluestone Resources, Inc., pays its other salaried employees. Commencing as of January 1, 2023, and on each January 1st thereafter, the then effective Base Salary shall be increased (but not decreased) by least an amount which shall reflect the increase, if any, in the cost of living during the previous 12 months by adding to the Base Salary an amount computed by multiplying the Base Salary by the percentage by which the level of the Consumer Price Index for the area including Birmingham, Alabama, as reported on January 1st of the new year by the Bureau of Labor Statistics of the United States Department of Labor has increased over its level as of January 1st of the prior year. Any additional salary increase will be based on the performance of the Executive and the performance of the Companies. The Companies shall deduct or cause to be deducted from Executive's compensation and benefits set forth in this Section 4 and in Sections 5 and 6, all taxes and amounts required by law to be withheld.

Section 5.     Incentive Compensation.

(a)     Sign-on Bonus. On or before the Effective Date, the Companies shall pay Executive a cash sign-on bonus of Three Hundred and Forty Thousand Dollars ($340,000), deducting or causing to be deducted from this amount all taxes and amounts required by law to be withheld. If Executive leaves prior to end of the Term, Executive agrees to repay sign-on bonus based on the following schedule: 100% repayment ($340,000) if within one year of the Effective Date, 66% repayment ($224,400) if within 2 years of the Effective Date, and 33% repayment ($112,200) if within 3 years of the Effective Date.

(b)     Cash Annual Bonuses. The Companies shall pay Executive an annual minimum cash bonus of ten percent (10%) of Base Salary for the Term on or before the March 31st for performance during the prior year. The amount of the performance bonus may be increased based on performance of Executive and/or performance of the Companies.

Section 6.     Fringe Benefits and Expenses.

(a)     General. In addition to the compensation described in Sections 4 and 5 of this Agreement, Executive shall have the right to participate in any medical, hospitalization, dental, disability, life or other similar insurance plans maintained by the Companies from time to time to the extent that Executive's position, tenure, salary, age, health and other qualifications make him eligible to participate, and such other fringe benefits as are provided to the other senior management employees of the Companies.

(b)     Paid Vacation. Executive shall be entitled to four weeks paid vacation per calendar year, plus such additional days paid sick leave in accordance with the Companies sick leave policy. Executive shall take vacation at such times and intervals as shall be appropriate and consistent with the proper performance of Executive's duties hereunder. In all other respects, Executive shall be subject to the Companies vacation and sick leave policies that are in effect during Executive's employment. Each year during the Term or Renewal Term of the Agreement, Executive shall be entitled to the use of two rooms for seven nights each at the Greenbrier Resort in Sulphur Springs, West Virginia.

(c)     Expenses. Companies shall promptly (and in any event within sixty (60) calendar days of submission of a request for reimbursement) reimburse Executive for reasonable business expenses incurred by Executive in the performance of his duties under this Agreement, provided Executive incurs and accounts for such expenses in accordance with all policies of the Companies in effect from time to time. These businesses expenses include, but are not limited to, all expenses related to Executive maintaining his current law licenses and court admissions (licenses, courses, continuing legal education, bar memberships, etc.). Further, the Companies shall reimburse Executive for reasonable moving expenses, storage, etc. for costs associated with relocating from his current office to a yet to be determined office location in Birmingham, Alabama.

(d)     Key Man Insurance. The Companies may obtain, in the name and for the benefit of Companies, such life, disability and other insurance policies on Executive as Companies may from time to time determine to be in the interest of the Companies. Executive shall take such medical and physical examinations as are required to obtain such insurance policies.

Section 7.     Termination. Executive's employment hereunder may be terminated at the end of the Term or any Renewal Term as provided in Section 2, or earlier as follows:

(a)  Death. Executive's employment hereunder shall terminate upon the death of Executive. However, the Base Salary compensation provided by the Companies in Section 4 shall continue for one year after the date of death of the Executive.

(b)  Disability. In the event any physical or mental disability renders Executive substantially unable to perform his duties hereunder, and such disability is expected to be lengthy or of indefinite duration (in any instance, this must be greater than 180 days) or any such disability entitles Executive to recover benefits under any long-term disability plan or policy maintained by him or the Companies, the Companies may terminate Executive's employment and its obligations under this Agreement ends.

(c)  By the Companies for Cause. Executive's employment may be terminated at any time by the Companies for Cause. For purposes of this Agreement, "*Cause*" means (i) a breach by Executive of any provision of this Agreement, which, if curable, is not cured within 10 days after Executive's receipt of written notice from the Companies; (ii) any conduct, action or behavior by Executive that has or may reasonably be expected to have a material adverse effect on the reputation or business of the Companies (including, without limitation, the commission of any felony or a lesser crime involving dishonesty, fraud, misappropriation, theft, wrongful taking of property, embezzlement, bribery, forgery or extortion) or which results in gain or personal enrichment of Executive to the material detriment of the Company Group (iii) commission of any act by Executive of gross negligence or malfeasance that is materially injurious to the Companies; (iv) dereliction of duties or misconduct that is materially injurious to any member of the Company Group; (v) breach of Executive's duty of loyalty to the Companies; or (vi) substance abuse, ongoing illegal drug use or habitual insobriety that is materially injurious to any member of the Company Group; (vii) willful failure to comply with any valid directive of Mr. Jay Justice; (viii) willful failure to perform his duties; (ix) Executive's material failure to comply with Companies policies that cause harm to the Companies.  The failure to include any fact in a termination notice that contributes to a showing of Cause does not preclude Companies from asserting that fact in enforcing its rights under this Agreement.  If Companies terminate Executive for Cause, within twenty (20) days after termination the Companies shall pay Executive a lump sum in the amount equal to (A) Executive's accrued but unpaid Annual Base Salary, (B) any accrued and unused vacation pay and (C) any earned but unpaid Performance Bonus (the "Accrued Obligations").

(d)  By the Companies without Cause. The Company may terminate Executive's employment at any time without Cause effective upon written notice to Executive and subject to the Termination payment in Section 8 of this Agreement.

(e)  By Executive. Subject to the cure provisions provided below, and at his option, Executive may terminate his employment hereunder for "Good Reason" (as defined below) by giving thirty (30) days written notice to the Company. For purposes of this Agreement, "Good Reason" shall be defined as:

(i)     a material diminution in the nature or scope of Executive's duties, responsibilities, authority, powers or functions;

(ii)    a reduction in Executive's compensation payable in accordance with Section 4 hereof, or failure to make scheduled bonus payments to Executive in accordance with Section 5 above;

(iii)   the Companies' material breach of any provision of this Agreement;

(iv)    a requirement that Executive relocate or have his principal place of business beyond thirty-five (35) miles of the city limits of Birmingham, Alabama;

(v)     the voluntary or involuntary transfer of greater than 50 percent ownership of one of entities in the Companies to any entity (individual or company) not owned or controlled by at least one of the Companies that is a party to this Agreement.

The foregoing notwithstanding, if the Companies cure the condition giving rise to the termination notice within fifteen (15) days following receipt of Executive's notice of termination, Executive's employment will not terminate. If the Companies fail to cure the condition, the termination for Good Reason shall become effective on the date specified in Executive's notice of termination. If Executive does not give notice of termination to the Companies timely as provided above after the occurrence of the Good Reason, then Executive's right to terminate his employment based upon such occurrence shall be waived; provided, however, that the failure of Executive to terminate his employment based upon the occurrence of a Good Reason shall not be deemed a waiver of Executive's right to terminate his employment upon the subsequent occurrence of a Good Reason.

Section 8.     Termination Payments and Benefits.

(a)     Executive Election Not to Extend, Termination for Cause, Termination without Good Reason, Termination Because of Death or Disability. If Executive's employment under this Agreement is terminated (i) by the election of Executive not to extend his employment at the end of the Term or any Renewal Term, (ii) by the Companies for Cause, (iii) by Executive without Good Reason, or (iv) by Executive's death or disability, all salary and bonus (which shall be prorated based upon his length of service during such fiscal year) payments and all other benefits and allowances hereunder shall cease at the termination, except as provided in Section 7.

(b)     Termination for Good Reason, Termination Without Cause, Companies Election Not to Extend. Upon the termination of employment (i) by Executive for Good Reason or (ii) by the Companies without Cause, then Executive shall become entitled to receive as a termination settlement an amount of Three Million Dollars ($3,000,000) (the "Termination Payment"). The Termination Payment shall be payable in periodic payments spread over the six (6) month period immediately following the effective date

of the termination in accordance with the Companies standard payroll practices and shall be subject to such deductions and withholding as are required by law or the policies of the Companies. In addition to the foregoing, the Companies shall continue (at its cost) Executive's health benefits for a period of twelve (12) months from the date of termination of Executive's employment.

(c)     Public Statement Regarding Termination. In the event Executive's employment terminates for any reason, Mr. Jay Justice and Executive shall agree upon a public statement pertaining to termination of Executive's employment, and the terms of said statement shall not be subject to subsequent modification by either party unless required by law. In the event Mr. Jay Justice and Executive are unable in good faith to agree upon such a statement, the Companies may make such public statements as are necessary to comply with the law.

(d)     No Other Benefits. Except as specifically provided in Section 7 or this Section 8, Executive shall not be entitled to any salary, bonus, allowance, severance payment, or other compensation or benefits from the Companies upon the termination of his employment under this Agreement regardless of the reason for the termination.

Section 9.     Companies Proprietary Information. This Section 9 imposes certain obligations upon Executive with regard to "Companies Proprietary Information" (as defined below), but this Section does not limit in any way Executive's obligations or duties arising elsewhere in this Agreement or under the law with regard to such Companies Proprietary Information.

(a)     Companies Proprietary Information. For purposes of this Agreement, "Companies Proprietary Information" means technical, business, customer, sales, and other information of Companies, whether or not recorded in writing, electronic media, or otherwise, which derives value from not being generally known to the public or to other persons or entities who can obtain value from its disclosure or use, and includes, without limitation, technical and non-technical data, compositions, devices, methods, techniques, drawings, inventions, processes, financial data, financial plans, designs, product plans, lists or information concerning actual or potential customers or suppliers, information regarding business plans and operations, methods and plans of operation, marketing strategies, sales and distribution plans or strategies, cost information, pricing strategies, acquisition and investment plans, and other strategic and tactical plans prepared by the Companies or their employees. Companies Proprietary Information includes information which is produced or held by Companies' affiliates and which is generated by third parties for the Companies and that the Companies treat, or are obligated to maintain, as confidential. Companies Proprietary Information shall not include any record, data, or information which is in the public domain provided the same is not in the public domain as a consequence of disclosure by Executive in violation of this Agreement.

(b)     Fiduciary Obligations. Executive agrees that Companies Proprietary Information is of critical importance to the Companies and agree that he holds and shall

hold all Companies Proprietary Information and information related thereto in a fiduciary capacity for the sole benefit of the Companies.

(c) Non-Use and Non-Disclosure. Executive shall protect the confidentiality of all Companies Proprietary Information at all times, both during and after the Term and any Renewal Terms. Executive shall not during the Term, any Renewal Term or at any time thereafter, (i) disclose, directly or indirectly, any of Companies Proprietary Information to any entity or person other than the Companies or authorized employees thereof who at the time of such disclosure, in the reasonable judgment of Executive, need to know such Companies Proprietary Information for valid business purposes of the Companies or such other persons to whom Executive has been specifically instructed to make disclosure by the Board, or to the extent required in the course of Executive's service to the Companies, (ii) disclose any of Companies Proprietary Information except as required by law, or (iii) use any Companies Proprietary Information, directly or indirectly, for his own benefit or for the benefit of any person or entity other than the Companies. At the termination of his employment, Executive shall deliver to the Companies all notes, letters, documents and records (whether contained in written, electronic or any other media) which may contain Companies Proprietary Information which are then in his possession or control.

Section 10. Severable Provisions. The provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provision. In the event that a court of competent jurisdiction shall determine that any provision of this Agreement or the application thereof is unenforceable in whole or in part because of the duration or scope thereof, the parties hereto agree that said court in making such determination shall have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form shall be valid and enforceable to the full extent permitted by law.

Section 13. Notices. All notices hereunder shall be in writing and shall be deemed to have been duly given on the date of personal delivery; or on the date of electronic confirmation of receipt, if sent by facsimile transmission or electronic mail; or three (3) days after deposit in the United States mail, if mailed by certified or registered mail, return receipt requested (postage prepaid); or one (1) day after deposit with a reputable overnight courier for overnight delivery (delivery charges prepaid), as follows:

If to the Companies:   Mr. Jay Justice
                       302 South Jefferson Street
                       Roanoke, VA 24011-1710

If to Executive:       Robert P. Fowler
                       513 Founders Park Circle
                       Birmingham, AL 35226
                       (205)613-6756

JUSTICE168968

Any person or entity entitled to notice may change the address to which notices shall be delivered or sent to him or it by notice given in accordance with this Section 13.

Section 14.    Miscellaneous.

(a)    Entire Agreement, Modification. This Agreement constitutes the entire agreement between the parties hereto with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral. This Agreement may not be amended, revised or waived, except by a writing signed by the parties.

(b)    Assignment and Transfer. At Executive's election and subject to the termination payment in Section 8 hereof, this Agreement shall not be terminated by the merger or consolidation of the Companies with any corporation or other entity or by the transfer of all or substantially all of the assets of the Companies to any other corporation, firm or entity. Neither this Agreement nor any of the rights, duties or obligations of Executive shall be assignable by Executive, nor shall any of the payments required or permitted to be made to Executive by this Agreement be encumbered, transferred or in any way anticipated, except as required by applicable laws or permitted by this Agreement.

(c)    Captions. Captions herein have been inserted solely for convenience of reference and in no way define, limit or describe the scope or substance of any provision of this Agreement.

(d)    No Conflicting Agreements. Executive represents and warrants to the Companies that (i) there are no restrictions, agreements, or understandings whatsoever to which Executive is a party which would prevent or make unlawful Executive's execution of this Agreement or Executive's employment hereunder; (ii) the execution of this Agreement and Executive's employment hereunder shall not constitute a breach or violation of any law, contract, agreement or understanding, oral or written, to which Executive is a party or by which Executive is bound; (iii) Executive is free and able to execute this Agreement and to enter into employment with the Companies; (iv) to Executive's knowledge, he has not violated nor is he in violation of any law, regulation, rule, order, stipulation or the like relevant to the Companies' business; and (v) this Agreement is Executive's valid and binding obligation, enforceable in accordance with its terms. The Companies represent that this Agreement is its valid and binding obligation, enforceable in accordance with its terms.

(e)    Attorneys' Fees. In the event that any suit or action is instituted arising out of or relating to this Agreement or the employment relationship between the parties, the prevailing party in such dispute shall be entitled to recover from the losing party all reasonable fees, costs and expenses of such suit or action, including without limitation, reasonable fees and expenses of attorneys and accountants, and including, without limitation, all reasonable fees, costs and expenses of appeals.

JUSTICE168969

(f)     Governing Law, Jurisdiction. This Agreement shall be construed under and enforced in accordance with the internal substantive laws of the State of Alabama. The Companies and Executive agree that this Agreement is entered into in the State of Alabama and contemplates and requires performance in the State of Alabama. Each party consents to the personal jurisdiction of the State of Alabama for any and all actions arising out of or relating to this Agreement.

(g)     Waiver of Breach. Except as provided herein, failure of either party to insist, in one or more instances, on performance by the other in strict accordance with the terms and conditions of this Agreement shall not be deemed a waiver or relinquishment of any right granted in this Agreement or of the future performance of any such term or condition or any other term or condition of this Agreement, unless such waiver is contained in a writing signed by the party making the waiver and specifically referencing this Agreement.

(h)     Independent Advice from Counsel. Each of the parties has received independent legal advice from legal counsel of his or its choice with respect to the advisability of entering into this Agreement and its terms. The terms of this Agreement are the result of negotiations between the parties, and the provisions of this Agreement shall be interpreted and construed in accordance with their fair meanings, and not for or against either party, regardless of which party may have drafted this Agreement or any specific provision.

(i)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(j)     Potential Conflict of Interests. The Companies recognize that giving Executive the titles and duties of Executive Vice President of Environmental Engineering and Regulatory Compliance and that of General Counsel for Environmental Affairs could lead to a potential conflict of interest and that Executive could be prohibited from performing certain duties based on this conflict. The Companies have agreed to waive this potential conflict for purposes of entering into the Agreement.

[Signature Page Follows]



CONFIDENTIAL

JUSTICE168970

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as a sealed instrument as of the Effective Date.

For Bluestone Resources, Inc., Southern Coal Corporation, and Justice Family Group LLC:

Signature: _____

By:     <u>Mr. James C. Justice III</u>
        Position: President of Bluestone Resources, Inc., and Coal Corporation and Member of Justice Family Group, LLC

Date:   October 19, 2021


For Executive:

Signature: _____

By:     Robert P. Fowler

Date:   October 19, 2021

# Exhibit B

# Total Attorney Time

| Date | Timekeeper | Narrative | Hours | Hourly Rate | Amount |
|---|---|---|---|---|---|
| 5/9/2024 | DGP | review intake, speak with client, evaluate case | 1.50 | $ 525.00 | $ 787.50 |
| 5/15/2024 | RC | Review case filings; | 3.00 | $ 625.00 | $ 1,875.00 |
| 5/21/2024 | RC | Reivew information; discuss with attorneys; | 0.80 | $ 625.00 | $ 500.00 |
| 5/22/2024 | RC | Prepare for meeting with client; | 0.80 | $ 625.00 | $ 500.00 |
| 5/23/2024 | RC | Review documents; prepare for meeting; meeting with Fowler & DG Pantazis; email to client; review emails and info from client; | 3.30 | $ 625.00 | $ 2,062.50 |
| 5/23/2024 | DGP | meeting with client | 3.60 | $ 525.00 | $ 1,890.00 |
| 5/28/2024 | DGP | review case file and client docs | 2.50 | $ 525.00 | $ 1,312.50 |
| 6/11/2024 | DGP | conference call with client and review deadlines | 1.20 | $ 525.00 | $ 630.00 |
| 6/11/2024 | RC | Review information from client; call with Fowler & DGP; | 1.20 | $ 625.00 | $ 750.00 |
| 6/14/2024 | RC | Preparation of requests for production to defendants; | 2.00 | $ 625.00 | $ 1,250.00 |
| 6/17/2024 | RC | Review documents from client and information from client; | 1.80 | $ 625.00 | $ 1,125.00 |
| 6/17/2024 | DGP | draft discovery to defendants | 2.50 | $ 525.00 | $ 1,312.50 |
| 6/18/2024 | RC | Preparation of requests for production to defendants; review documents, timeline and pleadings; | 3.00 | $ 625.00 | $ 1,875.00 |
| 6/21/2024 | RC | Edit discovery to defendants; | 0.80 | $ 625.00 | $ 500.00 |
| 6/24/2024 | DGP | work on RFPs and doc production | 2.50 | $ 525.00 | $ 1,312.50 |
| 6/25/2024 | RC | Edit discovery to defendants; emails with Plaintiff; | 0.80 | $ 625.00 | $ 500.00 |
| 7/10/2024 | DGP | draft PO and ESI protocol; develop discovery plan | 3.50 | $ 525.00 | $ 1,837.50 |
| 7/11/2024 | RC | Review of Defendant's discovery to Plaintiff; | 0.40 | $ 625.00 | $ 250.00 |
| 7/29/2024 | RC | Review of Defendant's discovery to Plaintiff; call with Plaintiff; | 1.40 | $ 625.00 | $ 875.00 |
| 8/6/2024 | RC | Defendant's responses; Plaintiff's responses; met with DG Pantazis; | 1.30 | $ 625.00 | $ 812.50 |
| 8/6/2024 | DGP | review and draft responses with RC; prepare ESI produciton for plaintiff | 3.40 | $ 525.00 | $ 1,785.00 |
| 8/7/2024 | DGP | review discovery requests and prepare answers | 1.70 | $ 525.00 | $ 892.50 |
| 8/14/2024 | RC | Call with DG Pantazis; call with defendant; | 0.30 | $ 625.00 | $ 187.50 |
| 8/14/2024 | DGP | call with defendants re discovery and doc review | 0.50 | $ 525.00 | $ 262.50 |
| 8/15/2024 | DGP | work on document production | 3.50 | $ 525.00 | $ 1,837.50 |
| 8/21/2024 | RC | Review/revise Protective Order draft; | 0.30 | $ 625.00 | $ 187.50 |
| 9/25/2024 | RC | Preparation of FRCP 30(b)(6) Notices; review claims, documents and timeline; | 3.50 | $ 625.00 | $ 2,187.50 |
| 9/25/2024 | DGP | 30b6 draft and prepare production | 2.50 | $ 525.00 | $ 1,312.50 |
| 9/25/2024 | DGP | Correspondence with client, co-counsel, and opposing counsel re: documents, discovery, and meeting scheduling; | 1.70 | $ 525.00 | $ 892.50 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 9/26/2024 | RC | Preparation of FRCP 30(b)(6) Notices; met with DG, organize, review documents and pleadings, email Defendant; | 3.00 | $ 625.00 | $ 1,875.00 |
| 9/26/2024 | DGP | meet with RC and work on discovery | 4.00 | $ 525.00 | $ 2,100.00 |
| 9/26/2024 | DGP | Correspondence with client, co-counsel, and opposing counsel re: case status, meeting, and document production; | 2.80 | $ 525.00 | $ 1,470.00 |
| 10/1/2024 | RC | Call with Plaintiff and DG; email to defendant; | 0.50 | $ 625.00 | $ 312.50 |
| 10/1/2024 | RC | Email to defendant; | 0.20 | $ 625.00 | $ 125.00 |
| 10/1/2024 | DGP | call with RC and RF | 0.30 | $ 525.00 | $ 157.50 |
| 10/2/2024 | RC | Met with DG; email to Plaintiff; | 0.30 | $ 625.00 | $ 187.50 |
| 10/2/2024 | DGP | meet with RC | 0.20 | $ 525.00 | $ 105.00 |
| 10/9/2024 | RC | Email defendant; | 0.20 | $ 625.00 | $ 125.00 |
| 10/14/2024 | DGP | work on plt production | 5.50 | $ 525.00 | $ 2,887.50 |
| 10/14/2024 | DGP | work on plaintiff documents | 3.20 | $ 525.00 | $ 1,680.00 |
| 10/15/2024 | RC | Defendant's email; reply to email; preparation of Plaintiff's discovery responses; | 1.80 | $ 625.00 | $ 1,125.00 |
| 10/16/2024 | RC | Plaintiff's discovery response preparation; | 1.00 | $ 625.00 | $ 625.00 |
| 10/22/2024 | RC | Emails with Plaintiff; extension and email with defendant; | 0.30 | $ 625.00 | $ 187.50 |
| 10/29/2024 | DGP | work on plaintiff documents | 3.50 | $ 525.00 | $ 1,837.50 |
| 10/30/2024 | RC | Preparation of Plaintiff's discovery responses; prepare for call; | 0.50 | $ 625.00 | $ 312.50 |
| 10/30/2024 | DGP | work on plaintiff documents | 4.00 | $ 525.00 | $ 2,100.00 |
| 10/31/2024 | RC | Emails with Plaintiff; call with Plaintiff; revise discovery responses; | 0.50 | $ 625.00 | $ 312.50 |
| 11/12/2024 | RC | Email John Saxon; | 0.20 | $ 625.00 | $ 125.00 |
| 12/5/2024 | RC | Deposition notices and emails; | 0.30 | $ 625.00 | $ 187.50 |
| 12/17/2024 | RC | Meeting re: discovery and depositions; | 1.00 | $ 625.00 | $ 625.00 |
| 12/17/2024 | DGP | meeting re depos | 1.00 | $ 525.00 | $ 525.00 |
| 12/19/2024 | RC | Review and organize; | 1.20 | $ 625.00 | $ 750.00 |
| 12/19/2024 | DGP | pull documents for depos | 3.20 | $ 525.00 | $ 1,680.00 |
| 12/19/2024 | DGP | Correspondence with co-counsel and opposing counsel re: motion for extension and document review; | 2.00 | $ 525.00 | $ 1,050.00 |
| 1/7/2025 | RC | Outline; prepare for depositions; witnesses; defendant's discovery; | 4.00 | $ 625.00 | $ 2,500.00 |
| 1/7/2025 | DGP | pull documents for depos | 3.00 | $ 525.00 | $ 1,575.00 |
| 1/8/2025 | RC | Witnesses; document review; review of parties' discovery; | 1.70 | $ 625.00 | $ 1,062.50 |
| 1/8/2025 | DGP | pull documents for depos | 2.50 | $ 525.00 | $ 1,312.50 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 1/8/2025 | DGP | Correspondence with co-counsel and opposing counsel re: deposition scheduling, locations, and ESI review; | 2.30 | $ 525.00 | $ 1,207.50 |
| 1/9/2025 | RC | Review emails and documents; prepare for depositions; | 4.00 | $ 625.00 | $ 2,500.00 |
| 1/9/2025 | DGP | review depo documents | 4.50 | $ 525.00 | $ 2,362.50 |
| 1/10/2025 | RC | Review emails and documents; outline Justice deposition; outline Ball deposition; | 3.20 | $ 625.00 | $ 2,000.00 |
| 1/13/2025 | RC | Review articles; organize emails; meeting with team; read previous deposition of Jay Justice; review info on organizations (other litigation); | 7.50 | $ 625.00 | $ 4,687.50 |
| 1/13/2025 | DGP | review docs for depos - other litigaiton and ESI | 3.00 | $ 525.00 | $ 1,575.00 |
| 1/14/2025 | RC | Read depositions of Justice & Ball (previous litigation); review info on organization; review deposition of Sumner Harrison; emails with client; duties & finances preparation in outline; call with client; | 6.00 | $ 625.00 | $ 3,750.00 |
| 1/14/2025 | DGP | review docs for depos, ESI | 3.50 | $ 525.00 | $ 1,837.50 |
| 1/15/2025 | RC | Review and research finances, credit suisse, organization, litigation, judgment; | 2.50 | $ 625.00 | $ 1,562.50 |
| 1/15/2025 | DGP | review docs for depos, ESI and research | 4.00 | $ 525.00 | $ 2,100.00 |
| 1/16/2025 | RC | Outline - sale, litigation, contract research & review; | 3.40 | $ 625.00 | $ 2,125.00 |
| 1/17/2025 | RC | Review emails; deposition outline; prepare Justice deposition outline; | 5.00 | $ 625.00 | $ 3,125.00 |
| 1/18/2025 | RC | Review emails and documents for depositions; | 2.00 | $ 625.00 | $ 1,250.00 |
| 1/20/2025 | RC | Review & outline emails & exhibits for depositions; outline Justice deposition; | 3.80 | $ 625.00 | $ 2,375.00 |
| 1/21/2025 | RC | Review & outline emails and exhibits for depositions; outline Justice deposition & Ball deposition; | 4.20 | $ 625.00 | $ 2,625.00 |
| 1/22/2025 | RC | Deposition preparation; review emails & outline; deposition preparation for Justice; deposition outline; prepare for Ball deposition; | 5.50 | $ 625.00 | $ 3,437.50 |
| 1/23/2025 | RC | Review emails & outline; add to outline; review finance information; prepare for Jay Justice deposition; preparation of exhibits for deposition; | 4.70 | $ 625.00 | $ 2,937.50 |
| 1/24/2025 | RC | Deposition preparation for Ball & 30(b)(6); | 4.50 | $ 625.00 | $ 2,812.50 |
| 1/24/2025 | DGP | review docs for depos | 3.00 | $ 525.00 | $ 1,575.00 |
| 1/25/2025 | DGP | review docs for depos | 4.50 | $ 525.00 | $ 2,362.50 |
| 1/26/2025 | RC | Prepare for Don Wiggins deposition; prepare exibits for same; | 2.20 | $ 625.00 | $ 1,375.00 |
| 1/26/2025 | DGP | review docs for depos and research | 2.00 | $ 525.00 | $ 1,050.00 |
| 1/27/2025 | RC | Prepare for Wiggins deposition; prepare deposition outline; prepare exhibits to send to Roanoke, VA; | 4.70 | $ 625.00 | $ 2,937.50 |
| 1/27/2025 | DGP | review docs for depos and additional research | 3.50 | $ 525.00 | $ 1,837.50 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1/28/2025 | RC | Prepare for Wiggins deposition; prepare for 30(b)(6) deposition; | 2.50 | $ | 625.00 | $ | 1,562.50 |
| 1/29/2025 | RC | Prepare for Justice deposition; prepare for Ball deposition; | 3.20 | $ | 625.00 | $ | 2,000.00 |
| 1/30/2025 | RC | Prepare for 30(b)(6) deposition; prepare for Ball deposition; prepare for Wiggins deposition; | 2.70 | $ | 625.00 | $ | 1,687.50 |
| 1/31/2025 | RC | Organize; gather information and exhibits; review exhibits; | 1.20 | $ | 625.00 | $ | 750.00 |
| 2/3/2025 | RC | Travel to Roanoke, VA for Justice deposition; deposition preparation; | 9.70 | $ | 625.00 | $ | 6,062.50 |
| 2/3/2025 | DGP | travel to roanoke for depos | 5.50 | $ | 525.00 | $ | 2,887.50 |
| 2/4/2025 | RC | Jay Justice deposition; call with client; prepare for Stephen Ball deposition; | 13.50 | $ | 625.00 | $ | 8,437.50 |
| 2/4/2025 | DGP | depo and prep for JJ depo | 11.00 | $ | 525.00 | $ | 5,775.00 |
| 2/5/2025 | RC | Stephen Ball deposition; calls with client; | 7.00 | $ | 625.00 | $ | 4,375.00 |
| 2/5/2025 | DGP | depo and prep for SB depo | 7.00 | $ | 525.00 | $ | 3,675.00 |
| 2/6/2025 | DGP | travel to bham | 5.50 | $ | 525.00 | $ | 2,887.50 |
| 2/7/2025 | RC | Travel to Birmingham; | 5.50 | $ | 625.00 | $ | 3,437.50 |
| 2/10/2025 | RC | Prepare for Don Wiggins deposition; prepare for Plaintiff's deposition; prepare for meeting; | 4.00 | $ | 625.00 | $ | 2,500.00 |
| 2/10/2025 | RC | Prepare for client meeting; prepare for Wiggins deposition; met with Fowler - deposition preparation; discuss with DGP; | 5.50 | $ | 625.00 | $ | 3,437.50 |
| 2/10/2025 | DGP | meet with RF and RC re depo prep | 4.20 | $ | 525.00 | $ | 2,205.00 |
| 2/11/2025 | RC | Prepare for Wiggins deposition; Wiggins deposition; met with DGP re: summary judgment; met with Kevin Jent re: summary judgment; | 2.50 | $ | 625.00 | $ | 1,562.50 |
| 2/11/2025 | RC | Call with DGP; call with Fowler; | 0.70 | $ | 625.00 | $ | 437.50 |
| 2/11/2025 | DGP | call with RC re depo prep | 0.30 | $ | 525.00 | $ | 157.50 |
| 2/11/2025 | DGP | Correspondence with co-counsel and opposing counsel re: deposition scheduling and scheduling order; | 0.50 | $ | 525.00 | $ | 262.50 |
| 2/13/2025 | RC | Met with Plaintiff; deposition preparation; updated disclosures; | 4.00 | $ | 625.00 | $ | 2,500.00 |
| 2/13/2025 | DGP | depo prep with client and RC | 4.00 | $ | 525.00 | $ | 2,100.00 |
| 2/14/2025 | RC | Met with Plaintiff; Plaintiff's deposition; met with Plaintiff and DGP; | 4.50 | $ | 625.00 | $ | 2,812.50 |
| 2/14/2025 | DGP | RF depo | 4.50 | $ | 525.00 | $ | 2,362.50 |
| 2/18/2025 | RC | Meeting on summary judgment; review Fowler draft; | 1.30 | $ | 625.00 | $ | 812.50 |
| 2/18/2025 | DGP | meeting re SJ filing with RC and KJ | 1.00 | $ | 525.00 | $ | 525.00 |
| 2/20/2025 | KWJ | Review file in preparation for SJ briefing - pleadings, depos, documents | 6.00 | $ | 550.00 | $ | 3,300.00 |
| 2/21/2025 | KWJ | Continue review of file in preparation for SJ briefing - pleadings, depos, documents | 4.50 | $ | 550.00 | $ | 2,475.00 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 2/21/2025 | DGP | compile SJ docs | 2.50 | $ 525.00 | $ 1,312.50 |
| 2/22/2025 | DGP | compil SJ docs | 3.00 | $ 525.00 | $ 1,575.00 |
| 3/3/2025 | RC | Review of summary judgment response and exhibits; | 1.00 | $ 625.00 | $ 625.00 |
| 3/3/2025 | DGP | review pleadings | 1.00 | $ 525.00 | $ 525.00 |
| 3/4/2025 | KWJ | Review of depos and documents preparing for SJ brief | 4.00 | $ 550.00 | $ 2,200.00 |
| 3/4/2025 | RC | Review summary judgment exhibits; met with DGP; Court Order review; email defendant; | 1.70 | $ 625.00 | $ 1,062.50 |
| 3/4/2025 | DGP | review SJ docs and prepare evidence for SJ | 6.00 | $ 525.00 | $ 3,150.00 |
| 3/5/2025 | KWJ | Continued review of depos, documents preparing for SJ brief | 5.00 | $ 550.00 | $ 2,750.00 |
| 3/5/2025 | RC | Call with Rob Fowler; | 0.30 | $ 625.00 | $ 187.50 |
| 3/5/2025 | DGP | review SJ docs and prepare evidence for SJ | 6.50 | $ 525.00 | $ 3,412.50 |
| 3/6/2025 | DGP | work on SJ draft | 7.00 | $ 525.00 | $ 3,675.00 |
| 3/7/2025 | DGP | work on SJ draft | 5.50 | $ 525.00 | $ 2,887.50 |
| 3/8/2025 | DGP | work on SJ draft | 6.00 | $ 525.00 | $ 3,150.00 |
| 3/9/2025 | DGP | work on SJ draft | 3.20 | $ 525.00 | $ 1,680.00 |
| 3/10/2025 | KWJ | Review of Initial SJ Brief sent by DG; review all evidentiary cites and work on revisions to facts; research into specific issues related to breach of contract as it applies to this case; emails with DG and RC re SJ briefing | 8.50 | $ 550.00 | $ 4,675.00 |
| 3/10/2025 | RC | Summary judgment brief; call with defendant; | 2.70 | $ 625.00 | $ 1,687.50 |
| 3/11/2025 | KWJ | Review and editing SJ Brief, research and writing argument section; Emails with DG and RC re brief | 6.50 | $ 550.00 | $ 3,575.00 |
| 3/11/2025 | RC | Notice to Court re: mediation; summary judgment brief; | 2.20 | $ 625.00 | $ 1,375.00 |
| 3/12/2025 | KWJ | Work on SJ Brief - research and drafting argument section | 8.00 | $ 550.00 | $ 4,400.00 |
| 3/12/2025 | RC | Met with Kevin Jent re: summary judgment; | 0.70 | $ 550.00 | $ 385.00 |
| 3/12/2025 | DGP | SJ cite review | 1.50 | $ 525.00 | $ 787.50 |
| 3/13/2025 | KWJ | Work on SJ Brief - research and drafting argument section; review of record for cites re argument | 7.50 | $ 550.00 | $ 4,125.00 |
| 3/13/2025 | DGP | SJ evidence and cite review | 3.00 | $ 525.00 | $ 1,575.00 |
| 3/14/2025 | KWJ | Work on SJ Brief; email from RC re extending deadline | 2.00 | $ 550.00 | $ 1,100.00 |
| 4/3/2025 | RC | Emails, email with defendant re: mediation; review research from Malik Moore; review research from Fowler; | 2.20 | $ 625.00 | $ 1,375.00 |
| 4/9/2025 | RC | Call with Plaintiff; | 0.50 | $ 625.00 | $ 312.50 |
| 4/11/2025 | RC | Email defendant re: mediation; review old emails; | 0.20 | $ 625.00 | $ 125.00 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 4/15/2025 | RC | Emails with defendant; email to court; | 0.40 | $ 625.00 | $ 250.00 |
| 4/30/2025 | RC | Mediation statement; review outline; deposition outlines; summary judgment brief and documents; | 1.50 | $ 625.00 | $ 937.50 |
| 4/30/2025 | DGP | research for mediation statement | 2.50 | $ 525.00 | $ 1,312.50 |
| 5/1/2025 | RC | Mediation statement; review exhibits; talk with DGP; | 4.50 | $ 625.00 | $ 2,812.50 |
| 5/1/2025 | DGP | meet with RC re mediaiton and research for mediation statement | 1.50 | $ 525.00 | $ 787.50 |
| 5/2/2025 | RC | Mediation statement; review depositions; | 3.70 | $ 625.00 | $ 2,312.50 |
| 5/5/2025 | RC | Mediation statement; mediation exhibits; information from client; | 4.80 | $ 625.00 | $ 3,000.00 |
| 5/6/2025 | RC | Edit and revise mediation statement; review research; damage calculation; | 4.50 | $ 625.00 | $ 2,812.50 |
| 5/6/2025 | DGP | Correspondence with client and co-counsel re: mediation statement and damage calculations; | 1.90 | $ 525.00 | $ 997.50 |
| 5/7/2025 | RC | Finalize mediation statement; damage exhibit and other exhibits; emails with client; | 2.50 | $ 625.00 | $ 1,562.50 |
| 5/7/2025 | DGP | mediation statement review | 1.50 | $ 525.00 | $ 787.50 |
| 5/9/2025 | DGP | mediation prep with RC | 1.00 | $ 525.00 | $ 525.00 |
| 5/9/2025 | RC | Prepare for mediation; met with DGP; read depositions; | 3.50 | $ 625.00 | $ 2,187.50 |
| 5/12/2025 | RC | Defendant's Motion to Add Counterclaim; met with client; mediation preparation; review insurance; reead depositions; | 6.70 | $ 625.00 | $ 4,187.50 |
| 5/13/2025 | RC | Met with Plaintiff; mediation; meet to discuss response to Motion to Amend; discuss summary judgment motion and brief; | 5.00 | $ 625.00 | $ 3,125.00 |
| 5/13/2025 | DGP | mediation and prep | 5.00 | $ 525.00 | $ 2,625.00 |
| 6/5/2025 | RC | Court Order re: Defendant's Motion to Amend; met with Kevin Jent to discuss summary judgment; discuss summary judgment with DG Pantazis; review deposition citations; | 3.00 | $ 625.00 | $ 1,875.00 |
| 6/5/2025 | DGP | meeting with RC and KJ re motion and SJ | 1.00 | $ 525.00 | $ 525.00 |
| 6/7/2025 | KWJ | Drafting SJ brief for our MSJ | 3.50 | $ 550.00 | $ 1,925.00 |
| 6/8/2025 | KWJ | Drafting SJ brief for our MSJ | 3.00 | $ 550.00 | $ 1,650.00 |
| 6/8/2025 | DGP | research for MSJ | 2.50 | $ 525.00 | $ 1,312.50 |
| 6/9/2025 | KWJ | Drafting SJ brief for our MSJ | 5.00 | $ 550.00 | $ 2,750.00 |
| 6/9/2025 | DGP | research for SJ | 3.20 | $ 525.00 | $ 1,680.00 |
| 6/10/2025 | KWJ | Drafting SJ brief for our MSJ | 3.50 | $ 550.00 | $ 1,925.00 |
| 6/11/2025 | KWJ | Drafting SJ brief for our MSJ | 8.10 | $ 550.00 | $ 4,455.00 |
| 6/12/2025 | KWJ | Drafting SJ brief for our MSJ | 7.50 | $ 550.00 | $ 4,125.00 |

| Date | Initials | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 6/13/2025 | KWJ | Drafting SJ brief for our MSJ | 7.00 | $ 550.00 | $ 3,850.00 |
| 6/14/2025 | KWJ | Drafting SJ brief for our MSJ | 6.50 | $ 550.00 | $ 3,575.00 |
| 6/15/2025 | KWJ | Drafting SJ brief on our motion for sj | 4.50 | $ 550.00 | $ 2,475.00 |
| 6/15/2025 | DGP | review SJ brief and edits | 2.50 | $ 525.00 | $ 1,312.50 |
| 6/16/2025 | KWJ | Drafting and editing SJ Brief | 11.00 | $ 550.00 | $ 6,050.00 |
| 6/16/2025 | DGP | review and edits to SJ brief | 3.20 | $ 525.00 | $ 1,680.00 |
| 6/17/2025 | KWJ | Drafting and editing Motion for SJ and Brief | 10.40 | $ 550.00 | $ 5,720.00 |
| 6/17/2025 | RC | Summary judgment brief; met with Kevin Jent; edit brief; | 2.50 | $ 625.00 | $ 1,562.50 |
| 6/17/2025 | DGP | research and doc review fo SJ | 4.20 | $ 525.00 | $ 2,205.00 |
| 6/18/2025 | KWJ | Drafting and finalizing Motion for SJ and Brief for Filing; discuss with co-counsel; | 8.50 | $ 550.00 | $ 4,675.00 |
| 6/18/2025 | RC | Summary judgment brief; edit brief; call with Kevin Jent; call with Kevin Jent and DG Pantazis; motion; documents under seal; call with DG Pantazis; finalize brief and motion; | 3.30 | $ 625.00 | $ 2,062.50 |
| 6/18/2025 | DGP | research and doc review for SJ | 5.50 | $ 525.00 | $ 2,887.50 |
| 6/18/2025 | DGP | Summary judgment brief, finalize & edit; discussing with co-counsel | 3.10 | $ 525.00 | $ 1,627.50 |
| **TOTAL** | | | **583.70** | | **$ 332,632.50** |

# Exhibit C

| Date | Expense | Amount |
|---|---|---|
| 5/31/2024 | Research Expense Lexis Nexis 5-1-2024 to 5-31-2024 | $ 5.68 |
| 5/31/2024 | Research Expense Lexis Nexis 5-1-2024 to 5-31-2024 | $ 9.22 |
| 6/30/2024 | Research Expense Lexis Nexis 6-1-2024 to 6-30-2024 | $ 8.13 |
| 8/21/2024 | Scans | $ 58.80 |
| 8/22/2024 | Scans | $ 11.70 |
| 8/27/2024 | Scans | $ 23.40 |
| 10/1/2024 | ESI Storage Fee | $ 600.00 |
| 11/1/2024 | ESI Storage Fee | $ 600.00 |
| 12/1/2024 | ESI Storage Fee | $ 600.00 |
| 12/17/2024 | Blowbacks/Prints | $ 11.40 |
| 1/1/2025 | ESI Storage Fee | $ 600.00 |
| 1/16/2025 | Travel Expense Reimburse Expenses 1-14-2025 (Flights) | $ 686.36 |
| 1/17/2025 | Photocopies | $ 6.00 |
| 1/17/2025 | Blowbacks/Prints | $ 295.60 |
| 1/21/2025 | Blowbacks/Prints | $ 35.80 |
| 1/23/2025 | Blowbacks/Prints | $ 129.60 |
| 1/24/2025 | Blowbacks/Prints | $ 25.20 |
| 1/24/2025 | Photocopies | $ 0.75 |
| 1/24/2025 | Scans | $ 1.20 |
| 1/31/2025 | Research Expense Lexis Nexis 1-1-2025 to 1-31-2025 | $ 14.86 |
| 1/31/2025 | Research Expense Lexis Nexis 1-1-2025 to 1-31-2025 | $ 41.56 |
| 2/1/2025 | ESI Storage Fee | $ 600.00 |
| 2/4/2025 | Overnight Shipping Shipping (Documents to deposition location) | $ 33.11 |
| 2/6/2025 | Travel Expense Reimburse Expenses 2-3-2025 to 2-6-2025 (Flight) | $ 548.37 |
| 2/6/2025 | Travel Expense Reimburse Expenses 2-3-2025 to 2-6-2025 (Parking) | $ 60.00 |
| 2/6/2025 | Travel Expense Reimburse Expenses 2-3-2025 to 2-6-2025 (Hotel) | $ 1,050.09 |
| 2/6/2025 | Meal Expense Reimburse Expenses 2-3-2025 to 2-6-2025 | $ 589.83 |
| 2/10/2025 | Blowbacks/Prints | $ 14.60 |
| 2/10/2025 | Photocopies | $ 6.00 |
| 2/10/2025 | Scans | $ 1.90 |
| 2/11/2025 | Overnight Shipping (Returning documents from deposition location) | $ 101.89 |
| 2/17/2025 | Transcript Expense Depo; Stephen W. Ball | $ 1,567.38 |
| 2/17/2025 | Scans | $ 0.10 |
| 2/18/2025 | Transcript Expense Depo; James C Justice, III | $ 2,342.52 |
| 2/26/2025 | Transcript Expense Depo; Don Wiggins | $ 522.75 |
| 2/28/2025 | Research Expense Lexis Nexis 2-1-2025 to 2-28-2025 | $ 22.38 |
| 3/1/2025 | ESI Storage Fee | $ 600.00 |
| 3/3/2025 | Transcript Expense Depo; Robert P Fowler | $ 833.25 |
| 3/31/2025 | Research Expense Lexis Nexis 3-1-2025 to 3-31-2025 | $ 223.84 |
| 3/31/2025 | Research Expense Lexis Nexis 3-1-2025 to 3-31-2025 | $ 21.77 |
| 4/1/2025 | ESI Storage Fee | $ 600.00 |
| 5/1/2025 | ESI Storage Fee | $ 600.00 |
| 5/7/2025 | Blowbacks/Prints | $ 0.40 |
| 5/7/2025 | Photocopies | $ 24.00 |
| 5/9/2025 | Blowbacks/Prints | $ 14.00 |
| 5/31/2025 | Research Expense Lexis Nexis 5-1-2025 to 5-31-2025 | $ 165.23 |
| 5/31/2025 | Research Expense Lexis Nexis 5-1-2025 to 5-31-2025 | $ 178.86 |
| 6/1/2025 | Research Expense Service | $ 600.00 |
| 6/1/2025 | Research Expense Lexis Nexis 6-1-2025 to 6-30-2025 | $ 497.13 |
| 6/1/2025 | Research Expense Lexis Nexis 6-1-2025 to 6-30-2025 | $ 324.40 |
| | **Total** | **$ 15,909.06** |